**Page 1**

1 IN THE UNITED STATES DISTRICT COURT

2 FOR THE NORTHERN DISTRICT OF GEORGIA

3 GAINESVILLE DIVISION

4

5 7 IL PROPERTIES, LLC, )

6   Plaintiff, )

7 ) CIVIL ACTION FILE

8 vs )

9 ) NO.: 2:21-cv-226-RWS

10 GARY KNIGHT, )

11   Defendant, )

12 _____)

13

14 DEPOSITION OF

15 JOHN THATCHER

16

17 Monday, July 31, 2023

18 10:17 a.m.

19

20 100 Galleria Parkway

21 Suite 1600

22 Atlanta, Georgia 30339

23

24

25 Kris Laroche, CSR No. 1696

**Page 2**

1 APPEARANCES OF COUNSEL

2

3 Appearing on behalf of the Plaintiff:

4

    FREEMAN MATHIS & GARY, LLP

5   Brian Goldberg, Esquire

    100 Galleria Parkway

6   Suite 1600

    Atlanta, Georgia 30339

7   Phone: 678.996.9140

    E-mail: brian.goldberg@fmglaw.com

8

9 Appearing on behalf of Defendant:

10   FGP LAW, LLC

    Frank G. Podesta, Esquire

11   555 Sun Valley Drive

    Suite N-3

12   Roswell, Georgia 30076

    Phone: 678.677.5143

13   Fax: 678.222.0123

    E-mail: fpodesta@fgplaw.com

14

15

16 Also present:

17   Gary Knight

18

19

20

21

22

23

24

25

**Page 3**

1 INDEX OF EXAMINATION

2 WITNESS: JOHN THATCHER,

3 EXAMINATION PAGE

4   By Mr. Podesta 6

**Page 4**

1 INDEX OF EXHIBITS

2 EXHIBITS DESCRIPTION PAGE

3 Exhibit A 2021.03.13-253

    River Heights 20

4

  Exhibit B 2021.03.07

5   Thor James Easement 27

6 Exhibit C 2021.03.07

    Thor James Water Easement 27

7

  Exhibit D 2021.04.19

8   183 Rinever Lodge 29

9 Exhibit E 2016.10.12

    Pradutt Plat 34

10

  Exhibit F 2021.04.02

11   92 Fishtrap Deal 37

12 Exhibit G 2009.04.02

    Thatcher E-mail 2 44

13

  Exhibit H 2009.10.30

14   Toccoa Heights Plat 51

15 Exhibit I 2021.05.31

    Preliminary Survey 54

16

  Exhibit J 2021.06.01

17   Recorded Plat F 282 54

18 Exhibit K 2021.05.31

    92 Fishtrap E-mail 61

19

  Exhibit L 2021.05.31

20   Easement E-mails 70

21 Exhibit M 2021.06.01

    Proposed HUD - 1 78

22

  Exhibit N 2021.xx.xx

23   183 River Lodge 78

24 Exhibit O Text 1 87

25 Exhibit P Text 2 115



Page 5

1          INDEX OF EXHIBITS, cont'd
2   EXHIBITS        DESCRIPTION              PAGE
3   Exhibit Q       Photographs              140

Page 6

1              DEPOSITION OF JOHN THATCHER
2                  Monday, July 31, 2023
3
4       (The oath was administered to the witness by the
5   court reporter.)
6               JOHN THATCHER,
7   having been first duly sworn, was examined and testified as
8               follows:
9               EXAMINATION
10  BY MR. PODESTA:
11      Q   Could you please state your full name for the record.
12      A   John Henry Thatcher the third.
13      Q   Okay.  And Mr. Thatcher, you understand what you are
14  here as a representative of 7 IL?
15      A   Yes.
16      Q   And you are the rule 30(b)(6) representative of that?
17      A   Yes, I'm a managing member.
18      Q   And you understand what that means?
19      A   Yes.
20      Q   With regard to -- let me ask you this first, have you
21  done a deposition before?
22      A   Yes.
23      Q   How long ago was that?
24      A   15, 20 years ago.
25      Q   Things have changed, obviously, we're a little bit

Page 7

1   more technological than we use to be.  If I go to ask you going
2   forward if, and you haven't done anything inappropriate at all,
3   but if I ask a question just please let me finish the question,
4   I'll let you finish your answers.  And the court reporter will
5   have a difficult time taking down nodding or head shacking
6   instead of a straight yes or no answer.  So if you don't mind
7   just please answer questions verbally.
8       A   Will do.
9       Q   Are you under the influence of any medications or
10  drugs today?
11      A   No.
12      Q   Mr. Thatcher, could you tell me a little bit about
13  your background?
14          MR. GOLDBERG:  Can I just say something real quick --
15          MR. PODESTA:  Yes.
16          MR. GOLDBERG:  -- on the record?  First of all, we
17  want to reserve the right to read and sign.  I just wanted
18  to make sure I got that on the record.  Second, are we
19  going to reserve the objections for trial with the
20  exception of form of question and privilege and all of
21  that?
22          MR. PODESTA:  Yes.  That's acceptable to be made.
23  All right.
24          MR. GOLDBERG:  Okay.  Yeah, just want to make sure.
25          MR. PODESTA:  All right.

Page 8

1   BY MR. PODESTA:
2       Q   Okay.  Mr. Thatcher, could just tell us a little bit
3   about your educational background.
4       A   I have a degree from Colorado State University in
5   agricultural business.  In a previous life I had some degrees
6   in the insurance industry.
7       Q   Okay.  What kind of degrees in insurance?
8       A   Designations, certified insurance counselor.
9       Q   Okay.  So you didn't get a college --
10      A   No.
11      Q   -- degree or anything in that fact?  Okay.  What did
12  you -- now, at this point you're a land developer; is that
13  correct?
14      A   No.
15      Q   What would you say your professional occupation is?
16      A   Entrepreneur, but that's pretty vague and let me go,
17  I'll expand on that.  My true profession is ranching now.  My
18  family has a ranch.  I am more into property management than
19  property development.
20      Q   Okay.  All right.  And as a rancher, do you have any
21  meaningful experiences with easements, land easements?
22      A   Lots.
23      Q   Could you give us a little description what that?
24      A   I do.  Currently I'm in negotiations with XL Power on
25  a very large power line going through our ranch.  Negotiating



Page 9

1  deals, Price, access, land usage, restoration of land, that's a
2  current one. I do option agreements. But, yes, I do,
3  easements are a major focus and protection of our properties.
4      Q   Okay. And do you personally write easements for your
5  properties or do you hire somebody to do it?
6      A   I let the other people write the easements.
7      Q   You let the buyers write the easements?
8      A   (Nonverbal)
9      Q   And this is in Colorado?
10     A   Correct.
11     Q   Is it exclusively in Colorado with the exception of
12  some Georgia easements that you've been dealing with recently?
13     A   I -- yes, except I think, yes. Then I had one done
14  in Oklahoma on a property.
15     Q   Okay. And are these easements complex? Are the one
16  or two page easements? How are they usually formed?
17         MR. GOLDBERG: I'm going to object to form, but
18     answer the question.
19         THE WITNESS: They can go up to, I'm going to give a
20     very vague answer, but I think that Excel's six pages. I
21     never count the, but yeah that one gets multiple sections,
22     multiple degrees, angles of power line. I mean, it gets,
23     that one's very specific because of where they're
24     accessing the chest. They can go large.
25

Page 10

1  BY MR. PODESTA:
2      Q   Okay. Do you have attorneys that work for you review
3  the easements?
4      A   Yes.
5      Q   In every case?
6      A   No.
7      Q   Why not?
8      A   It depends on the complexity.
9      Q   Okay. Could you define the stopping point of
10  complexity between an easement that you have reviewed by a
11  licensed attorney and an easement that you would not have
12  reviewed by a licensed attorney?
13         MR. GOLDBERG: I'm going to object to form again, but
14     answer the question.
15         THE WITNESS: I guess it would come down to how
16     comfortable I am reading the language.
17  BY MR. PODESTA:
18     Q   Comfortable that you're comfortable reading that
19  easement yourself?
20     A   Yes.
21     Q   And that's just a game day decision; correct?
22     A   Some of it goes into a family discussion.
23     Q   Family discussion with whom?
24     A   My father and my brother.
25     Q   Are they partners at 7 IL or?

Page 11

1      A   Yes.
2      Q   So they're members?
3      A   Yes. But the easements you're talking about are not
4  in 7 IL Properties.
5      Q   Understood. So there are multiple companies similar
6  to 7 IL that you own and operate at least a share of?
7      A   Yes.
8      Q   And the partners of 7 IL, are those just your brother
9  and your father?
10     A   Family members.
11     Q   How many family members?
12     A   So, it's my mother and my father; myself, my three
13  boys; my brother, his one daughter; my sister and her two
14  children.
15     Q   Okay. That's a number of members. Is Dan Harrison a
16  member of any of that?
17     A   No.
18     Q   How do you know Dan Harrison?
19     A   Dan Harrison is the outfitter that works on our
20  ranch --
21     Q   Okay.
22     A   -- guiding antelope and deer hunts and personal
23  friend and he's a realtor. And when I went on this parade of
24  buying properties around the country, he was a major part in
25  helping me handle the mass information.

Page 12

1      Q   Does he have any experience, any substantial
2  experience in drafting easements?
3      A   I don't know.
4      Q   You never hired him to draft an easement have you?
5      A   No.
6      Q   Have you hired him or have you individually or as 7
7  IL ever hired him to review an easement?
8      A   We've never hired him to review an easement.
9      Q   But he has reviewed them for you?
10     A   Yes.
11     Q   Has he reviewed any of the Georgia easements that
12  you've dealt with in the last two or three years?
13     A   Yes.
14     Q   Has he reviewed them professionally for you and given
15  you an opinion as to their efficacy or has he simply reviewed
16  them?
17     A   Explain efficacy for me, please.
18     Q   The effectiveness. The legal effectiveness.
19     A   Yes.
20     Q   Has he reviewed any of the easements related to any
21  of the Gary Knight deals?
22     A   Yes.
23     Q   Which ones?
24     A   He looked at all of the amendments and easements?
25     Q   Okay. And when you say the amendments, you mean the



Page 13

1  amendments to the purchase and sell agreements?
2      A   Yes.
3      Q   And he looked at every single one for all of the Gary
4  Knight deals?
5      A   I do believe.
6      Q   Okay.  What opinions did he give you?
7      A   Concerning see the -- I don't want to get it wrong, I
8  forget which one -- I think it's 253 property, Outlaw Ridge.
9      Q   253 River Heights?
10     A   Yes.  Is that Outlaw Ridge?
11     MR. KNIGHT:  Yes.  I'm not supposed to testify.
12     THE WITNESS:  I know.  You're ask -- yes.  Yes.  The
13  easement that Gary wrote up or his realtor wrote up, we
14  agreed on the content but wanted it more specifically
15  detailed on locations.
16  BY MR. PODESTA:
17     Q   Okay.  When was that drafted?
18     A   End of March, 1st of April.
19     Q   Of 2021?
20     A   Yes, I believe.
21     Q   And Gary's realtor was Be-, Brian White.
22     A   Brian White, I think.
23     Q   Okay.  So Brian White had drafted the easements or
24  you believe?
25     A   I don't know who, we received an amendment with the

Page 14

1  wording on it.  So I don't know who inked the contract.
2      Q   And it's possible then that it was Ms. McBee?
3      A   No.
4      Q   So from your understanding those contracts, those
5  amendments came from Mr. Knight's side of the deal?
6      A   Correct.
7      Q   And you and Mr. Harrison reviewed those amendments?
8      A   Correct.
9      Q   And do you recall whether there were amendments for
10  both the 92 Fish Trap deal and the 253 River Heights deal?
11     A   There a footpath addendum on the Fish Trap, I do
12  believe.  I could be wrong.  And then there was the easements
13  and then there were well share agreement easements also I do
14  believe.  Some of this, I closed like 16 properties in a month
15  so sometimes I have to, in other words, there were multiple
16  agreements in accessing and easements through that.
17     Q   Okay.  And you closed 16 properties in a month in
18  Georgia?
19     A   No.  In Florida, Georgia, Tennessee, Kentucky and
20  Oklahoma.
21     Q   How many properties did you close in Georgia in 2021?
22     A   Five location.
23     Q   Locations or properties?
24     A   Properties.  Well, let me clarify.  There was one in
25  Savannah that is technically, it's one address, three condos.

Page 15

1      Q   Understood.
2      A   So it's hard when you ask the question, there's your
3  answer.
4      Q   Okay.  And so four of the properties were in Blue
5  Ridge, Georgia?
6      A   Correct.
7      Q   And a number of them or did all of them have easement
8  issues?
9      MR. GOLDBERG:  Object for to form.  Answer the
10  question.
11     MR. PODESTA:  I can reask the question.  It's
12  probably a poor question.
13  BY MR. PODESTA:
14     Q   How many of the four properties in Blue Ridge,
15  Georgia had an easement requirement within the contract?
16     A   Are well share agreements considered in that?
17     Q   Let's say without them --
18     A   Okay.
19     Q   -- and then with them.
20     A   Okay.  One for sure and maybe two.  Well shares, just
21  one I do believe.
22     Q   Okay.
23     A   Maybe -- no, yeah, before I closed.  Correct, of what
24  I currently have closed in homes, yes.
25     Q   Okay.  And just for the record can you explain what

Page 16

1  well share easement is?
2      A   So one well services multiple properties and it's set
3  up through, it's usually on somebody else's or wherever it's at
4  and covers access eas- or maintenance how prices are divvied
5  up, you know, all the contingencies that could go wrong and how
6  it's supposed to be handled.
7      Q   So these easements are fairly detailed?
8      A   Yes.
9      Q   And there are other easements that you've been
10  dealing with these Georgia properties as well; is that correct?
11     A   Yes.
12     MR. GOLDBERG:  Object to form, but go ahead and
13  answer.
14     THE WITNESS:  Yes.
15  BY MR. PODESTA:
16     Q   Easements other than well share agreements?
17     A   Yes.  Most of the easements were already in place.  I
18  inherited.  I did not draft or anything else.  They were
19  easements that were known to me prior to closing.
20     Q   But there were contingencies as part of the purchase
21  and sell agreements that required the drafting of easements for
22  the Knight properties; correct?
23     A   Yes.
24     Q   And with regard to 253 River Heights, do you recall
25  what those easements revolved around?



Page 17

1    A    Access to the river.

2    Q    So there was a river behind the River Heights

3    property; correct?

4    A    Correct.

5    Q    And accessing that river required cross a railroad;

6    correct?

7    A    Correct.

8    Q    And in order to have a, I don't want to call it safe

9    but an easy access to the river, you had to cross this specific

10   portion of property that was on one of Mr. Knight's properties?

11   A    Correct.

12       MR. GOLDBERG:  Sorry.  I wanted to object to form

13       before you answered.  But you already answered it.

14   BY MR. PODESTA:

15   Q    So one of Mr. Knight's properties, was it 253 River

16   Heights or was it another property had access, easy access to

17   the river?

18   A    It was another property.

19   Q    Okay.  And do you recall which property that was?

20   A    I knew it at Knights Landing.  I think the name has

21   changed and I don't know.  I think it's 77 Knights Landing is

22   the address.  I'm not for sure.

23   Q    And so part of the deal for 253 River Heights was to

24   have an easement that would allow your, you to cross over to

25   the river using the 77 Knights Landing property?

Page 18

1    A    Correct.  And then also use a trail that went up

2    river through another property.

3    Q    Okay.  And what property was that?

4    A    I have no -- one of the -- I don't know.  I can't.

5    One of the ones up river from me or from that property.

6    Q    Was it possible to cross over the railroad tracks

7    without an easement?

8    A    Yes, it is possible except to bring in maintenance

9    equipment.

10   Q    Would it be prudent to cross over the railroad tracks

11   on the 253 River property without the easement?

12       MR. GOLDBERG:  Object to form, but answer it.

13       THE WITNESS:  I can't answer that.  I've only been on

14       that property once.  So I really, I don't know.

15   BY MR. PODESTA:

16   Q    So the principal reason that you wanted the easement

17   was for maintenance?

18   A    And easy access, easier access.

19   Q    Easier access.  How would you define easier access?

20   How is it easier?

21   A    You can take an ATV down there on the agreement that

22   he proposed for us.  And I never walked the trail up river.  I

23   don't know how that was.  I have problems with my feet, my

24   ankles, so I did not do that.  Mr. Knight provided a

25   side-by-side ATV to access property and show it to us.

Page 19

1    Q    Okay.  So you drove over it but you never walked over

2    it?

3    A    Correct.  And on the day we did the inspection.

4    Q    Which would have been May of 2021?

5    A    No.  Probably Mar-, end, I think it was the end

6    March.

7    Q    End of March.  And that was before ever signing the

8    Fish Trap agreement; correct?

9    A    I do believe.

10   Q    So when you were negotiating originally, the sales

11   price for 253 River Heights, was the easement contemplated at

12   that point?

13   A    I don't remember.

14   Q    Okay.

15   A    Yeah, I cannot remember.

16   Q    It's all right.  It wasn't included in the original

17   purchase and sell agreement; correct?

18       MR. GOLDBERG:  Object to form.

19   BY MR. PODESTA:

20   Q    The easement was not included in the original

21   purchase and sell agreement; correct?

22   A    I do not think so.

23   Q    All right.

24       MR. PODESTA:  Brian, you're going to be able to pull

25       up the exhibits on that?

Page 20

1        MR. GOLDBERG:  Yeah, I can pull it up on here.

2        MR. PODESTA:  All right.  If we could turn to the

3    2021 March 13th River Heights deal.  There in date order.

4        MR. GOLDBERG:  Sorry.  Say the date again.

5        MR. PODESTA:  It's 2021.03.13.

6        MR. GOLDBERG:  Okay.  I have the 34 pages, is that?

7        MR. PODESTA:  It's six--

8        MR. GOLDBERG:  I'm sorry, 68 pages.

9        MR. PODESTA:  Yes.

10       THE WITNESS:  Enlarge it.

11       MR. GOLDBERG:  I have it pulled up.

12       MR. PODESTA:  Okay.

13       MR. GOLDBERG:  You want to go through it?

14       MR. PODESTA:  Take a moment to review.  For the court

15   reporter and for the record, I'm going to change the title

16   of that to Exhibit A-2021.03.13 253 River Heights deal.

17       (Exhibit A was marked and identified for the record.)

18       THE WITNESS:  What did I do?

19       MR. GOLDBERG:  I think maybe he just changed it.

20       MR. PODESTA:  Yeah, I'm sorry.  I just changed the

21   name.

22       MR. GOLDBERG:  Just got to refresh this.

23       MR. PODESTA:  Good?

24       MR. GOLDBERG:  Yes.  If you want to use this to

25   scroll.



Page 21

1    THE WITNESS: Okay.

2 BY MR. PODESTA:

3    Q   Mr. Thatcher, it is 68 pages, so take your time.

4    A   Okay.

5      MR. GOLDBERG: And just for the record, what

6 discovery package is this? Is this Terry's production?

7      MR. PODESTA: Yes, this is from Terry's projection.

8 Terry Wilson's production, for the record.

9      MR. GOLDBERG: Okay.

10 BY MR. PODESTA:

11    Q   All right. Mr. Thatcher, if you turn to the first

12 page of this, am I correct that the offer date for this

13 purchase and sale agreement is March 13th of 2021?

