# PURCHASE AND SALE AGREEMENT

**Offer Date:** 03/13/2021

Better Homes and Gardens
metrobrokers

EXHIBIT

**A**

Georgia REALTORS

**2021 Printing**

## A. KEY TERMS AND CONDITIONS

1. **Purchase and Sale.** The undersigned buyer(s) ("Buyer") agree to buy and the undersigned seller(s) ("Seller") agree to sell the real property described below including all fixtures, improvements and landscaping therein ("Property") on the terms and conditions set forth in this Agreement.

   a. **Property Identification:** Address: 253 River Heights Rd

   City Blue Ridge _____, County Fannin County _____, Georgia, Zip Code 30513

   MLS Number: 298665 _____ Tax Parcel I.D. Number: 0050 91A1JA

   b. **Legal Description:** The legal description of the Property is *[select one of the following below]*:

   ☐ (1) attached as an exhibit hereto;

   ☐ (2) Condominium (attach F204 Condominium Resale Purchase and Sale Exhibit)

   ☑ (3) the same as described in Deed Book 819 _____, Page 26 _____, et. seq., of the land records of the above county; **OR**

   ☐ (4) Land Lot(s)_____ of the _____ District, _____ Section/ GMD,
   Lot 15 _____, Block _____, Unit _____, Phase/Section _____
   of _____ Subdivision/Development, according
   to the plat recorded in Plat Book _____, Page _____, et. seq., of the land records of the above county.

2. **Purchase Price of Property to be Paid by Buyer.**
   $ 929,000.00

3. **Closing Costs.**
   Seller's Contribution at Closing: $ N/A

4. **Closing Date and Possession.**
   Closing Date shall be 05/31/2021 _____ with possession of the Property transferred to Buyer
   ☑ at Closing **OR** ☐ _____ days after Closing at _____ o'clock ☐ AM ☐ PM (attach F219 Temporary Occupancy Agreement).

5. **Holder of Earnest Money ("Holder").** (If Holder is Closing Attorney, F510 must be attached as an exhibit hereto, and F511 must be signed by Closing Attorney.) BHGRE METRO BROKERS

6. **Closing Attorney/Law Firm.** Terry Wilson Law

7. **Earnest Money.** Earnest Money shall be paid by Buyer ☑ check ☐ACH ☐cash or ☐wire transfer of immediately available funds as follows:

   ☐ a. $_____ as of the Offer Date.

   ☑ b. $10,000.00 _____ within 5 _____ days from the Binding Agreement Date.

   ☐ c. _____

8. **Inspection and Due Diligence.**

   a. **Due Diligence Period:** Property is being sold subject to a Due Diligence Period of 14 _____ days from the Binding Agreement Date.

   b. **Option Payment for Due Diligence Period:** In consideration of Seller granting Buyer the option to terminate this Agreement, Buyer:
   (1) has paid Seller $10.00 in nonrefundable option money, the receipt and sufficiency of which is hereby acknowledged; plus
   (2) shall pay Seller additional option money of $_____ by ☐ check or ☐ wire transfer of immediately available funds either ☐ as of the Offer Date; **OR** ☐ within _____ days from the Binding Agreement Date. Any additional option money paid by Buyer to Seller ☐ shall (subject to lender approval) or ☐ shall not be applied toward the purchase price at closing and shall not be refundable to Buyer unless the closing fails to occur due to the default of the Seller.

9. **Lead-Based Paint.** To the best of Seller's knowledge, the residential dwelling(s) on the Property (including any portion thereof or painted fixture therein) ☐ was (attach F316 Lead-Based Paint Exhibit) **OR** ☐ was not built prior to 1978.

10. **Brokerage Relationships in this Transaction.**

    a. **Buyer's Broker is** BHGRE Metro Brokers _____ and is:
    (1) ☐ representing Buyer as a client.
    (2) ☑ working with Seller as a customer.
    (3) ☐ acting as a dual agent representing Buyer and Seller.
    (4) ☐ acting as a designated agent where:

    _____ has been assigned to exclusively represent Buyer.

    b. **Seller's Broker is** Ansley Atlanta Real Estate _____ and is:
    (1) ☑ representing Seller as a client.
    (2) ☐ working with Seller as a customer.
    (3) ☐ acting as a dual agent representing Buyer and Seller.
    (4) ☐ acting as a designated agent where:

    _____ has been assigned to exclusively represent Seller.

    c. **Material Relationship Disclosure:** The material relationships required to be disclosed by either Broker are as follows:
    N/A

11. **Time Limit of Offer.** _____ set forth herein expires at 6 _____ o'clock P _____ m. on the date 03/14/2021 _____.

Buyer(s) Initials _____ [03/13/21]    Seller(s) Initials _____

THIS FORM IS COPYRIGHTED AND MAY ONLY BE USED IN REAL ESTATE TRANSACTIONS IN WHICH Dee McBee IS INVOLVED AS A REAL ESTATE LICENSEE. UNAUTHORIZED USE OF THE FORM MAY RESULT IN LEGAL SANCTIONS BEING BROUGHT AGAINST THE USER AND SHOULD BE REPORTED TO THE GEORGIA ASSOCIATION OF REALTORS® AT (770) 451-1831.
Copyright© 2021 by Georgia Association of REALTORS®, Inc.

## B. CORRESPONDING PARAGRAPHS FOR SECTION A

**1. Purchase and Sale.**

    **a. Warranty:** Seller warrants that at the time of closing Seller will convey good and marketable title to said Property by limited warranty deed subject only to: (1) zoning; (2) general utility, sewer, and drainage easements of record as of the Binding Agreement Date and upon which the improvements (other than any driveway or walkway) do not encroach; (3) declarations of condominium and declarations of covenants, conditions and restrictions of record on the Binding Agreement Date; and (4) leases and other encumbrances specified in this Agreement. Buyer agrees to assume Seller's responsibilities in any leases specified in this Agreement.

    **b. Examination:** Buyer may examine title and obtain a survey of the Property and furnish Seller with a written statement of title objections at or prior to the closing. If Seller fails or is unable to satisfy valid title objections at or prior to the closing or any unilateral extension thereof, which would prevent the Seller from conveying good and marketable title to the Property, then Buyer, among its other remedies, may terminate the Agreement without penalty upon written notice to Seller. Good and marketable title as used herein shall mean title which a title insurance company licensed to do business in Georgia will insure at its regular rates, subject only to standard exceptions.

    **c. Title Insurance:** Buyer hereby directs any mortgage lender involved in this transaction to quote the cost of title insurance based upon the presumption that Buyer will be obtaining an enhanced title insurance policy since such a policy affords Buyer greater coverage.

**2. Purchase Price to be Paid by Buyer.** The Purchase Price shall be paid in U.S. Dollars at closing by wire transfer of immediately available funds, or such other form of payment acceptable to the closing attorney.

**3. Closing Costs.**

    **a. Seller's Contribution at Closing:** At closing, Seller shall make the referenced Seller's Monetary Contribution which Buyer may use to pay any cost or expense of Buyer related to this transaction. Buyer acknowledges that Buyer's mortgage lender(s) may not allow the Seller's Monetary Contribution, or the full amount thereof, to be used for some costs or expenses. In such event, any unused portion of the Seller's Monetary Contribution shall remain the property of the Seller. The Seller shall pay the fees and costs of the closing attorney: (1) to prepare and record title curative documents and (2) for Seller not attending the closing in person.

    **b. Items Paid by Buyer:** At closing, Buyer shall pay: (1) Georgia property transfer tax; (2) the cost to search title and tax records and prepare the limited warranty deed; and (3) all other costs, fees and charges to close this transaction, except as otherwise provided herein.

    **c. Prorations:** Ad valorem property taxes, community association fees, solid waste and governmental fees and utility bills for which service cannot be terminated as of the date of closing shall be prorated as of the date of closing. In the event ad valorem property taxes are based upon an estimated tax bill or tax bill under appeal, Buyer and Seller shall, upon the issuance of the actual tax bill or the appeal being resolved, promptly make such financial adjustments between themselves as are necessary to correctly prorate the tax bill. In the event there are tax savings resulting from a tax appeal, third party professional costs to handle the appeal may be deducted from the savings for that tax year before re-prorating. Any pending tax appeal for the year in which the Property is sold shall be deemed assigned to Buyer at closing. The liability to the county in which the Property is located for ad valorem real property taxes for the year in which the Property is sold shall be assumed by Buyer upon the Closing of the Property. Buyer agrees to indemnify Seller against any and all claims of the county for unpaid ad valorem real property taxes for the year in which the Property is sold.

**4. Closing Date and Possession.**

    **a. Right to Extend the Closing Date:** Buyer or Seller may unilaterally extend the closing date for eight (8) days upon notice to the other party given prior to or on the date of closing if: (1) Seller cannot satisfy valid title objections (excluding title objections that: (a) can be satisfied through the payment of money or by bonding off the same; and (b) do not prevent Seller from conveying good and marketable title, as that term is defined herein, to the Property); (2) Buyer's mortgage lender (even in "all cash" transactions where Buyer is obtaining a mortgage loan) or the closing attorney is delayed and cannot fulfill their respective obligations by the date of closing, provided that the delay is not caused by Buyer; or (3) Buyer has not received required estimates or disclosures and Buyer is prohibited from closing under federal regulations. The party unilaterally extending the closing date shall state the basis for the delay in the notice of extension. If the right to unilaterally extend the closing date is exercised once by either the Buyer or Seller, the right shall thereafter terminate.

    **b. Keys and Openers:** At Closing, Seller shall provide Buyer with all keys, door openers, codes and other similar equipment pertaining to the Property.

**5. Holder of Earnest Money.** The earnest money shall be deposited into Holder's escrow/trust account (with Holder being permitted to retain the interest if the account is interest bearing) not later than: (a) five (5) banking days after the Binding Agreement Date hereunder or (b) five (5) banking days after the date it is actually received if it is received after the Binding Agreement Date. If Buyer writes a check or pays with an ACH for earnest money and the same is deposited into Holder's escrow/trust account, Holder shall not return the earnest money until the check or ACH has cleared the account on which the check was written or from which the ACH was sent. In the event any earnest money check is dishonored by the bank upon which it is drawn, or earnest money is not timely paid, Holder shall promptly give notice of the same to Buyer and Seller. Buyer shall have three (3) banking days from the date of receiving the notice to cure the default and if Buyer does not do so, Seller may within seven (7) days thereafter terminate this Agreement upon notice to Buyer. If Seller fails to terminate the Agreement timely, Seller's right to terminate based on the default shall be waived.

**6. Closing Attorney/Law Firm.** Buyer shall have the right to select the closing attorney to close this transaction, and hereby selects the closing attorney referenced herein. In all cases where an individual closing attorney is named in this Agreement but the closing attorney is employed by or an owner, shareholder, or member in a law firm, the law firm shall be deemed to be the closing attorney. If Buyer's mortgage lender refuses to allow that closing attorney to close this transaction, Buyer shall select a different closing attorney acceptable to the mortgage lender. The closing attorney shall represent the mortgage lender in any transaction in which the Buyer obtains mortgage financing (including transactions where the method of payment referenced herein is "all cash"). In transactions where the Buyer does not obtain mortgage financing, the closing attorney shall represent the Buyer.

## 7. Earnest Money.

a. **Entitlement to Earnest Money:** Subject to the paragraph below, Buyer shall be entitled to the earnest money upon the: (1) failure of the parties to enter into a binding agreement; (2) failure of any unexpired contingency or condition to which this Agreement is subject; (3) termination of this Agreement due to the default of Seller; or (4) termination of this Agreement in accordance with a specific right to terminate set forth in the Agreement. Otherwise, the earnest money shall be applied towards the purchase price of the Property at closing or if other funds are used to pay the purchase price then the earnest money shall be returned to Buyer.

b. **Disbursement of Earnest Money:** Holder shall disburse the earnest money upon: (1) the closing of Property; (2) a subsequent written agreement of Buyer and Seller; (3) an order of a court or arbitrator having jurisdiction over any dispute involving the earnest money; or (4) the failure of the parties to enter into a binding agreement (where there is no dispute over the formation or enforceability of the Agreement). In addition, Holder may disburse the earnest money upon a reasonable interpretation of the Agreement, provided that Holder first gives all parties at least ten (10) days notice stating to whom and why the disbursement will be made. Any party may object to the proposed disbursement by giving written notice of the same to Holder within the ten (10) day notice period. Objections not timely made in writing shall be deemed waived. If Holder receives an objection and, after considering it, decides to disburse the earnest money as originally proposed, Holder may do so and send notice to the parties of Holder's action. If Holder decides to modify its proposed disbursement, Holder shall first send a new ten (10) day notice to the parties stating the rationale for the modification and to whom the disbursement will now be made. Holder shall disburse the earnest money to Seller by check in the event Holder: (1) makes a reasonable interpretation of the Agreement that the Agreement has been terminated due to Buyer's default; and (2) sends the required ten (10) day notice of the proposed disbursement to Buyer and Seller. The above-referenced check shall constitute liquidated damages in full settlement of all claims of Seller against Buyer and the Brokers in this transaction. Holder may require Seller to sign a W-9 before issuing a check to Seller for liquidated damages of $600 or more. Such liquidated damages are a reasonable pre-estimate of Seller's actual damages, which damages the parties agree are difficult to ascertain and are not a penalty.

c. **Interpleader:** If an earnest money dispute cannot be resolved after a reasonable time, Holder may interplead the earnest money into a court of competent jurisdiction if Holder is unsure who is entitled to the earnest money. Holder shall be reimbursed for and may deduct its costs, expenses and reasonable attorney's fees from any funds interpleaded. The prevailing defendant in the interpleader lawsuit shall be entitled to collect its attorney's fees, court costs and the amount deducted by Holder to cover Holder's costs and expenses from the non-prevailing defendant.

d. **Hold Harmless:** All parties hereby covenant and agree to: (1) indemnify and hold Holder harmless from and against all claims, injuries, suits and damages arising out of the performance by Holder of its duties; (2) not to sue Holder for any decision of Holder to disburse earnest money in accordance with this Agreement.

## 8. Inspection and Due Diligence.

a. **Right to Inspect Property:** Upon prior notice to Seller, Buyer and/or Buyer's representatives shall have the right to enter the Property at Buyer's expense and at reasonable times (including immediately prior to closing) to inspect, examine, test, appraise and survey Property. This right to enter shall include the time period after the end of any Due Diligence Period to, among other things, and without limitation, meet contractors and vendors, measure for renovations and confirm that any agreed upon repairs have been made and the Property otherwise remains in the same condition. Seller shall cause all utilities, systems and equipment to be on so that Buyer may complete all inspections. Buyer agrees to hold Seller and all Brokers harmless from all claims, injuries and damages relating to the exercise of these rights and shall promptly restore any portion of the Property damaged or disturbed from testing or other evaluations to a condition equal to or better than the condition it was in prior to such testing or evaluation. If Buyer is concerned that the Property may have been used as a laboratory for the production of methamphetamine, or as a dumpsite for the same, Buyer should review the National Clandestine Laboratory Register – Georgia at **www.dea.gov**.

b. **Duty to Inspect Neighborhood:** In every neighborhood there are conditions which different buyers may find objectionable. Buyer shall have the sole duty to become familiar with neighborhood conditions that could affect the Property such as landfills, quarries, power lines, airports, cemeteries, prisons, stadiums, odor and noise producing activities, crime and school, land use, government and transportation maps and plans. It shall be Buyer's sole duty to become familiar with neighborhood conditions of concern to Buyer. If Buyer is concerned about the possibility of a registered sex offender residing in a neighborhood in which Buyer is interested, Buyer should review the Georgia Violent Sex Offender Registry available on the Georgia Bureau of Investigation Website at **www.gbi.georgia.gov**.

c. **Warranties Transfer:** Seller agrees to transfer to Buyer, at closing, subject to Buyer's acceptance thereof (and at Buyer's expense, if there is any cost associated with said transfer), Seller's interest in any existing manufacturer's warranties, service contracts, termite treatment and/or repair guarantee and/or other similar warranties which, by their terms, may be transferable to Buyer.

d. **Property Sold "As-Is" Unless this Agreement is Subject to Due Diligence Period:**

   (1) **General:** Unless the Property is being sold subject to a Due Diligence Period referenced herein, the Property shall be sold "as-is" with all faults. Even if the Property is sold "as-is" Seller is required under Georgia law to disclose to the Buyer latent or hidden defects in the Property which Seller is aware and which could not have been discovered by the Buyer upon a reasonable inspection of the property. The inclusion of a Due Diligence Period herein shall: (a) during its term make this Agreement an option contract in which Buyer may decide to proceed or not proceed with the purchase of the Property for any or no reason; and (b) be an acknowledgement by Seller that Buyer has paid separate valuable consideration of $10 for the granting of the option.

   (2) **Purpose of Due Diligence Period:** During the Due Diligence Period, Buyer shall determine whether or not to exercise Buyer's option to proceed or not proceed with the purchase of the Property. If Buyer has concerns with the Property, Buyer may during the Due Diligence Period seek to negotiate an amendment to this Agreement to address such concerns.

   (3) **Notice of Decision Not To Proceed:** Buyer shall have elected to exercise Buyer's option to purchase the Property unless prior to the end of any Due Diligence Period, Buyer notifies Seller of Buyer's decision not to proceed by delivering to Seller a notice of termination of this Agreement. In the event Buyer does not terminate this Agreement prior to the end of the Due Diligence Period, then: (a) Buyer shall have accepted the Property "as-is" subject to the terms of this Agreement; and (b) Buyer shall no longer have any right to terminate this Agreement based upon the Due Diligence Period.

e. **Repairs:** All agreed upon repairs and replacements shall be performed in a good and workmanlike manner prior to closing.

9. **Lead-Based Paint.** If any portion of a residential dwelling on the Property was built prior to 1978, the Lead-Based Paint Exhibit (F316) is hereby attached as an exhibit to this Agreement. The term "residential dwelling" includes any painted fixture or material used therein that was built or manufactured prior to 1978.

10. **Brokerage Relationships in this Transaction.**

   a. **Agency Disclosure:** No Broker in this transaction shall owe any duty to Buyer or Seller greater than what is set forth in their brokerage engagements and the Brokerage Relationships in Real Estate Transactions Act, O.C.G.A. § 10-6A-1 et. seq.;

      (1) **No Agency Relationship:** Buyer and Seller acknowledge that, if they are not represented by Brokers in a client relationship, they are each solely responsible for protecting their own interests, and that Broker's role is limited to performing ministerial acts for that party.

      (2) **Consent to Dual Agency:** If Broker is acting as dual agent in this transaction, Buyer and Seller consent to the same and acknowledge having been advised of the following:

         i. **Dual Agency Disclosure:** *[Applicable only if Broker is acting as a dual agent in this transaction.]*

            (a) As a dual agent, Broker is representing two clients whose interests are or at times could be different or even adverse;

            (b) Broker will disclose all adverse material facts relevant to the transaction and actually known to the dual agent to all parties in the transaction except for information made confidential by request or instructions from each client which is not otherwise required to be disclosed by law;

            (c) Buyer and Seller do not have to consent to dual agency and the consent of Buyer and Seller to dual agency has been given voluntarily and the parties have read and understand their brokerage engagement agreements.

            (d) Notwithstanding any provision to the contrary contained herein Buyer and Seller each hereby direct Broker while acting as a dual agent to keep confidential and not reveal to the other party any information which could materially and adversely affect their negotiating position.

         ii. **Designated Agency Disclosure:** If Broker in this transaction is acting as a designated agent, Buyer and Seller consent to the same and acknowledge that each designated agent shall exclusively represent the party to whom each has been assigned as a client and shall not represent in this transaction the client assigned to the other designated agent.

   b. **Brokerage:** Seller has agreed to pay Seller's Broker(s) a commission pursuant to a separate brokerage engagement agreement entered into between the parties and incorporated herein by reference ("Seller Brokerage Engagement Agreement"). The Seller's Broker has agreed to share that commission with the Buyer's Broker. The closing attorney is hereby authorized and directed to pay the Broker(s) at closing, their respective portions of the commissions out of the proceeds of the sale. If the sale proceeds are insufficient to pay the full commission, the party owing the commission shall pay any shortfall at closing. The acceptance by the Broker(s) of a partial real estate commission at the closing shall not relieve the party owing the same from paying the remainder after the closing (unless the Broker(s) have expressly agreed in writing to accept the amount paid in full satisfaction of the Broker(s) claim to a commission). The Brokers herein are signing this Agreement to reflect their role in this transaction and consent to act as Holder if either of them is named as such. This Agreement and any amendment thereto shall be enforceable even without the signature of any Broker referenced herein. The broker(s) are express third-party beneficiaries to this Agreement.

   c. **Disclaimer:** Buyer and Seller have not relied upon any advice or representations of Brokers other than what is included in this Agreement. Brokers shall have no duty to inspect the Property or to advise Buyer or Seller on any matter relating to the Property which could have been revealed through a survey, appraisal, title search, Official Georgia Wood Infestation Report, utility bill review, septic system inspection, well water test, tests for radon, asbestos, mold, methamphetamine, and lead-based paint; moisture test of stucco or synthetic stucco, inspection of the Property by a professional, construction expert, structural engineer or environmental engineer; review of this Agreement and transaction by an attorney, financial planner, mortgage consultant or tax consultant; and consulting appropriate governmental officials to determine, among other things and without limitation, the zoning of Property, the propensity of the Property to flood, flood zone certifications, whether any condemnation action is pending or has been filed or other nearby governmental improvements are planned. Buyer and Seller acknowledge that Broker does not perform or have expertise in any of the above tests, inspections, and reviews or in any of the matters handled by the professionals referenced above. Buyer and Seller should seek independent expert advice regarding any matter of concern to them relative to the Property and this Agreement. Buyer and Seller acknowledge that Broker shall not be responsible to monitor, supervise, or inspect any construction or repairs to Property and such tasks clearly fall outside the scope of real estate brokerage services. If Broker has written any special stipulations herein, the party for whom such special stipulations were written: a) confirms that each such stipulation reflects the party's complete understanding as to the substance and form of the special stipulations; b) hereby adopts each special stipulation as the original work of the party; and c) hereby agrees to indemnify and hold Broker who prepared the stipulation harmless from any and all claims, causes of action, suits, and damages arising out of or relating to such special stipulation. Buyer acknowledges that when and if Broker answers a question of Buyer or otherwise describes some aspect of the Property or the transaction, Broker is doing so based upon information provided by Seller rather than the independent knowledge of Broker (unless Broker makes an independent written disclosure to the contrary).