14      MR. GOLDBERG: Hand on, we're getting there. I'm

15 sorry, can you ask the question again?

16      MR. PODESTA: Sure.

17 BY MR. PODESTA:

18    Q   At the top of this first page.

19    A   Which line?

20    Q   At the top where it says purchase and sale agreement

21 offer date. This is the March 13th, 2021?

22    A   Yes.

23    Q   Did if you turn to the bottom of the page it says it

24 was signed on March 14th, 2021, right above the initials?

25    A   Yes. No -- correct, that March 13th.

Page 22

1    Q   Well, the signatures are on March 14th.

2    A   Oh.

3    Q   No, I'm sorry, yes, you're right. The time limit

4 expires on the 14th.

5    A   Okay.

6    Q   Okay. And on line six of the first page, the closing

7 attorney law firm was Terry Wilson; correct?

8    A   Yes.

9    Q   So Terry Wilson was already going to be the attorney

10 to close this as of March 13th of 2021?

11    A   Correct. When we made the original offer, there was

12 a different closing attorney. Mr. Knight preferred to use

13 Terry Wilson and I did not care. It didn't matter to me. I

14 didn't know any of these people at the time.

15    Q   Okay. Who was the prior preposed closing attorney?

16    A   I don't remember.

17    Q   That's fair enough. If we could turn down then to

18 page 8 of this exhibit. That's your signature, electronic

19 signature on that page; is that correct?

20    A   Correct.

21    Q   Under buyer acceptance and contact information?

22    A   Yes.

23    Q   Then if we could turn to page 18. That's amendment

24 2, do you see that?

25    A   Yes.

Page 23

1    Q   And that was signed on March 31st of 2021?

2    A   Correct.

3    Q   Well, actually it was agreed to on March 31st but

4 signed --

5    A   No.

6    Q   -- April 5th?

7    A   Yes.

8    Q   I'm sorry.

9    A   No, I --

10    Q   I'm a terrible questioner.

11    A   Correct, I saw the date on top like you did and yes

12 the date and the signature stamp is different; correct.

13    Q   And just not to belabor the issue but for a cleaner

14 record, this was signed on April 5th of 2021?

15    A   Correct.

16    Q   And what is an amendment to agreement No. 2?

17    A   Amendment 2 is an agreement Gary offered, agreed to,

18 negotiate to, I don't remember what exact wording was on it, on

19 how we were going to access the river from that house.

20    Q   Okay. And this is the same easement and access that

21 we were discussing earlier?

22    A   Correct.

23    Q   So that you'd be able to have access from the house

24 on 253 River Heights to the river behind the railroad tracks?

25    A   Correct.

Page 24

1    Q   And that would cut through a different Gary Knight

2 property? The easement would allow you to cut through a

3 different Gary Knight property to reach the river?

4    A   Than the 253 property you're talking? I don't mean

5 to ask you a question.

6    Q   Yes.

7    A   Correct.

8    Q   Okay. Why did you request this easement?

9    A   For clarity.

10    Q   What does that mean?

11    A   So it's in writing because a verbal easement is not

12 enforceable. I wanted it in a document form that would then be

13 with the contract.

14    Q   Did you need this river access to purchase the

15 property?

16    A   Yes.

17    Q   Okay. Who negotiated this? Was this between Ms.

18 McBee and Mr. White or was this between you and Mr. Knight

19 directly? How was this handled?

20    A   It was between me and Mr. Knight. I don't know after

21 that who was involved.

22    Q   But did you call Mr. Knight and say I need an

23 easement for this?

24    A   We disgusted it on the day of the inspection. Some

25 time end of March.



Page 25

1    Q   And certainly that would be prior to March 31st

2 since this was drafted on March 31st?

3    A   Correct.

4    Q   Or potentially on March 31st?

5    A   Correct.

6    Q   Do you know who drafted amendment No. 2?

7    A   No.

8    Q   Do you know which side drafted amendment No. 2?

9    A   Mr. Knight's side.

10    Q   Okay.  If we can then turn to page 35.  This is the

11 operating agreement or the amendment operating agreement for 7

12 IL Properties; correct?

13    A   Correct.

14    Q   And then if you turn to page 48, that has a number of

15 names listed there with a few signatures.  Do you see that as

16 well?

17    A   Correct.

18    MR. GOLDBERG:  Hang on a second.

19    THE WITNESS:  You can go down further.  I know where

20    it's at on this.

21    MR. GOLDBERG:  You said page 48?

22    MR. PODESTA:  Yes.  Page 48 of the exhibit, not the

23    amended operating agreement.

24    MR. GOLDBERG:  Okay.

25    MR. PODESTA:  Okay.

Page 26

1 BY MR. PODESTA:

2    Q   Is that list of name where there could be a signature

3 an exhausted list of the members or partners of 7 IL

4 Properties?

5    A   Correct.

6    Q   And that's still the case?

7    A   Yes, except on one error.  Jackie Thatcher does not

8 have ownership.

9    Q   Who is Jackie Thatcher?

10    A   My brother's son.

11    Q   Is he a minor child?  Is that the issue?

12    A   He has developed, developmentally delays.

13    Q   Okay.  So is there a trust that's set up for his

14 portion?

15    A   My brother retained the ownership to pay.

16    Q   Understood.  And I'm not concerned with the lack of

17 signatures, I just wanted to confirm that that is the list of

18 all of the members of 7 IL Properties?

19    A   Correct.

20    Q   And it was at the time of March, April, May and June

21 of 2021 as well?

22    A   Correct.

23    Q   Okay.  If we can turn then to, it's another exhibit

24 and it is titled 2021.03.07 Thor James easement in the Dropbox.

25    MR. PODESTA:  Brian, I can title it Exhibit B now.  I

Page 27

1 don't want it to refresh your page.

2    MR. GOLDBERG:  I mean, you can do it now before we

3    click on it.

4    MR. PODESTA:  All right.  I've renamed it Exhibit B.

5    (Exhibit B was marked and identified for the record.)

6    MR. GOLDBERG:  Got it.

7 BY MR. PODESTA:

8    Q   Mr. Thatcher, could you just take a look at that for

9 a moment.  Mr. Thatcher, have your seen Exhibit B before?

10    A   No.

11    Q   Do you have any idea what it is?

12    A   It looks like it's easement of the cross properties

13 in the Toccoa River Heights subdivision.

14    Q   Do you know who Mr. Thor A. James is?

15    A   No.

16    Q   So you've never met Mr. James?

17    A   Not to my knowledge.

18    Q   All right.  We can close that exhibit.  And then it

19 will be very similar questions, but I would like to turn to

20 another easement.

21    MR. PODESTA:  Brian, I'll change the name of it in

22    the Dropbox now.  It will be Exhibit C in the 2021.03.07

23    Thor James Water.  It will now populate as Exhibit C.

24    (Exhibit C was marked and identified for the record.

25

Page 28

1 BY MR. PODESTA:

2    Q   All right.  Mr. Thatcher, take a moment to read that

3 one as well, if you don't mind.

4    A   Okay.

5    Q   Mr. Thatcher, have you seen this exhibit before?

6    A   No.

7    Q   Exhibits C, you've never seen it before?

8    A   (Nonverbal)

9    Q   And I assume your answer is not going to change as to

10 whether or not you know Mr. James?

11    A   No.

12    Q   All right.  Do you have any idea what this Exhibit C

13 is?

14    A   It's water well agreement between the lots and the

15 Toccoa Heights subdivision on how things are maintained,

16 modified, paid for.

17    Q   Similar to the ones you were discussing earlier?

18    A   Yes.

19    Q   Where there would be a water well located under one

20 property that was maybe accessed by multiple properties for

21 water?

22    A   Correct.

23    Q   All right.  If we could then turn to -- let me

24 retile it in the box there.  I will retitle this one Exhibit

25 D.  It will be 2021.04.19 183 River Lodge.



Page 29

1    (Exhibit D was marked and identified for the record.)

2    MR. GOLDBERG:  Seven pages?

3    MR. PODESTA:  Yes, correct.

4    THE WITNESS:  Okay.

5  BY MR. PODESTA:

6    Q    What is Exhibit D?

7    A    I believe it is the sellers disclosure statement on a

8  property I purchased in Blue Ridge.

9    Q    And that was purchased from the Pradutts?  Campbells

10  and Pradutts?

11    A    I don't remember her last name but let me see.

12  Probably.  Yes.

13    Q    And for the record it's Jocinda L. Pradutt.  I

14  pronounce that incorrectly.

15    MR. KNIGHT:  Pradutt.

16    MR. PODESTA:  There's a P, P-P-R on the signing.

17  BY MR. PODESTA:

18    Q    So something may have been wrong with the name of it.

19    A    I just knew it is Joci.

20    Q    Joci; okay.  And you purchased this property as well?

21    A    Correct.

22    Q    Was that subject to similar easement issues at all?

23    A    There was an easement existing that Mr. Knight had

24  but we didn't have any other easement access issues with this

25  property.

Page 30

1    Q    What was the easement that Mr. Knight had that

2  related to the 183 River Lodge property?

3    A    Mr. Knight had access to the 77 Knights Landing

4  property via this property.

5    Q    Okay.  He could access 77 Knights Lading via this

6  property from where?

7    MR. GOLDBERG:  Object to form.  Go ahead and answer.

8    THE WITNESS:  The main road, whenever that is.

9  BY MR. PODESTA:

10    Q    So it's a driveway access?

11    A    Yes.

12    Q    And you purchased 183 River Lodge?

13    A    Correct.

14    Q    And was that subject to any litigations?

15    A    Correct.

16    Q    It was?  So there was already an existing lawsuit

17  between Mr. Knight and Joci Pradutt on this property?

18    A    Correct.

19    Q    When you executed the sales agreement for that

20  property, were you already aware of that lawsuits?

21    A    We're talking the 183 River Heights?

22    Q    Correct.

23    A    Okay.  There's -- okay.  Yes.

24    Q    But you purchased it anyway?

25    A    Correct.

Page 31

1    Q    The seller disclosed that lawsuit?

2    A    Yes.

3    Q    Did that disclosure, the existence of the lawsuit

4  impact the price?

5    A    Not that I know of.

6    Q    So you paid the same price for the property knowing

7  that there was already an ongoing lawsuit?

8    A    Yes.

9    Q    Why?

10    MR. GOLDBERG:  I'm going to object to the extent that

11    any of the information that you could give is

12    attorney-client privilege information.  But to the extent

13    that you can answer for 7 IL and understand what his

14    question is without divulging any attorney-client

15    privilege information, then you can answer.  And you can

16    ask the question again, if you want.

17  BY MR. PODESTA:

18    Q    Without telling me what your lawyer has said, could

19  you tell me why you purchased the property at fair market value

20  knowing that it had, it was encumbered by ongoing litigation?

21    A    It was a very good house, great house, great view,

22  lots of acreage.  I really like the Toccoa Valley, whatever.

23  That really did.  I didn't know where I was going to be with

24  Gary Knight's situation.  I wanted one, it came up.  It fit our

25  marketing ideas and we purchased it.

Page 32

1    Q    When you say marketing ideas, it was intended to be a

2  rental home?

3    A    Correct.

4    Q    As was 253 River Heights?

5    A    Correct.

6    Q    As was 92 Fish Trap?

7    A    Correct.

8    Q    Did you have a title examination run on the property

9  of 183 River?

10    MR. GOLDBERG:  I'm going to say the same objection

11    about attorney-client privilege information but you can

12    answer the question to the extent you're not divulging any

13    attorney-client information.

14    THE WITNESS:  I can't answer that.  I don't know.

15  BY MR. PODESTA:

16    Q    Did you pay for a title examination?

17    A    I would assume I did but I can't swear that yes or

18  no.  I don't -- Georgia real estate is way different than what

19  I'm used to.  The title companies and attorney so that's why I

20  can't -- I would assume I did, but I don't know what I'm paying

21  for most of the time with some of these situations.

22    Q    Okay.

23    MR. PODESTA:  Brian, if it turns out that the title

24    examination was run, could you get me a copy of it?

25    MR. GOLDBERG:  I mean, if you've asked for it in



1  discovery, then we'll, you know, we can -- if it's been

2  asked for, I'll produce it.

3      MR. PODESTA: Okay.

4  BY MR. PODESTA:

5      Q   Looking at this property, this 183 River Landing, did

6  you have a survey inspection run on the property? Did you post

7  survey?

8      A   No.

9      Q   Did you for 92 Fish Trap?

10     A   No.

11     Q   How about for 253 River Heights?

12     A   No.

13     Q   Do you recall when you purchased this 183 River Lodge

14  drive?

15     A   July of that year.

16     Q   2021?

17     A   Yeah.

18     Q   And you closed on it in July, is that what you mean?

19     A   I do believe -- some time in the summer.

20     Q   But at least by May 31st of 2021 you'd been made

21  aware of the encroachment survey issue for 92 Fish Trap; is

22  that correct?

23     A   Say that? What date again?

24     Q   May 31st of 2021.

25     A   I do believe. Is that the Monday of Memorial Day?

1      Q   Yes, sir.

2      A   Yes.

3          MR. GOLDBERG: I think that's actually the Sunday.

4  The 31st is Sunday.

5          THE WITNESS: Sometime in that weekend I was

6  notified. How I was that -- correct.

7  BY MR. PODESTA:

8      Q   That's sufficient for me.

9          MR. KNIGHT: Monday was May 31st.

10         MR. PODESTA: Monday's the 31st?

11         MR. KNIGHT: Yes. Tuesday is the 1st.

12         MR. GOLDBERG: Sorry about that.

13         MR. PODESTA: That's no problem.

14  BY MR. PODESTA:

15     Q   All right. And then if you could then go to -- let

16  me pull up a different exhibit, I'm sorry. I'll retitle it

17  here. This will be Exhibit E as in ECHER. It will be the 2016

18  10-12 Pradutt Plat.

19     (Exhibit E was marked and identified for the record.)

20         MR. PODESTA: Has that come up?

21         MR. GOLDBERG: Yes, I got it.

22         MR. PODESTA: Beautiful.

23  BY MR. PODESTA:

24     Q   Mr. Thatcher, if you don't mind taking a look at it.

25     A   Okay.

1      Q   Okay?

2      A   Yes.

3      Q   Have you seen this?

4      A   Yes.

5      Q   So you are familiar with Exhibit E?

6      A   Correct.

7      Q   What is Exhibit E?

8      A   The legal description map of the River Lodge property

9  at 173 River Heights. I can't keep the addresses straight. I

10  know them by cabin names. We call it River Lodge.

11     Q   Okay. That's fair enough. Am I correct that at the

12  top of this map there's what appears to be the Toccoa River?

13     A   Correct.

14     Q   And that's the river that you would want access to;

15  correct?

16     A   I have access to this River via on this property.

17     Q   That's the River you would use on that property?

18     A   Yes.

19     Q   And there's a little space that says .52 acre. Could

20  you tell me what that is?

21     A   I'm assuming that's an amount of land that is between

22  the railroad tracks and the river that I own.

23     Q   Okay. And then underneath that is the railroad track

24  that you would have to cross or if you wanted to access the

25  river from your house on the property without any easement?

1      A   Correct.

2      Q   And then that little box, is that the house?

3      A   I'm going to make the assumption that the little box

4  that you're talking about, yes. I'm going --

5          MR. GOLDBERG: I'm going to object to form of the

6  question.

7          MR. PODESTA: Let me restate. It was a bad question.

8  BY MR. PODESTA:

9      Q   There's a little box that says deck and porch

10  immediately above the number 14 on the map.

11         MR. GOLDBERG: Do you see that?

12         THE WITNESS: Yeah. It's a two story frame with

13  something, an arrow to it, yes.

14  BY MR. PODESTA:

15     Q   Okay. That's the house; correct?

16     A   Correct.

17     Q   So without any easements you would need to, you could

18  walk across that railroad track to get the Toccoa River?

19     A   Correct, and we do.

20     Q   Okay. And this is the property that you bought? You

21  purchased this property?

22     A   Correct.

23     Q   Roughly July of 2021?

24     A   Correct.

25     Q   All right. And we can put that exhibit away for a



Page 37

1  moment. I'm going to mark -- it's a little past 11. Do you
2  want a break at all?
3      A   I'm good for a little bit.
4      Q   Okay. And I'm going to apologize, if you need a
5  break at any point, just let us know. All right.
6          MR. PODESTA: Brian, I'm marking this one Exhibit F.
7  it's the 2021.04.02 92 Fish Trap deal.
8  (Exhibit No.F was marked and identified for the record.)
9          MR. GOLDBERG: Okay.
10         MR. PODESTA: And for the record, this is this the
11  one that was produced by Mr. Wilson.
12         MR. GOLDBERG: That's what I was going to ask you.
13  So this was all the, so this was the documents that Terry
14  Wilson produced to us or to you, document request, request
15  for production of documents?
16         MR. PODESTA: Correct.
17         MR. GOLDBERG: As far as the 92 Fish Trap deal?
18         MR. PODESTA: Correct.
19         MR. GOLDBERG: Do you want to look through these?
20         THE WITNESS: Yeah. Pull it up for me.
21  BY MR. PODESTA:
22     Q   Mr. Thatcher, this one is 64 pages. So take your
23  time soon. Mr. Thatcher, if you could turn to page 2 of this
24  Exhibit F. Am I correct that this is the April 2nd, 2021,
25  purchase and sell agreement for 92 Fish Trap road?

Page 38

1      A   I do believe so, yes.
2      Q   And originally you were set to purchase that
3  individually from Mr. Knight; correct?
4      A   Yes, that was a typo.
5      Q   Okay. Do you recall who drafted Exhibit F?
6          MR. GOLDBERG: I'm sorry.
7          MR. PODESTA: Exhibit F, this exhibit.
8          MR. GOLDBERG: Oh, the entire --
9  BY MR. PODESTA:
10     Q   I'm sorry. Again, poor question. Who drafted the
11  original April 2nd, 2021, purchase and sale agreement within
12  Exhibit F?
13     A   No idea.
14     Q   Do you know if it was your side or Mr. Knight's side?
15     A   I have no idea.
16     Q   You do see that it says in line six, closing attorney
17  law firm, Hamilton Wilson.
18         MR. GOLDBERG: Hang on, he's getting there.
19         THE WITNESS: Yes.
20  BY MR. PODESTA:
21     Q   And that was Terry Wilson's firm; correct?
22     A   Correct.
23     Q   If you could turn to page, I think it's page 9, if
24  you could turn to page 9. Do you see your signature, your
25  e-signature on that page?