11. **Time Limit of Offer.** The Time Limit of the Offer shall be the date and time referenced herein when the Offer expires unless prior to that date and time both of the following have occurred: (a) the Offer has been accepted by the party to whom the Offer was made; and (b) notice of acceptance of the Offer has been delivered to the party who made the Offer.

## C. OTHER TERMS AND CONDITIONS

1. **Notices.**

   a. **Generally:** All notices given hereunder shall be in writing, legible and signed by the party giving the notice. In the event of a dispute regarding notice, the burden shall be on the party giving notice to prove delivery. The requirements of this notice paragraph shall apply even prior to this Agreement becoming binding. Notices shall only be delivered: (1) in person; (2) by courier, overnight delivery service or by certified or registered U.S. mail (hereinafter collectively "Delivery Service"); or (3) by e-mail or facsimile. The person delivering or sending the written notice signed by a party may be someone other than that party.

b. **Delivery of Notice:** A notice to a party shall be deemed to have been delivered and received upon the earliest of the following to occur: (1) the actual receipt of the written notice by a party; (2) in the case of delivery by a Delivery Service, when the written notice is delivered to an address of a party set forth herein (or subsequently provided by the party following the notice provisions herein), provided that a record of the delivery is created; (3) in the case of delivery electronically, on the date and time the written notice is electronically sent to an e-mail address or facsimile number of a party herein (or subsequently provided by the party following the notice provisions herein). Notice to a party shall not be effective unless the written notice is sent to an address, facsimile number or e-mail address of the party set forth herein (or subsequently provided by the party following the notice provisions herein).

c. **When Broker Authorized to Accept Notice for Client:** Except where the Broker is acting in a dual agency capacity, the Broker and any affiliated licensee of the Broker representing a party in a client relationship shall be authorized agents of the party and notice to any of them shall for all purposes herein be deemed to be notice to the party. Notice to an authorized agent shall not be effective unless the written notice is sent to an address, facsimile number or e-mail address of the authorized agent set forth herein (or subsequently provided by the authorized agent following the notice provisions herein). Except as provided for herein, the Broker's staff at a physical address set forth herein of the Broker or the Broker's affiliated licensees are authorized to receive notices delivered by a Delivery Service. The Broker, the Broker's staff and the affiliated licensees of the Broker shall not be authorized to receive notice on behalf of a party in any transaction in which a brokerage engagement has not been entered into with the party or in which the Broker is acting in a dual agency capacity. In the event the Broker is practicing designated agency, only the designated agent of a client shall be an authorized agent of the client for the purposes of receiving notice.

2. **Default.**
   a. **Remedies of Seller:** In the event this Agreement fails to close due to the default of Buyer, Seller's sole remedy shall be to retain the earnest money as full liquidated damages. Seller expressly waives any right to assert a claim for specific performance. The parties expressly agree that the earnest money is a reasonable pre-estimate of Seller's actual damages, which damages the parties agree are difficult to ascertain. The parties expressly intend for the earnest money to serve as liquidated damages and not as a penalty.
   b. **Remedies of Buyer:** In the event this Agreement fails to close due to the default of Seller, Buyer may either seek the specific performance of this Agreement or terminate this Agreement upon notice to Seller and Holder, in which case all earnest money deposits and other payments Buyer has paid towards the purchase of the Property shall be returned to Buyer following the procedures set forth elsewhere herein.
   c. **Rights of Broker:** In the event this Agreement is terminated or fails to close due to the default of a party hereto, the defaulting party shall pay as liquidated damages to every broker involved in this Agreement the commission the broker would have received had the transaction closed. For purposes of determining the amount of liquidated damages to be paid by the defaulting party, all written agreements establishing the amount of commission to be paid to any broker involved in this transaction are incorporated herein by reference. The liquidated damages referenced above are a reasonable pre-estimate of the Broker(s) actual damages and are not a penalty.
   d. **Attorney's Fees:** In any litigation or arbitration arising out of this Agreement, including but not limited to breach of contract claims between Buyer and Seller and commission claims brought by a broker, the non-prevailing party shall be liable to the prevailing party for its reasonable attorney's fees and expenses.

3. **Risk of Damage to Property.** Seller warrants that at the time of closing the Property and all items remaining with the Property, if any, will be in substantially the same condition (including conditions disclosed in the Seller's Property Disclosure Statement or Seller's Disclosure of Latent Defects and Fixtures Checklist) as of the Offer Date, except for changes made to the condition of Property pursuant to the written agreement of Buyer and Seller. At time of possession, Seller shall deliver Property clean and free of trash, debris, and personal property of Seller not identified as remaining with the Property. Notwithstanding the above, if the Property is destroyed or substantially destroyed prior to closing, Seller shall promptly give notice to Buyer of the same and provide Buyer with whatever information Seller has regarding the availability of insurance and the disposition of any insurance claim. Buyer or Seller may terminate this Agreement without penalty not later than fourteen (14) days from receipt of the above notice. If Buyer or Seller do not terminate this Agreement, Seller shall cause Property to be restored to substantially the same condition as on the Offer Date. The date of closing shall be extended until the earlier of one year from the original date of closing, or seven (7) days from the date that Property has been restored to substantially the same condition as on the Offer Date and a new certificate of occupancy (if required) is issued.

4. **Other Provisions.**
   a. **Condemnation:** Seller shall: (1) immediately notify Buyer if the Property becomes subject to a condemnation proceeding; and (2) provide Buyer with the details of the same. Upon receipt of such notice, Buyer shall have the right, but not the obligation for 7 days thereafter, to terminate this Agreement upon notice to Seller in which event Buyer shall be entitled to a refund of all earnest money and other monies paid by Buyer toward the Property without deduction or penalty. If Buyer does not terminate the Agreement within this time frame, Buyer agrees to accept the Property less any portion taken by the condemnation and if Buyer closes, Buyer shall be entitled to receive any condemnation award or negotiated payment for all or a portion of the Property transferred or conveyed in lieu of condemnation.
   b. **Consent to Share Non-Public Information:** Buyer and Seller hereby consent to the closing attorney preparing and distributing an American Land Title Association ("ALTA") Estimated Settlement Statement-Combined or other combined settlement statement to Buyer, Seller, Brokers and Brokers' affiliated licensees working on the transaction reflected in this Agreement for their various uses.
   c. **Duty to Cooperate:** All parties agree to do all things reasonably necessary to timely and in good faith fulfill the terms of this Agreement. Buyer and Seller shall execute and deliver such certifications, affidavits, and statements required by law or reasonably requested by the closing attorney, mortgage lender and/or the title insurance company to meet their respective requirements.
   d. **Electronic Signatures:** For all purposes herein, an electronic or facsimile signature shall be deemed the same as an original signature; provided, however, that all parties agree to promptly re-execute a conformed copy of this Agreement with original signatures if requested to do so by, the buyer's mortgage lender or the other party.

e. **Entire Agreement, Modification and Assignment:** This Agreement constitutes the sole and entire agreement between all of the parties, supersedes all of their prior written and verbal agreements and shall be binding upon the parties and their successors, heirs and permitted assigns. No representation, promise or inducement not included in this Agreement shall be binding upon any party hereto. This Agreement may not be amended or waived except upon the written agreement of Buyer and Seller. Any agreement to terminate this Agreement or any other subsequent agreement of the parties relating to the Property must be in writing and signed by the parties. This Agreement may not be assigned by Buyer except with the written approval of Seller which may be withheld for any reason or no reason. Any assignee shall fulfil all the terms and conditions of this Agreement.

f. **Extension of Deadlines:** No time deadline under this Agreement shall be extended by virtue of it falling on a Saturday, Sunday or federal holiday except for the date of closing.

g. **GAR Forms:** The Georgia Association of REALTORS®, Inc. ("GAR") issues certain standard real estate forms. These GAR forms are frequently provided to the parties in real estate transactions. No party is required to use any GAR form. Since these forms are generic and written with the interests of multiple parties in mind, they may need to be modified to meet the specific needs of the parties using them. If any party has any questions about his or her rights and obligations under any GAR form, he or she should consult an attorney. Provisions in the GAR Forms are subject to differing interpretations by our courts other than what the parties may have intended. At times, our courts may strike down or not enforce provisions in our GAR Forms, as written. No representation is made that the GAR Forms will protect the interests of any particular party or will be fit for any specific purpose. The parties hereto agree that the GAR forms may only be used in accordance with the licensing agreement of GAR. While GAR forms may be modified by the parties, no GAR form may be reproduced with sections removed, altered or modified unless the changes are visible on the form itself or in a stipulation, addendum, exhibit or amendment thereto.

h. **Governing Law and Interpretation:** This Agreement may be signed in multiple counterparts each of which shall be deemed to be an original and shall be interpreted in accordance with the laws of Georgia. No provision herein, by virtue of the party who drafted it, shall be interpreted less favorably against one party than another. All references to time shall mean the time in Georgia. If any provision herein is to be unenforceable, it shall be severed from this Agreement while the remainder of the Agreement shall, to the fullest extent permitted by law, continue to have full force and effect as a binding contract.

i. **No Authority to Bind:** No Broker or affiliated licensee of Broker, by virtue of this status, shall have any authority to bind any party hereto to any contract, provisions herein, amendments hereto, or termination hereof. However, if authorized in this Agreement, Broker shall have the right to accept notice on behalf of a party. Additionally, any Broker or real estate licensee involved in this transaction may perform the ministerial act of filling in the Binding Agreement Date. In the event of a dispute over the Binding Agreement Date, it may only be resolved by the written agreement of the Buyer and Seller.

j. **Notice of Binding Agreement Date:** The Binding Agreement Date shall be the date when a party to this transaction who has accepted an offer or counteroffer to buy or sell real property delivers notice of that acceptance to the party who made the offer or counteroffer in accordance with the Notices section of the Agreement. Notice of the Binding Agreement Date may be delivered by either party (or the Broker working with or representing such party) to the other party. If notice of accurate Binding Agreement Date is delivered, the party receiving notice shall sign the same and immediately return it to the other party.

k. **Statute of Limitations:** All claims of any nature whatsoever against Broker(s) and/or their affiliated licensees, whether asserted in litigation or arbitration and sounding in breach of contract and/or tort, must be brought within two (2) years from the date any claim or cause of action arises. Such actions shall thereafter be time-barred.

l. **Survival of Agreement:** The following shall survive the closing of this Agreement: (1) the obligation of a party to pay a real estate commission; (2) any warranty of title; (3) all written representations of Seller in this Agreement regarding the Property or neighborhood in which the Property is located; (4) the section on condemnation; (5) the obligations of the parties regarding ad valorem real property taxes; and (6) any obligations which the parties herein agree shall survive the closing or may be performed or fulfilled after the Closing.

m. **Terminology:** As the context may require in this Agreement: (1) the singular shall mean the plural and vice versa; and (2) all pronouns shall mean and include the person, entity, firm, or corporation to which they relate. The letters "N.A." or "N/A", if used in this Agreement, shall mean "Not Applicable", except where the context would indicate otherwise.

n. **Time of Essence:** Time is of the essence of this Agreement.

5. **Definitions.**
   a. **Banking Day:** A "Banking Day" shall mean a day on which a bank is open to the public for carrying out substantially all of its banking functions. For purposes herein, a "Banking Day" shall mean Monday through Friday excluding federal holidays.
   b. **Binding Agreement Date:** The "Binding Agreement Date" shall be the date when a party to this transaction who has accepted an offer or counteroffer to buy or sell real property delivers notice of that acceptance to the party who made the offer or counteroffer in accordance with the Notices section of the Agreement. Once that occurs, this Agreement shall be deemed a Binding Agreement.
   c. **Broker:** In this Agreement, the term "Broker" shall mean a licensed Georgia real estate broker or brokerage firm and its affiliated licensees unless the context would indicate otherwise.
   d. **Business Day:** A "Business Day" shall mean a day on which substantially all businesses are open for business. For all purposes herein, a "Business Day" shall mean Monday through Friday excluding federal holidays.
   e. **Material Relationship:** A material relationship shall mean any actually known personal, familial, social, or business relationship between the broker or the broker's affiliated licensees and any other party to this transaction which could impair the ability of the broker or affiliated licensees to exercise fair and independent judgment relative to their client.

6. **WARNING TO BUYERS AND SELLERS**: **BEWARE OF CYBER-FRAUD**. Fraudulent e-mails attempting to get the buyer and/or seller to wire money to criminal computer hackers are increasingly common in real estate transactions. Specifically, criminals are impersonating the online identity of the actual mortgage lender, closing attorney, real estate broker or other person or companies involved in the real estate transaction. In that role, the criminals send fake wiring instructions attempting to trick buyers and/or sellers into wiring them money related to the real estate transaction, including, for example, the buyer's earnest money, the cash needed for the buyer to close, and/or the seller's proceeds from the closing. These instructions, if followed, will result in the money being wired to the criminals. In many cases, the fraudulent email is believable because it is sent from what appears to be the email address/domain of the legitimate company or person responsible for sending the buyer or seller wiring instructions. The buyer and/or seller should verify wiring instructions sent by email by independently looking up and calling the telephone number of the company or person purporting to have sent them. Buyers and sellers should never call the telephone number provided with wiring instructions sent by email since they may end up receiving a fake verification from the criminals. Buyer and sellers should be on special alert for: 1) emails directing the buyer and/or seller to wire money to a bank or bank account in a state other than Georgia; and 2) emails from a person or company involved in the real estate transaction that are slightly different (often by one letter, number, or character) from the actual email address of the person or company.

7. **LIMIT ON BROKER'S LIABILITY**. BUYER AND SELLER ACKNOWLEDGE THAT BROKER(S):
   a. **SHALL, UNDER NO CIRCUMSTANCES, HAVE ANY LIABILITY GREATER THAN THE AMOUNT OF THE REAL ESTATE COMMISSION PAID HEREUNDER TO BROKER (EXCLUDING ANY COMMISSION AMOUNT PAID TO A COOPERATING REAL ESTATE BROKER, IF ANY) OR, IF NO REAL ESTATE COMMISSION IS PAID TO BROKER, THAN A SUM NOT TO EXCEED $100; AND**
   b. **NOTWITHSTANDING THE ABOVE, SHALL HAVE NO LIABILITY IN EXCESS OF $100 FOR ANY LOSS OF FUNDS AS THE RESULT OF WIRE OR CYBER FRAUD.**

8. **Exhibits and Addenda.** All exhibits and/or addenda attached hereto, listed below, or referenced herein are made a part of this Agreement. If any such exhibit or addendum conflicts with any preceding paragraph (including any changes thereto made by the parties), said exhibit or addendum shall control:
   - ☑ All Cash Sale Exhibit (F401) "A_____"
   - ☐ Back-up Agreement Contingency Exhibit (F604) "_____"
   - ☐ Closing Attorney Acting as Holder of Earnest Money Exhibit (F510) "_____"
   - ☐ Community Association Disclosure Exhibit (F322) "_____"
   - ☐ Condominium Resale Purchase and Sale Exhibit (F204) "_____"
   - ☐ Conventional Loan Contingency Exhibit (F404) "_____"
   - ☐ FHA Loan Contingency Exhibit (F407) "_____"
   - ☐ Lead-Based Paint Exhibit (F316) "_____"
   - ☐ Lease Purchase and Sale Exhibit (F207) (to be used with F916) "_____"
   - ☐ Lease for Lease/Purchase Agreement (F916) (to be used with F207) "_____"
   - ☐ Legal Description Exhibit (F807 or other) "_____"
   - ☐ Loan Assumption Exhibit (F416) "_____"
   - ☐ Sale or Lease of Buyer's Property Contingency Exhibit (F601) "_____"
   - ☐ Seller's Property Disclosure Statement Exhibit (F301, F302, F304, F307 or F310) "_____"
   - ☑ Survey of Property as Exhibit "B_____"
   - ☐ Temporary Occupancy Agreement for Seller after Closing Exhibit (F219) "_____"
   - ☐ USDA-RD Loan Contingency Exhibit (F413) "_____"
   - ☐ VA Loan Contingency Exhibit (F410) "_____"
   - ☐ Other _____
   - ☐ Other _____

**SPECIAL STIPULATIONS**: The following Special Stipulations, if conflicting with any exhibit, addendum, or preceding paragraph (including any changes thereto made by the parties), shall control:

☐ Additional Special Stipulations are attached.

**By signing this Agreement, Buyer and Seller acknowledge that they have each read and understood this Agreement and agree to its terms.**

## Buyer Acceptance and Contact Information

**1** *JOHN H THATCHER Mang. Mem.*  dotloop verified 03/13/21 3:10 PM EST BDOU-4UOP-GLTY-KBRG
**Buyer's Signature**

7 IL PROPERTIES LLC/JOHN THATCHER, Mang. Mem.
**Print or Type Name**                              **Date**

503 N Main, Ste 429, Pueblo, CO 81003
**Buyer's Address for Receiving Notice**

719-248-8652
**Buyer's Phone Number:** ☐ Cell  ☐ Home  ☐ Work

7ilinvestors@gmail.com
**Buyer's E-mail Address**

**2 Buyer's Signature**

**Print or Type Name**                              **Date**

**Buyer's Address for Receiving Notice**

**Buyer's Phone Number:** ☐ Cell  ☐ Home  ☐ Work

**Buyer's E-mail Address**

☐ **Additional Signature Page (F267) is attached.**

## Seller Acceptance and Contact Information

**1** *Garry Knight*
**Seller's Signature**

**Print or Type Name**                              **Date**

**Seller's Address for Receiving Notice**

**Seller's Phone Number:** ☐ Cell  ☐ Home  ☐ Work

**Seller's E-mail Address**

**2 Seller's Signature**

**Print or Type Name**                              **Date**

**Seller's Address for Receiving Notice**

**Seller's Phone Number:** ☐ Cell  ☐ Home  ☐ Work

**Seller's E-mail Address**

☐ **Additional Signature Page (F267) is attached.**

## Buyer's Broker/Affiliated Licensee Contact Information

BHGRE Metro Brokers
**Buyer Brokerage Firm**

*Dee McBee*  dotloop verified 03/13/21 2:54 PM EST IUAR-0YCC-KV32-OCR6
**Broker/Affiliated Licensee Signature**         **Date**

Dee McBee                        274384
**Print or Type Name**          **GA Real Estate License #**

770-655-5266
**Licensee's Phone Number**      **Fax Number**

deemcbeerealtor@gmail.com
**Licensee's E-mail Address**

NEG BOARD
**REALTOR® Membership**

801 E Main Street, Blue Ridge, GA 30513
**Broker's Address**

706-946-3800
**Broker's Phone Number**        **Fax Number**

MTBR28                           H6179
**MLS Office Code**              **Brokerage Firm License Number**

## Seller's Broker/Affiliated Licensee Contact Information

Ansley Atlanta Real Estate
**Seller Brokerage Firm**

*Brian White*
**Broker/Affiliated Licensee Signature**         **Date**

Brian White                      200818
**Print or Type Name**          **GA Real Estate License #**

770-561-1020
**Licensee's Phone Number**      **Fax Number**

brian@ansleyre.com
**Licensee's Email Address**

**REALTOR® Membership**

**Broker's Address**

404-480-4663
**Broker's Phone Number**        **Fax Number**

ANSBR                            75011
**MLS Office Code**              **Brokerage Firm License Number**

**Binding Agreement Date:** The Binding Agreement Date in this transaction is the date of ⋅ 3/14/21
and has been filled in by             Brian White                ⋅

Copyright© 2021 by Georgia Association of REALTORS®, Inc.



# ALL CASH SALE
# (NO FINANCING CONTINGENCY)
# EXHIBIT "A    "



2021 Printing

This Exhibit is part of the Agreement with an Offer Date of 03/13/2021 _____ for the purchase and sale of that certain
Property known as: 253 River Heights Rd _____ , Blue Ridge _____ Georgia 30513 _____ .

1. **All Cash Sale.** While Buyer has sufficient liquid assets to purchase the Property in this transaction for "all cash", Buyer:
   A. ☐ reserves the right to pay all or a portion of the purchase price by obtaining an institutional first mortgage secured by a deed to secure debt on the Property; AND/OR
   ☐ reserves the right to pay all or a portion of the purchase price by obtaining a non-institutional first mortgage or other loan (including a private "hard-money" loan).

   **OR**

   B. ☑ shall not have the right to obtain a mortgage financing to pay for all or a portion of the purchase price of the Property. The Buyer is not obtaining a loan; therefore, the Buyer has no right to unilaterally extend the closing date for eight (8) days for reasons of mortgage lender delay.