Page 39

1      A   Correct.
2      Q   And that is John Thatcher, managing member?
3      A   Correct.
4      Q   And that's managing member of 7 IL Properties?
5      A   Correct.
6      Q   Okay. If you could then turn to page 63. What is
7  page 63?
8      A   We're looking at amendment to agreement amendment No.
9  4.
10     Q   Yes, sir.
11     A   Changing my name, managing member to 7 IL Properties,
12  LLC.
13     Q   Okay. So that's correcting the typo that was
14  previously existing?
15     A   Correct.
16     Q   And then if we could turn back to page 19. And while
17  we're doing that, the purpose of that amendment was to insure
18  that it was 7 IL Properties purchasing 92 Fish Trap road, not
19  John Thatcher individually?
20     A   Correct. I don't have the money.
21     Q   Have you seen page 19 before?
22     A   Yes.
23     Q   Do you know what page 19 is?
24     A   A nightmare to understand. It is a survey of the
25  Toccoa Heights subdivision, I do believe it's the official lots

Page 40

1  12 through one or whatever it is.
2      Q   Okay. And that was included as part of the original
3  April 2nd contract?
4          MR. GOLDBERG: Object to form.
5  BY MR. PODESTA:
6      Q   Was page 19, which is labeled Exhibit C, Toccoa
7  Heights, part of the original April 2nd, 2021, contract
8  between Gary Knight and then John Thatcher as managing member
9  for the purchase of 92 Fish Trap road?
10     A   I believe it was. If not, I have seen it before in
11  another mailing e-mail or something. I do recognize it and I
12  have seen it.
13     Q   Okay. And you did not create this Toccoa Heights
14  plat?
15     A   No.
16     Q   And to your knowledge did Mr. Knight create that
17  Toccoa Heights plat?
18     A   No.
19     Q   That plat, to your knowledge, preexisted, well, was
20  created by someone other than you and Mr. Knight?
21     A   Correct. I'm going to make the assumption it's
22  whoever stamped it.
23     Q   That's a fair assumption. Looking at this plat, do
24  you see that the properties are numbered one though 12?
25     A   Correct.



Page 41

1   Q   And those are lot numbers; correct?

2   A   I assume so, yes.

3   Q   Do you know which property is 92 Fish Trap?

4   A   No. I'm going, I hate to say this but I would refer

5   that to somebody else that knows the lots better than I do.

6   Q   That's fair enough. All right. And then let me turn

7   to page 22 of this exhibit. Have you seen page 22 before?

8   A   Yes.

9   Q   What is page 22?

10  A   A agreement to have a professional attorney or

11  licensed attorney draw up agreements for river access and a

12  community well.

13  Q   And that this amendment No. 1 to the 92 Fish Trap

14  deal?

15  A   Correct.

16  Q   And you signed that on April 5th of 2021

17  electronically?

18  A   Correct.

19  Q   Why did you want amendment 1?

20  A   For access on a trail that went between this property

21  and another property for access to the river. And then a

22  proper well share agreement.

23  Q   Similar well share agreement to the ones we described

24  before?

25  A   Yes.

Page 42

1   Q   And you said access to a trail. Was it a walking

2   trail or vehicle trail? What kind of trail?

3   A   I don't remember. I've been to the property once. I

4   liked it and I was not a very mobile at the time to walk to the

5   trail. So I can't -- it was some type of trail access. That's

6   all I know.

7   Q   Okay. If you could then turn to page 26. This is

8   just more to clean something up. Does this appear to be a

9   duplicate of the prior amendment 1 to this agreement?

10  A   I do you believe so.

11  Q   All right. And the only requirement here was that

12  the easements for river access of water clarifications be drafted

13  by a George licensed attorney prior to or at closing; correct?

14  A   Correct.

15  Q   All right. Do you no when you first received draft

16  easements for the 92 Fish Trap property?

17  A   I am going to make the assumption somewhere around

18  April 5th. Usually I signed them within a day.

19  Q   Okay. All right. And do you recall who prepared the

20  easement that you saw?

21  A   No.

22  MR. PODESTA: Brian, I'm going to add another

23  exhibit. I believe we're on G at this point. It looks

24  like we are.

25  MR. GOLDBERG: I'm sorry. I just want to clarify

Page 43

1   what your last question was because maybe I misunderstood

2   or misheard you. Did you ask when he signed an

3   easement --

4   MR. PODESTA: First saw.

5   MR. GOLDBERG: -- or the amendment?

6   MR. PODESTA: I'm sorry. When he first saw an

7   easement agreement.

8   MR. GOLDBERG: An easement agreement as what we

9   just -- the amendment?

10  MR. PODESTA: The easement's contemplated by the

11  amendments. I'm sorry if that wasn't clear.

12  THE WITNESS: No, yeah. I thought you meant the date

13  when I saw that amendment. As far as I know, the best of

14  my knowledge, I have never seen a written executed

15  easement.

16  BY MR. PODESTA:

17  Q   But a draft easement for your execution?

18  A   I don't believe I've ever seen one.

19  Q   Okay. That's fair enough. If you can then pull up

20  what I've now marked --

21  A   I apologize. I didn't --

22  Q   I understand. It was a confusing point.

23  MR. GOLDBERG: Which letter?

24  MR. PODESTA: This is Exhibit G. I've marked it in

25  the Dropbox.

Page 44

1   BY MR. PODESTA:

2   Q   Mr. Thatcher, have you seen exhibit G?

3   (Exhibit G was marked and identified for the record.)

4   A   Yes.

5   Q   What is Exhibit G?

6   A   Is an e-mail I sent to Mr. Knight and my realtors,

7   Dee McBee and Dan Harrison, thanking them for showing us the

8   property and questions and clarifications I need.

9   Q   And one of those clarifications was related to the

10  easements for 253 River Heights; correct?

11  A   Correct.

12  Q   What is Outlaw Ridge?

13  A   That is the cabin name for that property.

14  Q   For 253 River Heights?

15  A   Correct.

16  Q   And so in the second sentence you wrote, the easement

17  is too vague in indemnity agreements between the stairs on

18  Outlaw Ridge and the trail access next door. What does that

19  mean?

20  A   There's a set of stairs that give you access from

21  that house to the property. And then there's the trail access

22  that goes up river. And the mentioning of that is not solid,

23  in my opinion, in the easement that he drafted or whoever

24  drafted.

25  Q   So there was an easement and that easement already



Page 45

1   existing for Outlaw Ridge, 253 River Heights, was just vague?

2   A   Correct.  And I do believe it goes to the addendum

3   two or three is referencing back to the amendment he gave and

4   signed.

5   Q   Okay.  And what is -- where did the indemnity

6   agreements come into play?  What does that mean?

7   A   Who $5 million insurance policy.  Usually when

8   something is asked for that it is usually, there's an

9   additional named insured or somebody's asking for a certificate

10  of insurance.  You know, who is asking for the proof of the

11  policy.

12  Q   So you were trying to figure out or you were trying

13  to get a more tailored easement with regard to what

14  indemnifications had to take place in that easement?

15  A   More specific, yes.

16  Q   And that had not been done at this point?

17  A   I -- what date was amendment 3?  I think this was

18  tied --

19      MR. GOLDBERG:  Do you want me to pull it up?

20      THE WITNESS:  Yeah.  Whichever the 253 Fish Trap that

21  this is referencing to.  I do believe this e-mail is after

22  that was signed.

23  BY MR. PODESTA:

24  Q   Are you talking about page, I believe it's 22.  Well,

25  this is a different deal.  I'm sorry.  This is 253 River

Page 46

1   Heights?

2   A   Correct.

3   Q   Are you talking about amendment to agreement

4   amendment No. 2, which is page 18 on that deal?

5   A   Yes.

6      MR. GOLDBERG:  Exhibit A?

7   BY MR. PODESTA:

8   Q   On Exhibit A?

9   A   Yes.  This e-mail is in reference to that?

10  Q   Okay.  So you're saying whoever drafted this, the

11  page 18 on Exhibit A was not specific enough?

12  A   Correct.

13  Q   And did not specifically explain the indemnification

14  issue?

15  A   And the legal lots, yes.

16  Q   Okay.  And then turning back to Exhibit G you say

17  right after that, I thought an attorney was going to write

18  this.  Do you see that?

19  A   Correct.

20  Q   You thought an attorney was going to write up the

21  amendment 2 from Exhibit A?

22  A   Correct.

23  Q   And it had been agreed that an attorney would draft

24  the easements; correct?

25  A   Correct.

Page 47

1   Q   Did you have any idea who that attorney should be?

2   A   No.

3   Q   And then it goes on to say, the lots are not defined

4   and a map would help in the future if there was a problem.

5   What do you mean by that?

6   A   It just said lots.  It had no association to Toccoa

7   Heights or ABC or XY subdivisions and a map drawing the exact

8   location of the trials and accesses.

9   Q   Okay.  So you're saying that this third sentence in

10  your e-mail in Exhibit G like the second sentence in the e-mail

11  is simply saying that page 18 of Exhibit A is not sufficiently

12  explicit?

13  A   Correct.  The content or the agreement is.  The idea

14  of the amendment is acceptable, it's good.  I just wanted

15  clarifications because if we got into an argument who is this

16  lot, if Gary was to pass away, somebody else, it doesn't hold

17  water if two third parties had this and tried to say, well what

18  do you have.

19  Q   Right.  And then presumably your concerns that you

20  voiced in Exhibit G would need to be reduced to a written

21  formalized easement at or before closing; correct?

22  A   Correct.

23  Q   Then turning down further in Exhibit G there's

24  another sentence that says a well share agreement and who is

25  the payer on the well.  What does that mean?

Page 48

1   A   Like seeing a well share agreement and who the

2   electric company is sending the bill to.

3   Q   Okay.  And so the electric company is involved with

4   the well share agreement?

5   A   They're the one that provide electricity that makes

6   the pump work.

7   Q   All right.

8   A   I want to make sure that whoever I'm paying pays the

9   electric company so that the well doesn't get shut off.

10  Q   Right.  Otherwise your property has no water.

11  A   Yes.

12  Q   So if the easement is poorly drafted or simply not

13  drafted, then you might not have water on your property?

14  A   Correct.

15  Q   Then you say a little bit above that you mentioned a

16  shared insurance policy on the track easement.  What is the

17  track easement?

18  A   The $5 million shared policy to cross the track.

19  Q   The railroad track?

20  A   Yes.

21  Q   So this is discussing insurance, liability insurance

22  to protect you as the purchaser of the property if someone was

23  injured or killed crossing the railroad track?

24  A   I got to stop and think.  Restate the question.

25  Q   Let me ask it a little bit more broadly so you can



Page 49

1 tell me what you're saying.

2    A    Okay.  I'm sorry.  I was an insurance professional

3 and that you just.

4    Q    You're discussing an insurance policy in the sentence

5 that relates to the railroad track, and then you later go on to

6 say I already have an excess of $5 million liability, I don't

7 want to add more.  What does that mean?  Was Mr. Knight

8 negotiating with you as to how much insurance you would each

9 have to carry if he gave you an easement to cross the tracks?

10    A    In amendment 2, whichever amendment we're back to.  I

11 think it was to exhibit, what, yeah.

12    Q    Exhibit A?

13    A    Yeah.  There's an agreement in there that says that

14 all parties agreed buyer to maintain $5 million liability

15 insurance for railroad crossing in order to use easements.  I

16 have a $5 billion umbrella already.

17    Q    So you were looking to clarify whether your current

18 umbrella policy was sufficient to cover that requirement in

19 amendment 2?

20    A    Correct, because it just says an insurance policy.  I

21 wanted clarification of what more specifics on that policy, if

22 my 5 million umbrella with cover it.  If not, do I have to join

23 this group.  What's the group -- I wanted specifics more on

24 this generic thing that says we're supposed to have $5 million.

25    Q    Who has your $5 million policy?  Is it 7 IL?  Is it

Page 50

1 John Thatcher?

2    A    Currently, I don't have one.

3    Q    At the time did John Thatcher have a $5 million

4 umbrella?

5    A    John Thatcher was mine.  I might have personally.

6 we're running under Thatcher Landing Cattle which could be

7 transferred over because of common interest.

8    Q    So you don't know whether 7 IL Properties had the $5

9 million property, insurance policy at that point?

10    A    At that point, no.  And that lets me know if I needed

11 to purchase one.  I needed clarification of what this was.  Was

12 that sufficient?  You know, it was a very vague thing and does

13 mine work to cover everything.  Yeah, it just it was vague

14 thing and I needed clarification.

15    Q    Do you know if you ever received that clarification

16 like an easement was drafted that said who had told the

17 $5 million policy?

18    A    No.

19    Q    It's 11:30.  That's a good stopping point because I'm

20 going to change subjects.

21        (BREAK TAKEN AT 11:31 A.M.)

22 BY MR. PODESTA:

23    Q    Can we got back on the record.  All right.  Mr.

24 Thatcher, I'm going to add another exhibit here that's more for

25 cleaning up the record than anything else.

Page 51

1        MR. PODESTA:  Brian, I'm marking this as Exhibit H.

2        MR. GOLDBERG:  Okay.

3 BY MR. PODESTA:

4    Q    If you wouldn't mind just taking a look at Exhibit H.

5 Have you seen Exhibit H before?

6        (Exhibit H was marked and identified for the record.)

7    A    Hold on.  I'm not that far yet.  Isn't that the

8 previous exhibit?

9    Q    It is part of a previous exhibit and that's why I'm

10 just trying to clean up the record.

11    A    Oh, yes.  I think I've seen this or something very

12 similar to it.

13    Q    Okay.  And then page 2 of Exhibit H rather is the

14 Toccoa Heights plat for all of the properties.

15    A    That's what we're looking at right now?

16    Q    Yes, sir.

17    A    Okay.  Yes, it looks like.

18    Q    Okay.  And it has the unfortunate quality of being

19 labeled Exhibit F at the top of the page, but it is in fact, on

20 top of page 1, but it is in fact the Exhibit H for this

21 deposition.

22    A    Okay.

23    Q    And so again you don't know those lot numbers

24 specifically but if lot 10 was 92 Fish Trap, would that look

25 familiar to you?

Page 52

1    A    I don't think lot 10 is Fish Trap.  I think that's

2 Knights Landing.  I think I own lot -- no, I don't know.  Which

3 way is up river?

4    Q    The river's on the top.

5    A    Is it going, is the water flowing to the top or to

6 the bottom?  It's kind of to the going.

7    Q    I don't know the answer to that.

8    A    There's a railroad.  Okay.  So keep going -- I'm not

9 thinking -- that's the river.  I really can't tell you on this

10 map.  It doesn't -- my brain tells me lot 12 or lot 11 was

11 River Heights I thought.

12    Q    Well, to --

13    A    I will make this question.  It's not supposed to.

14 Mr. Knight could you --

15    Q    I think I can resolve this.

16    A    Okay.

17    Q    If we could turn to Exhibit F, page 2?

18        MR. GOLDBERG:  Exhibit, not to be confusing but

19 Exhibit F is what it's referenced on the top?  Are we

20 talking about your exhibit?

21        MR. PODESTA:  My Exhibit F.

22        MR. GOLDBERG:  Okay.  Page 2?

23        MR. PODESTA:  Correct.  And it's the first page of

24 the purchase and sale agreement for the Fish Trap road.

25        THE WITNESS:  Okay.  So that's lot 10, okay.



Page 53

1  BY MR. PODESTA:

2  Q  Do you see that there?

3  A  Yes.

4  Q  Okay.  So then lot 10 is the Fish Trap road property;

5  correct?

6  A  I'm going to have to agree with it.  My brain says

7  it's not but I will.  How is that for being totally vague and

8  more than likely I believe your answer but my brain is saying,

9  going a whole different direction.

10  Q  Understood.  And so this deposition exhibit that

11  we're speaking of, Exhibit G, which is the Toccoa Heights plat,

12  is the only survey of lot 10 of 92 Fish Trap that you had seen

13  prior to your April 2nd, 2021, offer to purchase 92 Fish Trap

14  road; correct?

15  A  To the best of my ability, yes.

16  Q  Do you have any reason to believe that Mr. Knight was

17  aware that this survey that is Exhibit G might be incorrect

18  prior to April 2nd of 2021?

19  A  No.

20  Q  Do you have any evidence that Mr. Knight may have

21  known that this survey might be incorrect prior to April 2nd of

22  2021?

23  A  No.  Not as of that date, no.

24  Q  And let me turn to another exhibit here.

25     MR. PODESTA:  Brian, I'm going to name this one

Page 54

1  Exhibit H.  It's the 2021 May 31st preliminary survey.

2     MR. GOLDBERG:  We already have an Exhibit H.

3     MR. PODESTA:  Oh, I'm sorry.  Thank you.

4  BY MR. PODESTA:

5  Q  We'll call that Exhibit I.  Mr. Thatcher, if you

6  don't mind just taking a look at that when Brian has it opened.

7     (Exhibit I was marked and identified for the record.)

8     MR. KNIGHT:  Sorry.

9     THE WITNESS:  Been there, done that.

10     MR. GOLDBERG:  Are you good?

11     THE WITNESS:  And which lot is this?

12  BY MR. PODESTA:

13  Q  Let me ask you, have you seen this before?

14  A  It doesn't ring a bell.

15  Q  That's fair enough.  If we could tell then skip this

16  one for now and go to what I've marked in the folder, the

17  Dropbox as Exhibit J.

18     (Exhibit J was marked and identified for the record.)

19     MR. GOLDBERG:  This looks like the same.  Is this the

20  same one?

21     MR. PODESTA:  This is the recorded version of the

22  prior.

23     MR. GOLDBERG:  Okay.  Got you.

24  BY MR. PODESTA:

25  Q  And I'll represent to you the prior version was

Page 55

1  signed on May 31st of 2021 and this one was recorded on June

2  1st of 2021.  Do you see that?  If you look to the left

3  you'll see the signature of H. Samuel Walker dated May 31st of

4  2021.  Do you see that?

5  A  Uh-uh.

6  Q  And then slightly above that to the right it says

7  approved Fannin County land development office and it has a

8  signature as of June 1st of 2021?

9  A  Yes.

10  Q  And at the top of the page in the left corner it has

11  the book and page number where it was recorded?

12  A  Yes.

13  Q  Are you familiar with this Exhibit J at all?

14  A  The plat looks familiar, but not in this form.

15  Q  How so?

16  A  The one I have seen is not recorded.

17  Q  Okay.  Is that the prior exhibit, the prior exhibit

18  being I?

19  A  The one I have seen, the map is at a different, it's

20  similar but it's a different angles, if that makes any sense.

21  So I don't know if it was a rough draft but it was not approved

22  by anybody, but it was similar in.

23  Q  When did you first see that map?

24  A  So June 1st is Tuesday; correct?

25  Q  It's the closing date.

Page 56

1  A  Yes, yeah, the closing day probably noon was the

2  first time I ever saw a map.  It was very confusing because it

3  was on my phone --

4  Q  Okay.

5  A  -- and I didn't know what I was looking at.

6  Q  Okay.  If I represented to you that the bottom

7  property on this map is lot 10, that's the 92 Fish Trap

8  property that you were attempting to purchase.

9  A  Okay?

10  Q  Then the property above, if you refer back to the

11  Toccoa Heights plat that was two exhibits ago is lot 9.

12  A  And that would be 100 Fish Trap?

13  Q  Correct.

14  A  Correct, yes.

15  Q  That's your understanding?

16  A  Yes.

17  Q  And 100 Fish Trap was the one Gary Branch was looking

18  to purchase; correct?

19  A  I think that was his name, yes.

20  Q  And his name is on the right on both Exhibits J and

21  I.

22  A  Okay.

23  Q  As survey for; correct?

24  A  Yes.

25  Q  You didn't order this survey?



Page 57

1    A    No.

2    Q    Have you ever ordered a survey for this property?

3    A    No.

4    Q    For either of these properties --

5    A    No.

6    Q    -- 100 or 192?  No?

7    A    No.

8    Q    Have you ever ordered a survey for 183 River Landing?

9    A    River Lodge, no.

10    Q    River Lodge.  I'm sorry.

11    A    Yeah, that's okay, yes.  That's why I use cabin

12    names.

13    Q    Okay.  So you've never ordered a survey for 183 River

14    Lodge?

15    A    No.

16    Q    And never attempted to order a survey for 253 River

17    Landing?

18    A    No.

19    Q    Have you -- just to make it simple, have you ever

20    ordered a survey for any property in Georgia?