2. **Verification of Funds.** Within 5 _____ days from the Binding Agreement Date Buyer shall be obligated to provide or cause to be provided to Seller information describing in specific detail all of the sources of Buyer's funds to purchase the Property ("Required Information"). The Required Information shall consist of at least one of the following:
   A. A letter or letters from a trust, stock brokerage firm and/or financial institution holding funds, stocks, bonds and/or other assets (hereinafter collectively referred to as "Assets") of or on behalf of Buyer and dated subsequent to the Binding Agreement Date stating that Buyer has funds of at least an amount specified in the letter and/or Assets on deposit with the institution of a value specified in the letter, that are sufficient to allow Buyer to complete the purchase of the Property;
   B. An account statement or statements from the trust, stock brokerage firm and/or financial institution(s) holding funds and/or Assets confirming a specific amount of funds and/or Assets on deposit with the institution. Such account statement must be for the regular time period that such statements are issued immediately preceding the Binding Agreement Date.

3. **Authorization and Security.** Buyer does hereby authorize Seller and Listing Broker to communicate with any person providing information regarding Buyer's source of funds to purchase the Property to verify such information and to answer any questions Seller or Listing Broker may have regarding the source of Buyer's funds to purchase the Property. In providing any account statement to Seller, Buyer shall be entitled to delete or otherwise shield account numbers, social security numbers, telephone numbers and other information the release of which could jeopardize the security of the account or put the Buyer at greater risk of identity theft.

4. **Seller's Right to Terminate.** In the event Buyer fails to provide Seller with the Required Information within the timeframe set forth above, Seller shall notify Buyer of the default and give Buyer three (3) days from the date of the delivery of the notice to cure the same. If Buyer does not timely cure the default, Seller may terminate this Agreement within seven (7) days thereafter due to Buyer's default upon notice to Buyer. In the event Seller does not terminate this Agreement within that timeframe, the right to terminate on this basis shall be waived.

5. **Appraisal Contingency.** In addition to the other rights of Buyer set forth herein, this Agreement ☐ shall or ☑ shall not be subject to the Property appraising for at least the purchase price. Buyer shall have the rights set forth in this exhibit in the event the Property does not appraise for at least the purchase price in accordance with the terms and conditions set forth below:
   A. **Type of Appraisal:** The appraisal shall be a "certified appraisal" of the Property (as that term is defined in O.C.G.A. § 43-39A-2) performed or signed off by a licensed or certified appraiser (as those terms are defined in the rules and regulations of the Georgia Real Estate Appraiser's Board) and include a statement that the appraiser performed an "independent appraisal assignment" (as that term is defined in O.C.G.A. § 43-39A-2(13)) with respect to the Property.
   B. **Selection of Appraiser:** The appraiser shall be selected by *[Select one. The sections not selected shall not be a part of this Agreement.]:* ☐ Buyer, ☐Seller, OR ☐ Other ( _____ ); and all parties agree that this appraiser shall only perform a single certified appraisal of the Property.

THIS FORM IS COPYRIGHTED AND MAY ONLY BE USED IN REAL ESTATE TRANSACTIONS IN WHICH Dee McBee _____ IS INVOLVED AS A REAL ESTATE LICENSEE. UNAUTHORIZED USE OF THE FORM MAY RESULT IN LEGAL SANCTIONS BEING BROUGHT AGAINST THE USER AND SHOULD BE REPORTED TO THE GEORGIA ASSOCIATION OF REALTORS® AT (770) 451-1831.

Copyright© 2021 by Georgia Association of REALTORS®, Inc. _____ F401, All Cash Sale Exhibit, Page 1 of 2, 01/01/21

**C. Rights of Buyer if Property Does Not Appraise:** If any appraisal performed pursuant to and in accordance with this exhibit is for less than the purchase price of the Property, the Buyer shall have the right to request within ___N/A___ days from the Binding Agreement Date that Seller reduce the sales price of the Property to a price not less than the appraisal price by submitting an Amendment to Sales Price ("ATSP") to Seller along with a complete copy of the appraisal which is for less than the purchase price. In the event that Buyer does not submit an ATSP within the time frame referenced above, Buyer shall be deemed to have waived Buyer's right to request a reduction in the sales price and this Agreement shall no longer be subject to an appraisal contingency. The time limit of the offer for the Seller to accept or reject the ATSP shall run through the earlier of: (1) three (3) days from the date that the ATSP is delivered to Seller; or (2) the time of closing (excluding any extensions of the closing resulting from the unilateral extension of the closing date).

If Seller does not accept the ATSP, Buyer shall have the right, but not the obligation, to terminate this Agreement without penalty upon notice to Seller, provided that such notice is given within three (3) days of the earlier of: (a) the date that Buyer receives notice that Seller has not accepted the ATSP; or (b) the last date Seller could have accepted the ATSP. In neither circumstance shall the Buyer's right to terminate extend beyond the time of closing.

**D. Buyer Not Obligated to Seek Price Reduction:** Nothing herein shall require Buyer to seek any reduction in the sales price of the Property. If Buyer does not seek a reduction in the sales price, Buyer shall be obligated to purchase the Property for the price agreed to by the parties in the Agreement.

Buyer's Initials: _____ | *JHT* 03/03/21 3:10 PM EST dotloop verified |

Seller's Initials: _____ | *GK* |

EXHIBIT "B"







FINAL PLAT FOR
# TOCCOA HEIGHTS
## PHASE 2
2nd SECTION
LAND LOT 80 8th DISTRICT
FANNIN COUNTY, GA.
MAY 10, 2002



# PERSONAL PROPERTY AGREEMENT
# (BILL OF SALE)

**Date:** 03/13/2021



**2021 Printing**

State of Georgia
County of Fannin County

For and in consideration of the sum of Ten Dollars ($10), receipt and sufficiency of which is hereby acknowledged, I agree to sell to the undersigned Buyer the following personal property hereinafter described:

## PERSONAL PROPERTY

| ITEM | DESCRIPTION | PRICE |
|------|-------------|-------|
| | ALL FURNISHINGS AND DECORATIONS TO REMAIN IN CABIN AS SEEN ON 3/11/2021 | ZERO |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | **TOTAL $** | ZERO |

1. This Bill of Sale shall become operative only upon the closing of the Purchase and Sale Agreement, with an Offer Date of 03/11/2021 , covering the real property located at:

253 River Heights Rd, Blue Ridge, GA 30513 .

Buyer shall then have all rights and title to the property and such rights shall inure to his or her respective executors, administrators, heirs or assigns. If for any reason whatsoever, the sale does not close, then this Bill of Sale covering personal property herein described shall be null and void and the consideration paid for this Bill of Sale shall be returned to the undersigned Buyer.

2. Seller warrants that Seller is the lawful owner of the personal property and states the personal property is free from all liens and encumbrances of any kind whatsoever. Seller further warrants that Seller has the right to sell the personal property and will warrant and defend the right against the lawful claims and demands of all persons.

*JOHN H THATCHER Mang. Mem.*
dotloop verified
03/13/21 3:10 PM EST
VUHJ-T1BC-MSRE-JY4S

**1 Buyer's Signature**

*Gary Knight*

**1 Seller's Signature**

7 IL PROPERTIES LLC/JOHN THATCHER. Mang. Mem.
Print or Type Name

Print or Type Name

**2 Buyer's Signature**

**2 Seller's Signature**

Print or Type Name

Print or Type Name

☐ Additional Signature Page (F267) is attached.

☐ Additional Signature Page (F267) is attached.

THIS FORM IS COPYRIGHTED AND MAY ONLY BE USED IN REAL ESTATE TRANSACTIONS IN WHICH Dee McBee IS INVOLVED AS A REAL ESTATE LICENSEE. UNAUTHORIZED USE OF THE FORM MAY RESULT IN LEGAL SANCTIONS BEING BROUGHT AGAINST THE USER AND SHOULD BE REPORTED TO THE GEORGIA ASSOCIATION OF REALTORS® AT (770) 451-1831.

Copyright© 2021 by Georgia Association of REALTORS®, Inc.          F225, Personal Property Agreement (Bill of Sale), 01/01/21

# INSTRUCTIONS TO CLOSING ATTORNEY



**2021 Printing**

RE: Purchase and Sale Agreement between **John H Thatcher, Mang. Mem** ("Buyer") and
**Gary Knight** ("Seller") dated __3/14/2021__

for Property located at __253 River Heights Rd, Blue Ridge GA 30513__.

For and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned Buyer's Broker and Seller's Broker hereby confirm the real estate commissions to which they will be entitled upon the closing of the above-referenced transaction and direct the closing attorney to pay these amounts at closing from the sales proceeds.

## 1. Commissions Paid By Seller.
A. The total real estate commission to be paid by the Seller in this transaction is set forth below ("Sellers Total Commission"):

_____ % of the purchase price;

$_____ **$44,950.00** _____;

_____ (other)

B. The Seller's Broker agrees to share this commission with the Buyer's Broker by paying the Buyer's Broker the following:

_____ % of the purchase price;

$_____ **$22,475.00** _____;

_____ (other)

## 2. Commissions Paid By Buyer.
A. In addition to the Seller's Total Commission, the real estate commission to be paid by the Buyer in this transaction is set forth below ("Buyer's Total Commission"):

_____ % of the purchase price;

$_____;

_____ (other)

B. The Buyer's Broker agrees to share this commission with the Seller's Broker by paying the Seller's Broker the following:

_____ % of the purchase price;

$_____;

_____ (other)

## 3. General.
A. Neither Broker shall have a claim for a commission against the other Broker in the event the closing does not occur.
B. Notwithstanding the above, signing this Agreement shall not, unless otherwise specifically provided for herein, waive or limit the right of the Buyer's Broker or Seller's Broker to challenge, after the closing, either the entitlement to, or the amount of any commission paid or not paid hereunder, or to assert any claim or seek arbitration regarding the same.

THIS FORM IS COPYRIGHTED AND MAY ONLY BE USED IN REAL ESTATE TRANSACTIONS IN WHICH ~~Brian White~~ IS INVOLVED AS A REAL ESTATE LICENSEE. UNAUTHORIZED USE OF THE FORM MAY RESULT IN LEGAL SANCTIONS BEING BROUGHT AGAINST THE USER AND SHOULD BE REPORTED TO THE GEORGIA ASSOCIATION OF REALTORS® AT (770) 451-1831.

Copyright© 2021 by Georgia Association of REALTORS®, Inc.                F255, Instructions to Closing Attorney, Page 1 of 2, 01/01/21

ocuSign Envelope ID: CB38EDA3-BBDA-4239-B473-19F23473E721

## 4. Further Directions to Closing Attorney.
The Seller's Broker, the Buyer's Broker and their respective affiliated licensees hereby direct the closing attorney to disclose on the settlement statement for the above-referenced transaction the following referral fees and rebates they have or will be paid or have received or will receive in said transaction.

### A. Seller's Broker.
Fees and Rebates:

Service for Which Fee or Rebate is Being:

| Paid By Seller's Broker or Affiliated Licensees of Seller's Broker [Identify Amount Paid and To Whom]: | Paid |
|---|---|

| Received By Seller's Broker or Affiliated Licensees of Seller's Broker Other Than for Real Estate Commission [Identify Amount Received and By Whom]: | Received |
|---|---|

### B. Buyer's Broker.
Fees and Rebates:

Service for Which Fee or Rebate is Being:

| Paid By Buyer's Broker or Affiliated Licensees of Buyer's Broker [Identify Amount Paid and To Whom]: | Paid |
|---|---|

| Received by Buyer's Broker or Affiliated Licensees of Buyer's Broker Other Than Real Estate Commission [Identify Amount Received and By Whom]: | Received |
|---|---|

**SPECIAL STIPULATIONS:** The following Special Stipulations, if conflicting with any preceding paragraph or any exhibit or addendum hereto shall control:

☐ **Additional Special Stipulations are attached.**

Better Homes and Gardens Real Estate Metro Brokers

Ansley Atlanta Real Estate LLC

| Buyer Brokerage Firm | | Seller Brokerage Firm | |
|---|---|---|---|
| DocuSigned by: | | DocuSigned by: | |
| DEE MCBEE | 3/31/2021 | Brian White | 3/31/2021 |
| Broker/Affiliated Licensee Signature | Date | Broker/Affiliated Licensee Signature | Date |

Broker's Phone#_____

Broker's Phone#_____

Broker's FAX#_____

Broker's FAX#_____

NEGBOR

NEGBOR

REALTOR® Membership

REALTOR® Membership

Copyright© 2021 by Georgia Association of REALTORS®, Inc.

F255, Instructions to Closing Attorney, Page 2 of 2, 01/01/21



# AMENDMENT TO THE DUE DILIGENCE PERIOD
# AMENDMENT #1

Date: 03/22/2021



2021 Printing

Whereas, the undersigned parties have entered into a certain Agreement between JOHN H THATCHER, Mang. Mem.
_____ ("Buyer") and Gary Knight _____ ("Seller"), with a Binding
Agreement Date of 03/14/2021 _____ for the purchase and sale of real property located at:
253 River Heights Rd _____, Blue Ridge _____, Georgia 30513 ____; and

Whereas, the undersigned parties desire to amend the aforementioned Agreement, it being to the mutual benefit of all parties to do so;

Now therefore, for and in consideration of the sum of Ten Dollars ($10.00) and other valuable considerations paid by each to the other, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree that the Due Diligence Period shall be extended to expire at 6 _____ o'clock P ____.m. on the date of 04/01/2021 _____.

It is agreed by the parties hereto that all of the other terms and conditions of the aforementioned Agreement shall remain in full force and effect other than as modified herein. Upon execution by all parties, this Amendment shall be attached to and form a part of said Agreement.

**By signing this Amendment, Buyer and Seller acknowledge that they have each read and understood this Amendment and agree to its terms.**

JOHN H THATCHER Mang. Mem
dotloop verified
03/25/21 9:20 AM MDT
B572-K62M-HGX5-ZACT
**1 Buyer's Signature**

Gary Knight
**1 Seller's Signature**

**2 Buyer's Signature**

**2 Seller's Signature**

☐ Additional Signature Page (F267) is attached.

☐ Additional Signature Page (F267) is attached.

Better Homes & Gardens Real Estate Metro Brokers - Corporate
**Buyer Brokerage Firm**

Ansley Atlanta Real Estate
**Seller Brokerage Firm**

Dee McBee
dotloop verified
03/25/21 10:59 AM EDT
56TF-01M6-QPQ5-XFN5
**Broker/Affiliated Licensee Signature**

Brian White
**Broker/Affiliated Licensee Signature**

NEGBOR
**REALTOR® Membership**

NEGBOR
**REALTOR® Membership**

**Acceptance Date.** The above Amendment is hereby accepted, 3 o'clock P .m. on the date of 3/25/2021 ("Acceptance Date"). This Amendment will become binding upon the parties when notice of the acceptance of the Amendment has been received by offeror. The offeror shall promptly notify offeree when acceptance has been received.

THIS FORM IS COPYRIGHTED AND MAY ONLY BE USED IN REAL ESTATE TRANSACTIONS IN WHICH Dee McBee IS INVOLVED AS A REAL ESTATE LICENSEE. UNAUTHORIZED USE OF THE FORM MAY RESULT IN LEGAL SANCTIONS BEING BROUGHT AGAINST THE USER AND SHOULD BE REPORTED TO THE GEORGIA ASSOCIATION OF REALTORS® AT (770) 451-1831.

Copyright© 2021 by Georgia Association of REALTORS®, Inc.        F710, Amendment to the Due Diligence Period, 01/01/21

dotloop signature verification: ...



# AMENDMENT TO THE DUE DILIGENCE PERIOD
## AMENDMENT #2

**Date:** 04/01/2021



**2021 Printing**

Whereas, the undersigned parties have entered into a certain Agreement between JOHN H THATCHER, Mang. Mem.

_____ ("Buyer") and Gary Knight _____ ("Seller"), with a Binding
Agreement Date of _____ for the purchase and sale of real property located at:
253 River Heights Rd _____ , Blue Ridge _____ , Georgia 30513 _____ ; and

Whereas, the undersigned parties desire to amend the aforementioned Agreement, it being to the mutual benefit of all parties to do so;

Now therefore, for and in consideration of the sum of Ten Dollars ($10.00) and other valuable considerations paid by each to the other, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree that the Due Diligence Period shall be extended to expire at ← 11:59 o'clock P .m. on the date of 04/00/2021  4/5/21

_JHT_
04/01/21
7:12 PM EDT
dotloop verified

_JHT_
04/01/21
7:12 PM EDT
dotloop verified

It is agreed by the parties hereto that all of the other terms and conditions of the aforementioned Agreement shall remain in full force and effect other than as modified herein. Upon execution by all parties, this Amendment shall be attached to and form a part of said Agreement.

**By signing this Amendment, Buyer and Seller acknowledge that they have each read and understood this Amendment and agree to its terms.**

_JOHN H THATCHER Mang. Mem._
dotloop verified
04/01/21 11:31 AM EDT
BDGG-WXI-8241-DVE3

**1 Buyer's Signature**

_Gary Knight_

**1 Seller's Signature**

_____

**2 Buyer's Signature**

_____

**2 Seller's Signature**

☐ Additional Signature Page (F267) is attached.

☐ Additional Signature Page (F267) is attached.

Better Homes & Gardens Real Estate Metro Brokers - Corporate
**Buyer Brokerage Firm**

Ansley Atlanta Real Estate
**Seller Brokerage Firm**

_Dee McBee_
dotloop verified
04/01/21 10:49 AM
EDT

**Broker/Affiliated Licensee Signature**

_Brian White_

**Broker/Affiliated Licensee Signature**

_____

**REALTOR® Membership**

_____

**REALTOR® Membership**

**Acceptance Date.** The above Amendment is hereby accepted, _____ o'clock P .m. on the date of A/1/21
("Acceptance Date"). This Amendment will become binding upon the parties when notice of the acceptance of the Amendment has been received by offeror. The offeror shall promptly notify offeree when acceptance has been received.

THIS FORM IS COPYRIGHTED AND MAY ONLY BE USED IN REAL ESTATE TRANSACTIONS IN WHICH Dee McBee _____ IS INVOLVED AS A REAL ESTATE LICENSEE. UNAUTHORIZED USE OF THE FORM MAY RESULT IN LEGAL SANCTIONS BEING BROUGHT AGAINST THE USER AND SHOULD BE REPORTED TO THE GEORGIA ASSOCIATION OF REALTORS® AT (770) 451-1631.

Copyright© 2021 by Georgia Association of REALTORS®, Inc.          F710, Amendment to the Due Diligence Period, 01/01/21

# AMENDMENT TO AGREEMENT
## AMENDMENT # 2

Date: 3/31/21


*Georgia*REALTORS

2021 Printing

**Whereas**, the undersigned parties have entered into a certain Agreement between _____ **7IL Properties LLC / John H Thatcher Jr**

_____ ("Buyer") and _____ **Gary Knight** _____ ("Seller"), with a Binding Agreement Date of _____ **3/14/21** _____ for the purchase and sale of real property located at: _____ **253 River Heights** _____ , **Blue Ridge** , Georgia __**30513**__ ; and

**Whereas**, the undersigned parties desire to amend the aforementioned Agreement, it being to the mutual benefit of all parties to do so;

Now therefore, for and in consideration of the sum of Ten Dollars ($10.00) and other valuable considerations paid by each to the other, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree to modify and amend the aforementioned Agreement as follows: [Note: The following language is furnished by the parties and is particular to this transaction.]

All parties acknowledge and agree purchase contingent on easement being recorded at closing granting access to lots

14, 15, and 16 to all three (3) access points to the river as discussed with buyer and seller on 3/30/21.

Current Gated path to serve as property owners of lot 14,15, 16 use only for ATV use and/or, serve as foot path for

owners and tenants/guest. The current stairs to serve as foot path only for lot 14,15,16 owners, tenants/guest with a

shared maintenance agreement to be in place for lot 14,15,16. The third path to serve as foot path only to benefit

owners, tenants/ guest of lots 14,15,16.

All parties agree Buyer to maintain $5Million liability insurance for rail road crossing in order to use easements

Any Community well agreement / Easements to be written by Licensed Georgia attorney at or prior to closing

☐ **Additional pages are attached.**

It is agreed by the parties hereto that all of the other terms and conditions of the aforementioned Agreement shall remain in full force and effect other than as modified herein. Upon execution by all parties, this Amendment shall be attached to and form a part of said Agreement.

**By signing this Amendment, Buyer and Seller acknowledge that they have each read and understood this Amendment and agree to its terms.**

*JOHN H THATCHER Mang Mem.*
dotloop verified
04/05/21 4:40 PM EDT
M8WI-YWPM-3MVT-9610

**1 Buyer's Signature**

*Gary Knight*

**1 Seller's Signature**

**2 Buyer's Signature**

**2 Seller's Signature**

☐ **Additional Signature Page (F267) is attached.**

☐ **Additional Signature Page (F267) is attached.**

BHGRE Metro Brokers

Buyer Brokerage Firm

*Dee McBee*
dotloop verified
04/05/21 4:28 PM EDT
XRAM-B5UN-PP45-VW0X

~~Broker/Affiliated Licensee Signature~~

Ansley Real Estate

Seller Brokerage Firm

*Brian White*

**Broker/Affiliated Licensee Signature**

NEGBOR

**REALTOR® Membership**

NEG

**REALTOR® Membership**

**Acceptance Date.** The above Amendment is hereby accepted, 5 _____ o'clp _____ on the date of __**04/05/2021**__ , ("Acceptance Date"). This Amendment will become binding upon the parties when notice of the acceptance of the Amendment has been received by offeror. The offeror shall promptly notify offeree when acceptance has been received.

THIS FORM IS COPYRIGHTED AND MAY ONLY BE USED IN REAL ESTATE TRANSACTIONS IN WHICH _____ **Christopher White** _____ IS INVOLVED AS A REAL ESTATE LICENSEE. UNAUTHORIZED USE OF THE FORM MAY RESULT IN LEGAL SANCTIONS BEING BROUGHT AGAINST THE USER AND SHOULD BE REPORTED TO THE GEORGIA ASSOCIATION OF REALTORS® AT (770) 451-1631.