21    A    No.

22    Q    All right.  So turning back to Exhibit J, which is

23    the recorded version.  I think they are identical exhibits

24    except for the recording.

25    A    Okay.

Page 58

1    Q    Do you see on this exhibit where there was an

2    encroachment between lots 9 and lots 10?

3    A    Yes.

4    Q    And that encroachment was discovered by whom to your

5    knowledge?

6    A    What I was originally told, it was the purchaser of

7    100 Fish Trap.  Through your deposition process there's e-mails

8    in April that says Mr. Knight knew about it.

9    Q    Okay.  In April?

10    A    Yes.

11    Q    Okay.  So but for your understanding, when was the

12    first time you learned of this encroachment?

13    A    This exact encroachment was probably noon on June

14    1st, give or take a few hours.

15    Q    When were you aware that an encroachment might exist?

16    A    I was told that there could be a problem Friday

17    night.  So 31st would be on Monday, 30th, the 28th of June.

18    Like 5 o'clock I was notified by somebody that there could be a

19    problem with something.  I can't remember the exact wording,

20    but it was like, well, there's nothing I can do about it.

21    Q    Right.  Looking at this plat that's exhibit J, how

22    does the encroachment impact lot 10 of 92 Fish Trap?

23    MR. GOLDBERG:  I'm going to object to form but go

24    ahead and answer the question.

25    THE WITNESS:  How does it -- restate your question,

Page 59

1    please.

2    BY MR. PODESTA:

3    Q    How does this encroachment that's identified as area

4    0.16 acres impact which lot 10 which is 92 Fish Trap as you

5    were trying to purchase it?

6    A    It --

7    MR. GOLDBERG:  Same objection.

8    THE WITNESS:  It's not what we agreed to.

9    BY MR. PODESTA:

10    Q    Okay.  What's not what you agreed to?

11    A    The original lot lines.

12    Q    What lot lines did you agree to?

13    A    The previous record lots lines as of April 5th.

14    Q    So the Toccoa Heights plat that we saw earlier as a

15    prior exhibit?

16    A    If that's the last, yes.

17    Q    And that was, just for the record, that was Exhibit

18    E, the Pradutt plat?  No, I'm sorry, that's incorrect.  That

19    was Exhibit H, the Toccoa Heights plat; is that correct?

20    MR. GOLDBERG:  We're pulling that up.  You said H?

21    MR. PODESTA:  Exhibit H, the second page.

22    BY MR. PODESTA:

23    Q    The lot 10 that's identified on there.  That was the

24    one you agreed to?

25    A    Yes.

Page 60

1    Q    All right.  And I think that's where I made myself an

2    issue.  I improperly identified that in my exhibits here.

3    A    How could you do that with this?

4    Q    Incompetence.  All right.  Beautiful, now it's all

5    set.  So when you went to purchase 92 Fish Trap, which is lot

6    10, and you signed the purchase and sell agreement on April

7    5th of 2021, you were anticipating purchasing lot 10 as it

8    appears in Exhibit H, page 2?

9    A    Yes.

10    Q    And it's your understanding that Mr. Knight was

11    attempting to sell you lot 10 Exhibit H, page 2, as well?

12    A    Yes.

13    Q    Okay.  And obviously that sets aside the issue that

14    there was a typo that you were listed as John Thatcher managing

15    member which was later corrected to 7 IL Properties?

16    A    Correct.

17    Q    All right.  Can do you have a hard date other than

18    the Friday before closing that you learned of any possible

19    existence of an encroachment?

20    A    No.

21    Q    Had there been rumors of it?

22    A    No.

23    Q    And no phone calls to discuss the possible

24    encroachment?

25    A    No.



Page 61

1    Q    All right.  If we can then --

2         MR. PODESTA:  I'm sorry, Brian.  I'm going to pull up

3    another exhibit here.

4    BY MR. PODESTA:

5    Q    I will mark this one, just make sure I don't screw

6    this up, as Exhibit K.  I'm putting it in the box now.  All

7    right.  Mr. Thatcher, if you could, when it comes up, review

8    Exhibit K.

9         (Exhibit K was marked and identified for the record.)

10   A    Yes.

11   Q    What is Exhibit K?

12   A    The first time I was notified exactly what was going

13   on.

14   Q    So these are e-mails; correct?

15   A    Correct.

16   Q    And you are familiar with these e-mails?

17   A    Yes.

18   Q    And you've seen both all of the e-mails in this chain

19   before?

20   A    Except for Dee Mc-, Terry's to Dee McBee's and then

21   Dee McBee's -- the stuff that I'm not referenced in.  There's

22   some e-mails in here that were sent from Dee to Terry and then

23   Terry to Dee.

24   Q    Okay.  The first e-mail on top of Exhibit K is from

25   Terry Wilson to you CCing Dee McBee; is that correct?

Page 62

1    A    Correct.

2    Q    And that's Monday, May 31st.

3    A    Yes.

4    Q    At 9:02 a.m.?

5    A    Yes.

6    Q    All right.  And you're saying this the first time you

7    learned about the encroachment between 92 Fish Trap and 100

8    Fish Trap?

9    A    Yes.

10   Q    And that's between lots 10 and lots 9?

11   A    Correct.

12   Q    And this is, when you received this were there any

13   attachments to this?  Do you recall if you got a plat at that

14   point?

15   A    No, there was nothing.  There was just this is, and

16   have no idea what was wrong, what was going on.

17   Q    And then scrolling down a little bit to the second

18   page of the exhibit it looks like you responded to 10:10 a.m.

19   and you said nothing surprises me with him.  Am I correct in

20   assuming that him is Gary Knight?

21   A    Correct.

22   Q    And I will still plan on seeing you tomorrow; is that

23   correct?

24   A    Yes.

25   Q    What did you mean by nothing surprises me with Gary

Page 63

1    Knight?

2    A    I was warned doing business with Gary Knight by many

3    people in Blue Ridge of his character and how he did things.

4    Prior to this I only had a great praise.  Everything was done,

5    handled, great.  But I was warned, I was told about videos,

6    news articles on him and stuff.  So I was like, I was waiting

7    for something to happen.

8    Q    Okay.  Who warned you?

9    A    My realtor warned me.

10   Q    Dee McBee?

11   A    Dee McBee just said watch what you're doing, make

12   sure everything is documented.  I can tell you probably 15 or

13   20 people have all, had comments.  You know, one of the biggest

14   ones, go check YouTube, go check these videos out.

15   Q    And you don't recall any of the names of the other 15

16   or 20 people?

17   A    No.  But it seem like every time I mentioned I was

18   doing something with Gary Knight it was, oh, watch yourself.

19   Q    Do you know when Ms. McBee warned you about

20   Mr. Knight?

21   A    When we went and looked at the properties originally.

22   Q    And that --

23   A    Said he does not have a very good reputation in Blue

24   Ridge.

25   Q    And that would have been in early March of 2021?

Page 64

1    A    Probably.

2    Q    And then in with these other 15 to 20 people, do you

3    recall about when they warned you about Mr. Knight?

4    A    They still do.

5    Q    But when did they first start?

6    A    After I said I had some properties under contract.  I

7    was looking for management companies.

8    Q    Okay.  What was the context of looking for management

9    companies regarding Mr. Knight?

10   A    I had originally planned to use a company called

11   Evolve to do my management.  I interviewed cleaners, I

12   interviewed handyman to get an idea of who I wanted to use as a

13   staffing for that.  Several of those people made comments.  I

14   don't remember who they were.  And trying to that process

15   together with those cleaners and handyman have a crew in place.

16   Q    And when you say management, you mean you were

17   looking to have a property management company manage the rental

18   properties that you were purchasing in Blue Ridge, Georgia?

19   A    Correct.

20   Q    And that would include all of your book of business

21   in Blue Ridge, Georgia.

22   A    In Blue Ridge, yes.

23   Q    Who did you eventually hire?

24   A    I am currently with Southern Comfort.

25   Q    Did Southern Comfort have anything to say about



Page 65

1  Mr. Knight?

2     A    One of the principals had a comment about a late

3  night phone call from him about somebody that they hired that

4  he was working for Gary and did not have nice things to say

5  over the phone about it.

6     Q    Did Mr. Wilson have anything to warn you about

7  Mr. Knight?

8     A    I really never talked to Terry.  I mean, I never met

9  Terry officially until June 1st.

10    Q    The closing date?

11    A    The closing date.  That's the first e-mail I have

12  ever received from him directly.  I dealt with his staff on

13  just closing issues and questions and getting stuff like that.

14    Q    Okay.  And Mr. Knight -- well, Terry had mentioned to

15  you that there was a, "minor land swap between the lots." What

16  did you understand that to be?

17    A    Wide open, no idea.

18    Q    So at this point on May 31st on 9 in the morning you

19  hadn't seen a plat with the encroachment or any proposed land

20  swap at all?

21    A    No.

22    Q    Had you ever seen a proposed land swap?

23    A    No.

24    Q    So you didn't see a proposed land swap at closing on

25  June 1st either?

Page 66

1     A    I saw a map and that's all I've ever been officially

2  given.  I was never given a document for it.  I was never given

3  an offer, a consideration or anything.

4     Q    So what were you preparing to do on June 1st having

5  been made aware of the encroachment issue?

6     A    Close it as was.

7     Q    What is as it was?

8     A    The original plat that we had signed on the contract.

9     Q    Regardless of the encroachment?

10    A    Correct.

11    Q    And what price did you offer for that?

12    A    25,000.

13         MR. GOLDBERG:  I'm going to object to form but --

14         MR. PODESTA:  Let me restate that.

15         MR. GOLDBERG:  I mean, give me a second.

16         THE WITNESS:  Oh, I'm sorry.

17  BY MR. PODESTA:

18    Q    Having learned about the encroachment, what price

19  change did you offer for that?

20    A    $25,000.

21    Q    For what?

22    A    To do the land swap?

23    Q    To do the land swap.  But with no land swap you were

24  offering to do it for the same price?

25    A    Correct.

Page 67

1     Q    And how did you come to value the land swap at

2  $25,000?

3     A    Just a number that came to my mind.

4     Q    Okay.  When did you first propose that offer to

5  Mr. Knight?

6     A    We tried to come in and do an inspection on the

7  properties and he drove up and wouldn't let us do the

8  inspections as per the contract.  And said, we're not closing,

9  we're not closing.  We had to do this land swap and about that

10  time I had something on my phone, as close as I had, I couldn't

11  read what it was.  I said, well it will probably cost you

12  $25,000 to do that.  He got mad and left.

13    Q    Okay.  That was on the day of closing?

14    A    Yes.

15    Q    Was that before you went to Terry Wilson's office or

16  after?

17    A    Before.

18    Q    About what time in the morning?

19    A    Noon-ish.

20    Q    Who was with you?

21    A    Dee McBee.

22    Q    Just the two of you?

23    A    Yes.

24    Q    And how many times have you visited the 92 Fish Trap

25  property?

Page 68

1     A    Two counting that day.  Maybe three, but I think just

2  two.

3     Q    And how many times have you visited 183 River Lodge?

4     A    Two, at least three.  The day we inspected, the day I

5  met Gary, and I think we drove up there that of closing.  And

6  that might have been the extent of all the times I have you

7  ever been there.

8     Q    Okay.  And what about 253 River Heights?

9     A    That's the other one I was talking about.

10    Q    So you visited River Heights three times?

11    A    Yeah.  The day I insp-, I had the first viewing, the

12  day we met Gary and Brian for the inspection, we walked around,

13  and then I think that day of June 1st we drove up there.

14    Q    Okay.  And I'm not trying to confuse you.

15    A    No, that's okay.  It's very -- I understand.

16    Q    How many times have you attemp-, had you visited 183

17  River Lodge, the Pradutt property?

18    A    As of that date, none.

19    Q    As of today?

20    A    Oh.

21    Q    And that may be a bad question too because you

22  purchased it.

23    A    Yes.

24    Q    As of the date of closing.

25    A    None.



Page 69

1    Q    You had never visited it?

2    A    No.

3    Q    Really?  You purchased it sight unseen?

4    A    No.  I don't think the closing was until June.

5    Q    Right.  But you didn't visit the property prior to

6    making an offer on the Pradutt property?

7    A    No.

8    Q    Okay.

9    A    I trusted my realtor on that one.  She said, this is

10   a great property.  It's about to come on the market.  You

11   really like this area.  It's got acreage, a beautiful house,

12   I'm mean she sits next to a well.  Dee, I will take your advice

13   and put in under contract and it's contingent on my inspection.

14   I've done that one other time in Blue Ridge.  I made an offer

15   on a house called Spyglass or was it Spyglass or waterfall,

16   something like that.  Had it under contract contingent of my

17   inspection and when I did my inspection, the pictures were

18   wonderful.  The house was loved to death so we walked out of

19   that one.

20   Q    You walked out?

21   A    We walked away from the contract.  We voided, we took

22   the option and notified and voided the contract.

23   Q    Okay.

24   A    Sorry.

25   Q    No, no problem.  I'd like to turn to another exhibit

Page 70

1    which I believe will be exhibit --

2    A    And I would like to finish another clarification.

3    Q    Sure.

4    A    I also placed another house in Florida under contract

5    prior to my inspection.

6    Q    Okay.  And so you're saying you were physically at

7    that property?

8    A    I had under contract before I physically went to that

9    property.  And that market, if a house looked really good, you

10   needed to get it locked up with a contingency of your

11   inspection.

12   Q    Okay.  Yeah, that makes sense.  All right.  I'll turn

13   you now to Exhibit L, which is a series of e-mails that I

14   believe should have populated in the Dropbox.

15        (Exhibit L was marked and identified for the record.)

16        MR. GOLDBERG:  Take a look at those.  You can drive

17   it or I'll drive it.

18        THE WITNESS:  Go ahead.  I don't have the drive

19        easements -- oh, okay.  Easements with railroad crossing

20        agreement, okay.

21        MR. GOLDBERG:  Do you want me to go down?

22        THE WITNESS:  Yeah.

23   BY MR. PODESTA:

24   Q    And it's a 25 page exhibit so if you don't mind just

25   take some time to review.

Page 71

1    A    Yes.

2    Q    That is Exhibit L?

3    A    Uh-uh.

4    Q    Have you seen Exhibit L before?

5    A    Yes.

6    Q    What is Exhibit L?

7    A    It is some of the questions that I needed from Knight

8    concerning access, easements, insurance.  Some of that wasn't

9    what we agreed to --

10   Q    And what exactly?

11   A    Time restraints.  There wasn't a time restraint when

12   we negotiated our agreement.

13   Q    When did you negotiate the agreement?

14   A    The addendum 2 or 3 on the Toccoa Heights property.

15   This was what I have been looking for.

16   Q    This is what you were looking for?

17   A    Yes.

18   Q    But Mr. Knight is not a ref-, is not a party to these

19   e-mails is he?

20   A    I didn't see.  That's what I went back and looked

21   for.

22   Q    Is Mr. White a party to any of these e-mails?

23   A    It didn't look like it to me either.

24   Q    Do you know if Mr. Wilson ever sent to the

25   attachments and these e-mails to Mr. Knight or Mr. White?

Page 72

1    A    No idea.

2    Q    These e-mails include a series of or a couple of

3    easements.  When had you first seen these easements?

4    A    That day.  I can't tell you but that June 1st.

5    Q    Okay.  Do you know who drew up the easements?

6    A    I'm assuming Terry Wilson.

7    Q    Okay.  But you don't know if it's Terry Wilson?

8    You're just assuming or do you know?

9    A    I think he told me he drew them up but I don't know

10   if that meant globally in his office.  Somehow they were at

11   closing.  They were at the closing table that day.

12   Q    Okay.  Looking at these easements, when did you

13   negotiate these?

14        MR. GOLDBERG:  I'm going to object to form.

15   BY MR. PODESTA:

16   Q    Looking at the first easement, reciprocally easement

17   for footpath which begins on page 6 of Exhibit L.  When did you

18   negotiate that easement or the terms of that easement?

19   A    Back on March or April, whatever that had been, we

20   had been talking about.

21   Q    And were these terms correct from your point of view?

22   A    Mostly.

23   Q    Which were not correct?

24   A    The time one is what really clicked in my mind that

25   we didn't have a time frame.  I didn't want any restrictions.



Page 73

1 The least restrictions you have on a property, the better are
2 few are to keeping people from yelling at you.
3    Q   Okay.  What time frame were you looking for?
4    A   None.  There was none issued, none agreed to in that
5 amendment.
6    Q   Okay.  And then turning to the second easement which
7 is just title easement.  It begins on page 8.  What is that
8 exactly?
9    A   That is one I do not believe I've ever seen before,
10 but that is between Mr. Knight and Thor James.
11   Q   And what impact does it have on your attempted
12 closing of these properties?
13       MR. GOLDBERG:  I'm going to object to form and also
14    calling for legal conclusion, but you can answer it to the
15    extent that you understand.
16 BY MR. PODESTA:
17   Q   Maybe I should restate the question.  Why was the
18 easement beginning on page 8 and concluding on page 10 of
19 Exhibit L included as an attachment in this e-mail?
20       MR. GOLDBERG:  I'm going to have the same objections,
21    but answer to the extent you know.
22       THE WITNESS:  I'm going to make the assumption that
23    these were put on a piece of property that we had under
24    contract that was put, put in place and doesn't apply to
25    the -- let me back up.  So these, this contract, this

Page 74

1    easement was given on a property he, Mr. Knight, owned but
2    was under contract with me.  And this easement was not in
3    place on the notification of the contract.
4 BY MR. PODESTA:
5    Q   The easement for these lots, lots 14, 15, and 16 of
6 Toccoa Heights, which one were you under contract to purchase?
7    A   I think 16.  That's what I'm saying, I get confused
8 on -- whichever one.  So Mr. Knight gave easements on a
9 property he had contracted with me and it was not in the
10 agreement that we had signed originally.
11   Q   You're saying it wasn't in the seller's disclosures?
12   A   Correct.  Thank you.
13   Q   Okay.  And this agreement was between Mr. Knight and
14 Mr. James; correct?  The beginning of the --
15   A   Yes.
16   Q   Okay.  And the first time you saw this was on
17 May 31st of 2021?
18   A   That was June 1st.
19   Q   Well, the --
20   A   It was the e-mail date.
21   Q   The e-mail was May 31st?
22   A   Yes.
23   Q   So Mr. Wilson had never sent these to you beforehand?
24   A   No.
25   Q   And he had never raised the issue of Mr. Knight

Page 75

1 getting out easements on properties that you were about to
2 purchase?
3    A   Correct.
4    Q   And then looking below that there is, beginning on
5 page 11, a private road grade crossing agreement.  Do you know
6 why Mr. Wilson was e-mailing you that easement on May 31st?
7        MR. GOLDBERG:  Same objection as before to form and
8     calling for legal conclusion, but answer to the extent you
9     know.
10       THE WITNESS:  This one had some of the terms for the
11    insurance agreements.
12 BY MR. PODESTA:
13   Q   Okay.
14   A   And I am also going to make the assumption to know
15 what the rules were to use that crossing.
16   Q   Okay.  So you're saying that you believe Mr. Wilson
17 was sending you this agreement so that you understood how you
18 could handle the railroad crossings?
19   A   (Nonverbal)
20   Q   And when you first see this easement, the one that
21 began on page 11 and concludes on page --
22       MR. KNIGHT:  Frank, he nodded his head.  He didn't
23    answer the question.
24       MR. PODESTA:  I haven't finished asking the question.
25

Page 76

1 BY MR. PODESTA:
2    Q   And ends on page 25.
3    A   Start the question at the beginning.
4    Q   Sure.  When did you first see the easement that
5 begins in Exhibit L on page 11 ends of page 25?
6    A   May 31st.
7    Q   So Mr. Wilson did not send this to you prior to
8 May 31st?
9    A   No.
10   Q   And in looking back at these e-mails, when did you
11 actually open and review these e-mails, do you recall?
12       MR. GOLDBERG:  I'm going to object to the form of the
13    question.  Answer the question.
14       THE WITNESS:  I do believe Monday sometime, the 31st.
15 BY MR. PODESTA:
16   Q   Okay.  So looking at Exhibit L you believed you read
17 Exhibit L on Monday, May 31st?
18   A   (Nonverbal)
19   Q   Okay.  Did you inspect the agreements attached to
20 Exhibit L on Monday, May 31st?
21   A   Yes.  The attachments you're talking about.
22   Q   Yes.
23   A   Yes.
24   Q   Did you have any discussions with Ms. McBee about the
25 easements attached to this e-mail series?