Copyright© 2021 by Georgia Association of REALTORS®, Inc.

F701, Amendment to Agreement, 01/01/21

# AMENDMENT TO AGREEMENT
## AMENDMENT # ~~2~~ 3

Date: _____ 3/31/21



2021 Printing

**Whereas**, the undersigned parties have entered into a certain Agreement between _____ **7IL Properties LLC / John H Thatcher Jr**

_____ ("Buyer") and _____ **Gary Knight** _____ ("Seller"),

with a Binding Agreement Date of _____ 3/14/21 _____ for the purchase and sale of real property located at:

_____ **253 River Heights** _____, **Blue Ridge** , Georgia __ **30513** ; and

**Whereas**, the undersigned parties desire to amend the aforementioned Agreement, it being to the mutual benefit of all parties to do so;

Now therefore, for and in consideration of the sum of Ten Dollars ($10.00) and other valuable considerations paid by each to the other, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree to modify and amend the aforementioned Agreement as follows: [Note: The following language is furnished by the parties and is particular to this transaction.]

All parties acknowledge and agree purchase contingent on easement being recorded at closing granting access to lots

14, 15, and 16 to all three (3) access points to the river as discussed with buyer and seller on 3/30/21.

Current Gated path to serve as property owners of lot 14,15, 16 use only for ATV use and/or, serve as foot path for

owners and tenants/guest. The current stairs to serve as foot path only for lot 14,15,16 owners, tenants/guest with a

shared maintenance agreement to be in place for lot 14,15,16. The third path to serve as foot path only to benefit

owners, tenants/ guest of lots 14,15,16.

All parties agree Buyer to maintain $5Million liability insurance for rail road crossing in order to use easements

Any Community well agreement / Easements to be written by Licensed Georgia attorney at or prior to closing

☐ **Additional pages are attached.**

It is agreed by the parties hereto that all of the other terms and conditions of the aforementioned Agreement shall remain in full force and effect other than as modified herein. Upon execution by all parties, this Amendment shall be attached to and form a part of said Agreement.

**By signing this Amendment, Buyer and Seller acknowledge that they have each read and understood this Amendment and agree to its terms.**

*JOHN H THATCHER Mang. Memo* dotloop verified
04/05/21 4:40 PM EDT
M8WI-YWPM-3MVF-B61O

**1 Buyer's Signature**

*Gary Knight*

**1 Seller's Signature**

_____

**2 Buyer's Signature**

_____

**2 Seller's Signature**

☐ **Additional Signature Page (F267) is attached.**

☐ **Additional Signature Page (F267) is attached.**

BHGRE Metro Brokers

Buyer Brokerage Firm

Ansley Real Estate

Seller Brokerage Firm

*Dee McBee* dotloop verified
04/05/21 4:28 PM EDT
XRAM-BSUN-PP45-VW0X

~~Broker/Affiliated Licensee Signature~~

*Brian White*

**Broker/Affiliated Licensee Signature**

NEGBOR

REALTOR® Membership

NEG

REALTOR® Membership

**Acceptance Date.** The above Amendment is hereby accepted, 5 _____ o'clp _____ on the date of
_____ 04/05/2021 _____ , ("Acceptance Date"). This Amendment will become binding upon the parties when notice of the acceptance of the Amendment has been received by offeror. The offeror shall promptly notify offeree when acceptance has been received.

THIS FORM IS COPYRIGHTED AND MAY ONLY BE USED IN REAL ESTATE TRANSACTIONS IN WHICH _____ Christopher White _____ IS INVOLVED AS A REAL ESTATE LICENSEE. UNAUTHORIZED USE OF THE FORM MAY RESULT IN LEGAL SANCTIONS BEING BROUGHT AGAINST THE USER AND SHOULD BE REPORTED TO THE GEORGIA ASSOCIATION OF REALTORS® AT (770) 451-1831.

Copyright© 2021 by Georgia Association of REALTORS®, Inc.                    F701, Amendment to Agreement, 01/01/21



# AMENDMENT TO ADDRESS CONCERNS WITH
# PROPERTY AMENDMENT # 2  3

**[TO BE USED ONLY IF CONTRACT IS SUBJECT TO A DUE DILIGENCE PERIOD]**

**Date:** 04/05/2021



**2021 Printing**

**Whereas,** the undersigned parties have entered into a certain Agreement between JOHN H THATCHER, Mang. Mem.

| | ("Buyer") and Gary Knight | | | ("Seller"), with a |
|---|---|---|---|---|
| Binding Agreement Date of | 03/14/2021 | | for the purchase and sale of real property located at: | |
| 253 River Heights Rd | | , Blue Ridge | , Georgia 30513 | ("Agreement"). |

**Whereas,** the undersigned parties desire to amend the aforementioned Agreement, it being to the mutual benefit of all parties to do so. This Amendment shall become effective on the date when the party who has accepted the Amendment delivers notice of that acceptance to the party who proposed the Amendment in accordance with the Notice section of the Agreement.

This Amendment is intended to set forth the agreement of the parties relative to concerns raised by Buyer during the Due Diligence Period. If this Amendment does not become effective during the Due Diligence Period, it shall become null and void and of no legal force and effect.

In consideration of Seller agreeing to address certain concerns of Buyer with Property, all parties agree that if this Amendment is signed by Buyer and Seller and delivered to both parties, the remainder of Buyer's Due Diligence Period ☐ shall OR ☐ shall not terminate.

Now therefore, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree to modify and amend the Agreement to address the following concerns existing with the Property and for such other purposes as are set forth below:

[The following language is furnished by the parties and is particular to this transaction]

Both parties agree that the seller is to fix the following items as referenced in the Summary of the Inspection report dated 3/22/2021 by Titus Pugh that has been shared to all parties:

Comment 3: filled crack
Comment 4: filled also.
Comment 5: Fixed this.
Comment 6: This was fixed.
Comment 9: This was fixed.
Comment 14 this was fixed.
Comment 16 This was fixed
Comment 19 this was fixed.
Comment 20 This has 6 inch metal flashing and this was resealed and fixed.
Comment 21 this was fixed and entire fireplace is wire lathed with a moisure barrier and skim coat.
Comment 23 This was fixed.
Comment 24 This was fixed.
Comment 27 nothing needed.
Comment 31 this was fixed.
Comment 32 This was fixed.
Comment 33 this was fixed.
Comment 35 this was fixed.
Comment 39 this was fixed.
Comment 40. this is fixed.
Comment 43 this was fixed.
Comment 45 this was fixed.
Comment 48 this was fixed.
Comment 54 this was fixed.
Comment 60 this was fixed.
Comment 61 this was fixed.
Comment 64 This was fixed.
Comment 71 this was fixed.
Comment 72 this was fixed.
Comment 78 This was fixed.
Comment 79 This was fixed.
Comment 80 this was fixed.

THIS FORM IS COPYRIGHTED AND MAY ONLY BE USED IN REAL ESTATE TRANSACTIONS IN WHICH Dee McBee IS INVOLVED AS A REAL ESTATE LICENSEE. UNAUTHORIZED USE OF THE FORM MAY RESULT IN LEGAL SANCTIONS BEING BROUGHT AGAINST THE USER AND SHOULD BE REPORTED TO THE GEORGIA ASSOCIATION OF REALTORS® AT (770) 451-1831.

Copyright© 2021 by Georgia Association of REALTORS®, Inc.          F704, Amendment to Address Concerns with Property, Page 1 of 2, 01/01/21

☐ **Additional pages are attached.**

It is agreed by the parties hereto that all of the other terms and conditions of the aforementioned Agreement shall remain in full force and effect other than as modified herein. Upon execution by all parties, this Amendment shall be attached to and form a part of said Agreement.

**By signing this Amendment, Buyer and Seller acknowledge that they have each read and understood this Amendment and agree to its terms.**

| | |
|---|---|
| *JOHN H THATCHER, Mang. Mem.* <br> dotloop verified <br> 04/05/21 7:07 PM EDT <br> FARI-G5KG-DBQM-IF6P | *Gary Knight* |
| **1 Buyer's Signature** | **1 Seller's Signature** |

| | |
|---|---|
| | |
| **2 Buyer's Signature** | **2 Seller's Signature** |

☐ **Additional Signature Page (F267) is attached.**           ☐ **Additional Signature Page (F267) is attached.**

Better Homes & Gardens Real Estate Metro Brokers - Corporate
Buyer Brokerage Firm

Ansley Atlanta Real Estate
Seller Brokerage Firm

| | |
|---|---|
| *Dee McBee* <br> dotloop verified <br> 04/05/21 6:45 PM EDT <br> 836D-WU4S-KJLZ-FSRL | *Brian White* |
| **Broker/Affiliated Licensee Signature** | **Broker/Affiliated Licensee Signature** |

NEG BOR
**REALTOR® Membership**

NEG BOR
**REALTOR® Membership**

<u>Acceptance Date.</u> The above Amendment is hereby accepted, 11      )'ca      ₁ the date of 04/11/2021      ,
("Acceptance Date"). This Amendment will become binding upon the parties when notice of the acceptance of the Amendment has been received by offeror. The offeror shall promptly notify offeree when acceptance has been received.



**Better Homes and Gardens**
REAL ESTATE
**metrobrokers**

# AMENDMENT TO ADDRESS CONCERNS WITH
# PROPERTY AMENDMENT # 2̶ ̶3̶ 4

**[TO BE USED ONLY IF CONTRACT IS SUBJECT TO A DUE DILIGENCE PERIOD]**

*Georgia*REALTORS

**Date:** 04/05/2021

**2021 Printing**

**Whereas,** the undersigned parties have entered into a certain Agreement between JOHN H THATCHER, Mang. Mem.

| | ("Buyer") and Gary Knight | | ("Seller"), with a |
|---|---|---|---|
| Binding Agreement Date of | 03/14/2021 | | for the purchase and sale of real property located at: |
| 253 River Heights Rd | , Blue Ridge | , Georgia 30513 | ("Agreement"). |

**Whereas,** the undersigned parties desire to amend the aforementioned Agreement, it being to the mutual benefit of all parties to do so. This Amendment shall become effective on the date when the party who has accepted the Amendment delivers notice of that acceptance to the party who proposed the Amendment in accordance with the Notice section of the Agreement.

This Amendment is intended to set forth the agreement of the parties relative to concerns raised by Buyer during the Due Diligence Period. If this Amendment does not become effective during the Due Diligence Period, it shall become null and void and of no legal force and effect.

In consideration of Seller agreeing to address certain concerns of Buyer with Property, all parties agree that if this Amendment is signed by Buyer and Seller and delivered to both parties, the remainder of Buyer's Due Diligence Period ☐ shall OR ☐ shall not terminate.

Now therefore, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree to modify and amend the Agreement to address the following concerns existing with the Property and for such other purposes as are set forth below:

[The following language is furnished by the parties and is particular to this transaction]

Both parties agree that the seller is to fix the following items as referenced in the Summary of the Inspection report dated 3/22/2021 by Titus Pugh that has been shared to all parties:

Comment 3: filled crack
Comment 4: filled also.
Comment 5: Fixed this.
Comment 6: This was fixed.
Comment 9: This was fixed.
Comment 14 this was fixed.
Comment 16 This was fixed
Comment 19 this was fixed.
Comment 20 This has 6 inch metal flashing and this was resealed and fixed.
Comment 21 this was fixed and entire fireplace is wire lathed with a moisure barrier and skim coat.
Comment 23 This was fixed.
Comment 24 This was fixed.
Comment 27 nothing needed.
Comment 31 this was fixed.
Comment 32 This was fixed.
Comment 33 this was fixed.
Comment 35 this was fixed.
Comment 39 this was fixed.
Comment 40. this is fixed.
Comment 43 this was fixed.
Comment 45 this was fixed.
Comment 48 this was fixed.
Comment 54 this was fixed.
Comment 60 this was fixed.
Comment 61 this was fixed.
Comment 64 This was fixed.
Comment 71 this was fixed.
Comment 72 this was fixed.
Comment 78 This was fixed.
Comment 79 This was fixed.
Comment 80 this was fixed.

THIS FORM IS COPYRIGHTED AND MAY ONLY BE USED IN REAL ESTATE TRANSACTIONS IN WHICH Dee McBee **IS INVOLVED AS A REAL ESTATE LICENSEE. UNAUTHORIZED USE OF THE FORM MAY RESULT IN LEGAL SANCTIONS BEING BROUGHT AGAINST THE USER AND SHOULD BE REPORTED TO THE GEORGIA ASSOCIATION OF REALTORS® AT (770) 451-1831.**

☐ **Additional pages are attached.**

It is agreed by the parties hereto that all of the other terms and conditions of the aforementioned Agreement shall remain in full force and effect other than as modified herein. Upon execution by all parties, this Amendment shall be attached to and form a part of said Agreement.

**By signing this Amendment, Buyer and Seller acknowledge that they have each read and understood this Amendment and agree to its terms.**

| | |
|---|---|
| *JOHN H THATCHER, Mang. Mem.*    dotloop verified 04/05/21 7:07 PM EDT FARI-G3KG-D8QM-IF6P | *Gary Knight* |
| **1 Buyer's Signature** | **1 Seller's Signature** |

| | |
|---|---|
| | |
| **2 Buyer's Signature** | **2 Seller's Signature** |

☐ **Additional Signature Page (F267) is attached.**      ☐ **Additional Signature Page (F267) is attached.**

Better Homes & Gardens Real Estate Metro Brokers - Corporate      Ansley Atlanta Real Estate
**Buyer Brokerage Firm**                                                **Seller Brokerage Firm**

| | |
|---|---|
| *Dee McBee*    dotloop verified 04/05/21 6:45 PM EDT 836D-WU4S-KJLZ-PSRL | *Brian White* |
| **Broker/Affiliated Licensee Signature** | **Broker/Affiliated Licensee Signature** |

NEG BOR                                                      NEG BOR
**REALTOR® Membership**                                            **REALTOR® Membership**

**Acceptance Date.** The above Amendment is hereby accepted, 11       ɔ'ca       n the date of 04/11/2021      ,
("Acceptance Date"). This Amendment will become binding upon the parties when notice of the acceptance of the Amendment has been received by offeror. The offeror shall promptly notify offeree when acceptance has been received.

DocuSign Envelope ID: 1506C3E4-E1AC-4F13-90BF-9D1FEFA256F0



# AMENDMENT TO AGREEMENT
# AMENDMENT # 5

**Date:** 05/06/2021



2021 Printing

**Whereas,** the undersigned parties have entered into a certain Agreement between JOHN H THATCHER, Mang. Mem.

("Buyer") and Gary Knight ("Seller"),

with a Binding Agreement Date of 03/14/2021 for the purchase and sale of real property located at:

253 River Heights Rd , Blue Ridge , Georgia 30513 ; and

**Whereas,** the undersigned parties desire to amend the aforementioned Agreement, it being to the mutual benefit of all parties to do so;

Now therefore, for and in consideration of the sum of Ten Dollars ($10.00) and other valuable considerations paid by each to the other, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree to modify and amend the aforementioned Agreement as follows: [Note: The following language is furnished by the parties and is particular to this transaction.]

Both parties agree that the buyer name shall change from JOHN H THATCHER, Mang, Mem. to:

7 IL PROPERTIES, LLC, a Colorado Limited Liability Company

☐ **Additional pages are attached.**

It is agreed by the parties hereto that all of the other terms and conditions of the aforementioned Agreement shall remain in full force and effect other than as modified herein. Upon execution by all parties, this Amendment shall be attached to and form a part of said Agreement.

**By signing this Amendment, Buyer and Seller acknowledge that they have each read and understood this Amendment and agree to its terms.**

JOHN H THATCHER, Mang. Mem.
dotloop verified
05/06/21 10:31 AM EDT
G8JT-HQ8E-T6BS-N1D1
**1 Buyer's Signature**

Gary knight
**1 Seller's Signature**

**2 Buyer's Signature**

**2 Seller's Signature**

☐ **Additional Signature Page (F267) is attached.**

☐ **Additional Signature Page (F267) is attached.**

Better Homes & Gardens Real Estate Metro Brokers - Corporate
**Buyer Brokerage Firm**

Ansley Atlanta Real Estate
**Seller Brokerage Firm**

Dee McBee
dotloop verified
05/06/21 9:22 AM EDT
AJVN-TIZ0-NNWV-5V7Z
**Broker/Affiliated Licensee Signature**

Brian White
dotloop verified
05/07/21 9:36 AM EDT
LVHG-WW1Z-TAX4-ADMD
**Broker/Affiliated Licensee Signature**

NEGBOR
**REALTOR® Membership**

NEG BOR
**REALTOR® Membership**

**Acceptance Date.** The above Amendment is hereby accepted, _____ o'clock _____ .m. on the date of
5/8/2021 , ("Acceptance Date"). This Amendment will become binding upon the parties when notice of the acceptance of the Amendment has been received by offeror. The offeror shall promptly notify offeree when acceptance has been received.

THIS FORM IS COPYRIGHTED AND MAY ONLY BE USED IN REAL ESTATE TRANSACTIONS IN WHICH Dee McBee IS INVOLVED AS A REAL ESTATE LICENSEE. UNAUTHORIZED USE OF THE FORM MAY RESULT IN LEGAL SANCTIONS BEING BROUGHT AGAINST THE USER AND SHOULD BE REPORTED TO THE GEORGIA ASSOCIATION OF REALTORS® AT (770) 451-1831.

Copyright© 2021 by Georgia Association of REALTORS®, Inc. F701, Amendment to Agreement, 01/01/21

# AMENDMENT TO AGREEMENT
## AMENDMENT # __6__

Date: _____5/20/21_____



2021 Printing

**Whereas,** the undersigned parties have entered into a certain Agreement between _____**7IL Properties LLC**_____

_____ ("Buyer") and _____**Gary Knight**_____ ("Seller"),

with a Binding Agreement Date of _____3/14/21_____ for the purchase and sale of real property located at:

_____**253 River Heights Rd**_____, **Blue Ridge** , Georgia __30513__ ; and

**Whereas,** the undersigned parties desire to amend the aforementioned Agreement, it being to the mutual benefit of all parties to do so;

Now therefore, for and in consideration of the sum of Ten Dollars ($10.00) and other valuable considerations paid by each to the other, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree to modify and amend the aforementioned Agreement as follows: [Note: The following language is furnished by the parties and is particular to this transaction.]

"Seller reserves the right to include this transaction via an assignment of Seller's rights as part of an IRC, Section 1031

tax deferred exchange for the benefit of Seller, at no cost, expense or liability to Buyer. Buyer further agrees to execute

any and all documents (subject to the reasonable approval of Buyer's counsel) as are reasonably necessary in

connection therewith, provided that the close of this transaction for the conveyance of Seller's property shall not be

contingent upon or subject to the completion of such exchange. Buyer understands and acknowledges that Seller is

participating in the 1031 Tax Deferred Exchange Program]. Seller agrees to indemnify and hold Buyer free and

harmless from any cost, expense or liability, including attorney's fees resulting from Buyer's participation in such

exchange."

☐ **Additional pages are attached.**

It is agreed by the parties hereto that all of the other terms and conditions of the aforementioned Agreement shall remain in full force and effect other than as modified herein. Upon execution by all parties, this Amendment shall be attached to and form a part of said Agreement.

**By signing this Amendment, Buyer and Seller acknowledge that they have each read and understood this Amendment and agree to its terms.**

_JOHN H THATCHER Mang. Mem._ 
dotloop verified
05/20/21 2:11 PM MDT
0RPJ-G87A-IUI9-IGOD

**1 Buyer's Signature**

_Gary Knight_

**1 Seller's Signature**

_____

**2 Buyer's Signature**

_____

**2 Seller's Signature**

☐ **Additional Signature Page (F267) is attached.**

☐ **Additional Signature Page (F267) is attached.**

_BHGRE METRO BROKERS_

Buyer Brokerage Firm

_Dee McBee_  
dotloop verified
05/20/21 3:43 PM EDT
E2EV-FWZW-QZQ5-T1ZO

**Broker/Affiliated Licensee Signature**

Ansley Real Estate

Seller Brokerage Firm

_Brian White_

**Broker/Affiliated Licensee Signature**

NEGBOR

**REALTOR® Membership**

NEG

**REALTOR® Membership**

**Acceptance Date.** The above Amendment is hereby accepted, _____ o'clock _____.m. on the date of _____, ("Acceptance Date"). This Amendment will become binding upon the parties when notice of the acceptance of the Amendment has been received by offeror. The offeror shall promptly notify offeree when acceptance has been received.

THIS FORM IS COPYRIGHTED AND MAY ONLY BE USED IN REAL ESTATE TRANSACTIONS IN WHICH _____Christopher White_____ IS INVOLVED AS A REAL ESTATE LICENSEE. UNAUTHORIZED USE OF THE FORM MAY RESULT IN LEGAL SANCTIONS BEING BROUGHT AGAINST THE USER AND SHOULD BE REPORTED TO THE GEORGIA ASSOCIATION OF REALTORS® AT (770) 451-1831.