Page 77

1  A  No.
2  Q  Did you have any discussions with anyone who is not
3  your attorney?
4  A  No.
5  Q  Do you have any discussions with Mr. Wilson on
6  May 31st about these easements?
7  A  No.
8  MR. GOLDBERG:  I'm going to object to --
9  THE WITNESS:  I'm sorry.
10  MR. GOLDBERG:  Except if there's any attorney-client
11  privileges you're going to discuss but he said no.  So it
12  doesn't sound like there was an issue there any way.
13  MR. PODESTA:  Fair enough.
14  MR. GOLDBERG:  Give me --
15  THE WITNESS:  That's why I brought these.
16  BY MR. PODESTA:
17  Q  This one will be a --
18  A  I would like to reframe my answer to that question.
19  Q  Sure.
20  A  I don't think I looked at those until Tuesday
21  morning.
22  Q  Tuesday, June 1st?
23  A  June 1st.  I was on the road coming here then.
24  Q  Okay.  Okay.
25  A  So.

Page 78

1  Q  Fair enough.
2  MR. PODESTA:  Brian, I've labeled another exhibit as
3  Exhibit M as in Mary.
4  (Exhibit M was marked and identified for the record.)
5  BY MR. PODESTA:
6  Q  Mr. Thatcher, if you could take a look at Exhibit M.
7  It's fairly short.
8  MR. GOLDBERG:  Good?
9  THE WITNESS:  Yeah.
10  BY MR. PODESTA:
11  Q  Have you seen Exhibit M before?
12  A  Not to my knowledge, no.
13  Q  Do you know what Exhibit M is?
14  A  Yes.  It's settlement statement for River Heights.  I
15  might have been given it in the closing packet but I don't
16  think, we didn't close so I never got through it.
17  Q  Okay.  So you don't, you can't answer any questions
18  about Exhibit M other than what it appears to be?
19  A  Yes.
20  Q  Okay.  Then I'd like to turn to, I'm going to label
21  this as Exhibit N as in Nancy.
22  (Exhibit N was marked and identified for the record.)
23  MR. PODESTA:  Brian, I think that will populate in
24  there now.
25  MR. GOLDBERG:  I got it.

Page 79

1  BY MR. PODESTA:
2  Q  Mr. Thatcher, if you don't mind reviewing Exhibit N
3  as in Nancy.  All right.  Mr. Thatcher, what is Exhibit N?
4  A  Looks like it is Community Association Disclosure
5  form.
6  Q  For what?
7  A  183 River Lodge.
8  Q  And that was the Joci Pradutt property?
9  A  Yes.
10  Q  What is a Community Association Disclosure form?
11  A  Just lets me know if there's an HOA enforced to pay
12  dues to.
13  Q  Okay.  Did Ms. Pradutt give you any other disclosures
14  relating to this property?
15  MR. GOLDBERG:  I'm going to object to form of the
16  question, but answer the question.
17  THE WITNESS:  I would like to have a time out with my
18  attorney.
19  MR. PODESTA:  That's fine.  You answer the question
20  before we, but I did object.
21  THE WITNESS:  Okay.  Answer -- ask your question
22  again, please.
23  BY MR. PODESTA:
24  Q  Did Ms. Pradutt give you any other disclosure forms
25  prior to closing the 183 River Lodge property?

Page 80

1  A  Maybe.  I don't remember but probably.
2  Q  Did you purchase title insurance on the property?
3  A  I don't --
4  MR. GOLDBERG:  I'm going to object to form.  You
5  wanted to take a break and I wanted him to finish the
6  question before we move on.  But are you agree with that?
7  MR. PODESTA:  Yeah, that's fine.
8  (BREAK TAKEN AT 12:36 P.M.)
9  BY MR. PODESTA:
10  Q  All right.  So with regard to the 253 River Heights
11  property, because have gone a little bit back and forth as what
12  the terms of the easement were.  What were the agreed terms of
13  easement on that property?
14  MR. GOLDBERG:  Do you want to refer to the contract?
15  THE WITNESS:  Yes, let's go to the contract.
16  MR. GOLDBERG:  What contract was that, 253?
17  MR. PODESTA:  253 River Heights, that's Exhibit A as
18  an apple.  If it helps it's page 18.
19  MR. GOLDBERG:  Thank you.
20  THE WITNESS:  Yeah, okay.  Now ask your question
21  again.
22  BY MR. PODESTA:
23  Q  Sure.  What were the terms of the easement to the 253
24  River Heights property?
25  MR. GOLDBERG:  I'm going to object to the form.  You



Page 81

1  can answer the question.

2      THE WITNESS:  All parties acknowledge and agree

3  purchase contingent on easements being recorded at closing

4  granting access to lots 14, 15, and 16 to all three access

5  points to the river as discussed with buyer and seller on

6  3/30/21.  Current gated path to service property owners of

7  lots 14, 15, and 16 use only for ATV use and/or service

8  footpath for owners, tenants, and guests.  The current

9  stairs to service for path only for lot 14, 15, 16 owners,

10  tenants, guests with a shared maintenance agreement to be

11  in place for lot 14, 15, and 16.  The third path to serve

12  as a footpath only to benefit owners, tenants, and guests

13  lots 14, 15, and 16.  All parties agree buyer to maintain

14  $5 million liability insurance for railroad crossing in

15  order to use easement.  All community well agreements and

16  easements should be written by licensed Georgia attorney

17  to, at or prior to closing.

18  BY MR. PODESTA:

19      Q   Okay.  In the proposed easements drafted by Mr.

20  Wilson, did it state explicitly that all parties agree, buyer,

21  being 7 IL Properties would maintain a $5 million liability

22  insurance?

23      MR. GOLDBERG:  Object to the form and calling for a

24  legal conclusion but --

25      MR. PODESTA:  I'm simply asking what it says in the

Page 82

1  agreement.

2      MR. GOLDBERG:  Same objection, but go ahead and

3  answer.

4      THE WITNESS:  Yes.

5  BY MR. PODESTA:

6      Q   It says in the proposed agreements that you will

7  carry $5 million in insurance?

8      MR. GOLDBERG:  I'm sorry.  Are you asking about to

9  the easement?  Which document are you referring?

10      MR. PODESTA:  I'm sorry.  The proposed easements

11  which were the attachments to Exhibit L.

12      MR. GOLDBERG:  Okay.  So you're him asking about

13  Exhibit L.  Okay.  Here's Exhibit L.  Let me see if I can

14  put that.

15      THE WITNESS:  I'm going to ask him if I could have it

16  printed.  I have not refreshed on that agreement in years.

17      MR. PODESTA:  Sure.  Brian, would you be able to

18  print that?

19      MR. GOLDBERG:  You want to print those?

20      THE WITNESS:  Please.  And then it's going to take me

21  a while to read it.  Do we want to do a lunch break while

22  we're doing that?  Is that acceptable or?

23      MR. PODESTA:  Sure.  No problem.

24      THE WITNESS:  It's going to take me 20 or 30 minutes.

25      MR. PODESTA:  That's fair enough.

Page 83

1      (BREAK TAKEN AT 12:42 P.M.)

2  BY MR. PODESTA:

3      Q   We were discussing easements before the break.  There

4  was discussion you might recall about Exhibit A and the

5  amendment to agreement amendment No. 2 that was done on March

6  31st, and that was for the 253 River Heights easement.  And

7  we were talking about the specifics of the easement and how

8  they applied to the easement drafts that Mr. Wilson had drafted

9  for the closing.  If you turn to Exhibit F and turn to page 22,

10  which is amendment to agreement amendment No. 1 for Exhibit F,

11  we went over that briefly.  If you could turn to that.

12      MR. GOLDBERG:  What page?

13      MR. PODESTA:  It's page 22 on Exhibit F.

14      MR. GOLDBERG:  Yes.  We're there.

15      THE WITNESS:  Okay.

16  BY MR. PODESTA:

17      Q   Okay.  So what were the specific terms of the

18  easement that were agreed to for 92 Fish Trap?

19      A   That there was a trail between the two properties, if

20  I remember correctly and I don't remember greatly on it, that

21  was used by both 92 and 100 Fish Trap to access the river.  And

22  I can't remember if it wandered on both property lines or if

23  Gary just want the access for the other people, which was fine,

24  it was historically done that way.  So that was the footpath

25  for that property that needed to be drawn up.

Page 84

1      Q   Okay.  And that was worth, what do you think that was

2  worth?  What was it worth to you?

3      A   It was part of the agreement Gary made.  So I don't

4  have a value.  It was brought up in this time frame and.

5      Q   Is it anywhere in the Fish Trap deal agreement in any

6  amendment?

7      A   Isn't --

8      MR. GOLDBERG:  I'm going to object to the form of the

9  question.

10  BY MR. PODESTA:

11      Q   Can you find the deal for the specifics of the

12  footpath anywhere within the April 2nd, 2021 92 Fish Trap

13  deal or it's amendments?

14      A   Is that what we're looking at.  Go to the top, that

15  one for me.  Yes, amendment to agreement No. 1.

16      Q   Is that the only place?

17      A   I don't know.

18      Q   Okay.  Can you point to anywhere else that it's

19  discussed within the agreement?

20      A   I don't know.

21      Q   Okay.  The actual language in agreement amendment 1,

22  the April 5th, 2021, amendment that is page 22 to Exhibit F

23  says, all parties acknowledge and agree river easements and

24  community well water maintenance agreements to be drafted by

25  Georgia licensed attorney prior to or at closing.  But it



Page 85

1  doesn't, is there any specifications as to the hours or the
2  river easement, the manner of use of the river easement or the
3  vehicles that could be use, who has the right, anything beyond
4  that all?
5      MR. GOLDBERG:  I'm going to object to form but answer
6  the question.
7      THE WITNESS:  No.
8  BY MR. PODESTA:
9      Q   Okay.  So there's nothing beyond that that you know
10  of for 92 Fish Trap at all?
11     A   No.
12     Q   Okay.  And 92 Fish Trap, as we discussed earlier, was
13  land lot 10 of Toccoa Heights; correct?
14     A   Correct.
15     Q   If you turn to Exhibit L and, you know, I'm not
16  trying to bounce around but if you wouldn't mind.
17     MR. GOLDBERG:  Okay.
18  BY MR. PODESTA:
19     Q   And go to page 6, which is the reciprocal easement
20  for footpath, do you see that?
21     A   Yes.
22     Q   That was drafted, apparently drafted by Mr. Wilson?
23     A   Yes.
24     Q   And if you turn to the second whereas on page 6.  It
25  says whereas 7 IL is the owner of the following described

Page 86

1  property.  And then it goes on to define that property and then
2  it says being lot 10 of Toccoa Heights, do you see that?
3      A   Yes.
4      Q   Okay.  So this is the 92 Fish Trap proposed footpath
5  easement that we're discussing?
6      A   Correct.
7      MR. GOLDBERG:  I'm going to object to form but go
8  ahead.
9      THE WITNESS:  I'm sorry.
10     MR. GOLDBERG:  You answered the question.
11     THE WITNESS:  Yes.
12  BY MR. PODESTA:
13     Q   And just to clean up the record so page 6 and page 7
14  of Exhibit L that says reciprocal easement for footpath on the
15  top of the page is the reciprocal easement for footpath that
16  Mr. Wilson was proposing for 92 Fish Trap's deal?
17     A   Yes.
18     Q   Okay.  With regard to the language in here there is
19  clearly more specificity than in Exhibit F page 22; correct?
20     A   Correct.
21     Q   How was this additional language arrived at?  Was
22  there a written agreement?
23     A   Just the amendment No. 1 to that contract.
24     Q   That's it?
25     A   (Nonverbal)

Page 87

1      Q   All right.  And then I'm going to changed to another
2  exhibit just to make sure that we're going to Exhibit O.
3      (Exhibit O was marked and identified for the record.)
4      MR. PODESTA:  Brian, I'm going to mark these in the
5  Dropbox now.  It will be Exhibit O, text one.
6      MR. GOLDBERG:  Okay.  Got it.
7      MR. PODESTA:  Okay.  Awesome.
8  BY MR. PODESTA:
9      Q   Mr. Thatcher, if you could review Exhibit O.  It is
10  not the shortest exhibit in the world so if you might want to
11  take a moment to review it.
12     A   Okay.
13     Q   Yeah.  It's a big read.  So, first of all, can you
14  tell me what is Exhibit O?
15     A   Text messages from my old Google phone.
16     Q   Between yourself and Dee McBee?
17     A   Yes.
18     Q   And am I correct that these text messages were
19  produced by you?
20     A   Correct.
21     Q   So just going through them.  First, if you look at
22  line 4725 it discusses, and I understand that you had said
23  previously that many of these properties are referred to by the
24  cabin's name rather than the address.
25     A   Correct.

Page 88

1      Q   This one at 4725 referrers to Old Gravel Road?
2      A   Correct.
3      Q   What is that property?
4      MR. GOLDBERG:  I'm sorry, which line is this.
5      MR. PODESTA:  4725.
6      MR. GOLDBERG:  What page would that be?
7      MR. PODESTA:  This would be on page 1.
8      THE WITNESS:  Okay.
9  BY MR. PODESTA:
10     Q   And that is discussing Old Gravel Road.  What is Old
11  Gravel Road?
12     A   Old Gravel Road, the address -- I can tell you that
13  one -- that's 55, 555 Old Gravel Road is the actual address.
14  We call it hibernation station.  It is a properties that I did
15  purchase.
16     Q   Okay.  And that is not a Gary Knight purchase?
17     A   No.
18     Q   Who did you purchase it from?
19     A   I can't remember.  A couple from Minnesota I thought
20  but I could be wrong.
21     Q   And it's in Blue Ridge, Georgia?
22     A   Yes.
23     Q   And do you recall what you purchased it for?
24     A   860 I think.  I won't swear by it but something.
25     Q   And that was a 7 IL purchase --



Page 89

1    A    Correct.

2    Q    -- not a John Thatcher?

3    A    Correct.

4    Q    Okay.  And then scrolling down to line, same page,

5  line 4685.  It references to 190 Toccoa Heights.

6    A    Okay.

7    Q    Okay.  What is 190 Toccoa Heights?

8    A    I do believe that is Gary's property that is above

9  the 253, the one we referenced as Outlaw Ridge.  I think that's

10  it but I could be wrong.

11   Q    But it's also in Blue Ridge.

12   A    Yes.

13   Q    And did you purchase that property?

14   A    No.  I don't think we made an offer.

15   Q    All right.  And then scrolling down to the next page,

16  4660, just sent Mountain High.  Is Mountain High a property?

17       MR. GOLDBERG:  I'm sorry.  Which one?

18       MR. PODESTA:  I'm sorry.  4660 it's at the top of

19   page 2.

20       MR. GOLDBERG:  Okay.  Right there.

21       THE WITNESS:  I'm going to make the assumption it's a

22   cabin.  I don't remember any details about that.

23  BY MR. PODESTA:

24   Q    So, you didn't purchase Mountain High?

25   A    No.

Page 90

1    Q    Okay.

2    A    No idea, no.

3    Q    Okay.  Presumably it's in Blue Ridge but that's all

4  you recall?

5    A    Yes.

6    Q    And Dee McBee was acting as an agent for any deal

7  that's referenced in her text messages; am I correct?

8    A    Yes.

9    Q    There would be no reason to text Dee McBee about

10  something's that's outside of purview as your agent.  That's a

11  terrible question.  Maybe the worse one so far.  You didn't

12  have any reason to text Dee McBee about a property purchase

13  deal that she wasn't involved in?

14       MR. GOLDBERG:  I'm going to object to the form, but

15   go ahead and answer.

16       THE WITNESS:  I kept her informed on other properties

17   as we were buying around the country.  She wasn't involved

18   with them, but she was curious.

19  BY MR. PODESTA:

20   Q    Okay.  Understood.  And if you turn to 4655.  It

21  refers to a proof refunds letter.

22   A    I do believe that is a letter sent to, sent from my

23  1031 agent.

24   Q    To?

25   A    Oh, sorry, wrong.  That's later on.  What date was

Page 91

1  that?  What was the date, 3/13.  A letter stating where the

2  funds were coming from.  I think that's the, I can't swear

3  exactly which letter it is but I sent numerous letters to, but

4  it's more likely saying do I have the money or where the money

5  is coming from.

6    Q    Got it.  Because these were cash deals?

7    A    Correct.

8    Q    They wanted to confirm they would close.  And so 92

9  Fish Trap was a cash deal?

10   A    Correct.

11   Q    And 253 River Heights was also a cash deal?

12   A    Correct.

13   Q    And 183 River Lodge was a cash deal?

14   A    Correct.

15   Q    So in those deals you would have had to provide a

16  proof refunds letter that would demonstrate where the funds,

17  where the purchase of the cash deal was coming from?

18   A    The only person that asked for that was Gary.

19   Q    Okay.

20   A    I did not provide that to anybody else.  Gary asked

21  the most specific questions of anybody I was dealing with.

22   Q    Why do you think that was?

23   A    He's intelligent.

24   Q    Okay.  With regard to these proof of funds letters,

25  I'll represent I've been through the file, I haven't seen

Page 92

1  anything that would look to me like a proof refunds letter.

2  What did you send out as your proof of funds letters?

3    A    I'm going to make this a long answer.  So we sold

4  part of the ran-, my family's ranch to a company called NextEra

5  Energy.  They are, were owned by Florida Light and Power and

6  now they're their own entity.  I had them write me up a letter

7  stating their intentions and sent that.

8    Q    Understood.  So you did not send any documentation

9  with a bank statement or net worth statement that had some sort

10  of securities or holdings or anything to that extent?

11   A    Not to my knowledge, no.

12   Q    What was the net worth or 7 IL at the time in March

13  to June of 2021?

14   A    I'm going to rephrase your question for you to make

15  it more simple.  From March until approximately May 15th,

16  250,000.  As of May 15th, approximately 16 million.

17   Q    Okay.  So the net worth didn't change, it was simply

18  the liquid assets that changed in that time; correct?

19   A    Correct.

20   Q    So what was the net worth as of say April of 2021?

21   A    250,000.

22   Q    So the property, did the property come in to 7 ILL

23  around March 15th?  What changed the value of the property?

24       MR. GOLDBERG:  I'm going to object to the form of the

25   question.



Page 93

BY MR. PODESTA:

Q   It was a duplex question. Why did the value of 7 IL,
why did the net worth of 7 IL increase meteorically on March
15th of 2021, on May 15th of 2021?