Copyright© 2021 by Georgia Association of REALTORS®, Inc.                    F701, Amendment to Agreement, 01/01/21



**ilson**
**amilton**
Real Estate Law

316 Summit Street, Blue Ridge, GA 30513
Phone (706)946-6808
Fax (706)946-6809
aleia@wilsonhamilton.com

## HOA Assessment Request

**Our File # 21-0403 1031**              **Closing Date: 06/01/2021**

**Current Property Owner: Gary Knight**

**Property Address : 253 River Heights Road, Blue Ridge, GA 30513**

Name of Association (if applicable) : Toccoa Heights

Mailing Address: 11217 Brookhavenclub Dr., Johns Creek, GA 30097

Contact name for HOA/Road Maintenance: Jimmy Cole

Email/Phone: jcole7707@bellsouth.net /770.616.8727

Dues are Mandatory: ( YES ) or NO          Assessment Period:( Annually ) Quarterly Monthly Other
                     CIRCLE ONE                                                CIRCLE ONE

Assessment Amount $_____ For what Dates: _____
                                                    BEGINNING - ENDING

Amount Paid This Period $_____   Good through date:_____
                                          -(make ck. payable to Jimmy Cole)

Amount Currently Due $ __200.00__   Good through date: _12/31/2021_

Breakdown of fees: (multiple years due, late fees, inquiry fees, etc): _____

*Based on needs of road repairs and voted on
by the homeowners.

Form completed by _____          Your Title THHA Rep.



Real Estate Law

316 Summit Street, Blue Ridge, GA 30513
Phone (706)946-6808
Fax (706)946-6809
aleia@wilsonhamilton.com

*N/A –*
*All wells*
*are private*
*per lot*

# Water Letter Request

**Our File # 21-0403 1031**                **Closing Date:  06/01/2021**

**Current Property Owner:  Gary Knight**

**Property Address : 253 River Heights Road, Blue Ridge, GA 30513**

Name of Association/Company/Water Service Provider:

Mailing Address:

Contact Name:

Contact Email and Phone#:

Dues are Mandatory:     YES   or   NO          Assessment Period: Annually  Quarterly  Monthly  Other
                                         CIRCLE ONE                                                                        CIRCLE ONE

Assessment Amount $_____     For what Dates: _____
                                                                                                   BEGINNING - ENDING

Amount Paid This Period $_____        Good through date:_____

Amount Currently Due $_____        Good through date: _____

Breakdown of fees: (multiple years due, late fees, inquiry fees, etc): _____

_____

_____

Form completed by _____          Your Title _____

Water Letter Request                                                          9/14/2018

708/0266747872/XP521/1/4



May 26, 2021


Attn Aleia
Wilson, Hamilton
706-946-6809



The Wells Fargo Home Mortgage payoff statement is enclosed.
                        Mortgagor:       Gary Knight
                        Property address: 253 River Heights R
                                         Blue Ridge GA 30513
708 Loan number: 0266747872            Loan type: CONV W/O PMI

The enclosed amount is needed to pay off the loan and is only good
through 06-08-21. After that time, you'll need to request a new payoff
statement because the amount will change.
This is because the loan accrues interest daily.

Please make sure to take care of these important items:
* Cancel any automatic payments right away. If you're enrolled in our
  automatic payment program, you'll need to cancel this at least five
  business days before the next scheduled withdrawal date.
* Update your mailing address by contacting us at the number below.
  We'll need your most current address to send any remaining escrow
  balance or the year-end interest statement.

What you need to know
* We may continue to make payments for the real estate tax and
  property insurance premium from the escrow account. If you have
  questions about upcoming payments, please call us.
* We'll settle any remaining funds in the escrow account in accordance
  with the applicable federal law.

We're here to help
If you have questions or need further assistance, please contact us at
1-866-234-8271, Monday - Friday, 6:00 a.m. to 10:00 p.m., or Saturday,
8:00 a.m. to 2:00 p.m. Central Time.

708/0266747872/XP522/2/4/0000034131664
May 26, 2021                Page 2 - 708 Loan number 0266747872
Mortgagor:      Gary Knight
Property address: 253 River Heights R
                  Blue Ridge GA 30513
708 Loan number:  0266747872           Loan type: CONV W/O PMI
WELLS FARGO HOME MORTGAGE - PAYOFF STATEMENT
All figures are subject to final verification by the noteholder. The
TOTAL AMOUNT OUTSTANDING of $ 341,316.64 is based on the good
through/closing date of 06-08-21. Below is a breakdown of that amount.

1.  TOTAL PRINCIPAL, INTEREST, AND OTHER AMOUNTS OUTSTANDING UNDER
NOTE/SECURITY INSTRUMENT
Note: 06-01-21 is the next payment date under Note/Security Instrument
Unpaid Principal balance                                    318,591.03
Second Unpaid Principal balance                              20,986.00
Interest as of 06-08-21                                       1,714.61
(Second) Interest as of 06-08-21                                   .00
TOTAL AMOUNT OUTSTANDING UNDER NOTE/SECURITY INSTRUMENT     341,291.64
2.  ADDITIONAL CONTRACTUAL AND OTHER FEES AND CHARGES OUTSTANDING
Recording Costs                                                  25.00
Property Inspection                                                .00
Obligation Fee                                                     .00
Buydown/Corp Subsidy                                               .00
Special Handling                                                   .00
TOTAL CONTRACTUAL AND OTHER FEES AND CHARGES OUTSTANDING         25.00
TOTAL AMOUNT OUTSTANDING through 06-08-21                   341,316.64

708/0266747872/XP522/3/4/0000034131664
May 26, 2021                    Page 3 - 708 Loan number 0266747872

WELLS FARGO HOME MORTGAGE - PAYOFF STATEMENT CONTINUED
What you should know about the payoff amount:
The total amount outstanding is good through 06-08-21, or until any
activity occurs on the account. If funds are received after 06-08-21,
the payoff amount will be subject to an
additional $ 45.82 of interest per Day.

Any of the following payment activity on the account prior to 06-08-21
will change the payoff amount:
* We make disbursements from the escrow account for items due.
* If any check/electronic withdrawal previously credited to the loan
  is rejected by the financial institution from which it is drawn.

Recent escrow disbursement amounts and dates:
Real estate taxes:       $    2,066.35        12-10-20
Homeowners Insurance     $    2,879.76        12-21-20

Important Information:
* If the funds received are not the full payoff amount, we'll apply
  funds from the escrow account to complete the payoff.
* Interest will continue to accrue until we receive the full payment.
  This means the total payoff amount will change.
* After the payoff is complete, we'll release the lien on the property
  in accordance with state law. Please call us if you have any questions
  about the lien release process. You can also mail any questions or
  requests to: Wells Fargo Home Mortgage
  PO Box 10335, Des Moines, IA 50306

We're here to help
If you have questions or need further assistance, please contact us at
1-866-234-8271, Monday - Friday, 6:00 a.m. to 10:00 p.m., or Saturday,
8:00 a.m. to 2:00 p.m. Central Time.

708/0266747872/XP523/4/4/0000034131664
May 26, 2021                    Page 4 - 708 Loan number 0266747872

WELLS FARGO HOME MORTGAGE - PAYOFF TRANSMITTAL FORM
Please send the funds by wire. This is the fastest way to complete the
payoff. If a wire transfer is not an option, we prefer a cashier's
check or certified funds.

WHERE TO SEND PAYOFF FUNDS
By WIRE: no checks
Beneficiary Wells Fargo Bank, N.A.
Beneficiary Bank ABA: 121000248
Beneficiary Bank Acct: 4127400093
Beneficiary Bank Address:
1 Home Campus
Des Moines IA 50328
Special Information for Beneficiary:
Apply funds to: 708 loan 0266747872
Mortgagor: Gary Knight
Sender's Name and Phone Number

By MAIL: including OVERNIGHT
Wells Fargo Home Mortgage
Attn: Payoffs, MAC F2302-045
1 Home Campus
Des Moines IA 50328

Important Notes:
* We must receive funds by 2:00 pm Central Time for same day processing.
* Please know, payoffs are not posted on weekends or holidays. If funds
  are sent on those days, interest will be added to the payoff amount.
* All figures are subject to final verification by the noteholder.

How to protect yourself from imposter wire fraud:
* Be sure you trust the recipient. An impostor may contact you by email
  and ask you to wire funds for the loan closing to an account under
  their control. The message will usually appear to be from someone you
  are working with.
* Verify the payment request. Before wiring any funds, confirm the
  details of the payment and vendor information with a phone call. When
  you do, it's important to use a phone number that you know and trust,
  instead of what's provided in the payment request.

We're here to help
If you have questions or need further assistance, please contact us at
1-866-234-8271, Monday - Friday, 6:00 a.m. to 10:00 p.m., or Saturday,
8:00 a.m. to 2:00 p.m. Central Time.

PAYOFF COUPON: If funds are being mailed in, include this coupon. It
helps ensure the payoff process is completed quickly.
-----------------------------------------------------------------------
708 Loan number:  0266747872
Property address: 253 River Heights R
                  Blue Ridge GA 30513

TOTAL PAYOFF AMOUNT: $ 341,316.64

THIS FIGURE IS GOOD THROUGH 06-08-21 AMOUNT REMITTED _____

**WELLS FARGO** **Home Mortgage**

Return Mail Operations
PO Box 14411
Des Moines IA 50306-3411

| | |
|---|---|
| Statement date | 05/02/21 |
| Loan number | 0266747872 |
| Payment due date | 06/01/21 |
| Total amount due | $2,722.08 |

On or after 06/16/21, a late charge of $114.72 may apply.

Property address
253 RIVER HEIGHTS ROAD
BLUE RIDGE, GA 30513

**Customer Service**

Correspondence
PO Box 10335
Des Moines IA 50306

Payments
wellsfargo.com
PO Box 105632
Atlanta GA 30348

Telephone*
1-866-234-8271

Fax
1-866-278-1179

Hours of operation
Mon. - Fri 6 a.m. - 10 p.m.
Sat 8 a.m. - 2 p.m. CT

Purchase or refinance
1-800-554-2880

GARY KNIGHT
PO BOX 2625
BLUE RIDGE, GA 30513-0046

*We accept telecommunications relay service calls

---

### Explanation of amount due

| | |
|---|---|
| Principal | $900.57 |
| Interest | $1,393.84 |
| Escrow | $427.67 |
| Current payment | $2,722.08 |
| Total amount due 06/01/21 | $2,722.08 |

### Account summary

| | |
|---|---|
| Unpaid principal balance | $318,591.03 |
| (This amount is not a payoff amount.) | |
| Unpaid second principal balance | $20,986.00 |
| Escrow balance | $1,543.56 |
| Interest rate | 5.250% |
| Maturity date (month/year) | 02/40 |

### Past payments breakdown

| | Since last statement | Year-to-date |
|---|---|---|
| Total received* | $2,680.30 | $14,686.20 |
| Principal | $896.65 | $4,897.53 |
| Interest** | $1,397.76 | $5,614.39 |
| Escrow | $385.89 | $4,174.28 |

*This total may include the unapplied funds balance from the Account summary section.
**This information should not be used for tax purposes. If you have tax-related questions, please consult your tax advisor.

---

### Activity since your last statement

| Date | Description | Total | Principal | Interest | Escrow | Other |
|---|---|---|---|---|---|---|
| 05/01 | Payment | $2,680.30 | $896.65 | $1,397.76 | $385.89 | |

### Important messages

This is not a bill, our records indicate your payments are scheduled to withdraw automatically. All funds are applied when sufficient funds have accumulated to make a full monthly payment as outlined in your mortgage note. A payment remitted via another source will not stop the drafting process. If you are paying off your loan, please contact us at least five (5) days prior to your next withdrawal date.

### For your consideration

We thank you for your business and look forward to serving you and your future home financing needs

Let us give you a quick complimentary review of your Wells Fargo home loan to ensure that it continues to meet your current and future needs. Whether you're planning a move, wondering if now is a good time to refinance or have other home financing needs, we are happy to help you explore options and answer any questions. If you apply for new financing, we'll help you save time on your online application by uploading your Wells Fargo account information for Wells Fargo customers who use their Wells Fargo Online® username and password at the start of their application.

Call 1-888-633-8662 or contact your local home mortgage consultant. If you are on active military duty, please consult your legal advisor regarding the relief you may be eligible for under the Servicemembers Civil Relief Act or state law.

Stay connected with your mortgage online
Manage your mortgage and other Wells Fargo accounts in one convenient place with Wells Fargo Online®. Log into your account to find more information on your balance, interest rate, payment amount, and other current details of your mortgage. You can also set alerts to your mobile device, make or schedule payments, download important documents, or manage your paperless options.

Enroll or log in today at www.wellsfargo.com

---

GARY KNIGHT
PO BOX 2625
BLUE RIDGE, GA 30513

Loan number
0266747872
On or after 06/16/21, a late charge of $114.72
may apply.

Please specify additional funds

| | | |
|---|---|---|
| Payment sent | A | $ |
| Additional principal | B | $ |
| late charges | C | $ |
| Other fee(s) | D | $ |
| Additional escrow (if applicable) | E | $ |
| Total amount enclosed (Please do not send cash) | F | $ |

Check here and see reverse for address correction.

WELLS FARGO HOME MORTGAGE
PO BOX 105632
ATLANTA GA 30348-5632

This is not a bill, but for your information only.

708 0266747872 9 100002722080283680027220800000000 000000000000000000 2

**Make Wells Fargo your first choice**

For questions about your current mortgage loan: 1-866-234-8271

For questions about a new mortgage loan: 1-866-846-9111

Wells Fargo also offers:
- Checking, Savings, CDs, Personal Loans     1-866-932-6736
- Cash Wise Visa Card     1-866-932-6736
- Student Loans     1-888-511-7304
- International access (where available) 00-800-28832122

**Important information** - Payments received after normal business hours will be credited the following business day.

If you send your payment to any other location, it may cause a processing delay. When you provide a check as payment, you authorize us either to use information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction. When we use information from your check to make an electronic fund transfer, funds may be withdrawn from your account as soon as the same day we receive your payment, and you will not receive your check back from your financial institution. If your mortgage check does not clear upon initial presentment, your bank may charge a fee and we may attempt to withdraw funds from your account electronically up to a maximum of three times. If we are not able to successfully collect these funds, the check amount will be reversed from your loan.

If you would like to make an extra payment toward the loan principal, please indicate with the payment that it is intended for pre-payment of principal, and we will evaluate whether the payment is eligible for a principal pre-payment based on the account status. If we receive funds in excess of the total amount due without instructions, those excess funds may be applied to future contractual payments, fees, costs, escrow shortages or principal, depending upon the specifics of the account and the amount of the funds received.

**Fee schedule** - Fees for assumptions, partial releases, and other services will be quoted upon request.

Disputing account information reported to credit bureaus - We may furnish information about your account to credit bureaus. You have the right to dispute the accuracy of information that we have reported by writing to us at the correspondence address noted on the front of this statement and describing the specific information that is inaccurate or in dispute and the basis for any dispute with supporting documentation. In the case of information that you believe relates to identity theft, you will need to provide us with an identity theft report.

**Fannie Mae educational resources** - If you would like additional information regarding your loan, educational resources are available at Fannie Mae's Know Your Options™ website.

Access your account online any time - View details of your mortgage account, including official tax information, payment activity and more. Please visit the website listed on the front of this statement.

**Payment options** - There are multiple ways to make a payment:
-Online - You can schedule free payments online. Simply sign on to the website listed on the front of this statement and schedule your payment securely at your convenience.
-Pay by Phone - Payments can be scheduled by calling Customer Service.
-By Mail or in person - You can mail your payment or bring it into any Wells Fargo Branch at no charge. Please be sure to include your payment coupon from your statement.

Need to wire payment funds? For assistance in finding the nearest location, call 1-800-926-9400 for MoneyGram® Express Payments or 1-800-325-6000 for Western Union® Quick Collect® payments.

**Notice regarding Third Party Liens** - Wells Fargo will not allow the use of a loan from another lender to pay taxes. Such loans violate your mortgage agreement as they create liens on your property that may take priority over the mortgage lien.

**Notice regarding Property Tax Deferrals** - Wells Fargo is not able to accept Property Tax Deferrals in all states, based on the terms of the deferral program. Please contact us to confirm if the tax deferral offered in your state is an approved program.

**Servicemembers Civil Relief Act** - The Servicemembers Civil Relief Act (SCRA) may offer protection or relief to members of the military who have been called to active duty. If either you have been called to active duty, or you are the spouse, registered domestic partner, partner in a civil union, or financial dependent of a person who has been called to active duty, and you haven't yet made us aware of your status, please contact our Military Customer Service Center at 1-866-936-7272 or fax your Active Duty Orders to 1-877-658-4585, attention SCRA. In addition, if you are considering a refinance please be aware that you should consult with your legal advisor regarding the potential loss of any benefits.

**Housing counselor information** - For help exploring options, the Federal government provides contact information for housing counselors, which you can access by contacting the Consumer Financial Protection Bureau at http://www.consumerfinance.gov/find-a-housing-counselor/, or obtain no-cost assistance by contacting the Department of Housing and Urban Development at https://apps.hud.gov/offices/hsg/sfh/hcc/hcs.cfm or by calling 1-800-569-4287.

**Disaster information** - Our disaster assistance team is here to help if you're ever affected by a disaster, like a fire, flood, or storm. If you need help with your insurance claim, payments, or anything else related to your mortgage, please contact us. You can call us at the number listed on the front of this statement, or visit wellsfargo.com/recovery for additional information.

**New York property borrowers** - We are registered with the Superintendent of the New York Department of Financial Services as an exempt servicer. You may file complaints and obtain further information about Wells Fargo by contacting the New York State Department of Financial Services Consumer Assistance Unit at 1-800-342-3736 or by visiting the Department's website at www.dfs.ny.gov.

**Designated address for qualified written request, notice of error, request for information**
Borrowers have certain rights under Federal law related to resolving errors and requesting information about their account, and that they may learn more about their rights by contacting the servicer. A qualified written request, notice of error, and request for information are written correspondence (not on a payment coupon or other payment medium) that must include, or otherwise enable us to identify the: name of each borrower, account number and a description of the error you believe has occurred OR a request for specific information (or additional accounting) regarding your account. Your submission must be in writing and sent to: P.O. Box 10335, Des Moines, IA 50306.

Wells Fargo Home Mortgage is a division of Wells Fargo Bank, N.A. Member FDIC ©2020 Wells Fargo Bank, N.A. Member FDIC All rights reserved. NMLSR ID 399801



---

Address and phone number change - Please be sure to check the box on the front of payment coupon.

| | |
|---|---|
| Borrower first name | Borrower last name |
| Co-borrower first name | Co-borrower last name |
| New mailing address | |
| City, state/zip | |
| Home phone | Work phone |



**Buyer Information Sheet**

Property Address: 223 River Heights Blue Ridge GA 30513

Buyer(s) Legal Name: 7IL Properties &

Buyer(s) Social Security Number (REQUIRED): _____ &

Mailing Address: _____

Home/Work/Cell Phone: 719/248-8652    Email Address: 7IL investors @ gmail.com

*If Buyer(s) is a Corporation, Trust, LLC or other entity, please provide the following information requested below. A copy of the By-Laws (Corporation), Trust Agreement (Trust) or Operating Agreement (LLC) will be required.*

Name of Entity: 7IL Properties, LLC   EIN Number: 86-1882744

Entity Mailing Address: 503 N Main St #29 Pueblo CO 81003

Individual(s) Signing for Entity & in what Capacity: John H. Thatcher III - Managing Member

**If Applicable:**

Who is your Lender & Loan Officer: N/A

Phone Number: _____    Email Address: _____

**Will Buyer(s) be Present at Closing?**          [ ] Yes          [ ] No  Hopefully

**If Selected "Yes"**

Which location would you prefer to close at?        [X] Blue Ridge    [ ] Ellijay

What time would you prefer to close? The closing time will be confirmed based on availability.

[X] 10:00AM    [ ] 11:00AM    [ ] 12:00PM    [ ] 1:00PM    [ ] 2:00PM    [ ] 3:00PM

**If Selected "No"**

Will there be a Power of Attorney?            [ ] Yes        [X] No

Which Buyer(s) will need the Power of Attorney? _____   Who will sign on their behalf? _____

*If you are unable to attend the closing, please contact your pre-closer for options that may be available.*

*Attendance by all parties is highly recommended as said options may delay funding and incur additional fees.*

# AMENDED AND RESTATED
# OPERATING AGREEMENT
## OF

# 7IL PROPERTIES, LLC

This Amended and Restated Operating Agreement is entered into by the members upon mutual execution and made effective concurrent therewith and amends, restates, and replaces the Operating Agreement of January 27, 2021 in its entirety.

## ARTICLE 1
## DEFINED TERMS

**1.1 ACT.** The "Act" means the Colorado Limited Liability Company Act, Title 7, Article 80, Colorado Revised Statutes and related Articles, as amended from time to time. Any reference to specific sections or number of the Act shall include sections of like or similar import which replace the specific sections as a result of changes to the Act made after the date of this Agreement.

**1.2 AGREEMENT.** The "Agreement" means this Operating Agreement, as amended from time to time.

**1.3 COMPANY.** The "Company" means the limited liability company formed in accordance with this Agreement.

**1.4 INTERNAL REVENUE CODE.** Internal Revenue Code ("IRC") shall refer to the Internal Revenue Code of the United States. Any reference to specific sections of the IRC shall include sections of like or similar import which replace the specific sections as a result of changes to the IRC made after the date of this Agreement.

**1.5 INTEREST HOLDER.** "Interest Holder" means any person who holds Membership Units, whether as a Member or as an unadmitted assignee of a Member.

**1.6 MANAGER.** "Manager" means a person elected or otherwise designated by the Members of the Company to manage the Company.

**1.7 MEMBER.** "Member" means each person signing this Agreement and any person who subsequently is admitted as a Member of the Company.

**1.8 PERSON.** "Person" means an individual, corporation, partnership, association, limited liability company, trust, estate or other entity.

**1.9 TRANSFER.** "Transfer" means to encumber, sell, exchange, gift, distribute, assign, dispose of, transfer by intestate or testate succession, or otherwise transfer, whether voluntarily, or

involuntarily, or by operation of law, either in trust or outright, including transfers pursuant to any judicial order.