A   So there was six sections of land was the technical
net worth of 7 ILL Properties. At that point in time it was
only valued as grazing land. Even though we had an option on
there and the closing date of a sale, the value did not
increase until the option was executed and the money was
transferred.

Q   Okay. And I'm not trying to ask you --

A   No, no, it's a legitimate question. I want to make
sure I answer it. It's all accounting shenanigans. I mean,
same six sections, we traded six sections for 16 million.

Q   And not to belabor the question, but wasn't the
option to transfer those sections for $16 million effectively
worth $16 million?

MR. GOLDBERG: I'm going to object to the form of the
question. You can answer.

THE WITNESS: I can answer it. Not by accounting
standards.

BY MR. PODESTA:

Q   So theoretically you could have declined the option
in which case 7 IL would have remained worth it's $250,000?

A   No, we could not have declined the option because it

Page 94

was a legal contract.

Q   Okay.

A   The only reason, as I understand accounting laws,
which is worth that piece of paper, an option has no value on
the property until it is executed.

Q   Okay. And so the option was irrevocable; right? It
was an option that you carried and no one could stop you from
exercising?

MR. GOLDBERG: I'm going to object to the form of the
question but answer it.

THE WITNESS: I'm going to restate your question, if
that's okay. I understand what you're -- the options we
have have a time limit life expectancy, three to five
years. So In three to five years it goes away. Now, most
of them renew. So yes, if they don't execute the option,
that piece of paper just disappears. I can't stop it
because it's a legal real estate contract but.

BY MR. PODESTA:

Q   Okay. What would the net worth of 7 IL be today if 7
IL executed every option it was in possession of?

A   7 IL has no other options in its portfolio.

Q   Okay. That makes sense. All right. Then going back
to the questions, it says on 4650 in reference to text 4651,
"It doesn't make sense for me at the price." And I believe
what it's it was talking about is Mountain High countering

Page 95

verbally at $440,000; is that correct?

MR. GOLDBERG: Hang on a second. Let me -- 4651, is
that the text you're talking about?

MR. PODESTA: And 50, yes.

MR. GOLDBERG: Okay. These two. Just read that.

THE WITNESS: Yes. And I now remember what property
that was, yes.

BY MR. PODESTA:

Q   Okay. You're finished? So looking at 4650 and 4651,
is it correct that the language, it doesn't make sense for me
at that price in 4650 refers to Mountain High countered
verbally at 440, presumably, thousand dollars in 4651?

A   Correct.

MR. GOLDBERG: I'm going to object to the form of the
question. Answer it.

THE WITNESS: Yes.

BY MR. PODESTA:

Q   Okay. And then 4650 continues on to say, that means
we still have money to spend. I can shop in the one
million-dollar range. What does that mean?

A   I still hadn't spent any money. I think I realized
that I needed to move up my price target from, I can't remember
what it was, I was trying to stay up moving up to the
million-dollar range.

Q   Why?

Page 96

A   Looking at the properties that were, we wanted at
that price range we were looking at, which I think was six to
seven hundred thousand, I can't swear exactly which range we
started looking at. There was nothing that I thought would
work. Moved up to a million. We did some analysis on the
market on what rent, what doesn't, what makes sense. Those
houses in the upper end make more sense.

Q   Better business decisions?

A   Yes.

Q   And then turning to page 3 we see the line 4475.

MR. GOLDBERG: 4475?

MR. PODESTA: Correct, on page 3. It's right in the
middle.

MR. GOLDBERG: Okay. Right there.

BY MR. PODESTA:

Q   Okay. In it it looks like you wrote to Dee McBee, I
also talked with Gary and it is the realtor that is nervous on
my letter. What does that mean? What letter? I assume Brian
White?

A   I have no idea.

Q   Okay. So you have no idea if that's related maybe to
a 1031 exchange letter?

A   I would be totally guessing what letter, what
document. Yeah, I apologize, I don't remember.

Q   Okay. And then turning to 4456 on the same page. It



Page 97

1　says, it's a message from Dee McBee. Old Gravel Road has not
2　been a legitimate rental. Remember they said the son was
3　letting people rent and they tore stuff up. What did that
4　mean?
5　　　A　The house was not in good shape. And I'll use the
6　reference, Gary's houses were turn-key ready, beautifully done.
7　This house had very little to make it a turn-key. So we had to
8　buy new bedding, new wall art, new dinning room tables.
9　Basically we had to refurnish.
10　　　Q　Okay. And then turning to page 4, the top text which
11　is 4422.
12　　　A　Yes.
13　　　Q　It mentions Spyglass came back at 1.1. Am I correct
14　that Spyglass is the name of another cabin rental?
15　　　A　Correct. It was a house that on pictures looked
16　wonderful and then you went to it, it was rough. It just, it
17　was not a house that we thought would have worked in our
18　business plan. So I originally had to put it under contract
19　before I went to see it. And I had to terminate the contract
20　because our clause of the visual inspection.
21　　　Q　Okay. And so it was a property you were considering
22　buying and the offer price was 1.1 million?
23　　　A　I do believe.
24　　　Q　And then if you scroll down towards the bottom of the
25　page between text 4159 and the bottom text 4155.

Page 98

1　　　A　Okay.
2　　　Q　And I'm referencing 4159 where it says, please
3　assigned terms for Spyglass. Is it correct that 4155 where it
4　says, another one for the easement, is relating to Spyglass?
5　　　MR. GOLDBERG: I'm going to object to the form but
6　answer it.
7　　　THE WITNESS: I don't know.
8　BY MR. PODESTA:
9　　　Q　So you don't really know which properties easements
10　she's referring to in 41- --
11　　　A　No and I'm racking my head to think if there was an
12　easement on Spyglass. I just can remember the house and the
13　view and the driveway up and that's about all I can remember
14　and the waterfalls. But that's all I can really remember on
15　the house.
16　　　Q　So was it the case that most of the properties in
17　Toccoa Heights or even Blue Ridge generally had easement
18　issues?
19　　　MR. GOLDBERG: Object to the from. You can answer.
20　　　THE WITNESS: I wouldn't say issues but there were,
21　most of them had some type of easement associated with
22　them, either through an access or a well share agreement.
23　I'm thinking of the other ones we looked at. Usually if
24　the ones I didn't go if there was a lot of attachments to
25　the MLS form with easements and accesses.

Page 99

1　BY MR. PODESTA:
2　　　Q　Okay.
3　　　A　They just get a little ugly.
4　　　Q　So maybe it's better to ask you this way. In Blue
5　Ridge, did you visit any properties that were not on well
6　water?
7　　　A　I don't think so.
8　　　Q　So is it fair to say that all the properties you
9　considered purchasing in 2021 in Blue Ridge had a well water
10　easement issue either providing it to another property or
11　receiving well water from another property?
12　　　A　No.
13　　　MR. GOLDBERG: Object to form.
14　　　THE WITNESS: No.
15　BY MR. PODESTA:
16　　　Q　Okay. Which properties that you looked in Blue Ridge
17　in 2021 did not have a well water issue?
18　　　A　I couldn't even guess on what I looked at.
19　　　Q　How many properties in Blue Ridge did you look at for
20　the potential of purchasing in '21?
21　　　A　On paper though MLS, 30 to 40, maybe more.
22　　　Q　How many did you personally visit?
23　　　A　15 to 20.
24　　　Q　Okay. How many did you make an offer on?
25　　　A　Maybe eight.

Page 100

1　　　Q　And would it be fair to say that you purchased all
2　eight with the exception of the Knight properties?
3　　　A　No.
4　　　Q　How many did you ultimately purchase?
5　　　A　Four.
6　　　Q　Of the eight that you made an offer on, how many had
7　an easement that would have been a condition of closing?
8　　　MR. GOLDBERG: I'm going to object to form, but
9　answer the question.
10　　　THE WITNESS: I can't answer that one. I'm sorry.
11　It's two years. I'm racking my brain and I'm going, yeah,
12　I can't answer that. I have no idea.
13　BY MR. PODESTA:
14　　　Q　Okay. Now, you did purchase 183 River Lodge?
15　　　A　Yes.
16　　　Q　What were the other three cabin names that you
17　purchased?
18　　　A　Hibernation station, Deer Watch, and Family
19　Farmhouse.
20　　　Q　Okay. When you closed Hibernation Station, did you
21　have to execute easement agreements?
22　　　A　Just the well share.
23　　　Q　When you closed Deer Watch -- was it Deer Watch --
24　did you have to execute an easement agreement?
25　　　A　None.



Page 101

1    Q   And when you closed Family --
2    A   Farmhouse.
3    Q   -- Farmhouse, did you have to execute an easement
4  agreement?
5    A   No.
6    Q   Okay.  So those, Family Farmhouse and Deer --
7    A   Watch.
8    Q   -- Watch had zero easements whatsoever?
9    A   Correct.  To the best of my knowledge, yeah.
10   Q   Okay.  And then going down further still on page 5,
11  I'm sorry, it's 4129.
12   A   Okay.
13   Q   English Manor, the gargoyle house, was this just
14  another property that you looked at but did not go under
15  contract with?
16   A   We purchased that one.  That became Family Farmhouse.
17  Long transformation.  It was -- I'll give you the history of
18  that, I'm not sure what your next question will be.  It was a
19  bed-and-breakfast owned by a British couple from Cayman Islands
20  who hated each other.  Surprised one person wasn't buried,
21  literally.  There was gargoyles all over the house.  Gargoyles
22  climbing the chimney, gargoyles going up the staircase.  We
23  bought it at a very good price and we transformed it into a
24  farmhouse style off of another property we purchased in
25  Oklahoma following that theme.  And we removed all the

Page 102

1  gargoyles.
2    Q   Okay.  How much did you purchase that for?
3    A   550 I think.
4    Q   How much did you have to put into it to get it up to
5  rental condition?
6    A   Approximately 30 or 40.
7    Q   That's not too bad?
8    A   No.
9    Q   All right.  Then turning to page 7, a couple pages
10  down.  If you go to 4051 through 4049, Dee McBee says, I sent
11  the easement stuff.  This is April 2nd of 2021.
12   A   Okay.
13   Q   Am I correct that in assuming that she's talking
14  about the easement stuff for the 253 River Heights property?
15   A   Or the Fish Trap property.  What's the date on that?
16   Q   4/2.
17   A   I would make the assumption it was one of those two
18  properties.
19   Q   Okay.  And you responded what should I do working on
20  the easement?
21   A   I have no idea.
22   Q   So what would you be doing if you were working on an
23  easement?
24       MR. GOLDBERG:  I'm going to object to the form of the
25       question.  Answer.

Page 103

1       THE WITNESS:  Probably reading it.
2  BY MR. PODESTA:
3    Q   Okay.  So you didn't draft any easements personally?
4    A   I do not draft easements.
5    Q   Did you make edits to any easements personally?
6    A   No.
7    Q   Os it would be really limited to I am reading your
8  easements?
9    A   I have a firm rule, I do not write easements no
10  matter whether, what it is.  Other parties write easements for
11  me.
12   Q   Understood.
13   A   Firm and fast.
14   Q   Maybe wise the same rule.  Then if you go down to the
15  same page, page 7, 3963?
16       MR. GOLDBERG:  I'm sorry.  Say that again?
17       MR. PODESTA:  3963.
18       MR. GOLDBERG:  Okay.
19       THE WITNESS:  What date is that?
20       MR. PODESTA:  April 4th.
21       THE WITNESS:  Okay.
22  BY MR. PODESTA:
23   Q   This text message is talking about River Heights;
24  correct?  In the middle it says, can you have a termination
25  agreement ready on River Heights in case nothing happens and

Page 104

1  you cannot get a hold of me?
2    A   I am going to make the assumption that that was on
3  River Heights and if we didn't get the information we needed
4  from Gary.
5    Q   Okay.  And then two text messages down you say, I
6  don't want that property without proper easements.  That's
7  River Heights; correct?
8    A   Yes.
9    Q   You did not want that property without the correct
10  easements?
11   A   (Nonverbal)
12   Q   Okay.  And then the next page, on page 8, Dee McBee
13  responds on 3960 that she understands and that on 3959 that
14  that he has still not responded to Fish Trap.  Was she talking
15  about Mr. Knight was not responding regarding the easements for
16  Fish Trap?
17   A   I have no idea.
18   Q   Okay.  And then it goes into a little discussion
19  about Cobbler.  And then after that on 3945 it says, what about
20  the Forest Drive.  Is that another property?
21   A   That's the Farmhouse.  That was the address, 300
22  Forest Drive.
23   Q   Okay.  And that's one of the properties that did not
24  have any sort of easement issues?
25   A   No.  You need a roster to understanding all the



Page 105

1 easement, yeah, the jargon, yes.

2    Q   All right. So you ultimately ended up purchasing

3 that property?

4    A   Farmhouse.

5    Q   Yes.

6    A   Yes.

7    Q   Okay. All right. And we're going to go down quite a

8 bit. Going down to page 11 of the exhibit. It's 2945 is the

9 text message. It's the last one on page 11.

10    A   Okay.

11    Q   On that one, which was April 28th of 2021, Dee

12 McBee says, please help this sweet lady at your attorney's

13 office. Her name is Aleia -- I believe it's Aleia. Who -- I'm

14 not asking what she said but who is Aleia and what attorney's

15 office was she working at?

16    A   I have no idea on the name but I'm assuming it is

17 Terry Wilson's office that they're asking for an operating

18 agreement. And I'm guessing on most of that but that's my,

19 where I would put the two plus two together.

20    Q   Okay. So Terry Wilson at that point was your

21 attorney?

22    A   Not that I knew of.

23    Q   Okay.

24    A   I did not understand Georgia law.

25    Q   Okay.

Page 106

1    A   And I don't know why Dee would be talking to any

2 attorney of mine in Colorado.

3    Q   Well, is it possible that she was talking to a 1031

4 attorney?

5    A   He's not an attorney, my 1031 agent.

6    Q   Okay. So you didn't have an attorney involved for

7 the 1031?

8    A   In Colorado you don't have to.

9    Q   And that may be the case anywhere. I was just

10 wondering.

11    A   Yeah, I have no idea.

12    Q   So no other attorneys other than Mr. Wilson were

13 involved in the Fish Trap or River Heights deals that you're

14 aware of?

15    A   Correct.

16    Q   And you did not higher separate counsel for those

17 deals until after the closing date?

18    A   Correct.

19    Q   All right. And I may have asked you this but when

20 did you first physically meet Mr. Wilson? Was it at the

21 closing?

22    A   Yeah.

23    Q   Did you meet him over the phone previously?

24    A   Not to my knowledge. I mean, I don't think I ever, I

25 think that e-mail was the first time I ever had a contacts

Page 107

1 [sic] with him.

2    Q   Okay. Then turning down to page 17. If you look at

3 the second text, which is 1656, you said to Ms. McBee on 5/26,

4 I would be interested in taking Knights Landing if I could get

5 off of Fish Trap. Why was that?

6    A   Knights Landing was a better property. I can't

7 remember why an issue came up. I don't understand, I don't

8 remember the context of the conversation leading to that.

9    Q   Okay. And that's talking about 77 Knights Landing?

10    A   Yes.

11    Q   And Knights Landing is the cabin name for 77 Knights:

12 Landing?

13    A   Yes, if I remember right, yes.

14    Q   And then in response Ms. McBee said, I think you need

15 a lot more information. According to Terry someone is suing

16 him over something with that property. Is it your

17 understanding that has to do with the Pradutt suit?

18    A   Yes.

19    Q   Did you know that at the time?

20    A   I didn't know anything about anything. I think

21 that's when I found out or something that the house that the

22 place didn't close. That's when -- I think, I think how it

23 went is that I think that someone said that Knights Landing

24 didn't close because I originally made an offer on Knights

25 Landing and it was turned down by Mr. Knight. And I found out

Page 108

1 it was still up and I'd been interested in that went over Fish

2 Trap.

3    Q   Not due to any encroachment issues?

4    A   No. It's another beautiful house.

5    Q   Okay. And then below that in response to her you

6 say, the same day, still 5/26 in text message 1654, great I bet

7 you it has to do with the easement. What easement?

8    A   No idea. Oh, I think I would make the reference on

9 that one to the genericness of the easement that Gary proposed

10 in the amendment.

11    Q   Okay. So the Gary's proposal in the amendment for

12 Fish Trap?

13    A   A No for --

14    Q   River Heights?

15    A   Yes.

16    Q   Would impact a lawsuit with Knights Landing?

17    A   If it was as vague as what I was offered.

18    Q   Okay. So what you're saying here is more Gary gave

19 the buyers of the Knights Landing as vague of an easement offer

20 as I've seen, I could see the deal blowing up?

21    A   Yes.

22    Q   And then so maybe that's consistent with 1502 then

23 where Dee says, River Heights will most likely still close on

24 Tuesday depending on Terry's office getting the wording correct

25 for easement. However, Fish Trap will maybe be on Thursday.



Page 109

1 There has been a problem getting Alpha Survey to finish their

2 work.

3    A    That is the first time I've heard of the easement

4 issue on Fish Trap.

5    Q    The easement issue or the encroachment?

6    A    The encroachment issue, excuse me.

7    Q    So at that point on 528 something was happening with

8 Fish Trap's encroachment?

9    A    Yes.

10    Q    And Alpha Survey who is performing the survey was

11 trying to get that handled?

12    A    I assume so.  I don't -- I would make the assumption

13 but I don't know who ended up doing it, but, yes.

14    Q    Okay.  And Dee is also saying that Terry's office

15 needed to get the wording correct for the easement on River

16 Heights?

17    A    Correct.

18    Q    What was happening there?

19    A    I hadn't seen one.  And that's all I -- it just has

20 been, you know, I need to see these easements.  I want to see

21 the way their written.

22    Q    So that you didn't end up in a lawsuit like 77

23 Knights Landing?

24    A    If that's what happens.  I have no idea why exactly,

25 what blew up on 77 Knights Landing.

Page 110

1    Q    Okay.  But you suspected it was the easement?

2    A    I was my -- off the cuff, yes.

3    Q    Fair enough.  And you didn't want to be in a lawsuit

4 over some poorly drafted easement?

5         MR. GOLDBERG:  Object to form.

6         THE WITNESS:  Yes.

7 BY MR. PODESTA:

8    Q    Did anyone from your office at 7 IL or did Ms. McBee

9 or Mr. Harrison, yourself, push Terry Wilson to get easements

10 out the door so that you could review them?

11    A    Not that I know of.

12    Q    Did you personally push Terry?

13    A    (Nonverbal)

14    Q    For --

15    A    I know you don't push attorneys.

16    Q    Two, fear judge.  Did you ask Ms. McBee to urge Terry

17 along to get the easements drafted?

18    A    No.

19    Q    Do you know whether Dan Harrison did?

20    A    I have no idea.

21    Q    Do you know whether any other agent of 7 IL or member

22 of 7 IL urged Ms. McBee to urge Terry to prepare the easements?

23         MR. GOLDBERG:  I'm going to object to form.

24         THE WITNESS:  I have no idea but I highly doubt.

25

Page 111

1 BY MR. PODESTA:

2    Q    Okay.  Were you the only person who was a member of 7

3 IL communicating with Ms. McBee?

4    A    Yes.

5    Q    Were you the only -- I don't want to ask this

6 badly -- were you and/or Dan Harrison the only agents of 7 IL

7 communicating with Ms. McBee?

8    A    Yes.

9    Q    And I don't mean that as a trick question.  If

10 someone who's a gardener?