**1.10 OTHER DEFINITIONS.** Except as otherwise provided in this Agreement, definitions of terms in this Agreement shall be as defined in the Act.

## ARTICLE 2
## ORGANIZATION

**2.1 FORMATION AND OPERATION.** The Members have formed the Company pursuant to the laws of the State of Colorado by filing Articles of Organization with the Secretary of State. The Members agree to operate the Company in accordance with this Agreement.

**2.2 NAME.** The name of the Company shall be **7IL PROPERTIES, LLC.** The Company may do business under that name and under any other name or names which the Managers selects. If the Company does business under a name other than that set forth in its Articles of Organization, then the Company shall file a statement of trade name or any other instrument required by the Act.

**2.3 PURPOSE.** The Company is organized to engage in any business permitted under the Act or the laws of any jurisdiction in which the Company may do business.

**2.4 TERM.** The term of the Company began upon the filing of Articles of Organization with the Colorado Secretary of State and shall continue until its existence is terminated pursuant to Article 9 of this Agreement.

**2.5 PRINCIPAL OFFICE.** The principal office of the Company in Colorado ("Principal Office") shall be located at 1000 I.L. Ranch Road, Boone, Colorado 81025. The Principal Office may be changed by the Manager at any time. The Company may have any other places of business, either within or without Colorado as the Manager may designate.

**2.6 REGISTERED AGENT.** The name and address of the Company's registered agent ("Registered Agent") in Colorado shall be Douglas J. Kwitek, 601 N. Main Street, Suite 200, Colorado 81003. The name and address of the Registered Agent may be changed by the Manager at any time.

## ARTICLE 3
## FINANCE

**3.1 CAPITAL CONTRIBUTIONS.** The Class A Members described below have previously contributed assets, primarily including real property, to the Company.

**3.2 LIABILITY FOR COMPANY DEBTS.** No Interest Holder shall be liable under a judgment, decree, or order of a court, or in any other manner for a debt, obligation, or liability of the Company.

2

**3.3 MEMBERSHIP UNITS.** The capital of the Company shall be divided into equal 100,000 parts, hereinafter referred to as "Membership Units". The Membership Units shall be divided into three classes:

> **Class A** Membership Units, which shall be entitled to vote, or so-called, "Voting Units";
> **Class B** Membership Units shall not be entitled to vote, or so-called "Non-Voting Units"; and
> **Class C** Membership Units shall not be entitled to vote, or so-called "Non-Voting Units" with restrictions on distributions.

> **Class A** Membership Units shall initially be issued in the total number of 30,000 Units.
> **Class B** Membership Units shall initially be issued in the total number of 56,000 Units.
> **Class C** Membership Units shall initially be issued in the total number of 14,000 Units.

**3.4 ALLOCATION OF MEMBERSHIP UNITS.** Membership Units shall be allocated as follows:

| Members Name | Membership Units/Ownership |
|---|---|
| The John H. Thatcher Jr. Trust dated March 8, 2004 | 15,000 Class A Units/15% ownership |
| The Beth E. Thatcher Trust dated March 8, 2004 | 15,000 Class A Units/15% ownership |
| The John H. Thatcher Jr. Trust dated March 8, 2004 | 10,000 Class B Units/10% ownership |
| The Beth E. Thatcher Trust dated March 8, 2004 | 10,000 Class B Units/10% ownership |
| John H. Thatcher III | 15,000 Class B Units/15% ownership |
| Timothy E. Thatcher | 10,500 Class B Units/10.5% ownership |
| Kathlyn L. Carroll | 10,500 Class B Units/10.5% ownership |
| John H. Thatcher IV | 2,000 Class C Units/ 2% ownership |
| Zachary E. Thatcher | 2,000 Class C Units/ 2% ownership |
| Joshua A. Thatcher | 2,000 Class C Units/ 2% ownership |
| Jack E. Thatcher | 2,000 Class C Units/ 2% ownership |
| Madison R. Thatcher | 2,000 Class C Units/ 2% ownership |
| Bryson C. Carroll | 2,000 Class C Units/ 2% ownership |
| Emilee B. Carroll | 2,000 Class C Units/ 2% ownership |

**3.5 NO INTEREST ON OR RIGHT OF RETURN OF CAPITAL CONTRIBUTIONS.** Interest Holders shall not be paid interest on any capital contributions, and, except as otherwise provided in this Agreement, no Interest Holder shall have the right to receive the return of any capital contribution. In the case of any distributions, no Interest Holder shall have the right to receive any distributions other than cash.

**3.6 CAPITAL ACCOUNTS.** A separate Capital Account ("Capital Account") shall be maintained for each Interest Holder using the tax basis method of accounting:

a. Each Interest Holder's Capital Account shall be increased by: (i) the amount of cash contributed to the Company other than as a loan; (ii) the agreed value of the contracts or other property contributed to the Company by such Interest Holder, less any liabilities thereon assumed

3

by the Company or to which the contributed property is subject; and (iii) the Interest Holder's share of all items of Company income and gain including income and gain exempt from tax.

b. Each Interest Holder's Capital Account shall be decreased by: (i) the amount of cash and the value of any property less any liabilities assumed by such Interest Holder and liabilities to which distributed property is subject distributed by the Company to the Interest Holder; and (ii) the Interest Holder's share of all items of Company deduction and loss including nondeductible expenses and losses.

**3.7 LOANS.** Any Interest Holder may, at any time, make or cause a loan to be made to the Company in any amount and on those terms upon which the Company and the Interest Holder agree.

**3.8 ADDITIONAL CAPITAL CONTRIBUTIONS.** No Interest Holder shall be required to contribute any additional capital to the Company.


# ARTICLE 4
## MEMBERS AND VOTING

**4.1 MEMBER.** The name, present mailing address and taxpayer identification number of each Member shall be provided to the Company by each Member.

**4.2 ANNUAL MEETING.** The annual meeting of the Members shall be held at the Principal Office, or at such other place, date and time as the Manager may designate, the second Tuesday in the month of January in each year, at 5:00 p.m. If the day fixed for the annual meeting is a legal holiday, the meeting shall be held on the next succeeding business day. At the annual meeting any proper business may be transacted.

**4.3 SPECIAL MEETINGS.** Special meetings of the Members may be called by a Manager or by any Member.

**4.4 NOTICE OF MEETING.** Written notice stating the place, day and hour of the meeting and, in case of a special meeting, the purposes for which the meeting is called, shall be delivered not less than 3 days nor more than 50 days before the date of the meeting, either personally or by mail, by or at the direction of the Manager or Member(s) calling the meeting, to each Member of record. When all the Members of the Company are present at any meeting, or if those not present sign in writing a waiver of notice of the meeting or subsequently ratify all the proceedings of the meeting, the transactions of the meeting are as valid as if a meeting were properly called and notice had been given.

**4.5 QUORUM AND VOTING.** At any meeting of the Members, including Class A, Class B, and Class C Membership Unit holders, presence of the Class A Members owning a majority of the Class A Membership Units entitled to vote, in person or by proxy, shall constitute a quorum.

If a quorum is present, the affirmative vote of the Class A Members owning a majority of the Class A Membership Units entitled to vote present at the meeting shall be the act of the Members as to any business that may be transacted at the meeting, unless the vote of a greater proportion or number is required by this Agreement. If such a quorum is not present at any meeting of the Members, the meeting may be adjourned for a period not to exceed 60 days at any one adjournment. At the adjourned meeting at which a quorum shall be present, any business may be transacted which might have been transacted at the meeting as originally notified. The Class A Members present at a meeting at which a quorum was present, may continue to transact business until adjournment, notwithstanding the withdrawal of enough Class A Members to leave less than a quorum. Class B and Class C Unit Membership Holders shall be permitted to attend the meetings but may not cast votes.

**4.6 ACTION WITHOUT A MEETING.** Any business which may be transacted at a meeting of the Members may be transacted without a meeting if evidenced by one or more written consents describing the action taken, signed by each Member. The written consent of the Members has the same force and effect as a unanimous vote of the Members.

## ARTICLE 5
## PROFITS AND LOSSES

**5.1 DETERMINATION OF PROFITS AND LOSSES.** The net profits and losses of the Company shall be determined in accordance with federal income tax principles, as soon as practicable after the close of each Company fiscal year.

**5.2 ALLOCATION OF PROFITS AND LOSSES.** Income, gain, loss, deductions, and credits shall be allocated among the Interest Holders in the ratio of their ownership of Membership Units, except as otherwise provided in the IRC with respect to property contributed to the Company by an Interest Holder.

**5.3 DISTRIBUTIONS.** Distributions shall be made in accordance with good and sound business and accounting practices and shall be determined in the sole discretion of the Manager. Distributions need not be made on any scheduled basis. If the Manager does elect, in his sole discretion to issue distributions, said distributions may be made in a non-pro rata manner and need not be made in the ratio of the Interest Holder's ownership of Membership Units. In determining distributions, the Manager shall consider current needs and prudent reserves for operating capital, investment opportunities, payment of debt, and preservation of capital on behalf of the Company.

Distributions to Class C Unit Holders, if the Manager elects such, shall be made no more frequently than quarterly, and may be made directly to the Class C Unit Holders or to the conservator, guardian or other legal representative of the same, at the direction of the Manager.

## ARTICLE 6
## RECORDS AND INSPECTIONS

**6.1 RECORDS**. The Company shall keep such books and records as are required by the Act, at the Principal Office of the Company, or at such other places as the Manager may determine.

**6.2 INSPECTION**. The records of the Company are subject to inspection and copying by Interest Holders and the Manager in accordance with the provisions of §7-80-408 of the Act.

## ARTICLE 7
## MANAGEMENT

**7.1 MANAGER MANAGEMENT**. The Company shall be managed by a Manager or Managers, who may, but need not, be a Member, as follows:

A majority vote of the Class A Voting Units shall appoint or remove a Manager or Managers.

**7.2 GENERAL POWERS**. Subject to the restriction set forth in Section 7.5 below, the Managers, shall have full, exclusive, and complete discretion, power, and authority, subject in all cases to the other provisions of this Agreement and the requirements of applicable law, to manage, control, administer, and operate the business of the Company for the purposes herein stated, and to make all decisions affecting such business, including, without limitation, for Company purposes, the power to:

a. acquire by purchase, lease, or otherwise, any real or personal property, tangible or intangible;

b. construct, operate, maintain, finance, and improve, and to own, sell, convey, assign, mortgage, or lease any real estate and any personal property;

c. sell, dispose, trade, or exchange Company assets in the ordinary course of the Company's business;

d. enter into agreements and contracts and to give receipts, releases and discharges;

e. purchase liability and other insurance to protect the Company's properties and business;

f. borrow money for and on behalf of the Company, and, in connection therewith, execute and deliver instruments authorizing the confession of judgment against the Company;

g. execute or modify leases with respect to any part or all of the assets of the Company;

h. prepay, in whole or in part, refinance, amend, modify, or extend any mortgages or deeds of trust which may affect any asset of the Company and in connection therewith to execute for and on behalf of the Company any extensions, renewals or modifications of such mortgages or deeds of trust;

i. execute any and all other instruments and documents which may be necessary or in the opinion of the Manager desirable to carry out the intent and purpose of this Agreement, including, but not limited to, documents whose operation and effect extend beyond the term of the Company;

j. make any and all expenditures which the Manager, in his sole discretion, deems necessary or appropriate in connection with the management of the affairs of the company and the carrying out of its obligations and responsibilities under this Agreement, including, without limitation, all legal, accounting and other related expenses incurred in connection with the organization, financing and operation of the Company;

k. enter into any kind of activity necessary to, in connection with, or incidental to, the accomplishment of the purposes of the Company; and

l. invest and reinvest Company reserves in short-term instruments or money market funds.

**7.3 DUTIES OF THE MANAGER**. Unless eliminated or modified by this Agreement, the Manager shall owe to the Company the duties set forth in §7-80-404 of the Act.

**7.4 INDEMNIFICATION OF THE MANAGER**. The Company shall reimburse a Manager for payments made and indemnify a Manager for liabilities incurred by the Manager if such payments were made or liabilities incurred without violation of the Manager's duties to the Company.

**7.5 EXTRAORDINARY TRANSACTIONS**. Notwithstanding anything to the contrary in this Agreement, the Manager shall not undertake any of the following without the approval of the Class A Voting Members owning a majority of the Class A Membership Units:

a. the Company purchasing any single asset which purchase price exceeds $250,000.00;

b. the Company's engaging in business in any jurisdiction which does not provide for the registration of limited liability companies; and

c. the Company's electing to exercise any purchase option pursuant to Article 8.

## ARTICLE 8
## TRANSFER OF MEMBERSHIP UNITS AND WITHDRAWAL
## OF INTEREST HOLDERS

**8.1 RESTRICTION ON TRANSFER OF MEMBERSHIP UNITS.** No Member, other than a trustee who holds a LLC Interest in trust and transfers the interest in accordance with the terms of the trust, may Transfer all or any part of his or her LLC Interest unless the Member complies with the rules set forth in this Article. Any Transfer made in violation of this Article 8 shall be void *ab initio* and without effect. Any Member who purports to Transfer all or any part of its LLC Interest in violation of this Article 8, or the terms of the trust, shall be deemed to be in default of this Agreement and "Transferring Interest Holder" and subject to the terms of Section 8.4, below.

(a) **Class A Membership Unit Transfers.** The original Class A Members as set forth in Article 3.4 above may transfer Class A Membership Units to each other, without the need for further compliance with the provisions of this Agreement, and those Units shall retain their character as Class A Membership Units. The original Class A Members herein may also transfer their Class A Membership Units to the Co-Trustees of the Thatcher Irrevocable 2019 Trust or to any Class B Membership Holders by gift, transfer, distribution, or devise, without the need for further compliance with the provisions of this Agreement, and those Units shall retain their character as Class A Membership Units.

Any transfer of Class A Membership Units from any Interest Holder to any other party under any other circumstances than those described above whether voluntary or involuntary, by gift, sale, inheritance, bequest, devise, creditor claim, judicial order or decree, or by operation of law, shall result in those Class A Membership Units converting to Class B Membership Units, and remaining Class B Membership Units indefinitely.

(b) **Class B Membership Unit Transfers.** Notwithstanding any of the other terms set forth herein, without the consent of any other Member, a Member may transfer all, or a portion, of such Member's Class B Membership Units to, or in trust for the benefit of, such Member's spouse or any of such Member's descendants; provided such transferee consents to all of the terms of this Operating Agreement, in writing. The definition of "descendant" shall be that set forth in the Colorado Probate Code on the date of transfer. Units so transferred shall retain their characterization as Class B Membership Units.

(c) **Class C Membership Unit Transfers.** Notwithstanding any of the other terms set forth herein, without the consent of any other Member, a Member may transfer all, or a portion, of such Member's Class C Membership Units to, or in trust for the benefit of, such Member's spouse or any of such Member's descendants; provided such transferee consents to all of the terms of this Operating Agreement, in writing. The definition of "descendant" shall be that set forth in the Colorado Probate Code on the date of transfer. Units so transferred shall retain their characterization as Class C Membership Units.

**8.3 VOLUNTARY SALE OF MEMBERSHIP UNITS.** In the event that a Member (the "Selling Member") receives a bona fide offer from an independent third party (the "Offeror") to sell any part of his or her interest in the LLC, the Selling Member shall, by written notice (the "Offer Notice") delivered to the other Members (the "Offeree Members"), advise the Offeree Members of the Offeror's offer, the name of the Offeror, and the price and terms of the offer. The Offeree Members shall, individually or collectively, have the following options:

(a) within sixty (60) days of receipt of the Offer Notice, agree to purchase the interest in the LLC by providing written notice of acceptance (the "Acceptance Notice") of the LLC Interest which is the subject of the offer at the price contained within the offer; or

(b) permit the Selling Member to transfer the Selling Member's Interest in the LLC to the Offeror for the price and upon the terms contained within the Offer Notice; provided that such Offeror agrees, in writing, to accept and be bound by all of the terms of this Operating Agreement.

If the Offeree Member or Members deliver an Acceptance Notice, the purchase will be completed within ninety (90) days of the Offer Notice. In the event more than one Offeree Member provides an Acceptance Notice, the Offeree Members shall purchase such interest proportionately based upon their respective LLC Interests. The closing date for the sale and purchases shall be included within the Acceptance Notice and will be sent by the Offeree Member(s) to the Selling Member by certified mail, return receipt requested, which closing date shall not be later than ninety (90) days from the date of mailing. The time and place of closing shall be 10:00 a.m. at the principal place of business of the LLC. At the closing of the sale and purchase, the Selling Member shall execute all documents necessary to effectuate the transfer of the interest of the Selling Member to the Offeree Members, and each Offeree Members shall pay twenty-five (25%) of the purchase price of the interest which he or she is acquiring in cash or by certified check. The balance of said purchase price shall be paid in sixty (60) equal monthly installments, the first of such installments being due and payable one (1) month after the date of closing. The said sixty (60) monthly installments shall be evidenced by non-negotiable promissory notes, payable to the Selling Member and shall bear interest at the rate of ten percent (10%) per annum. Notwithstanding the terms hereinabove set forth, the Offeree Members shall be permitted to prepay the full balance, or any part thereof remaining due at any time, with interest only to the date of prepayment. If less than the full amount of the remaining balance is prepaid, such prepayment shall be applied against the last installments due, in order of time. The failure of any Offeree Member to provide a timely Acceptance Notice shall be deemed to be a rejection of the Offer Notice by that Offeree Member. No Member can deliver more than one (1) Offer Notice per calendar year to the other Members of the LLC.

**8.4 INVOLUNTARY SALE OF MEMBERSHIP UNITS.** Except as otherwise provided in Section 8.2, upon the death, termination or dissolution of an Interest Holder as contemplated in §7-80-704 of the Act, or successor provision, that Interest Holder shall be considered a

Transferring Interest Holder, unless Members owning a majority of the Class A Membership Units consent to the Transfer. The Transferring Interest Holder shall be deemed to offer for sale to the Remaining Members all of the Membership Units owned of record by the Transferring Interest Holder (the "Offered Units"). Any Interest Holder may deliver notice to the Members and to the Company of the death, termination or dissolution of the Transferring Interest Holder or Transfer of Membership Units pursuant to Section 8.8.

### 8.5 OPTION TO PURCHASE.

a. The Remaining Members shall have the exclusive right to purchase the Offered Units for a period of sixty (60) days after the receipt of notice under the provisions of Sections 8.3 or 8.4. The right of the Remaining Members to purchase the Offered Units shall be in the percentage their respective Membership Units bear to all the outstanding Membership Units, exclusive of the Membership Units owned by the Transferring Interest Holder. If any Remaining Member fails to exercise his right to purchase the Offered Units or any portion thereof within that sixty (60) days, the other Remaining Members shall have an additional ten (10) days in which to purchase the Offered Units or any portion thereof covered by such right, upon the same terms. The above rights shall be exercised by giving written notice thereof to the Transferring Interest Holder and to all Remaining Members.

b. Upon receipt by the Company of notice that the Remaining Members did not elect to purchase all of the Remaining Offered Units, the Company shall have a period of fifteen (15) days in which to elect to purchase the Remaining Offered Units which the Remaining Members did not elect to purchase. This right shall be exercised by giving written notice to all Interest Holders.

c. If the Remaining Members or the Company elect to purchase the Offered Units, or any portion thereof, the Remaining Members or the Company shall purchase such Offered Units at the price determined in accordance with Section 8.6 (the "Purchase Price") and upon the terms set forth in Section 8.7.

d. If the Remaining Members or the Company elect to purchase the Offered Units, or any portion thereof, the closing date for the purchase (the "Closing Date"), shall be set not earlier than ten (10) nor later than sixty (60) days after the final purchase option is exercised.

e. To the extent the Remaining Members or the Company do not elect to purchase the Offered Units, or any portion thereof, as provided herein, the Transferring Interest Holder shall have the right to Transfer such Offered Units to any person during the sixty (60) day period immediately following expiration of the rights herein provided. If no such Transfer is completed within said period, the restrictions and rights herein provided shall be restored and shall continue in full force and effect and, in the case of an offer made pursuant to Section 8.4, the Transferring Interest Holder's successor shall thereafter be a Member.

**8.6 PURCHASE PRICE.** Unless agreed upon between the parties, the Purchase Price shall be determined by the accountant then regularly employed by the Company in the manner provided

in this paragraph. The Purchase Price shall be a price equal to the fair market value of the Membership Units being purchased determined as of the applicable date with no allowance for good will and appropriate discounts for minority interests, restricted interests, and lack of marketablity. The applicable date shall be the date of exercise of the Company's or any Member's right to purchase Membership Units as provided under Section 8.5; provided, however, in the case of the death of an Interest Holder, the applicable date shall be the date of such Interest Holder's death. The determination of fair market value shall be made in accordance with sound appraisal practices and principles and shall be based on currently acceptable valuation techniques.

**8.7 TERMS OF PAYMENT.** Unless other payment terms are agreed upon, the Purchase Price shall be paid by the purchaser's good and sufficient promissory note payable to the Transferring Interest Holder or the Transferring Interest Holder's successor, personal representative, executor, administrator or other legal representative, as the case may be. The note shall bear interest per annum at the applicable federal rate. Principal and interest amounts shall be paid in five (5) annual, consecutive installments of equal payments of principal plus interest, commencing one (1) year after date of the note. Prepayment in full or in part shall be permitted at any time. The note shall be secured by a collateral security agreement granting the Transferring Interest Holder or the Transferring Interest Holder's successor, personal representative, executor, administrator or other legal representative security interests in the Membership Units being purchased. The Members and the Transferring Interest Holder's successor, personal representative, executor, administrator or other legal representative, if any, shall do all things and execute and deliver any documents and legal instruments necessary or desirable to carry out the provisions of this Agreement, and to give the selling Interest Holder a security interest in the Membership Units being transferred.