11    A    Yes.  I will clarify family rules on that.  There's

12 one boss, one person handles whatever business venture we're

13 in.  It keeps it very clean.

14    Q    Okay.  That makes sense.

15         MR. GOLDBERG:  We've been going for a little bit.  Do

16 you wan to --

17         THE WITNESS:  I'm still good for a minute or two.  My

18 bladder is not crying yet.

19 BY MR. PODESTA:

20    Q    I'm going to get there.  Okay.  And turning to page

21 18, text message 1352, which was May 31st the day before

22 closing.

23         MR. GOLDBERG:  Sorry, page 18 and I was the number?

24         MR. PODESTA:  Yes, sir, 1352.

25         MR. GOLDBERG:  Got it.

Page 112

1         THE WITNESS:  Yes.

2         MR. PODESTA:  Looking above that, the text message

3 above that is No. 1394.  So there's a gap of 42 text

4 messages.  Am I correct that those are just redacted

5 because they are privileged?

6         MR. GOLDBERG:  They were not related to any of this

7 lawsuit.

8         MR. PODESTA:  They were completely nonresponsive?

9         MR. GOLDBERG:  Correct.

10         MR. PODESTA:  But they were not privileged?

11         MR. GOLDBERG:  Correct.  They were just unrelated,

12 nonresponsive.

13         MR. PODESTA:  Okay.

14 BY MR. PODESTA:

15    Q    Then looking at 1352 it appears that you had sent a

16 text message to Ms. McBee and to Mr. Harrison that said, is

17 there an agreement in River Heights that mirrors the Fish Trap

18 water agreement.  What did that mean?

19    A    I'm going to make the assumption that it was a

20 similar well agreement.

21    Q    Okay.

22    A    I can't tell you exactly but that's my assumption.

23    Q    What were you asking though when it says is there an

24 agreement in River Heights?  Does that mean is there an

25 agreement in the already existing purchase and sale agreement



1 package or does it mean there's an agreement waiting for us to
2 sign at closing?
3      MR. GOLDBERG: Object to form.
4      THE WITNESS: I have no idea back then. I apologize.
5 I can't remember.
6 BY MR. PODESTA:
7      Q    That's all right. And then you said in the next
8 message, 1351, I can't forward it to Dan. I didn't want to
9 start this war today but there's no better than the present. I
10 think it leaves out the work day. What couldn't you forward to
11 Dan?
12     A    What time? What date?
13     Q    That's May 31st at 5:45 p.m.
14     A    I have no idea. I'm trying to think of e-mails that
15 we had in that time frame. I think maybe it was the notice of
16 the lot line.
17     Q    The encroachment?
18     A    The encroachment, I'm sorry.
19     Q    No problem. And Dan is Dan Harrison?
20     A    Correct.
21     Q    What war was there to start?
22     A    At the last minute the lot length changes in my world
23 is a very dangerous path to go down because you're now changing
24 properties, you're changing the rules, you're changing
25 everything.

1      Q    What does that mean? What are you changing?
2      A    The contract.
3      Q    To change the whole deal?
4      A    Uh-uh, can.
5      Q    Okay. So when you say there's no time like the
6 present, basically what does that mean?
7      A    Don't wait and let's figure out what it is and handle
8 it and get it over with.
9      Q    So you weren't looking to start a lawsuit that day,
10 you were looking to figure out a way to solve the problem?
11     A    Yes.
12     Q    What --
13     A    I man, here's my, I go to my prior training saying
14 this but I was --
15     MR. GOLDBERG: Don't preface something like that.
16     MR. PODESTA: Look, we can all agree that this is
17 Brian's problem.
18     THE WITNESS: Yeah, no, but in most worlds you are
19 contacted by the person making the mistake and explaining
20 the mistake. All I do is I'm getting third-hand
21 information at the time that there's a problem. No idea
22 what the problem is. So your mind can start wondering and
23 creating situations that aren't there.
24 BY MR. PODESTA:
25     Q    Okay. And so there was no war beginning, it was more

1 of a problem solving endeavor?
2      A    Correct.
3      Q    Do you recall if any solutions were traded back and
4 forth at that point?
5      A    We didn't even know what the problem was.
6      Q    Okay. All right.
7      MR. PODESTA: Brian, this is probably a good place to
8 take a stop.
9      MR. GOLDBERG: Okay.
10     (BREAK TAKEN AT 2:54 P.M.)
11 BY MR. PODESTA:
12     Q    Back on the record. So turning to what I've now
13 marked as Exhibit P in the Dropbox. These I'll represent to
14 you are text messages between yourself and Dan Harrison.
15     (Exhibit P was marked and identified for the record.)
16     A    Okay.
17     Q    Could you just take a moment to review it.
18     A    Okay.
19     MR. GOLDBERG: Want me to zoom in to here?
20     THE WITNESS: That's good right there.
21     MR. GOLDBERG: That's eight pages?
22     MR. PODESTA: Yeah, correct.
23     MR. GOLDBERG: I can zoom in more.
24     THE WITNESS: No. Okay.
25

1 BY MR. PODESTA:
2      Q    All right. So first of all just basic questions up
3 front. Is this the log of text messages that you provided to
4 us?
5      A    I assume so.
6      MR. PODESTA: Brian, is --
7      MR. GOLDBERG: Yes, I'll represent to you that this
8 was removed from the broken phone. That was the company
9 that, you know, we geared to do that work.
10     MR. PODESTA: Okay.
11 BY MR. PODESTA:
12     Q    And, Mr. Thatcher, are you familiar with these text
13 messages?
14     A    Yes.
15     Q    And they are text messages between yourself and Dan
16 Harrison?
17     A    Correct.
18     Q    All right. Turning first to the second page to 4262.
19 There's an incoming text message from Dan Harrison on March
20 28th of 2021?
21     A    Uh-uh.
22     Q    Is it correct that if I were to click that link it
23 would be the link to a news story about Gary Knight and his
24 cabin rental company?
25     A    I would think so.

Page 117

1   Q   And a fairly negative news story of that?
2   A   Yes.
3   Q   And that you responded in the next text, 4261, Dee
4   warned me about him.
5   A   Yes.
6   Q   And that's Gary Knight?
7   A   Yes.
8   Q   What did she say in warning you about him?
9   A   He does not have a great reputation in Blue Ridge.
10  Q   That's it?
11  A   I can't remember much more than that.  But I deal
12  with a lot of people that do have bad reputation so it doesn't
13  scare me.  Just when you deal with that to, you know if there's
14  a bad reputation you just know you need to handle things a
15  little different.
16  Q   Okay.  And in response Dan Harrison actually said,
17  scary.  So it was scary at least to Dan Harrison?
18  A   Yes.
19  Q   And then you said in response to that, we get to meet
20  him in the den.  What does that mean?
21  A   I just in one of his houses.
22  Q   Okay.  But you get to meet him in the den?
23  A   Of where the problem of that news story was.
24  Q   In Blue Ridge?
25  A   Yes.

Page 118

1   Q   So the den is Blue Ridge?
2   A   I have since -- I have no idea exactly of where I
3   ment den to be.
4   Q   But him is definitely Gary Knight?
5   A   Correct.
6   Q   All right.  And then I'm going down to 4246 Dan
7   Harrison said, but I have olives for you.  What did he mean by
8   that?
9       MR. GOLDBERG:  Hang on.  We're trying to find this.
10      MR. PODESTA:  Sure.
11      THE WITNESS:  I think that's from me to him.
12  BY MR. PODESTA:
13  Q   Rather, yes.
14  A   That the plane gave me olives, I don't like olives.
15  Q   Okay.  So it's physical olives?
16  A   Yes.
17  Q   It wasn't an olive branch --
18  A   No.
19  Q   -- to extend to Mr. Knight?
20  A   I still give him olives when I take them out of the
21  little box and give it to him.
22  Q   Okay.  That is fair enough.  Now moving down to 4070.
23  This is sent on April 2nd of 2021.
24      MR. GOLDBERG:  What page is that?
25      MR. PODESTA:  I'm sorry, it's page 3.

Page 119

1       MR. GOLDBERG:  4070.
2       MR. PODESTA:  Right.
3       MR. GOLDBERG:  Okay.  Read that.
4       THE WITNESS:  Take the highlight off for me.  Yes.
5   BY MR. PODESTA:
6   Q   So Dan Harrison wrote to you, John, would you be
7   willing to agree to this.  Is this, and looking at it, 60K in
8   escrow seller to repair water damage and structure problems per
9   inspection report.  All items that need to be address will be
10  itemized.  All work will be supervised and expected by our
11  certified inspector to bring back to code.  Any monies left
12  over of the 60K will be returned to seller.  Does that involve
13  one of the Knight properties?
14  A   No.
15  Q   Okay.  Which property did that have to do with?
16  A   5550 Old Gravel Road.
17  Q   Okay.  And that's not the gargoyle house?
18  A   No, Hibernation Station.
19  Q   Got you.  Okay.  And then down on page 4 to 3929,
20  this one is also from Dan.  But it's curious in a sense because
21  ordinarily you're columns would indicate whether or not there
22  was a CC.  And I believe if we turn to the top, the forth
23  collum in all of these is where a CC is identified.  So it's
24  hard to tell who this was sent to.  But it says, Brian, Dan
25  Harrison here with John Thatcher.  Was that a text to Brian

Page 120

1   that was CCing you or was that a draft that you were discussing
2   with Mr. Harrison?
3       MR. GOLDBERG:  I'm going to object to the form.  And
4   I just want to say also that just for the record that
5   whatever was provided to you here just for your own
6   reference and purposes that this is the raw data that was
7   given to us by that company.  So if there -- I don't know,
8   you know, if you're referencing if there's a CC that you
9   think should be there or shouldn't be there, this is the
10  data that came from that company.  So I just want to make
11  that a caveat, you know, to understanding, you know, if
12  you're asking him about like the data, that's where, I
13  mean, it all came from there.  So we can stipulate that
14  this is the raw data that came from there or, I mean, if
15  you want to ask him a specific question about the data, I
16  think we'll just have to defer to the company as to what
17  they produced, if that makes sense?
18      MR. PODESTA:  Sure.
19      MR. GOLDBERG:  I'm not trying to derail your question
20  here but if that's what you were asking about, with the CC
21  and the data, this is what we got.
22  BY MR. PODESTA:
23  Q   So this appears to not have a CC.  So this text
24  message is coming from Dan Harrison to you; correct?
25  A   I'm going to guess.  I was -- I can't -- I got the



Page 121

1 message through some means. How is that? I don't know how --
2 you know, reading I think, yeah, this was not intended to be
3 mine. It was not, I was meant to be a party of but not the
4 recipient.
5 Q Okay. And it says Brian, Dan Harrison here with John
6 Thatcher. John needs an attorney to write the easements for
7 walking path and also shared well agreement. This is all
8 simple if Gary owns the property, but with different owners, it
9 needs to be Georgia legal terminology by a legal entity, thank
10 you. I assume that in some sense was meant to get to Dan
11 Harrison; correct?
12 A I read it as it's from Dan Harrison.
13 Q I'm sorry, to Brian White. I apologize.
14 A I would make that assumption also.
15 Q And, John, is you, needs an attorney to write the
16 easements for the walking path and shared well agreement. So
17 you were, you and or Brian -- the Brian and Dan is going to
18 butcher me all day. You and/or Dan Harrison were advising
19 Brian that you needed an attorney to write the easements for
20 the walking path and shared well agreements?
21 A What date is this?
22 Q 4/5/21.
23 A Okay. Yes.
24 Q Okay. And this is in the middle of the day. It was
25 12:52. Would this had been before or after you executed the

Page 122

1 two exhibits or amendments rather to the River Heights and Fish
2 Trap contracts?
3 A I think it --
4 MR. GOLDBERG: Do you need to refer to --
5 MR. PODESTA: Feel free to.
6 THE WITNESS: Okay. Yeah.
7 MR. PODESTA: Those would be Exhibit A, page 18, and
8 Exhibit F, page 22.
9 MR. GOLDBERG: I'm sorry. Your question was about
10 the amendments?
11 MR. PODESTA: Yes.
12 BY MR. PODESTA:
13 Q So when you sent -- Dan sent this text on your
14 behalf. He was asking for an attorney to write the easements
15 for the walking path and shared well agreement for the two
16 properties we've been over, the Fish Trap and River Heights;
17 correct?
18 A (Nonverbal).
19 Q Okay. And shortly thereafter it appears --
20 MR. GOLDBERG: April 5th.
21 THE WITNESS: What time?
22 MR. GOLDBERG: 4:28 eastern.
23 THE WITNESS: Okay.
24 BY MR. PODESTA:
25 Q And you singed them shortly thereafter; is that

Page 123

1 correct?
2 MR. GOLDBERG: I'm sorry, what was the number of the
3 text you had again?
4 MR. PODESTA: No, problem. 3929.
5 THE WITNESS: Okay. Now rephrase, I think you've
6 asked me but rephrase your question now that I've looked
7 at everything.
8 BY MR. PODESTA:
9 Q Okay. So this text was sent the same day but prior
10 to the signature on both amendments; correct?
11 A Yes.
12 Q And so Mr. Harrison was telling Brian white that you
13 needed these easements to be drafted by a Georgia attorney?
14 A Yes.
15 Q And then shortly thereafter the two amendments gets
16 signed. Why, given the timing, why are the amendments that are
17 to, I don't want to use the word married deals, but concurred
18 deals, why are they so different? Why is the amendment for
19 River Heights populated with information and the other one
20 fairly started?
21 MR. GOLDBERG: I'm going to object to the form,
22 question.
23 MR. PODESTA: It was a compound question. I can
24 reask it.
25

Page 124

1 BY MR. PODESTA:
2 Q Why does the 253 River Heights amendment have so much
3 detail while the 92 Fish Trap amendment has none?
4 MR. GOLDBERG: I'm going to have the same objection,
5 but answer the question.
6 THE WITNESS: The 92 Fish Trap, if I remember
7 correctly, only had to do with a small walking path
8 between the two properties and it's a little bath. This
9 property had multiple entrances and exits to the river
10 through multiple different peoples ground winding trails
11 that went back and forth. So the simplicity of the Fish
12 Trap was easier to facilitate than the deal, the easement
13 for the Outlaw Ridge.
14 BY MR. PODESTA:
15 Q Okay. So you're saying that the Fish Trap deal had
16 less complexity in its easements?
17 A Yes.
18 Q And that is why you signed both of them despite the
19 discrepancy and detail?
20 MR. GOLDBERG: I'm going to object to the form.
21 THE WITNESS: I signed them because of the clause,
22 all community well agreements and easements to be written
23 by licensed Georgia attorney at or prior to closing.
24 BY MR. PODESTA:
25 Q And, again, apart from Mr. Wilson, you didn't hire



Page 125

1  any attorneys whatsoever?

2      A  No.

3      Q  What discussions did you have with Mr. Knight about

4  hiring an attorney?

5      A  None.

6      Q  What discussions did you have about hiring an

7  attorney with Mr. White?

8      A  None.

9      Q  All right.  Then scrolling down a little bit further,

10  and I'm going to close Exhibits A and F, to text message 1351

11  on page 5 of this Exhibit P.

12      MR. GOLDBERG:  Okay.

13  BY MR. PODESTA:

14      Q  That's the message where you said, I can't forward it

15  to Dan.  I didn't want to start this war today but there's no

16  better blank than the present.  But the text message below that

17  which removes Dee McBee from the thread is 1350.  And in it Dan

18  says just to you, I didn't fail, I did ask Brian to put all

19  concerns on easements and water rights on paper for all to

20  sign, with a series of exclamation marks, amendment fucking 3,

21  yay, me, us.  Gary has zero legs to stand on.  What does that

22  mean?

23      MR. GOLDBERG:  Object to form.

24  BY MR. PODESTA:

25      Q  What does your text message mean?

Page 126

1      MR. GOLDBERG:  Same objection.

2      THE WITNESS:  I didn't send it.

3  BY MR. PODESTA:

4      Q  What do you believe Mr. Harrison meant?

5      A  That we have an easement in place with amendment

6  No.2, Exhibit A.  That an easement is given.

7      Q  What does Gary has zero legs to stand on mean?

8      A  No idea.

9      Q  And what does amendment fucking 3, yay, me, us, mean?

10      A  No idea.

11      Q  Okay.  And I didn't fail, what does that mean?

12      A  No idea.

13      Q  Okay.  So you had no idea what he was talking about

14  except for the comment that there were easements on paper for

15  all to sign?

16      MR. GOLDBERG:  Object to form.

17      THE WITNESS:  I have no idea.

18  BY MR. PODESTA:

19      Q  Were there easements on paper for all to sign?

20      A  Yes.  Amendment 2 on Exhibit A.

21      Q  Was that an easement you could file with Fannin

22  County?

23      A  No.

24      MR. GOLDBERG:  Object to form.

25

Page 127

1  BY MR. PODESTA:

2      Q  Was Exhibit 2- was amendment 2 to Exhibit A was an

3  easement that you could file with Fannin County?

4      A  I have no idea.  I'm not an attorney.

5      Q  Was amendment 1 to Exhibit F an easement-, I'm sorry.

6  Was amendment 3 to Exhibit F an easement that you could file

7  with Fannin County?

8      MR. GOLDBERG:  Object to form, and calls for a legal

9  conclusion but answer.

10      THE WITNESS:  I have no idea unless I have an

11  attorney.

12  BY MR. PODESTA:

13      Q  Okay.  Without giving us a legal conclusion, are you

14  aware of any easements on paper that were available for all to

15  sign?

16      A  All the addendum that you produced in evidence.

17      Q  Was there anything that you had in your possession as

18  of May 31st that you could sign that you had not yet signed?

19      A  No.

20      Q  Then going on to the next text is 1349.  This is you

21  responding to Dan Harrison.  It says, I have faith in you.  I

22  would bring back a bottle of Savannah but you have one.  What

23  does the first part mean, I have faith in you?

24      A  He said he didn't fail so I have faith in him.  I

25  don't -- sometimes people rant on e-mails or text and it's just

Page 128

1  easier to answer a question and then go on.

2      Q  Okay.  And the next one, 1348, is him responding.

3  Oh, man, I was sweating bricks and was going to have no sleep

4  tonight but all is good.  What do you believe he meant by that?

5      A  That the amendment was signed.  Not for sure.

6      Q  Okay.  Then going on to 1343 he sent you a text that

7  said, it's there and your agent protected you.  What's there

8  and how were you protected or do you not know?

9      A  I have no idea.

10      Q  Okay.

11      A  It could have been to another closing at another

12  property.

13      Q  Okay.  Then going down the same page to 1338.  This

14  is an incoming from Mr. Harrison.  It says, same as amendment

15  3, he didn't follow through.  His agent failed him.  Was this

16  in reference to Mr. Knight and his agent Brian White?

17      A  I can't answer that one.

18      Q  Did you and Mr. Harrison have any phone call

19  discussions about Mr. White failing Mr. Knight?