**8.8 TRANSFERS PURSUANT TO JUDICIAL ORDER.** The voluntary or involuntary transfer of any Membership Units pursuant to any judicial order, whether resulting from being involved in a bankruptcy proceeding, divorce proceeding, execution, attachment, legal process, enforcement of a pledge, trust or encumbrance, or sale under any of them, shall be subject to this Agreement. Any purchaser or transferee of any Membership Units pursuant to any such order shall be deemed to be a Transferring Interest Holder effective as of the date of the purchase by said purchaser or transferee or the order of transfer to said purchaser or transferee is made, and said purchaser or transferee shall make an offer in accordance with the terms of Section 8.4, et seq.

**8.9 RESTRICTION ON RIGHTS OF TRANSFEREE.** Except as provided below, the transferee of any Membership Units shall not be entitled to vote on any matter or exercise any rights of a Member. If the transferee is already a Member, such transferee shall not be entitled to vote on any matter or exercise any rights of a Member with respect to the Membership Units transferred. The transferee shall be entitled to receive, to the extent transferred, only the distributions to which the transferor would be entitled. The transferee shall be admitted as a Member, only upon the unanimous consent of the Class A Voting Members, provided that the transferee executes and delivers to the Company an acknowledgement and agreement to be bound by the terms and conditions of this Agreement.

**8.10 NOTICE OF TRANSFER.** Neither the Company nor any Interest Holder shall be bound by a Transfer until notice has been given to the Company of the name and current mailing address of the transferee.

## ARTICLE 9
## DISSOLUTION

**9.1 DISSOLUTION.** The Company shall be dissolved upon the unanimous written agreement of all of the Class A Voting Members.

**9.2 WINDING UP.** If the Company is dissolved, the Members shall wind up its affairs in accordance with the provisions of the Act then in effect.

## ARTICLE 10
## REPRESENTATIVES OF INTEREST HOLDERS

**10.1 DEATH AND INCOMPETENCY.** If an Interest Holder who is an individual dies or a court of competent jurisdiction adjudges him to be incompetent to manage his person or his property, the Interest Holder's personal representative, executor, administrator, guardian, conservator, or other legal representative may receive notice for the deceased or incompetent Interest Holder and may exercise all of the powers of the Interest Holder.

**10.2 MINORITY.** If an Interest Holder is a minor, the Interest Holder's conservator, or if none, the Interest Holder's guardian, or if none, the Interest Holder's parent may receive notice for the minor Interest Holder and may exercise all of the powers of the Interest Holder.

**10.3 AGENT UNDER POWER OF ATTORNEY.** An agent of an Interest Holder serving under a power of attorney which authorizes exercising the powers of the Interest Holder may receive notice for the Interest Holder giving the power of attorney and may exercise all of the powers of the Interest Holder.

## ARTICLE 11
## NOTICE

**11.1 NOTICE TO INTEREST HOLDERS.** Any notice to an Interest Holder required or permitted by this Agreement shall be in writing and shall be deemed to have been sufficiently given for all purposes if delivered personally, by mail, by private carrier, or by any other means to which the Interest Holder agrees in a writing delivered to the Manager. If mailed, and in a comprehensible form, the notice shall be deemed delivered when deposited in the United States mail, postage prepaid addressed to the party to whom such notice is intended to be given at the address set forth in the Company records, or at the address provided pursuant to Section 8.10, as such address may be amended by the Interest Holder in a writing provided to the Manager. If notice is given other than by mail and provided that such notice is in a comprehensible form, the notice is deemed delivered on the date received by the party to whom such notice is intended to be given. A waiver in writing, signed by the party entitled to notice, whether before, at, or after the time stated in the notice, shall be deemed equivalent to giving notice.

**11.2 NOTICE TO THE COMPANY**. Any notice to the Company required or permitted by this Agreement shall be in writing and shall be deemed to have been sufficiently given for all purposes if delivered personally, by mail, by private carrier or by any other means to which the Manager agrees in a writing delivered to all Interest Holders. If mailed, and in a comprehensible form, the notice shall be deemed delivered when deposited in the United States mail, postage prepaid addressed to the Manager at the Principal Office. If notice is given other than by mail, and provided that such notice is in a comprehensible form, the notice is deemed delivered on the date received by the Manager. A waiver in writing, signed by the Manager, whether before or after the time stated in the notice, shall be deemed equivalent to giving notice.

## ARTICLE 12
## GENERAL PROVISIONS

**12.1 FISCAL YEAR**. The fiscal year of the Company shall begin on the first day of January and end on the last day of December of each year, unless otherwise determined by resolution of the Members.

**12.2 METHOD OF ACCOUNTING**. The financial records of the Company shall be maintained on a cash on a cash or accrual method of accounting as determined by the Company CPA.

**12.3 AMENDMENTS**. This Agreement may be amended or repealed and a new Agreement may be adopted upon the unanimous written agreement of the Members.

**12.4 FURTHER INSTRUMENTS**. The Members hereby agree to execute such other and further instruments and documents as are, or may become, necessary or convenient to effectuate the purposes of the Company.

**12.5 INTEGRATION**. This Agreement represents the entire agreement between the Members and there are no oral or collateral agreements or understandings.

**12.6 CAPTIONS**. The captions of the sections and articles are set forth only for convenience and reference and are not intended in any way to define, limit or describe the scope or intent of this Agreement.

**12.7 GOVERNING LAW**. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Colorado.

**12.8 SEVERABILITY**. If any provision of this Agreement is declared by an arbitrator or court of competent jurisdiction to be invalid, void or unenforceable, such provision shall be deemed to be severable and all other provisions of this Agreement shall remain fully enforceable and this Agreement shall be interpreted in all respects as if such provision were omitted.

_____

John H. Thatcher

_____

Tim E. Thatcher

_____

Kathlyn Carroll

_____

John H. Thatcher IV

_____

Zachary E. Thatcher

_____

Joshua A. Thatcher

_____

Jack E. Thatcher

_____

Madison R. Thatcher

_____

Bryson C. Carroll

_____

Emilee B. Carroll

2

**12.9 ASSURANCES**. Each Member shall execute all such certificates and other documents and shall do all such filing, recording, publishing and other acts as the Manager deems appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the property of the Company.

**12.10 BINDING PROVISIONS**. This Agreement is binding upon, and inures to the benefit of, the Members and their respective heirs, executors, administrators, personal and legal representatives, successors, and permitted assigns.

**12.11 CONSTRUCTION**. Throughout this Agreement, words denoting the singular may be construed as denoting the plural, and words of the plural may be construed as denoting the singular, and words of one gender may be construed as denoting such other gender as is appropriate.

**12.12 COUNTERPARTS**. This Agreement may be executed in several counterparts and as to executed, shall constitute one Agreement, binding on all the parties, even though all the parties have not signed the same counterpart. Any counterpart of this Agreement which has attached to it separate signature pages, which altogether contain the signatures of all the parties, shall be deemed a fully executed instrument for all purposes.

**12.13 FACSIMILE AND ELECTRONIC SIGNATURES**. Facsimile and electronic signatures shall be acceptable to and binding upon all parties. The parties hereto have caused this Agreement to be duly executed the day and year first above written.

**MEMBERS:**

JOHN H. THATCHER JR. TRUST DATED MARCH 8, 2004

By: John H. Thatcher Jr., Trustee

By: Beth E. Thatcher, Trustee

BETH E. THATCHER TRUST DATED MARCH 8, 2004

By: John H. Thatcher Jr., Trustee

By: Beth E. Thatcher, Trustee

(Signatures continue on next page)

14

## MINUTES OF A SPECIAL MEETING OF

## 7IL PROPERTIES, LLC

The Class A Voting Members of **7IL Properties, LLC** (Company) met on ___April 28, __, 2021 for a special meeting of the company. The Class A Voting Members, the **John H. Thatcher Jr. Trust, dated March 8, 2004** by John H. Thatcher Jr. and Beth E. Thatcher, as co-trustees, and the **Beth E. Thatcher Trust, dated March 8, 2004**, by John H. Thatcher Jr. and Beth E. Thatcher, as co-trustees appeared personally and waived notice of the time, place and purpose of the meeting.

The Class A Voting Members met to discuss the Company's purchase of the following properties for the following amounts:

| Address: | Purchase Price: |
|---|---|
| 1. 174 Deer Watch Lane, Epworth GA 30541 | TBD |
| 2. 92 Fish Trap Rd, Blue Ridge GA 30513 | TBD |
| 3. 550 Old Gravel Rd, McCaysville GA, 30555 | TBD |
| 4. 223 River Heights, Blue Ridge GA, 305613 | TBD |
| 5. 300 Forest Drive, Morgantown, GA, 30560 | TBD |

The Class A Voting Members then discussed giving John H. Thatcher III as manager the authority to purchase the properties for the purchase prices set forth above, and upon motion being duly made, seconded and unanimously carried, it was:

**RESOLVED** that John H. Thatcher III as manager of the Company be and is hereby authorized on behalf of the Company to purchase the properties described above for the purchase prices indicated, and to execute any documentation necessary to effectuate the same.

Beth E. Thatcher, Secretary



# Sparks EXCHANGE Solutions
## 1031 Qualified Intermediary

**Closing Instructions**

| | |
|---|---|
| Closing Agent | Wilson Hamilton Law |
| Exchangor | Gary Knight |
| Subject Property | 253 River Heights Rd, Blue Ridge, Fannin County, GA 30513 |
| Closing Date | June 1, 2021 |

**Relinquished Real Property**

These instructions are your authorization to handle this tax deferred exchange closing by direct conveyancing title from Exchangor to Purchaser.

DOCUMENTS ENCLOSED:

1. Wiring Instructions.
2. Invoice
3. Exchange agreement. Please ask Gary Knight to sign first before closing time.
4. Assignment of Real Estate Purchase and Sale Agreement. Please ask purchasers to sign.
5. Direction from seller to pay proceeds to Qualified Intermediary. Please ask Mr. Knight to sign.
6. Real estate sales contract assignment. Please ask Mr. Knight to sign.
7. Direct to convey to seller form.
8. W-9
9. Privacy Policy
10. Recommended contract Verbiage.

CLOSING STATEMENT/ CLOSING DISCLOSURE:

1. Line item showing 1031 Exchange Funds to Sparks Exchange Solutions, LLC.
2. Separate line item showing Qualified Intermediary Fee $855.
3. Signature line to read as: Sparks Exchange Solutions, LLC, as Qualified Intermediary for Gary Knight,
By: P. Darrin Sparks, CEO & Managing Member Approved By Gary Knight, Signature
Qualified Intermediary can sign settlement agreement prior by e-sign, overnight or facsimile

DISBURSEMENT OF FUNDS: Please transfer by wire payable to Sparks Exchange Solutions, LLC representing Net sales proceeds & Intermediary Fee.

POST CLOSING:

Please return a copy of the executed documents related to the 1031 Exchange above & the Settlement statement. Please call with any questions.



## Sparks EXCHANGE Solutions
1031 Qualified Intermediary

### Domestic Wiring Instructions

| | |
|---|---|
| Receiving Bank ABA | 021000021 |
| Receiving Bank Name | JP Morgan Chase |
| Receiving Bank Address | 4 New York Plaza<br>New York, NY 10004-2413 |
| Beneficiary Account Number-<br>Further Credit: | 700626265 |
| Beneficiary FI Name-<br>Further Credit: | Edward Jones<br>12555 Manchester Rd, St Louis, MO 63131 |
| Beneficiary Account Name & Number:<br>Final Credit | Sparks Exchange Solutions, LLC<br>Account # 158-22086-1-5<br>178 Haralson Place<br>PO Box 1142<br>Blairsville, GA 30514 |
| Reference | G Knight 21067GF |

**WIRE FRAUD ALERT:**

**Please call our office prior to submitting funds.**



Sparks EXCHANGE Solutions
1031 Qualified Intermediary

# INVOICE

**DATE** June 1, 2021

TO
Gary Knight
PO Box 2625
Blue Ridge, GA 30513

| Description | Amount |
| --- | --- |
| 1031 Forward/ Delayed Exchange | $855.00 |
| Exchange #21067GF | |
| 253 River Heights Rd, Blue Ridge, Fannin County, GA 30513 | |

**Total Currently Due**                                                                          **$855.00**

Payment is due at time of signing.

THANK YOU FOR YOUR BUSINESS!



Sparks EXCHANGE Solutions
1031 Qualified Intermediary

PO Box 1142
Blairsville, GA 30514
Phone (706) 897-3236
dsparks.@sparks1031.com

EXCHANGE AGREEMENT NO. 21067GF

This Agreement is entered into this June 1, 2021, by and between Gary Knight, hereinafter referred to as "Exchangor", and Sparks Exchange Solutions, LLC, hereinafter referred to as "Qualified Intermediary".

WHEREAS, Exchangor owns that real property, hereinafter referred to as "Relinquished Property", described in Exhibit "A" attached hereto and hereby incorporated by reference herein; and

WHEREAS, Exchangor desires only to exchange the Relinquished Property for like-kind property, hereinafter referred to as "Replacement Property", in such a way as to qualify for tax deferred treatment under Internal Revenue Code Section 1031 and similar state statutes; and

WHEREAS, Exchangor has been unable to find suitable Replacement Property for accomplishing said tax-deferred exchange; and

WHEREAS, Exchangor, with a continued intent to complete a tax-deferred exchange pursuant to Internal Revenue Code Section 1031, is willing to assign the Real Estate Sale Contract for the Relinquished Property to the Intermediary, so that the Intermediary shall be the seller of the Relinquished Property in order to allow for the closing of the sale of the Relinquished Property pending the location of suitable Replacement Property as specified herein; and

WHEREAS, Intermediary is willing to act as a "qualified intermediary", as that term is defined in Treasury Regulations Section 1.1031(k)-1(g)(4), in connection with Exchangor's tax-deferred exchange; and

WHEREAS, Intermediary is willing to accept the assignment of the Real Estate Sale Contract for the Relinquished Property and to hold the proceeds from the sale of the Relinquished Property as set forth herein and to utilize the same in securing, acquiring and transferring to Exchangor suitable Replacement Property to complete the tax-deferred exchange according to the terms and conditions as set forth herein;

THEREFORE, the parties hereto agree as follows:

1. Subject to and conditioned upon the close of the sale of the Relinquished Property and otherwise subject to and upon the terms and conditions set forth in this Agreement, including the authority for direct deeding contained in Paragraph 13 hereof. Intermediary hereby agrees to acquire the Relinquished Property from Exchangor, to transfer the Relinquished Property to the Purchaser thereof, to acquire the Replacement Property from the Seller thereof and to transfer the Replacement Property

to Exchangor. Each of the above transfers is part of an integrated interdependent, mutual and reciprocal plan intended to effectuate a tax-deferred exchange by Exchangor of like-kind properties pursuant to and in accordance with the provision of Internal Revenue Code Section 1031, as now or hereafter amended and the Regulations thereunder.

2. Exchangor shall transfer all of Exchangor's rights in and to the Relinquished Property, under the provisions of Paragraph 13 hereof authorizing direct deeding, by delivery at the time of closing of the sale of the Relinquished Property of a deed conveying the Relinquished Property to the Purchaser. Exchangor shall in this event also execute and deliver to Intermediary and Purchaser, on or before the closing of the sale of the Relinquished Property, an Assignment of Real Estate Sale Contract for the Relinquished Property, assigning Exchangor's rights and benefits thereunder to Intermediary.

3. In order to account for and monitor the Exchange Value in respect to the Relinquished Property, Intermediary agrees to establish an exchange account concerning this transaction in Intermediary's books and records in favor of Exchangor (hereinafter referred to as the "Exchange Account"). The opening entry for the Exchange Account shall be the Exchange Value with respect to the Relinquished Property as determined under Paragraph 4 below. Thereafter, the balance in the Exchange Account shall be reduced from time to time by (i) Intermediary's fees and costs, (ii) the Exchange Value with respect to each Replacement Property (i.e., all amounts expended by Intermediary in connection with the acquisition of each Replacement Property, as determined under Paragraph 5 below), and (iii) any other payments made or costs or expenses incurred by Intermediary for which Exchangor is obligated or responsible under this Agreement. The balance of the Exchange Value remaining in the Exchange Account also shall be increased in accordance with Paragraph 16 below. Intermediary shall provide Exchangor with an accounting of the Exchange Value in the Exchange Account as soon after the 180th day (or closing of the final Replacement Property if sooner) as is practical. In preparing the accounting, Intermediary shall be relying upon information and settlement statements supplied by third-parties and Exchangor hereby releases Intermediary from any liability whatsoever in connection with such reliance.

4. In respect to the Relinquished Property, "Exchange Value" shall mean the total consideration received by Intermediary from the closing of the sale of the Relinquished Property. All real estate commissions, prorations of income and expenses (including rents, interest on encumbrances, real estate taxes, etc.), closing costs, title insurance premiums, escrow fees, survey charges, attorneys' fees, transfer taxes and any other amounts otherwise chargeable to Exchangor as seller of the Relinquished Property shall be charged to Intermediary and shall reduce the Exchange Value of the Relinquished Property.

5. In respect the Replacement Property, "Exchange Value" shall mean the total costs and expenses incurred by Intermediary, in accordance with the provisions of this Agreement in connection with the acquisition and conveyance thereof to Exchangor, including, without limitation, the aggregate amount of all deposits and expenditures by Intermediary in respect to the purchase price, real estate commissions, prorations of income and expenses (including rents, interest on encumbrances, real estate taxes, etc.), closing costs, title insurance premiums, escrow fees, survey charges, attorneys' fees, transfer taxes and other amounts otherwise chargeable to Intermediary in connection with the acquisition and conveyance of the Replacement Property to Exchangor, but excluding any existing mortgage, trust deed or other secured loans which may be assumed or taken subject to by Exchangor.

6. At the time of the closing of the sale of the Relinquished Property, the proceeds from the sale of the Relinquished Property, shall be paid directly to Intermediary and be held by Intermediary pursuant to the terms of this Agreement.

7. Intermediary is instructed to invest said funds in FDIC insured money market accounts, U. S. Government Obligations, or any similar investment until such time as the invested proceeds and any accrued interest are to be used pursuant to the terms of this Agreement. The market value of investments may fluctuate. Intermediary will not invest Exchangor's assets in mutual funds.

8. In no event shall Intermediary be required to make a cash payment for Replacement Property, including all costs and expenses of said purchase, in excess of the funds held by the Intermediary in the Exchange Account.

9. In the event additional cash is necessary to acquire the Replacement Property, said amount (i) shall be advanced by Exchangor to Intermediary; (ii) shall be used by Intermediary to acquire the Replacement Property; (iii) shall be considered an interest-free loan from Exchangor to Intermediary (fully satisfied upon the conveyance of the Replacement Property to Exchangor); and (iv) in the event the Replacement Property is not conveyed to Exchangor, shall be repaid by Intermediary to Exchangor, upon the written demand of Exchangor.

10. For purposes of this Agreement:

a. The period between the "Conveyance Date" and midnight of the 45th day thereafter is defined as the "Identification Period"; and

b. The period between the "Conveyance Date" and midnight of the earlier of the 180th day thereafter or the due date (including extensions) of the taxpayer's tax return for the taxable year in which the transfer of the Relinquished Property occurs is defined as the "Exchange Period".

11. Within 45 days after the transfer of the Relinquished Property, hereinafter referred to as the "Conveyance Date", Exchangor shall by written notice to Intermediary identify Replacement Property anywhere in the United States. Such notice from Exchangor shall unambiguously identify the Replacement Property by street address or legal description. Thereafter Intermediary shall undertake to acquire the Replacement Property upon such terms or pursuant to such agreement as Exchangor has negotiated with the Seller of such Replacement Property. Provided, however, that Intermediary shall incur no liability to Exchangor hereunder if efforts to purchase Replacement Property on the terms and conditions specified by Exchangor shall be unsuccessful. All agreements to purchase shall be assigned to Intermediary. The Replacement Property shall be conveyed by direct deed from the Seller to Exchangor.

12. The Intermediary shall not be required to make any warranties or representations regarding the Relinquished Property which are not guaranteed by Exchangor. Further, the Intermediary shall not be required to make any warranties or representations regarding the Replacement Property which would survive as to the Intermediary following conveyance of the Replacement Property.

13. To the extent permitted by Internal Revenue Code Section 1031 and the Regulations promulgated thereunder, legal title to the Relinquished Property shall be conveyed directly from the Exchangor to Purchaser, and legal title for the Replacement Property shall be conveyed directly from the Seller to Exchangor. The means for accomplishing such direct deeding shall require the execution of an

assignment of the Real Estate Sale Agreement between the Exchangor and the Intermediary for the Relinquished Property, and a separate assignment of the Real Estate Purchase Agreement between the Exchangor and the Intermediary for the Replacement Property.

14. Exchangor acknowledges and agrees that:

a. The Intermediary shall not be required to assume any secured loan on any Replacement Property or to execute any promissory notes or other evidence of indebtedness in connection with such acquisitions which would impose any personal liability on the Intermediary for the payment thereof.

b. In no event shall the Intermediary be required to pay a cash amount for the Replacement Property, including all costs and expenses incurred in connection with such purchase, in excess of the funds then held by the Intermediary in the Exchange Account.

c. The Intermediary shall act only in accordance with the written instructions of Exchangor and on the terms of this Agreement in making said acquisition and may refuse to proceed with said acquisition in the event said instructions exceed the scope of this Agreement.

d. In no event shall the Intermediary complete, execute or deliver any form or Environmental Disclosure Document pursuant to any federal, state or local statute, law or ordinance.