20      A  Not that I remember.

21      Q  Do you recall the leaving on May 31st of 2021 that

22  Mr. White had somehow failed Mr. Knight?

23      A  No.

24      Q  Okay.  Then going down to 1332 it says, deduct 200

25  from Fish Trap and 300 from River Heights because of lower



Page 129

1  value without easements.  What does that mean?
2      A   I think that was his opinion that if we didn't get
3  the easements signed, that was the value of those properties
4  without the accesses.
5      Q   Okay.  So did you agree with that?
6      A   I don't know.  I didn't -- I had it in the back of my
7  mind.  I can't say I agreed with it but it was a leverage item
8  that would definitely be thought of but there was lots of
9  issues, ideas going on.  And it goes back to the unknown item
10  of no one telling you what's going on so you create your own
11  issues.
12      Q   Understood.  So would you agree with Mr. Harrison
13  that's Fish Trap would be worthless to the tune of six figures
14  less without easements?
15      MR. GOLDBERG:  Object to form.
16      THE WITNESS:  Six figures less than Fish Trap.  For
17    Fish Trap, no.
18  BY MR. PODESTA:
19      Q   For River Heights?
20      A   Rephrase your question again, please.
21      Q   How much less do you think River Heights would have
22  been worth without easements?
23      A   One to 200,000.
24      Q   And that's including the water well?
25      A   No.  Water well is worth zero.

Page 130

1      Q   Okay.  What about Fish Trap, how much would Fish Trap
2  had been worth?  How much less would Fish Trap had been worth
3  without easements?
4      MR. GOLDBERG:  Object to form.
5      THE WITNESS:  Without a water well, zero.
6  BY MR. PODESTA:
7      Q   Okay.  And just without footpaths?
8      A   I would have to look at the footpath map before I
9  could answer that.  I think the footpath is all on the property
10  that I had under contract so it wouldn't have mattered.  But I
11  think the footpath easement was concerned on the other property
12  and I could be incorrect.
13      Q   With regard to these footpath easements, am I correct
14  that the easement did not just control the use of the footpath
15  but also the maintenance of the footpath?
16      MR. GOLDBERG:  Object to form.
17      THE WITNESS:  I don't know.
18  BY MR. PODESTA:
19      Q   Is that because the easements weren't prepared?
20      MR. GOLDBERG:  Object to form.
21      THE WITNESS:  They were prepared at closing but I
22    can't remember what they said in reading them now.
23  BY MR. PODESTA:
24      Q   And you never signed any easements at closing?
25      A   No.

Page 131

1      Q   Okay.
2      MR. PODESTA:  Let me take a five minutes.  I'm just
3    going to go off the record for a minute.
4      MR. GOLDBERG:  Okay.
5      (BREAK TAKEN AT 3:32 P.M.)
6  BY MR. PODESTA:
7      Q   Going back to these properties, just wanted to ask
8  you a few questions.  First, with regard to 253 River Heights.
9  You said you were in bad physical condition at the time.  I
10  won't ask what was wrong, but how far did you get on that
11  property physically?
12      A   I was able to walk on all floors.
13      Q   Okay?
14      A   Interior everywhere.  Exterior, I couldn't walk to
15  the pump house, but I was able to get to the bottom with Gary
16  Knight's Kubota, mule, whatever he has.  So I was able to see
17  the entire property.
18      Q   Were you able to cross the railroad tracks and get to
19  the river?
20      A   Yes, with the side-by-side.
21      Q   With the vehicle; okay.  And then with regard to 183
22  you said you had never been there prior to; correct?
23      A   No, I've been there.
24      Q   Prior to sale?  Prior to purchase?
25      A   Yes.

Page 132

1      Q   Okay.  How far were you able to get on that property?
2      A   I was able to inspect all the floors and I think I
3  was, I don't know if I made it down to the fireplace or not.
4      Q   The outside fireplace?
5      A   Yeah.
6      Q   But did you make it to the river?
7      A   No.
8      Q   Okay.  So you were unable to use the easement to
9  cross the railroad tracks?
10      A   Correct.
11      Q   Did you see the easement from a distance?
12      A   Yes.
13      Q   Was it gravel?  Was it paved path?  Or road?  What
14  was it?
15      A   Gravel.
16      Q   And then with regard to 92 Fish Trap, how far did you
17  get on that one?
18      A   Well --
19      Q   Did you --
20      A   -- backup your question.  I thought the second one
21  was on Fish Trap.
22      Q   Oh, no, on 183 River Lodge.
23      A   183.  I was able to walk.  I was able to -- so let's
24  go back.  Start your question again with 182 because I combined
25  Fish Trap and the answer with that one.  I'm sorry.



Page 133

1    Q    Okay.  So maybe to clean it up a little bit.  So for
2  183 River Lodge, which is the Pradutt property, were you able
3  to get to the river?
4    A    Yes.
5    Q    Using the easement?
6    A    No.  I don't have an easement.
7    Q    Right.  So you went without the easement over the
8  property?
9    A    I crossed the railroad tracks, yes.
10    Q    In a vehicle or on foot?
11    A    On foot many times.
12    Q    Okay.  And is the easement that would be there paved,
13  gravel, road, what is it?
14    A    Which easement are you talking about?
15    Q    The footpath easement.
16    A    There isn't a footpath easement on River Lodge.
17    Q    The path that the Pradutt's were having an issue
18  with.
19    A    Okay.  That was actually a road.
20    Q    That's an actual road; okay.  And then back to 92.
21  So you got down to the river on 92?
22    A    No, I was never was on the river of 92.
23    Q    But did you get to the railroad tracks?
24    A    I just looked off of the porch.
25    Q    Okay.  That's the furthest you got was looking down

Page 134

1  --
2    A    On Fish Trap, yes.
3    Q    Okay.  Have you seen the Blue Ridge scenic railroad
4  trains at any point on any of the properties?
5    A    Yes.
6    Q    On which properties?
7    A    The 183.
8    Q    Okay.  What about -- what time roughly was it when
9  you saw the train?
10    A    Many times we've stayed in that cabin.
11    Q    How many times have you stayed in that cabin?
12    MR. GOLDBERG:  Object to form.
13  BY MR. PODESTA:
14    Q    How many times have you stayed in the cabin on River
15  Lodge, 183 River Lodge?
16    A    Three or four.
17    Q    Okay.  Like weekend trips, three or four weekend
18  overnighters?
19    A    Midweek.  I don't do weekends because I would lose
20  money.
21    Q    That's fair enough.  Do you have any idea how
22  Mr. Knight acquired the railroad crossing?
23    A    No.
24    Q    So you are currently in possession of 183 River
25  Lodge?  You own that property?

Page 135

1    A    Yes.
2    Q    And you rent that property to third parties?
3    A    Correct.
4    Q    And they sometimes leave the property and use
5  Mr. Knights easements?
6    MR. GOLDBERG:  I'm going to object to the form.
7  Also, I just want to note, I don't think that that
8  property was noticed on the 30(b) (6).  So to the extent
9  that you're asking questions to 7 IL about that, I don't
10  think that the topics cover that.
11    MR. PODESTA:  I'll ask -- do we need to formally
12  switch?
13    MR. GOLDBERG:  No.
14    MR. PODESTA:  I'll ask Mr. Thatcher.
15  BY MR. PODESTA:
16    Q    Are you aware of 7 IL's guest crossing into
17  Mr. Knights property from 183 River Lodge to use his railroad
18  access point?
19    A    I have been told they have.  The question and concern
20  in the railroad owns the railroad.  You can walk down the
21  railroad as far as you want to.  It's crossing into his
22  properties is the issue.
23    Q    Right.
24    A    But, no, there's a sign up that stops people from
25  doing that.  It's in the lease agreement and everything.

Page 136

1    Q    You mean your lease agreement with your renters?
2    A    Correct.
3    Q    And it persists to happen anyway?
4    A    I have no idea.  I thought it was stopped?
5    Q    Do you know who maintains the railroad crossing on
6  Mr. Knight's property?
7    A    No.
8    Q    You don't maintain any of it?
9    A    I don't own it, no.
10    Q    All right.  Have you ever asked Mr. Knight for
11  permission to have your guests of 183 River Lodge cross his,
12  the railroad crossing at his property?
13    A    No.
14    MR. GOLDBERG:  Object to form.
15  BY MR. PODESTA:
16    Q    Have your guests ever asked you for permission to
17  cross there?
18    A    Not that I know of.
19    Q    Have your maintenance crews ever crossed on Mr.
20  Knight's property?
21    A    Not that I know of.
22    Q    Okay.  Let me changed gears here a little bit.  With
23  regard to the Fish Trap Road property, what damages do you
24  believe you have in this lawsuit?
25    MR. GOLDBERG:  I'm going to object to the form, but



Page 137

1  go ahead and answer.
2      THE WITNESS:  Damages, loss of rents, attorney fees,
3  interest.  Everything that's in the contract.
4  BY MR. PODESTA:
5      Q   Okay.  And in the contract of course you would have
6  paid a purchase price?
7      A   Correct.
8      Q   Based on what you thought you were purchasing at the
9  time.
10      MR. GOLDBERG:  Object to form.
11  BY MR. PODESTA:
12      Q   Based on what you believe that terms of the contract
13  set forth?
14      A   Based what I believe?
15      Q   All right.  Let me rephrase the question.  You signed
16  a purchase contract, purchase and pale agreement on April 5th
17  of 2021 for the Fish Trap Road property?
18      A   You're talking about Exhibit B?
19      Q   Exhibit F.
20      MR. GOLDBERG:  For the record, I mean, Exhibit F is
21  64 pages.  You mean the?
22  BY MR. PODESTA:
23      Q   The purchase and sale agreement within Exhibit F.
24      A   Yes.
25      Q   You signed that agreement?

Page 138

1      A   Correct.
2      Q   And you would have had to pay the purchase price
3  based on that agreement?
4      A   Yes.  The purchase price of 850,000.
5      Q   Okay.  And that would have been subtracted from any
6  damages you might have; right?  You would have certainly had to
7  pay that?
8      MR. GOLDBERG:  Object to form.  You can answer.
9      THE WITNESS:  Rephrase the question.
10  BY MR. PODESTA:
11      Q   You said you'd be entitled to interest, interest on
12  what?
13      A   On the damages.
14      Q   On what damages?
15      A   The --
16      MR. GOLDBERG:  Object.  I'm going to object to the
17  form and to the extent you're calling for a legal
18  conclusion but answer --
19      MR. PODESTA:  Well, he said he's entitled to
20  interest.
21      MR. GOLDBERG:  Go ahead.
22      THE WITNESS:  I'm entitled to interest on the losses
23  I have obtained up-to-date.  Not I had no losses at
24  closing on June 1st.  I've had losses since then.
25

Page 139

1  BY MR. PODESTA:
2      Q   Okay.  Is the same true of the Fish-, of the 253
3  River Heights property?
4      A   What is true?
5      Q   That you had no losses as of the date of closing but
6  you've had losses since that date?
7      A   Correct.
8      Q   And those losses would include what?
9      A   Lost of profit, attorney fees, interest.
10      Q   And the lost of profit for both properties would be
11  lost of profits from the rents you would have received from
12  parties renting the property?
13      A   Yes.
14      Q   Less any expenses you had related to that?
15      A   Correct.
16      Q   Okay.  How would you measure your loss profits for
17  the 92 Fish Trap property?
18      MR. GOLDBERG:  I'm going to object to form and
19  calling for a legal conclusion.  You're asking him to
20  state Georgia law and how he's going to measure --
21      MR. PODESTA:  I'm not.
22  BY MR. PODESTA:
23      Q   I'm asking you to calculate your damages.  How would
24  you measure, how would you calculate the profit for 92 Fish
25  Trap from the date of June 1st, 2021, had you purchased it?

Page 140

1      MR. GOLDBERG:  I'm going to state the same objection
2  but answer it to the extent you can.
3      THE WITNESS:  Based upon the profit and loss
4  statement that Mr. Knight has provided.
5  BY MR. PODESTA:
6      Q   Are you able to confirm the accuracy of Mr. Knight's
7  profit and loss statement?
8      A   No.
9      Q   For either property?
10      A   No.
11      Q   And then lastly, one of the last things anyway, I've
12  got Exhibit Q in the Dropbox.  And these are just some
13  photographs.  And just please take a moment and familiarize
14  yourself with Exhibit Q.
15      (Exhibit Q was marked and identified for the record.)
16      MR. GOLDBERG:  Have you ever seen this?
17      THE WITNESS:  No.
18      MR. GOLDBERG:  Were these produced in discovery?
19      MR. PODESTA:  We just got them.
20      MR. GOLDBERG:  Okay.  All right.  Well, I'm going to
21  lodge an objection for this was, you know, this was never
22  produced in discovery.  But, you know, to the extent you
23  can answer any questions, we'll answer any questions but
24  with that standing objection.
25      MR. PODESTA:  Sure.



Page 141

1  BY MR. PODESTA:
2     Q   Do you recognize that cite?
3     A   Yes.
4     Q   What is that cite?
5     A   That is the railroad crossing that Gary Knight has.
6     Q   Okay.  Were you aware that on July 25th, six days
7  ago, a number of your tenants crossed Mr. Nights property?
8     A   Are those my tenants or are those some people further
9  down the railroad tracks?
10    Q   I'm just asking if you are --
11    A   I have no idea who those people are.  But I've see
12 people walk down the track from other properties.
13    Q   All right.  So you're not aware if those are you
14 tenants or otherwise?
15    A   No.
16    Q   Has Mr. Knight lodged recent complaints with regard
17 to your tenants crossing the railroad property?
18    A   Not in the last couple months.
19    Q   Okay.  Let us take one more break and then we should
20 be close to wrapping up.
21        (BREAK TAKEN AT 4:07 P.M.)
22 BY MR. PODESTA:
23    Q   How many years have you been in the vacation rental
24 business, Mr. Thatcher?
25    A   Two.

Page 142

1     Q   And 7 IL, how long has it been in the business?
2     A   Two.
3     Q   Was 7 IL started in 2021?
4     A   Either '21 or '20.  I can't tell you the date that it
5  was created.
6     Q   But acquired its first vacation rental property in
7  2021; correct?
8     A   Correct.
9     Q   And that was in May?  Am I off on that?
10    A   No.  It wasn't a vacation rental that was acquired in
11 May, it was a commercial building.
12    Q   So when was the first vacation rental acquired?
13    A   Probably the June 1st date.  I acquired a lot of
14 them that week.
15    Q   Do you believe that your profits for the Fish Trap
16 property and the River Heights property would have been roughly
17 equivalent with what Gary Knight was able to make as a profit
18 for those properties?
19    A   I would say it be very similar.
20    Q   What would be the basis for that assumption?
21    A   The River Lodge property.
22    Q   What about it?
23    A   It makes about the same as what he showed on those
24 other properties.
25    Q   Okay.  So you're saying that your purchase of the 183

Page 143

1  River Lodge property was commensurate with what it had been
2  doing previously?
3     A   The profits were real similar between the two
4  properties.  The two year profit that he provided.  It's PNL
5  was very close to that house.
6     Q   And who is managing River Lodge?
7     A   Southern Comfort.
8     Q   And have they been managing River Lodge the entire
9  time that you owned River Lodge?
10    A   I do believe, yes.
11    Q   Okay.  All right.  Brian, I have no further
12 questions.
13        MR. GOLDBERG:  Okay.  Give us just a second and we'll
14    decide if we're done here.
15        MR. PODESTA:  Okay.
16        (BREAK TAKEN 4:18 P.M.)
17    MR. GOLDBERG:  Just for the record, I think I said
18    this in the very beginning but I just want to make sure
19    that it's on the record that we do reserve the right to
20    sign.
21        MR. PODESTA:  Yes.
22        MR. GOLDBERG:  Read and sign.
23        MR. PODESTA:  Okay.
24        (CONCLUDED AT 4:21 P.M.)
25

Page 144

1          C E R T I F I C A T I O N
2     G E O R G I A :
3     Clayton County:
4
5        I hereby certify that the foregoing transcript was
6     stenographically recorded by me, as stated in the caption.
7     The colloquies, statements, questions, and answers thereto
8     were reduced to typewriting under my direction and
9     supervision; and the transcript is a true and correct
10    record of the testimony/evidence given to the best of my
11    ability.
12       I further certify that I am not a relative or
13    employee or attorney or counsel of any of the parties, nor
14    am I a relative or employee of such attorney or counsel,
15    nor am I financially interested in the action.
16       This 31st day of July, 2023.
17
18
19    Kris Laroche, CCR, CVR
20    Certified Court Reporter
21    Certification No.  1696
22
23
24
25

## Page 145

1       D I S C L O S U R E

2       STATE OF Georgia

3       COUNTY OF CLAYTON

4

5       Pursuant to Article 10.B of the rules and regulations

6  of the Board of Court Reporting of the Judicial Council of

7  Georgia, I make the following disclosure:

8       I am a Georgia Certified Court Reporter.  I am here

9  as an independent contractor.

10       I will not be taking this job under any contract that

11  is prohibited by O.C.G.A. 15-14-37(a) and (b).

12       I have no contract/agreement to provide court

13  reporting services with any party to the case, any counsel

14  in the case, or any reporter or reporting agency from whom

15  a referral might have been made to cover this job.

16       I will charge usual and customary rates to all

17  parties in the case, and a financial discount will not be

18  given to any party to this litigation.

19       This 31st day of July, 2023.

20

21

22       Kris Laroche, CCR, CVR

23       Certified Court Reporter

24       Certification No.  1696

25

## Page 146

1  Reference No.: 9984615

2

3  Case:  7 IL PROPERTIES vs GARY KNIGHT

4

       DECLARATION UNDER PENALTY OF PERJURY

5

       I declare under penalty of perjury that

6  I have read the entire transcript of my Depo-

   sition taken in the captioned matter or the

7  same has been read to me, and the same is

   true and accurate, save and except for

8  changes and/or corrections, if any, as indi-

   cated by me on the DEPOSITION ERRATA SHEET

9  hereof, with the understanding that I offer

   these changes as if still under oath.

10

11  _____

12       John Thatcher

13

14       NOTARIZATION OF CHANGES

15          (If Required)

16

17  Subscribed and sworn to on the _____ day of

18

19  _____, 20_____ before me,

20

21  (Notary Sign)_____

22

23  (Print Name)              Notary Public,

24

25  in and for the State of _____

## Page 147

1  Reference No.: 9984615

   Case:  7 IL PROPERTIES vs GARY KNIGHT

2

3  Page No._____Line No._____Change to:_____

4  _____

5  Reason for change:_____

6  Page No._____Line No._____Change to:_____

7  _____

8  Reason for change:_____

9  Page No._____Line No._____Change to:_____

10  _____

11  Reason for change:_____

12  Page No._____Line No._____Change to:_____

13  _____

14  Reason for change:_____

15  Page No._____Line No._____Change to:_____

16  _____

17  Reason for change:_____

18  Page No._____Line No._____Change to:_____

19  _____

20  Reason for change:_____

21  Page No._____Line No._____Change to:_____

22  _____

23  Reason for change:_____

24

   SIGNATURE:_____DATE:_____

25  John Thatcher

## Page 148

1  Reference No.: 9984615

   Case:  7 IL PROPERTIES vs GARY KNIGHT

2

3  Page No._____Line No._____Change to:_____

4  _____

5  Reason for change:_____

6  Page No._____Line No._____Change to:_____

7  _____

8  Reason for change:_____

9  Page No._____Line No._____Change to:_____

10  _____

11  Reason for change:_____

12  Page No._____Line No._____Change to:_____

13  _____

14  Reason for change:_____

15  Page No._____Line No._____Change to:_____

16  _____

17  Reason for change:_____

18  Page No._____Line No._____Change to:_____

19  _____

20  Reason for change:_____

21  Page No._____Line No._____Change to:_____

22  _____

23  Reason for change:_____

24

   SIGNATURE:_____DATE:_____

25  John Thatcher