15. Except for payments made from the Exchange Account to reimburse Exchangor for expenses paid by Exchangor for the sale of the Relinquished Property or the acquisition of Replacement Property, such as title reports, earnest money, etc., which reimbursement shall be permitted upon written request from Exchangor and which payments are authorized under Treasury Regulations Section 1.1031(k)-1(g)(7)(ii), the Exchangor shall not be entitled to receive any portion of the Exchange Account or any growth factor (i.e. interest) thereof nor to receive, pledge, borrow or otherwise obtain the benefits of money or other property held in the Exchange Account prior to the termination of this Agreement.

16. If Interest earned on the Exchange Account is accounted for the benefit of Exchangor, then interest amount shall be reported as interest income on Exchangor's tax return, regardless of whether said interest is applied to the purchase of Replacement Property or is received by Exchangor in cash as part of the distribution of the Exchange Account to Exchangor upon termination of this Agreement. The Exchangor shall not be entitled to receive, pledge, borrow or otherwise obtain the benefits of said interest prior to the termination of this Agreement.

17. This Agreement shall terminate, and the Exchange Account shall be paid to Exchangor by the Intermediary under the following conditions:

a. If the Exchangor fails to identify Replacement Property within 45 days after the Conveyance Date and the exchange has failed, this Agreement shall terminate, and the Intermediary shall pay the Exchange Account to Exchangor after the 45th day.

b. If Exchangor has timely identified Replacement Property, after Exchangor has received all of the identified Replacement Property to which Exchangor is entitled, this Agreement shall terminate, and the Intermediary shall pay the Exchange Account to Exchangor.

c. Otherwise, at the end of the Exchange Period, provided, however, that in the event the Intermediary has executed one or more contracts to purchase Replacement Property which have not been acquired

by the Intermediary within 180 days after the Conveyance Date, and the Intermediary reasonably determines that it may be liable at law or in equity under such contract or contracts, the Intermediary shall not be required to pay the Exchange Account to Exchangor until such time as the Intermediary obtains a complete release of liability under such contract or contracts from the person obligated to transfer the Replacement Property.    The provisions of this paragraph 17 are meant to incorporate and conform with Treasury Regulations Section 1.1031(k)-1(g)(6) and if any of these provisions are inconsistent with such Regulation, the Regulation shall control.

18. The Exchangor is limited to designating as Exchange Property, property that is like kind to the Relinquished Property in accordance with Internal Revenue Code Section 1031(a).

19. In designating the Replacement Property, the Exchangor may (i) designate up to three properties as Replacement Property; or (ii) designate properties which do not exceed 200% of the Exchange Value of the Relinquished Property.

20. Intermediary shall not be required, in dealing with the Relinquished Property, the Replacement Property or in otherwise acting under this Agreement to enter into any contract or other obligation in its proprietary corporate capacity, nor to make itself individually liable to pay or incur the payment of any damages, attorneys' fees, fines, penalties, forfeitures, costs, charges or other sums of money whatsoever. Intermediary shall have no individual liability or obligation whatsoever arising from its ownership of the legal title to the Relinquished Property or Replacement Property, or with respect to any act done or contract entered into or indebtedness incurred in relation to the Relinquished Property, Replacement Property or in otherwise acting under this Agreement. Intermediary reserves the right to incorporate the limitations of its liability set forth in this paragraph in any instrument or document executed in connection herewith.

21. Exchangor hereby agrees to indemnify, defend and hold Intermediary, its officers, employees, attorneys and agents, harmless from and against all loss, cost or damage resulting from its participation in this exchange except to the extent that such loss, cost or damage is due to Intermediary's gross negligence or willful misconduct.

Exchangor shall further indemnify, defend, protect and hold Intermediary free and harmless from and against any and all claims, liabilities, penalties, forfeitures, losses or expenses (including attorney's fees) or death of, or injury to any person or damage to any property whatsoever, arising from or caused in whole or in part, directly or indirectly, by the presence in, on, under or about the Relinquished Property or the Replacement Property or any improvements thereon of any "Hazardous Materials" (as hereinafter defined) or the use, analysis, discharge or generation of Hazardous Materials to, in, on, under or about from or from any such property or improvements thereon. Exchangor's obligations hereunder shall include, without limitation, and whether foreseeable or unforeseeable, all costs of any required or necessary repair, cleanup or detoxification or decontamination of any of said Property or any improvements, and the preparation and implementation of any closure, remedial action or other required plans in connection therewith, and these obligations to indemnify Intermediary shall survive the transfer of any such Property or improvements to Intermediary's successor in interest. For purposes of the indemnity provisions hereof, any acts or omissions of, or by, employees, agents, Intermediaries or representatives of Exchangor (whether or not they are negligent, intentional, willful or unlawful) shall be strictly attributable to Exchangor. For the purposes of this paragraph, "Hazardous Materials" shall include but not be limited to substances defined as "hazardous substance "Hazardous Materials," or

"toxic substances" in the comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 USC §9601, et. seq.; the Hazardous Materials Transportation Act 49 USC §1801, et. seq.; the Resource Conservation and Recovery Act, 42 USC §6901, et. seq.; the Toxic Substances Control Act, 15 USC §2601 et. seq.; or as any said abovementioned laws may be amended from time to time, and in the Regulations adopted and the publications promulgated pursuant to said laws.

22. Intermediary shall not be required to pay, discharge or attend to the release of any claim, lien or encumbrances (including but not limited to mechanics or material men's liens, real and personal property taxes, assessments, income taxes, inheritance or estate taxes, excise taxes, special assessments or penalties and interest thereof) involving the Relinquished Property, Replacement Property or Exchange Account. If there shall be asserted any such claim, lien or encumbrance of any nature against the Relinquished Property or Replacement Property, Intermediary shall have no duty or responsibility to defend against such assertion or to take any other action with respect thereto.

23. If Intermediary shall pay or incur any liability to pay any money on account of this Agreement, or incur any liability to pay any money on account of any litigation as a result of holding title to the Relinquished Property, Replacement Property or otherwise in connection with this Agreement, whether because of breach of contract, injury to person or property, fines or penalties under any law or otherwise, the Exchangor shall pay on demand to Intermediary, with interest thereon at the highest rate permitted by law until paid, all such payments made by Intermediary together with its expenses, including reasonable attorneys' fees, and Exchangor shall indemnify and hold Intermediary harmless of and from any and all liabilities incurred by it for any reason whatsoever in connection with this Agreement. Intermediary shall not be required to convey or otherwise deal with the funds held in the Exchange Account so long as any money is due Intermediary under this Agreement, nor shall Intermediary be required to advance or pay any money, or to appear in, prosecute or defend any legal proceedings on account of or involving this Agreement or any property or interest hereunder or any transaction relating to the Agreement.

24. In the event Intermediary is instructed to or requested to do any act or refrain from doing any act, performance of which or non-performance of which, in Intermediary's sole opinion, would subject Intermediary to unreasonable risk of liability, expense or litigation, Intermediary shall have no obligation to perform such act or to refrain from performing such act except upon being furnished instructions or indemnity adequate in Intermediary's sole, absolute and uncontrolled discretion, to protect Intermediary against such risk of liability, expense or litigation, or except in accordance with an adjudication by a court of competent jurisdiction and the determination of all appeals and expiration of all applicable appeal periods in any appropriate legal or equitable proceeding, including, without limiting the generality of the foregoing, an action for an accounting or to secure approval of an accounting, a suit for declaratory judgment, an interpleader action or a suit for instructions to Intermediary. In any such action, the Intermediary shall be entitled to judgment against the Exchangor, or all of them if more than one, for any expenses or costs including reasonable attorneys' fees incurred in such action, to the extent that the court may determine.

25. Intermediary shall have no liability to any party or their successors or assigns on account of electing to act in accordance with any provision of this Agreement, as reasonably construed by Intermediary, regardless of whether or not such provision may subsequently be reformed or declared invalid or unenforceable or otherwise construed in any litigation or proceeding.

26. INTERMEDIARY MAKES NO REPRESENTATIONS OR WARRANTIES, NOR SHALL INTERMEDIARY BEAR ANY RESPONSIBILITY OR LIABILITY CONCERNING THE FEDERAL OR STATE TAX LAW CONSEQUENCES TO EXCHANGOR OR THE TRANSACTION CONTEMPLATED HEREIN, INCLUDING WITHOUT LIMITATION, THE STATUS OF ANY REPLACEMENT PROPERTY AS LIKE-KIND PROPERTY OR THE QUALIFICATION OF THIS TRANSACTION AS A TAX DEFERRED EXCHANGE PURSUANT TO INTERNAL REVENUE CODE SECTION 1031 OR APPLICABLE STATE LAWS. INTERMEDIARY DOES NOT GUARANTEE OR WARRANT A FAVORABLE TAX OUTCOME AS A RESULT OF THE TRANSACTION CONTEMPLATED HEREIN. EXCHANGOR ACKNOWLEDGES THAT EXCHANGOR HAS BEEN ADVISED TO SEEK EXCHANGOR'S OWN INDEPENDENT LEGAL COUNSEL OR TAX COUNSEL IN REGARD TO THE TRANSACTION CONTEMPLATED HEREIN AND THE TAX ASPECTS AND CONSEQUENCES OF SAME. EXCHANGOR SPECIFICALLY WAIVES ANY RIGHT TO RECOVER FROM INTERMEDIARY ANY SUMS INCURRED BY EXCHANGOR AS A RESULT OF THE DISALLOWANCE OF THE TRANSACTION CONTEMPLATED HEREIN AS A LIKE-KIND TAX DEFERRED EXHANGE PURSUANT TO INTERNAL REVENUE CODE SECTION 1031.

27. The Intermediary may resign by serving notice on the Exchangor. The resignation shall become effective 14 days following service of said notice. Exchangor may appoint a new Intermediary within the said 14-day period. In the event that a new Intermediary is not appointed, then any property then held by the resigning Intermediary shall be conveyed to Exchangor and any funds being held shall be paid out as provided for in Paragraph 17, as though such funds were being held at the end of the Exchange Period.

28. **Intermediary shall receive for its services in connection with this Agreement a fee of <u>$855 for the first sale and purchase of one replacement property and $300 for each subsequent purchase.</u> In addition, thereto, Intermediary may charge a reasonable fee for any special services required to be rendered. The fees may include the pass through of wire fees charged by financial institution for incoming and originated wires. The Intermediary may look to any property or funds held by it under this Agreement for payment thereof.**

29. All notices provided or required to be given under this Agreement shall be deemed to have been duly given, served, and delivered if mailed by United States registered or certified mail addressed to the party entitled to receive the same at the address specified in this Agreement; provided, however, that any party may change its mailing address by giving to the other parties written notice of its new mailing address, and any notice so given shall be deemed to have been given, served and delivered on the date on which said notice was mailed in the matter herein provided. In addition, all notices provided or required to be given under this Agreement shall be deemed to have been duly given, served and delivered if made by facsimile transmission and shall be deemed to have been given, served and delivered on the date of the facsimile transmission; provided, however, that such notice shall also be mailed by United States registered or certified mail as set forth above. All such notices shall be given to the parties as follows

Intermediary:          Sparks Exchange Solutions


Exchangor:             Gary Knight


30. Time is of the essence of this Agreement.

PO Box 1142, Blairsville, GA 30514          dsparks@sparks1031.com          Telephone (706) 897-3236
108 Blue Ridge Hwy, Ste 6, Blairsville, GA 30512                                                              Fax (706) 781-3378

31. Exchangor certifies he has sought legal counsel as well as advice from tax advisor regarding this transaction. Exchangor acknowledges Sparks Exchange Solutions nor its representatives may give tax or legal advice.

32. Each party is acting as a principal in this exchange transaction and not as the agent of the other party.

33. This Agreement may not be amended or modified in any respect whatsoever except by an instrument in writing signed by the parties hereto. This Agreement constitutes the entire Agreement between the parties with respect to the subject matter hereof. If any provisions of this Agreement shall be held invalid, such provision or provisions shall be severable and such invalidity shall not affect any other provision hereof.

34. This Agreement shall be construed in accordance with the laws of the State of Georgia. The parties hereto consent to the jurisdiction and venue of this Judicial District, Union County, Georgia for any legal action, court proceedings or litigation in regard to, as a result of or pursuant to this Exchange Agreement.

35. This Agreement inures to the benefit of and binds all parties hereto, their heirs, legatees, devisees, administrators, executors, successors and assigns.

36. This Agreement may be executed in duplicate counterparts, each of which so executed shall, irrespective of the date of its execution and delivery, be deemed an original, and said counterparts together shall constitute one in the same agreement.

37. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.


Signature Next Page

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on the date and year first above written:

_____, Gary Knight, Exchangor

Dated _____

In presence of,

_____, Notary Public


_____, Sparks EXCHANGE Solutions, LLC as Qualified Intermediary
by P. Darrin Sparks, CEO & Managing Member.



## Sparks EXCHANGE Solutions
### 1031 Qualified Intermediary

**NOTICE OF ASSIGNMENT OF REAL ESTATE SALE CONTRACT FOR RELINQUISHED PROPERTY**

Relinquished Real Property located at 253 River Heights Rd, Blue Ridge, Fannin County, GA 30513
Seller reserves the right to include this transaction via an assignment of Seller's rights as part of an IRC, Section 1031 tax deferred exchange for the benefit of Seller, at no cost, expense or liability to Buyer. Buyer further agrees to execute any and all documents (subject to the reasonable approval of Buyer's counsel) as are reasonably necessary in connection therewith, provided that the close of this transaction for the conveyance of Seller's property shall not be contingent upon or subject to the completion of such exchange. Buyer understands and acknowledges that Seller is participating in the 1031 Tax Deferred Exchange Program]. Seller agrees to indemnify and hold Buyer free and harmless from any cost, expense or liability, including attorney's fees resulting from Buyer's participation in such exchange.

You are hereby notified that the Seller under the Real Estate Sale Contract, a copy of which is attached hereto, has assigned to the undersigned all of the Seller's rights and benefits under said Contract, and the undersigned as Assignee, has accepted said Assignment. A copy of said Assignment is attached hereto.

Receipt acknowledged by Purchaser:
7 IL Properties, LLC

_____, John H. Hatcher, Managing Member

Qualified Intermediary accepted this Contract Assignment under an existing Exchange Agreement 21067GF

By: _P. Darrin Sparks_ , P. Darrin Sparks, CEO & Managing Member, Sparks Exchange Solutions, LLC.

PO Box 1142, Blairsville, GA 30514     dsparks@sparks1031.com     Telephone (706) 897-3236
108 Blue Ridge Hwy, Ste 6, Blairsville, GA 30512                                              Fax (706) 781-3378



# Sparks EXCHANGE Solutions
## 1031 Qualified Intermediary

DIRECTION TO PURCHASER TO PAY PROCEEDS FOR

RELINQUISHED PROPERTY DIRECTLY TO INTERMEDIARY

June 1, 2021

TO: Wilson Hamilton Law as Closing Agent

The undersigned Seller, and the undersigned Intermediary, as Assignee of the Real Estate

Sales Contract dated March 13, 2021, by and between Gary Knight, as seller and 7 IL Properties, LLC as Purchaser, hereby direct you to pay the net proceeds from the sale of property which is the subject of said Contract directly to: Sparks EXCHANGE Solutions, LLC, as Intermediary under Exchange Agreement No. 21067GF dated June 1, 2021.

Seller:

_____, Gary Knight

Assignee/Intermediary:

Sparks EXCHANGE Solutions, LLC, as Intermediary under

Exchange Agreement No. 21067GF dated June 1, 2021.

_____

P. Darrin Sparks, its CEO & Managing Member
Sparks Exchange Solutions, LLC

ASSIGNMENT OF REAL ESTATE SALE CONTRACT

FOR RELINQUISHED REAL PROPERTY LOCATED AT 253 River Heights Rd, Blue Ridge, Fannin County, GA 30513

This Agreement entered into this 1st day of June 2021, by and Gary Knight, hereinafter called Assignor, and Sparks EXCHANGE Solutions, LLC, as Intermediary under Exchange Agreement No. 21067GF dated June 1, 2021, hereinafter called Assignee.

WHEREAS, Assignor as Seller entered into a certain Real Estate Sale Contract, a copy of which

is attached hereto as Exhibit "A" and is incorporated herein by reference; and

WHEREAS, Assignor and Assignee have executed an Exchange Agreement No. 21067GF dated June 1, 2021, in which Assignor has agreed to transfer the property described in Exhibit "A" to Assignee, in consideration of Assignee's acquisition of suitable Replacement Property and transfer same to Assignor, so that Assignor may accomplish a tax deferred exchange of like-kind property pursuant to the provisions of Internal Revenue Code Section 1031; and

WHEREAS, Assignee agrees to assume Assignor's benefits under the Real Estate Sale Contract

attached hereto as Exhibit "A";

NOW, THEREFORE, the parties agree as follows:

1. Assignor hereby assigns to Assignee the Seller's rights in and under the Real Estate Sale

Contract attached hereto as Exhibit "A". All representations and warranties in the Real Estate Sale

Contract shall survive this Assignment.

2. Assignee hereby accepts the Seller's rights in and under the Real Estate Sale Contract

attached hereto as Exhibit "A".

3. Assignee hereby requests and directs the Assignor to deed directly to Purchaser the

property subject to the Real Estate Sale Contract attached hereto as Exhibit "A".

IN WITNESS WHEREOF, the parties have executed this Agreement as their free and voluntary

act and deed, on the date and year first above written.

SELLER/ASSIGNOR:

INTERMEDIARY/ASSIGNEE:
Sparks EXCHANGE Solutions, LLC, as

_____, Gary Knight

Intermediary under Exchange
Agreement No. 21067GF

Dated June 1, 2021.

BY: _____



**Sparks EXCHANGE Solutions**
1031 Qualified Intermediary

DIRECTION TO SELLER TO CONVEY RELINQUISHED PROPERTY DIRECTLY TO EXCHANGOR TO:

DATE: June 1, 2021

To Seller: The undersigned, as Assignee under a certain Real Estate Purchase Contract dated March 13, 2021, by and between Gary Knight as Seller(s), and 7 IL Properties, LLC, as Purchaser(s), hereby directs you the Seller to deed the property which is the subject of said Contract directly to: 7 IL Properties, LLC

ASSIGNEE/INTERMEDIARY:

Sparks EXCHANGE Solutions, LLC,

as Intermediary under Exchange

Agreement No.  21067GF

By: _____,

P. Darrin Sparks,
its CEO & Managing Member,
Sparks Exchange Solutions, LLC



## Sparks EXCHANGE Solutions
### 1031 Qualified Intermediary

**PRIVACY POLICY**

Sparks Exchange Solutions is committed to protecting the personal information that you disclose in connection with your 1031 Exchange. Our firm protects the information you provide to us from disclosure to other parties without your consent.

However, there are important exceptions of which you should be aware.

- If your Exchange Agreement allows you to earn interest, the total amount will be reported by means of submitting Form 1099-Int to the Internal Revenue Service.
- Additional information may be shared with state and federal agencies responsible for tax administration. The state agency must request this information in writing and the request must be signed by an official designated to request such information.
- Pursuant to a court order, return information may be shared with law enforcement agencies for investigation and prosecution of non-tax criminal laws.
- Provide for disclosures to powers of attorney and other designees. You may give oral consent to speak with a third party, if necessary, to resolve any matter. However, oral consent does not substitute for a power of attorney or a legal designation, and the discussion is limited to the issue for which the consent is given.

Under applicable law, you may request a copy of any personal information.

**OUR SECURITY PROCEDURES**

• We will maintain physical, electronic and procedural safeguards to safeguard your personal information and all information regarding your account.
• We will continue to maintain our dedication to protecting your privacy before, during and after your exchange has been completed.
• We will seek your authorization prior to sending your exchange funds to Replacement Property closing agent.
• We will verify wiring or other withdrawal instructions prior to completion.

**INVESTMENT POLICY**

- Your exchange Funds will never be comingled with this firm's operating account.
- 100% liquidity. While restricted outside of your control, your funds will remain 100% liquid & unencumbered during your exchange.

Rev. April 2021



# Sparks EXCHANGE Solutions
## 1031 Qualified Intermediary

BUYER OF EXCHANGOR'S PROPERTY - COOPERATING WITH EXCHANGOR (Sale of Relinquished Property – Phase I):

"Seller reserves the right to include this transaction via an assignment of Seller's rights as part of an IRC, Section 1031 tax deferred exchange for the benefit of Seller, at no cost, expense or liability to Buyer. Buyer further agrees to execute any and all documents (subject to the reasonable approval of Buyer's counsel) as are reasonably necessary in connection therewith, provided that the close of this transaction for the conveyance of Seller's property shall not be contingent upon or subject to the completion of such exchange. Buyer understands and acknowledges that Seller is participating in a 1031 Tax Deferred Exchange Program. Seller agrees to indemnify and hold Buyer free and harmless from any cost, expense or liability, including attorney's fees resulting from Buyer's participation in such exchange."


SELLER OF ACQUISITION PROPERTY - COOPERATING WITH EXCHANGOR
(Purchase of Replacement Property – Phase 2):

"Buyer reserves the right to include this transaction via an assignment of buyer's rights, as part of an IRC, Section 1031 tax deferred exchange for the benefit of Buyer, at no cost, expense or liability to Seller. Seller further agrees to execute any and all documents (subject to the reasonable approval of Seller's counsel) as are reasonably necessary in connection therewith, provided that the close of escrow for the conveyance of Seller's property shall not be contingent upon or subject to the completion of such an exchange. Buyer agrees to indemnify and hold Seller free and harmless from any cost, expense or liability, including attorney fees, resulting from Seller's participation in such exchange.