## Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF GEORGIA
 2              GAINESVILLE DIVISION
 3
    7 IL PROPERTIES, LLC,        )
 4                               )
            Plaintiff,           )  Civil Action No.:
 5                               )  2:21-cv-226-RWS
        vs.                      )
 6                               )
    GARY KNIGHT,                 )
 7                               )
            Defendant.           )
 8                               )
 9
10
        VIDEOCONFERENCE DEPOSITION OF
11              TERRY L. WILSON
12
13
14           Friday July 21, 2023
                  1:50 p.m.
15
16
17
              Remote Proceeding
18           Blue Ridge, Georgia 30055
19
20
21
            Justin Hoffman, CCR
22             Notary Public
           Commission No. HH 279701
23
24
25
```

## Page 2

```
 1            APPEARANCES OF COUNSEL
 2
    On Behalf of Plaintiff, 7 IL Properties, LLC:
 3
        BRIAN S. GOLDBERG, ESQ.
 4      FREEMAN MATHIS & GARY
        100 Galleria Parkway, Suite 1600
 5      Atlanta, Georgia 30339-5948
        (770) 818-0000
 6      brian.goldberg@fmglaw.com
        APPEARED VIA VIDEOCONFERENCE
 7
 8  On Behalf of Plaintiff, Terry L. Wilson:
 9      TANIA TUTTLE, ESQ.
        MCLAIN & MERRITT
10      3445 Peachtree Road Northeast Suite 500
        Atlanta, Georgia 30326
11      (404) 365-4575
        ttuttle@mmatllaw.com
12      APPEARED VIA VIDEOCONFERENCE
13
    On Behalf of Defendant, Gary Knight:
14
        FRANK G PODESTA, ESQ.
15      FGP LAW LLC
        555 Sun Valley Drive, Suite N-3
16      Roswell, Georgia 30076
        (678) 677-5143
17      fpodesta@fgplaw.com
        APPEARED VIA VIDEOCONFERENCE
18
19
    Also present:
20
        Gary Knight, Defendant
21
22
23
24
25
```

## Page 3

```
 1            INDEX OF EXAMINATION
 2  EXAMINATION                            PAGE
 3  Examination by Mr. Podesta               6
 4  Examination by Mr. Goldberg             60
 5  Further Examination by Mr. Podesta      65
 6  Examination by Mr. Goldberg             78
 7  Further Examination by Mr. Podesta      79
 8            INDEX TO EXHIBITS
 9  NUMBER          DESCRIPTION           PAGE
10  Exhibit 1    Fish Trap Deal Documents    8
11  Exhibit 2    River Heights Deal Documents 13
12  Exhibit 3    Emails                      32
13  Exhibit 4    Emails                      36
14  Exhibit 5    Emails                      41
15  Exhibit 6    Easement for Footpath       78
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1      Deposition of Terry L. Wilson
 2          July 21, 2023
 3
 4      (Reporter disclosure made pursuant to
 5  Article 10.B of the Rules and Regulations of the
 6  Board of Court Reporting of the Judicial Council of
 7  Georgia.)
 8      THE REPORTER:  We are going on the record.
 9  Today is July 21, 2023.  The time is 1:50 p.m. Eastern
10  Time.
11      Good afternoon.  My name is Justin Hoffman.
12  I'm the reporter assigned to this case.
13      I request all parties stipulate and agree that
14  by videoconference technology, this will be the remote
15  deposition of Terry L. Wilson in the case of 7 IL
16  Properties, LLC, versus Gary Knight.
17      Before going on the record, the witness
18  positively identified himself to me as Terry Wilson by
19  driver's license issued by the State of Georgia.  And
20  the witness is presently located in Blue Ridge, Georgia.
21      Counsel, will you please state your appearance
22  for the record, your firm, who you represent, and that
23  you agree to stipulate that we may place this witness
24  under oath and report this proceeding remotely?
25      MS. TUTTLE:  My name is Tania Tuttle with
```



Page 5

1  McLain & Merritt, and I'm here representing Mr. Wilson.

2  And, yes, that is fine as to the stipulations.

3      MR. GOLDBERG:  Brian Goldberg with Freeman

4  Mathis & Gary, and I'm representing the plaintiff in

5  this case.  And yes, we stipulate.

6      MR. PODESTA:  Frank Podesta with FGP Law in

7  Roswell, Georgia.  I represent the defendant, Gary

8  Knight.  And, yes, we stipulate as well.

9      THE REPORTER:  I will now swear in the

10  witness.  Please raise your right hand.

11      TERRY L. WILSON, having been first duly sworn,

12  testified as follows:

13      THE REPORTER:  Thank you.

14      Counsel, you may now proceed.

15      MR. PODESTA:  All right.  Thank you.

16      First off, Tania, Brian, do either of you have

17  any objections to just reserving all objections save for

18  the form?

19      MS. TUTTLE:  That's fine.

20      MR. GOLDBERG:  Yes, I agree.

21      MS. TUTTLE:  And we'll reserve and sign

22  please.

23      MR. PODESTA:  Okay.  Read and sign?

24      MS. TUTTLE:  Read and sign, yes.  Thank you.

25      MR. PODESTA:  No problem.

Page 6

1          EXAMINATION

2  BY MR. PODESTA:

3      Q.  All right.  Mr. Wilson, I realize you're an

4  attorney, so I hope this isn't duplicative, but have you

5  ever been involved in a deposition before?

6      A.  Yes.

7      Q.  Okay.  And so you know that it would be

8  helpful for the court reporter if we each finish our

9  questions and answers before speaking over each other?

10      A.  Yes.

11      Q.  And that nodding or shaking your head is not

12  helpful to the transcript?

13      A.  Yes.

14      Q.  Okay.  And so we'll get verbal -- verbal

15  answers?

16      A.  Yes.

17      Q.  Okay.  Could you tell me a little bit about

18  your background, sir?

19      A.  Okay.  I am originally from Colorado.  I went

20  to University of Denver undergrad in law school;

21  graduated law school in 1992; practiced in Colorado for

22  about ten years; moved to Georgia in the middle of 2004;

23  got my license in Georgia by reciprocity in January

24  2005; and I hung a shingle February 2005 here, in Blue

25  Ridge; started doing real estate transactions; and I've

Page 7

1  mostly been doing real estate closings ever since.

2      Q.  Okay.  Thank you.  And am I correct in

3  assuming that you don't have a whole lot of relatives in

4  Fannin County, Georgia, or Northern District Hall?

5      A.  I have zero relatives in Georgia.

6      Q.  Okay.  Well, that'll make it simple.  And I

7  don't suppose that you're likely to have any issues

8  related to a jury anyway.

9      Are you familiar generally with the facts of

10  this case?  Do you know what this case is about?

11      A.  Yes.

12      Q.  Okay.  And you understand that to involve two

13  real property transactions?

14      A.  Yes, I do.

15      Q.  And those transactions would be for 92 Fish

16  Trap Road and 253 River Heights Road, correct?

17      A.  Yes, yes.

18      Q.  Okay.  Is it -- would it be reasonable for me

19  to call them the Fish Trap and River Heights --

20      A.  Yes.

21      Q.  -- deals?

22      Okay.  All right.

23      A.  Yes.

24      MR. PODESTA:  So along that line, let me show

25  you what we will mark as Defense -- well, I assume we're

Page 8

1  only going to have one set of exhibits here.  Do you

2  have any exhibits, Brian?

3      MR. GOLDBERG:  No.

4      MR. PODESTA:  Do you have any exhibits?

5      MS. TUTTLE:  I -- no.

6      MR. PODESTA:  Okay.  So we'll -- we'll call it

7  Exhibit 1.

8      (Deposition Exhibit 1 marked for

9  identification.)

10  BY MR. PODESTA:

11      Q.  It would be what I would represent to you to

12  be the Fish Trap deal.  Would you mind just reviewing

13  that file?

14      MS. TUTTLE:  Just a second.  A month ago.

15      MR. GOLDBERG:  Would that be the file named

16  "Complete"?

17      MR. PODESTA:  Yes.

18      MS. TUTTLE:  That's what I recognize, too.

19      (Cross-talk.)

20      MR. PODESTA:  Yes, that would be --

21      MS. TUTTLE:  The one that says "Full"?

22      MR. PODESTA:  The one at the bottom that says

23  "Complete."

24      And in the Dropbox, I'll rename that

25  Exhibit 1.  I'll just put the Exhibit 1 name in front of



Page 9

1 it. You can rename it.

2     MS. TUTTLE: Got it.

3     MR. PODESTA: Okay.

4     MR. GOLDBERG: Yes.

5 BY MR. PODESTA:

6     Q. All right. Mr. Wilson, have you seen

7 Exhibit 1 before?

8     A. Yes.

9     Q. What is Exhibit 1?

10     A. So the Page 1 is the MLS sheet. I don't know

11 if I've seen that before. That's not normally part of

12 what we get, but it may have been a part of the

13 contract.

14     Everything else are the contract documents

15 starting with the purchase and sale agreement; the other

16 documents that the Realtor would've sent in at the time

17 the contract was sent to us, including the commission

18 being held; and then there's amendments following it.

19     Q. Okay. And you are not the real estate

20 agent --

21     A. Correct.

22     Q. -- on this deal?

23     MS. TUTTLE: Just make sure you let him finish

24 his questions.

25     THE WITNESS: Oh, I'm sorry.

Page 10

1     MS. TUTTLE: It's okay. Just, he'll just get

2 mad at you and we also don't want you to get into the

3 habit of it.

4     THE WITNESS: Sorry, Justin.

5 BY MR. PODESTA:

6     Q. So you are not the real estate agent in this

7 deal, correct?

8     A. That is correct.

9     Q. And what was your role? Did you have a role?

10     A. I'm the closing attorney.

11     Q. Okay. And what does that mean you do?

12     A. So we receive the contract. We order title, a

13 title search, a 50-year title search. When the search

14 comes back, we review the title search. We convert it

15 usually into a commitment but at least put it into

16 our -- our file, our SoftPro system that -- it generates

17 the documents for closings, including the settlement

18 statement and the deeds.

19     We also are the escrow agent for receiving the

20 money from the buyer and disbursing it to all the

21 parties according to the settlement statement.

22     Q. Okay. And who do you represent in this deal?

23     A. Per the contract, I believe in a cash

24 transaction, we represent the buyer.

25     Q. Okay. And this was -- this was a cash

Page 11

1 transaction, correct?

2     A. Yes, yes.

3     Q. Okay. All right. And did you -- you did not

4 prepare the bulk of Exhibit 1; is that correct?

5     A. That is correct.

6     Q. Is there any portion of Exhibit 1 that you

7 actually prepared?

8     A. I don't believe so. I will come to it again

9 to make sure.

10     (Pause.)

11     A. I did not prepare anything in this Exhibit 1.

12     Q. Okay. Who would've prepared it at this point?

13     A. The buyer's agent.

14     Q. And that would be Ms. Dee McBee?

15     A. Correct.

16     Q. Okay. And how did this -- when did you first

17 receive a copy of Exhibit 1? Well, that may be a bad

18 question because there are amendments to Exhibit 1, but

19 when did you first receive a copy of the purchase and

20 sale agreement portion of Exhibit 1 that begins on

21 Page 2 of the exhibit?

22     A. I don't remember when that would've been.

23     Q. Okay.

24     A. If I would approximate, four to six weeks

25 prior to closing.

Page 12

1     Q. Okay. And closing was set for June --

2     June --

3     Q. -- 1, 2021.

4     A. -- 1st. I apologize. Yes, June 1st.

5     Q. Okay. So four to six weeks would be somewhere

6 in mid April of 2021 --

7     A. About right, yes.

8     Q. -- mid to late April?

9     A. Okay. Okay. And then there are amendments to

10 this agreement. Were those provided to you in realtime?

11 Do you recall?

12     A. I don't recall. Amendments 1 and 2, the dates

13 are so close to the -- to the original date of the

14 contract that I would say that we -- we received them

15 with the contract.

16     Q. Okay.

17     A. Amendment 3 is dated later, so we would've

18 received it sometime after.

19     Q. That makes sense.

20     A. As well as Amendment 4 and 5.

21     MS. TUTTLE: And just for clarification,

22 you're referring to the date on each individual

23 amendment?

24     THE WITNESS: Yes, at the top of the page,

25 yes.



Page 13

1      MR. PODESTA:  Okay.  All right, we could set
2   that one aside for a moment and come back to it.
3      I almost feel foolish marking these physically
4   because Justin has copies, but I'll hand you what I
5   would like to mark as Exhibit 2.
6      (Deposition Exhibit 2 marked for
7   identification.)
8   BY MR. PODESTA:
9      Q.  Have you seen --
10     MR. PODESTA:  And for Tania, that's the
11  complete River Heights (indiscernible.)  So I'll -- I'll
12  change the name of that one as well to Exhibit 2 in the
13  Dropbox.
14  BY MR. PODESTA:
15     Q.  Mr. Wilson, have you ever seen Exhibit 2
16  before?
17     A.  Yes, I have.
18     Q.  Okay.  And what -- what is Exhibit 2?
19     A.  So this is a purchase and sale agreement offer
20  dated March 13, 2021, for 253 River Heights Road.
21     Q.  Okay.  And that document is the River Heights
22  deal, correct?
23     A.  Yes, sir.
24     Q.  Okay.  And the date on that document is March
25  13th, correct?

Page 14

1      A.  Yes, that is the offer date.
2      Q.  Okay.  And the closing date was still
3   June 1st, correct?
4      A.  This closing date says May 31st, but as I
5   recall, that was Memorial Day.
6      Q.  Right.  Okay.  Gotcha.  When do you recall
7   receiving this or when do you imagine you received the
8   original form of this without the amendments?
9      A.  It's really hard to say.  Typically, I believe
10  at that time it was about four to six weeks in advance
11  of a transaction.  But I remember Dee telling me ahead
12  of time that there was some contracts coming and
13  speaking with her about it, but I don't remember when we
14  received the contracts.
15     Q.  Okay.  Understood.  And you would've received
16  these well in advance of closing?
17     A.  Yes.
18     Q.  Okay.  And your roles in this agreement, the
19  River Heights deal, were the same as in the Fish Trap
20  deal, correct?
21     A.  It is the same.
22     Q.  So you were the closing attorney?
23     A.  I am.
24     Q.  You did not prepare this document?
25     A.  Correct.

Page 15

1      Q.  You represented the buyer because it was a
2   cash sale?
3      A.  Correct.
4      Q.  Okay.  And the buyer's agent was Dee McBee,
5   correct?
6      A.  Correct.
7      Q.  Okay.  Did you negotiate any portion of this
8   agreement?
9      A.  No.
10     Q.  Did you negotiate any portion of Exhibit 1?
11     A.  No.
12     Q.  And, you know, again, I -- I realize it's a
13  fairly long exhibit, but am I correct that you prepared
14  none of Exhibit 2?
15     A.  (No response.)
16     Q.  And I should say that's not a trick question.
17  There is a buyer information sheet that's got your
18  information at the top.
19     But I guess to rephrase it, could you tell me
20  which portions you did create?
21     A.  All right.  We did not create any of the GAR
22  documents, any of the contracts or the amendments.
23     Q.  Okay.  And when you say GAR documents, you
24  simply mean Georgia Realtors documents?
25     A.  Yes, correct.

Page 16

1      Q.  Okay.  And those are the forms that come at
2   the beginning of this?
3      A.  Yes, sir.
4      Q.  Okay.  All right.  So turning back generally
5   to Exhibit 1, what was -- what was the Fish Trap deal?
6   What was being bought?  What was the -- what was the
7   purchase price?  Who was buying and who was selling?
8      A.  92 Fish Trap Road was the property that is in
9   Toccoa Heights; the purchase price, 850,000; with the
10  closing on June 1st; 14 days due diligence, both parties
11  have agents.
12     Is that sufficient or would you like more?
13     Q.  Well, yes, that -- that's sufficient.
14     A.  Thank you.
15     Q.  And is it fair to say that if you turn to a --
16  a handwritten Toccoa Heights page --
17     (Cross-talk.)
18     A.  Yes.
19     Q.  -- it looks like this, you'll see the -- the
20  word "Exhibit C" at the top of it in Toccoa Heights, and
21  it looks like a plat.
22     A.  I have that, yes.
23     Q.  Okay.  Was that incorporated into that deal?
24     A.  Yes.
25     Q.  Okay.  So that -- that is -- what is that?



Page 17

1    A.  This is a subdivision plat of Toccoa Heights
2  containing -- it appears like Lots 1 through 12 and the
3  Sheet 2 of 2.
4        MR. GOLDBERG:  I'm sorry.  Just to clarify,
5  are you looking at -- is this Page 13 on top there?
6        MR. PODESTA:  It's the one that looks like
7  this.
8        MS. TUTTLE:  Yeah, I don't think they're
9  based -- they're not numbered.
10        MR. GOLDBERG:  And this is the Fish Trap
11  Complete.
12        MR. PODESTA:  Correct, that's the Fish Trap.
13        MS. TUTTLE:  I have it as Page 20 of 65 on
14  Exhibit 1 on the document, if that -- if that helps.
15        MR. PODESTA:  That sounds more correct.
16  BY MR. PODESTA:
17    Q.  And just to clarify which page this is, this
18  is the page that says, in a handwritten form, "Exhibit
19  C" at the top and then in bold and underlined, "Toccoa
20  Heights."
21    A.  Yes, it is.
22    Q.  And it's got what appears to be a wedge-shaped
23  plat of numerous properties.
24    A.  Yes, sir.
25    Q.  Okay.  And that was incorporated into

Page 18

1  Exhibit A -- Exhibit 1, rather, as part of the
2  agreement?
3    A.  Yes.
4    Q.  Okay.  And is it correct that there are a
5  number of lots numbered from Lot 1, 2, 3, 4, counting
6  down to Lot 12 in a line --
7    A.  Yes.
8    Q.  -- with Lot 7 by itself kind of over on the
9  side?
10    A.  Yes, sir.
11    Q.  And this deal involved Lot 10, correct?
12    A.  Yes.
13    Q.  Okay.  And to your knowledge, I realize you
14  don't have comprehensive knowledge of this, but to your
15  knowledge, was this page, this plat of Toccoa Heights,
16  relied on in the creation of this deal?
17        MS. TUTTLE:  Object as to form.
18        You can answer the question.
19        THE WITNESS:  Yes.
20        If -- if I may add to that?
21  BY MR. PODESTA:
22    Q.  Sure.
23    A.  Our process is to look at first Page 1 of a
24  contract to determine the parcel number; the legal
25  description, as best as possible; and then refer to the

Page 19

1  exhibits for clarification.
2    Q.  Okay.  Okay.  And this Exhibit C, this Toccoa
3  Heights page, this plat would've been utilized to
4  clarify the boundaries of Lot 10, correct?
5    A.  Yes, sir.
6    Q.  Okay.  All right.  And you did not create
7  Exhibit C?
8    A.  I did not.
9    Q.  And you had nothing to do with providing
10  Exhibit C, correct?
11    A.  I did not.
12    Q.  Okay.  Okay.  All right.  Then we could put
13  that away for a moment, and we'll come back to the other
14  stuff in a bit.
15        MS. TUTTLE:  I was just kind of looking at
16  this, going back and forth.
17        MR. PODESTA:  I appreciate it.  Keep it clean.
18  BY MR. PODESTA:
19    Q.  Do you recall these properties having easement
20  issues?
21    A.  There were easements involved.  Gary owned
22  multiple of these lots.  We had done a transaction
23  approximately a month prior on an adjoining lot for a
24  fellow named Thor James, and it -- it included
25  easements.  And that was my introduction to the several

Page 20

1  easements that we were going to have to deal with.
2    Q.  Okay.  And do you recall easements for well
3  water?
4    A.  Yes.
5    Q.  And river access?
6    A.  Yes.
7    Q.  And a footpath?
8    A.  Yes.
9    Q.  Okay.  Just one at a time, what were the
10  issues and which properties were affected by the well
11  water incident?
12        MS. TUTTLE:  Object as to form.
13        THE WITNESS:  I know it was the Thor James
14  House.  I believe it was...
15        MR. PODESTA:  Please, feel free to proceed.
16        MS. TUTTLE:  And if there's other documents
17  that you believe that will assist you in answering the
18  questions.
19        THE WITNESS:  So I believe it was -- it may
20  have been 9, 10, 11.  I believe there was three
21  properties.  I believe it was Thor's and then two more
22  of Gary's at that time, one of them being this property,
23  Lot 10.
24  BY MR. PODESTA:
25    Q.  Okay.  So Lot 10 was impacted by a well water



Page 21

1  agreement?

2      A.  Yes.

3      Q.  Okay.  What was the issue with the well water

4  incident?

5          MS. TUTTLE:  Object as to form.

6          You can answer.

7          THE WITNESS:  In North Georgia, we have a lot

8  of shared-well situations where multiple lots will use

9  one well.  Gary had owned all three of the lots on that

10  well, and I -- I say three.  It may have been four.  But

11  I believe it's three of the wells -- of the lots for

12  that well, which was fine.

13          But once you sell those off, you want a

14  shared-well agreement so the person who is buying the

15  lot has a right to that water and an access for

16  easements if -- if there's a problem with the water.

17  BY MR. PODESTA:

18      Q.  Okay.  So in the absence of a well water

19  easement, am I correct that 92 Fish Trap would've had no

20  right to an access to water?

21          MS. TUTTLE:  Object as to form.

22          You can answer.

23          THE WITNESS:  Yes.  I believe that lot -- that

24  well was on a separate parcel, if not a separate lot.

25  It could have been on the one Gary was retaining.  I

Page 22

1  don't recall which lot it was.  But whichever lot it is

2  not on, yes, without a well agreement, they would not

3  have had water.

4  BY MR. PODESTA:

5      Q.  Okay.  And then there was also a -- an issue

6  of footpath easements, correct?

7      A.  Yes.

8      Q.  Which properties were impacted by footpath

9  easements?

10          MS. TUTTLE:  (Inaudible.)

11          THE WITNESS:  So I believe it was Tracts 14

12  and 15:  15 being 253 River Heights Road; 14 being the

13  adjoining lot.

14  BY MR. PODESTA:

15      Q.  Okay.  What was the effect on 253 River

16  Heights of a footpath agreement?

17      A.  They were -- and -- and I might interject one.

18  There may have been a property above.  I remember there

19  being another property that Gary didn't own that was

20  involved in an easement earlier.  And I believe we were

21  trying to -- we were accommodating it as well.  And I

22  don't remember which easement it was being accommodated

23  in.  It might have been the footpath.

24          So this was to benefit -- actually, I believe

25  it went back and forth across 14 and 15.  So it was

Page 23

1  benefiting both 14 and 15 to walk down a footpath to the

2  railroad tracks and then to the river.

3      Q.  Okay.  So just -- so I have a good

4  understanding of what was going on, the footpath which

5  was subject to the proposed easements would allow the

6  owners of the property to access the river?

7      A.  Yes.

8      Q.  And to cross the railroad tracks?

9      A.  As I recall, the -- once you get to the

10  railroad tracks, I don't remember if there was another

11  easement on the other side of the property that was

12  already there or whether we were making one all the way

13  to that river.  But I remember it meandered across the

14  property lines of both, as I believe.  And so it was a

15  joint -- a mutual easement, is what it would be.

16      Q.  Okay.  And earlier we discussed a river-access

17  easement.  How does that -- how is that distinguished

18  from the footpath?

19      A.  All right.  As I recall, the river-access

20  easement is across (indiscernible) the furthest lot

21  down, and it was for, like, vehicle access in case work

22  needed to be done.

23          I don't recall the involvement in this one.

24  When Gary and I were talking about it over the big

25  picture with the other tracts, we discussed it, and I do

Page 24

1  not remember which tracts it was applying to.

2      Q.  Okay.  But do you recall that both 250 River

3  Heights -- 253, rather, River Heights and 92 Fish Trap

4  had easement components to them?

5      A.  Yes.

6      Q.  And both deals were subject to the creation of

7  easements?

8      A.  In order to convey the title clearly, as I

9  understood it, yes.

10      Q.  Okay.  All right.  And if we could turn back

11  to Exhibit 1, maybe I'll pull this up in an electronic

12  form so I'll have an easier time explaining what page

13  I'm looking at to Tania and Brian.

14          If we could turn back to Exhibit 1, there

15  are -- there's Amendment 1 to that exhibit.  And on

16  my -- on the exhibit that's in the Dropbox that's been

17  submitted to Justin, it's Page -- I believe it's Page 23

18  of 65.  Do you see that?

19          MR. GOLDBERG:  I'm on that, yep.

20          MS. TUTTLE:  Amendment Number 1, is that what

21  we're looking at?

22          MR. PODESTA:  Yes, ma'am.

23          MS. TUTTLE:  Okay.

24  BY MR. PODESTA:

25      Q.  Do you see that amendment as well on that



1  paper form, sir?
2     A.  I do.
3     Q.  Okay.  And am I correct that this amendment
4  was entered into April 5th of 2021?
5     A.  Yes.
6     Q.  Okay.  Not particularly long after the
7  April 2, 2021, date that this agreement was entered
8  into?
9     A.  Yes.
10    Q.  Okay.  And do you see that the purpose of this
11  amendment is to say, all parties acknowledge and agree
12  river easements and community well water maintenance
13  agreements to be drafted by a Georgia-licensed attorney
14  prior to or at closing?
15    A.  Yes.
16    Q.  Okay.  You didn't prepare that though?
17    A.  This form, I did not.
18    Q.  Okay.  But that is an amendment to the 92 Fish
19  Trap agreement, correct?
20    A.  Yes.
21    Q.  Okay.  And we can put that aside for a moment
22  and go to Exhibit 2.  And within Exhibit 2, I'm turning
23  towards --
24       MS. TUTTLE:  Exhibit 2, not amendment.  I'm
25  sorry.

1       MR. PODESTA:  Oh, I'm sorry.  For Brian and
2  Tania, this will be Page 20 of 69.  It'll be the page
3  that says, "Amendment to Agreement, Amendment 2," and 2
4  is crossed out, but 3 is there?
5       THE WITNESS:  Yes, sir.
6  BY MR. PODESTA:
7     Q.  Okay.  Awesome.  And you could see that that
8  one was executed on March 31, 2021?
9     A.  Yes, sir.
10    Q.  Okay.  And this one says -- am I correct that
11  this one says, "All parties acknowledge and agree
12  purchase contingent on easement being recorded at
13  closing granting access to the Lots 14, 15, and 16 to
14  all three access points to the river as discussed with
15  buyer and seller on 3/30/21"?  Do you see that?
16    A.  I do.
17    Q.  Okay.  What -- what did that mean?
18       MS. TUTTLE:  I just do want to clarify for the
19  record, obviously, I don't know if you highlighted, but
20  this does have a highlighted --
21          (Cross-talk.)
22    MR. PODESTA:  That's fine.
23       MS. TUTTLE:  Whatever is given is different
24  from -- it's just slightly different.  I just want to
25  bring it up.  Make sure everyone was aware this one's

1  highlighted on the (indiscernible.)
2       MR. PODESTA:  Fair enough.
3       MS. TUTTLE:  Sorry.
4       MR. PODESTA:  No problem.  So --
5       MR. GOLDBERG:  I'm sorry.  Did you say just --
6  I didn't (inaudible), but did you say it was -- asked
7  the question that it was dated March 31st?  Or did you
8  ask when it was signed, March 31st?
9       MR. PODESTA:  Well, that's -- that is a good
10  question.
11  BY MR. PODESTA:
12    Q.  When was it dated?
13    A.  So by -- going by the top date, which is just
14  easiest for me to do, it is March 31, 2021.
15    Q.  But it was -- it was not signed until
16  April 5th.  And I -- I see this -- the writing is
17  extremely small.  But do you see that?
18    A.  I see where that is.
19    Q.  There appear to be some glasses in the room,
20  but --
21          (Cross-talk.)
22       MS. TUTTLE:  I can blow it up.
23       THE WITNESS:  Yeah.
24       MS. TUTTLE:  I can blow it up, if you like.
25       THE WITNESS:  Okay.  Yes.  At 4:40 p.m.

1  April 5th.
2  BY MR. PODESTA:
3     Q.  Okay.  All right.  And what was the purpose of
4  this amendment?
5     A.  All right.  So let's see.
6          (Pause.)
7     A.  So this is for this -- 14, 15 -- that -- that
8  easement is for the road access.  That is for the
9  vehicle access across -- that's got to be Lot 16.  I
10  believe that's the lot on the end.
11    Q.  Okay.  And it -- it says -- it says a little
12  bit further down, "Current gated path to serve as
13  property owners of Lot 14, 15, 16 use only for ATV use."
14  Is that what you mean?
15    A.  Yes, sir.
16    Q.  And then it says, "Serve as footpath for
17  owners and tenants/guests as well."
18    A.  Yes.
19    Q.  Okay.  "The current stairs to serve as
20  footpath only for Lot 14, 15, and 16."
21    A.  Yes.
22    Q.  And then, "Tenants/guests with a shared
23  maintenance agreement to be in place for Lots 14, 15,
24  and 16."
25    A.  Yes.

Page 29

1  Q.  And then finally, "Third -- "The third path to
2  serve as footpath only to benefit owners, tenants/guests
3  of Lot 14 and 15."
4  A.  14, 15, and 16.
5  Q.  Go ahead.
6  A.  Yes, sir.
7  Q.  I'm sorry.  Then it discusses liability
8  insurance for the easements and a -- and a well
9  agreement as well?
10  A.  Yes.
11  Q.  And these easements are agreed to be prepared
12  or written by a licensed Georgia attorney at or prior to
13  closing, correct?
14  A.  Yes.
15  Q.  Okay.  All right.  So this one seems to be a
16  little bit more built out than Amendment 1 to Exhibit 1,
17  correct?
18  A.  Yes.
19  Q.  But, again, you didn't draft this?
20  A.  That is correct.
21  Q.  So would you know why this one's more involved
22  or more complete?
23      MS. TUTTLE:  Object as to form.
24      You can answer.
25      THE WITNESS:  So I'm trying to coordinate my

Page 30

1  dates and my memory.  The -- the Thor James transaction
2  brought a lot of this -- it didn't bring it to light.
3  Gary had already talked to me about it, and we actually
4  visited the site to talk about it, which would've been
5  before the Thor James transaction.
6      There is an easement, an existing easement,
7  that was over Lot 16, I believe, which was not owned by
8  Gary.  This was owned by other people, which is being
9  discussed here, and that was the one for the vehicle use
10  to go down to do maintenance across the railroad tracks,
11  as I recall.
12      The -- I believe it was after this, we did
13  some reviewing of that easement.  And I don't -- I
14  believe it was only -- it could be shared for the use of
15  Lot 15.  There was a -- there was a -- a reason we
16  couldn't make that lot available or make that access
17  available to the other lots.  And I think it was
18  restricted in there that it was to be for just one lot,
19  to benefit one lot.
20  BY MR. PODESTA:
21  Q.  So then that's the reason that the 92 Fish
22  Trap one is more truncated or --
23  A.  Lot 10 would not have been included into that
24  easement.
25  Q.  Okay.  So do you know what easements were

Page 31

1  being discussed for Lot 10 specifically?
2      (Pause.)
3  A.  All right.  I believe the first one is that
4  one we were just discussing, to be able to access with
5  vehicle.
6  Q.  Okay.
7  A.  That at the time, you didn't know that that
8  was the case that you couldn't, I believe.
9      I believe the second one -- I remember there
10  being a gate up there, and we went out and visited it,
11  and that was going to be -- so that was ATV use, but I
12  believe it was a different path.  I don't believe it was
13  the same one that went around 15.  I don't remember
14  where that one -- that one went.
15      And as I recall, that is one of the easements
16  we did with Thor James.
17  Q.  Okay.  And when -- when you say "ATV," so
18  we're talking recreational ATV use, or?
19  A.  Not a rip around path.  This was for easy
20  travel to go down to the -- this is not a large -- and
21  it's a steep area.  There's no fooling around.  This was
22  more for just getting down there and getting back.
23  Q.  Okay.  And maintenance at all, or?
24  A.  Yes.
25  Q.  Okay.

Page 32

1  A.  Yes.
2      MR. PODESTA:  Okay.  So let me turn -- we
3  could put those away for a moment.  I'll turn to this
4  next exhibit, and I should mention to Tania and Brian
5  that I'll -- I'll mark this as Exhibit 3.  And it's the
6  exhibit in the Dropbox that's referred to as River
7  Heights, dash, emails.  I'll change that in the Dropbox,
8  and I'll rename that as Exhibit 3, of course, put the --
9  the remainder of the information behind.
10      (Deposition Exhibit 3 was marked for
11  identification.)
12  BY MR. PODESTA:
13  Q.  Just take a moment to review that.  Have you
14  seen that before?
15  A.  Yes.
16  Q.  Okay.
17      MS. TUTTLE:  Look through all -- all the
18  pages.  There's more than one page there.
19      MR. GOLDBERG:  And just for the record, on --
20  on what I'm seeing is 12 pages for electronic files.
21      MS. TUTTLE:  Yeah.  And this only -- that is
22  true.  It's only three here.
23      THE WITNESS:  Oh, yeah.  This -- these are the
24  only portions for me, but --
25      MS. TUTTLE:  Oh, okay.

Page 33

1    THE WITNESS:  -- the one on -- the one on the
2  Dropbox is correct.
3      MR. GOLDBERG:  Okay.
4      THE WITNESS:  Yeah, I'm sorry.  The -- the
5  rest --
6      MS. TUTTLE:  So these three pages are in the
7  12 -- are probably the top --
8      (Cross-talk.)
9      MR. PODESTA:  They're the first three of the
10  12.  They're the only ones we'll need for -- for this
11  file.  And I think -- now that I see this, I think I
12  needed to split this.  So this will be more than one
13  exhibit, but it's only the first three pages that we're
14  talking about as Exhibit 3.
15      MS. TUTTLE:  Okay.
16  BY MR. PODESTA:
17    Q.  So I'm sorry, Mr. Wilson.  Have you seen
18  Exhibit 3 before?
19    A.  Yes.
20    Q.  Okay.  What is Exhibit 3?
21    A.  It is the -- starts out as an email from our
22  pre-closer welcoming, congratulations, how our
23  pre-closers get in touch with people.  And it finishes
24  with Gary emailing Kristen to tell her, hey, I'm --
25  "I've reached out to Terry regarding this close as well

Page 34

1  as 253 River Heights.  Both of these properties have
2  easements, a well agreement, and a railroad-crossing
3  agreement that need to be handled first thing as I need
4  to get the language to the two buyers for their
5  sign-off."
6    Q.  Okay.  Who is Kristen Chancey?
7    A.  She was an employee at the time.  She was a
8  pre-closer.
9    Q.  An employee of Wilson --
10    A.  Wilson --
11    Q.  -- Hamilton?
12    A.  -- Hamilton, yes, sir.
13    Q.  And that's your company?
14    A.  Yes, sir.
15    Q.  Okay.  Who is Aaliyah Stan?  Am I correct on
16  the spelling -- pronunciation?
17    A.  That -- that is correct.
18      And she also is a former employee of Wilson
19  Hamilton and she also was a pre-closer.
20    Q.  Okay.  So on the first page of Exhibit 3, do
21  you see the email in the middle from Gary Wright to --
22  Gary Knight, rather, to Kristen Chancey?
23    A.  Yes.
24    Q.  And that is April 12th of 2021?
25    A.  Yes.

Page 35

1    Q.  And Mr. Knight says, "Hello, Kristen, I
2  reached out to Terry."  I assume that's --
3    A.  Yes.
4    Q.  -- you that she was referring to?
5      "Regarding this close," and that's the 253
6  River Heights close?
7    A.  290 River Heights Road is in the subject line.
8    Q.  Okay.
9    A.  That, as I recall, is Thor James.
10    Q.  Okay.  And so this email is referring to Thor
11  James's property and the 253 River Heights property?
12    A.  Yes.
13    Q.  When it says, "Both of these properties have
14  easements, a well agreement, and a railroad-crossing
15  agreement that need to be handled first thing as I need
16  to get the language to the two buyers for their
17  sign-off."
18    A.  Yes.
19    Q.  Who were the two buyers?
20    A.  Thor James was certainly one of them.  I don't
21  remember there being another contract.  So I would say
22  that that would be -- yes, that would be 7 IL.
23    Q.  Okay.  So the -- the one buyer, Thor James, is
24  for 290 River Heights Road, and 7 IL or -- at the time
25  it would've been John Thatcher would be 253 River

Page 36

1  Heights?
2    A.  Yes.
3    Q.  Okay.  And then you responded to this after it
4  had been forwarded to you by Ms. Chancey; is that right?
5    A.  Yes, to Kristen.  I responded.
6    Q.  Okay.  And you wrote to Kristen, "He and I are
7  supposed to have a phone call this morning."  I assume
8  that is you and Mr. Knight?
9    A.  That is correct.
10    Q.  Okay.  And you'll -- and then you say, "I'll
11  note task the file when he does."
12    A.  Yes.
13    Q.  Okay.  Okay.  And we could put that aside for
14  a moment and give you another document.
15      MR. PODESTA:  Okay.  And I think, once again,
16  like the prior email document, I have created
17  conglomerate exhibits in the Dropbox which I'll have to
18  cure.
19      But this one is the file that is named -- I'm
20  sorry, sir, Fish Trap Road emails.  And I'll rename this
21  one Exhibit 4, but it'll only be the first page of this
22  Dropbox file.
23      MS. TUTTLE:  One page.
24      (Deposition Exhibit 4 was marked for
25  identification.)



Page 37

1     MR. GOLDBERG: So I see two files that say
2  Fish Trap email. Is it the one that has emails Pages
3  44, 56?
4     MR. PODESTA: Yes.
5     MR. GOLDBERG: Okay.
6     MR. PODESTA: Yes.
7     MS. TUTTLE: And it starts with "Gotcha,
8  thanks," correct?
9     MR. PODESTA: Correct, correct. And I've
10  renamed this one Exhibit 4 in the Dropbox, but it's --
11  it's only the first page.
12  BY MR. PODESTA:
13     Q. Have you seen this one before, sir?
14     A. Yes.
15     Q. Okay. And am I -- sorry. Am I correct that
16  this is an email exchange between Brian White and
17  yourself?
18     A. Yes, it is.
19     Q. Okay. Who is Brian White?
20     A. He is the Realtor for Gary Knight.
21     Q. Okay. So he was representing Gary Knight in
22  both the Fish Trap Road and the River Heights?
23     A. Yes.
24     Q. Okay. And this email at the bottom, on May
25  26th, do you see where it said -- where Brian White

Page 38

1  emailed you and said, "Hey, buddy, hope all is well in
2  your world. Just got off the phone with Gary Knight,
3  and he asked if" -- "if I would check in on the easement
4  you were drafting for 92 and 100 Fish Trap.
5     "We're scheduled to close 92 Fish Trap on 6/1,
6  and Gary mentioned he isn't comfortable reviewing day of
7  closing and would like to have time to review
8  beforehand. Any update on this?"
9     A. That is correct.
10     Q. Okay. And, again, 92 Fish Trap is one of the
11  7 IL deals, and 100 Fish Trap is Gary Branch's deal?
12     A. That's right.
13     Q. Okay. And you were -- were you a closing
14  attorney for Gary Branch's deal as well?
15     A. I was.
16     Q. Okay. I guess this is all kind of a small
17  community then, right? So you -- you closed -- you were
18  attempting to close four deals for Gary Knight?
19     A. I believe it was three deals for Gary -- no.
20  It would be four deals with Gary -- no, four --
21     Q. Maybe five --
22     A. You had four, two for 7 IL, Gary Branch --
23  four deals.
24     Q. Okay. And you had 77 Fish Trap as well and
25  183?

Page 39

1     A. Boy --
2     Q. You don't have to --
3     MS. TUTTLE: If you don't -- if you don't
4  remember, that's perfectly fine.
5  BY MR. PODESTA:
6     Q. But you also closed several deals for 7 IL and
7  Mr. Thatcher as well, right?
8     A. Yes.
9     Q. Okay. Not including the Gary Knight deals?
10     A. Yes.
11     Q. Did any of them have easement issues?
12     A. No.
13     Q. Okay. And I'm sorry. Just bit of a tangent,
14  but going back to this email, you responded to Mr. White
15  saying, "Yes, I spoke with him at length about it
16  yesterday." Is that Gary Knight?
17     A. Yes.
18     Q. "And my plan is to get it to him by tomorrow
19  morning." Is that the easements?
20     A. That one in particular would be between 92 and
21  100. I believe that is the walking path easement.
22     Q. So the walking path easements for 92 and 100
23  for both Gary Branch and 7 IL Fish Trap deals?
24     A. Yes.
25     Q. Okay. And then Mr. White says basically,

Page 40

1  thank you?
2     A. Yes.
3  Okay. All right. And that -- I'm sorry, was -- that
4  was Exhibit 4.
5     (Pause.)
6     MR. GOLDBERG: Are you okay there?
7     MR. PODESTA: Yeah.
8     MR. GOLDBERG: Oh, okay.
9     MR. PODESTA: Thank you. And this is yours,
10  by the way, so if you need it.
11     THE WITNESS: Oh, no.
12     MR. PODESTA: I have plenty. Let me know.
13  You know, just to make sure I get this one properly in
14  the record without another fiasco, do you mind if we go
15  off the record for about ten minutes?
16     MS. TUTTLE: That's fine.
17     MR. PODESTA: I'll use the restroom, I'll talk
18  to Mr. Knight, and I'll come back and make sure this is
19  properly in the Dropbox.
20     MS. TUTTLE: Sure.
21     MR. PODESTA: Yes. Okay. Justin, can we go
22  off?
23     THE REPORTER: We're going off the record.
24  The time is 2:33 p.m.
25     (A recess was taken.)



Page 41

1    (Deposition Exhibit 5 marked for
2  identification.)
3        THE REPORTER:  We are going (inaudible.)
4        MS. TUTTLE:  So this is the (inaudible) 21?
5        MR. PODESTA:  Correct.
6  BY MR. PODESTA:
7     Q.   All right.  And I'm sorry, Mr. Wilson.  I
8  don't have a perfectly printed-out version of this.
9  It's on -- it's correct on there.
10        MS. TUTTLE:  Here.  I'll (indiscernible) it.
11  I don't know how to do this, but there are two computers
12  in front of you.
13        UNIDENTIFIED SPEAKER:  Yeah.
14        MS. TUTTLE:  There you go.
15  BY MR. PODESTA:
16     Q.   Okay.  And Mr. Wilson, I'm only really looking
17  at the first two pages of this at the moment.  Could you
18  familiarize yourself with that?
19        MS. TUTTLE:  Let's start at the bottom.  So
20  you want him -- page -- this is where it starts, page --
21        MR. PODESTA:  (Indiscernible) right off the
22  first page.
23        UNIDENTIFIED SPEAKER:  I (indiscernible).
24        MR. PODESTA:  Beginning with, "Good morning,
25  John."

Page 42

1        MS. TUTTLE:  Okay.
2        THE WITNESS:  Okay.
3        MR. GOLDBERG:  Okay.
4  BY MR. PODESTA:
5     Q.   Do you see that email?
6     A.   Yes, yes, I do.
7     Q.   Okay.  And that is dated May 31, 2021?
8     A.   Yes.
9     Q.   Okay.  And that is from you but to John
10  Thatcher.  Is that who's 7ilinvestors@gmail.com?
11     A.   That is correct.
12     Q.   And Dee McBee?
13     A.   That is correct.
14     Q.   All right.  And this one says, "Good morning,
15  John.  Sorry to bother you on a holiday, but I just got
16  off the phone with seller, Gary Knight, and was told
17  something I was not aware of until now.  I suspect you
18  didn't know about it either.
19        "Gary has adjoining 100 Fish Trap scheduled to
20  close this Thursday 6/3, which I knew about, but he's
21  agreed to a minor land swap between the lots to allow
22  100 Fish Trap room for a garage.  The total acreage
23  would be the same, and Gary says it doesn't interfere
24  with 92 Fish Trap, but we won't know until we see a
25  survey of the plan swap.

Page 43

1        "I just sent an email to the surveyor.  He's
2  hired, Sam Walker, of Alpha Surveying to get a timeline,
3  but he likely won't respond until tomorrow."
4        Well, let me ask you some questions about that
5  first part.
6        First, you -- you obviously knew that Gary had
7  adjoining lot, 100 Fish Trap, and that it was set to
8  close because you were going to handle the closing,
9  right?
10     A.   Yes.
11     Q.   What you didn't know until that point was that
12  there was a -- an encroachment, correct, or did you?
13     A.   There --
14        MS. TUTTLE:  Object to the form.
15        Go ahead.
16  BY MR. PODESTA:
17     Q.   Well, what did you know about an encroachment?
18     A.   I don't remember there being an encroachment.
19  What I remember is the -- that Gary -- and it must have
20  been Monday, but I couldn't remember.  It could have
21  been Saturday or Sunday because it was right during the
22  holiday -- said, "Well, we have to get the new survey."
23        I'm like, "What -- what is that?"
24        "Well, we're doing a swap so we could give
25  Gary Branch more room for a garage up top."

Page 44

1        Okay.  And that was the first I heard of that.
2     Q.   Okay.
3     A.   So that's what I was referring to.
4     Q.   Okay.  So you had never previously heard about
5  an encroachment at that point?
6     A.   No.
7     Q.   Okay.  And so you, apart from the garage
8  issue, had no idea why there might be a lot swab?
9     A.   Correct.
10     Q.   Okay.  And so, to your knowledge, on May 31st,
11  when you sent this email, you believed that the
12  Exhibit C to our Exhibit 1 was an accurate depiction --
13  or included an accurate depiction of Lot 10?
14     A.   Yes.
15     Q.   And Lot 10 is the 92 Fish Trap spot of
16  property.
17     A.   I'm pretty certain.  I'd have to review the
18  file because I would look at my search, my title search
19  to be completely -- because like I say, I don't, you
20  know, base it 100 percent on that.  That gets the ball
21  rolling.  And then we look at the search.
22        If there was a newer plat that the agent
23  didn't get and that was more up to date, then we
24  would've been using the newer plat.
25     Q.   Okay.  So prior to May 31st, no one would've



Page 45

1  told you that there might be a -- an issue as to the
2  actual boundaries of Lot 10, 92 Fish Trap?
3      A.  That's correct.  I remember -- as I remember,
4  that's the first time I've heard -- I heard of it.  I
5  was a little taken aback at being a holiday right before
6  the closing, and these are substantial closings for me,
7  and I was doing everything I could to make them happen.
8      Q.  Yeah.  Understood.  Understood.  Okay.  And if
9  you go further down Exhibit 5 to what is electronically
10 page here -- I believe it's electronically the third
11 page, yes, so electronically the third page.  Do you see
12 that?
13     A.  I do.
14         MS. TUTTLE:  Starting with, "Dee McBee"?
15         MR. PODESTA:  Yes, ma'am.
16         MS. TUTTLE:  Monday, May 31st.  Okay.
17 BY MR. PODESTA:
18     Q.  And that's Monday, May 31st, at 12:11?
19     A.  I'm sorry.  Yes.
20     Q.  Okay.  And it -- that's the email that asks,
21 "Terry, is everything straightened out with the property
22 called Knights Landing?"
23         Which property is Knights Landing?
24     A.  That's a reference to what they use for cattle
25 rentals, and I don't know which one he was referring to

Page 46

1  as Knights Landing.
2      Q.  Okay.  And then she says, "John is buying
3  [sic] called River Heights."  You may have no idea how
4  to interpret that.  I'm not sure what that means.
5      A.  It is just below the other one that John is
6  buying.  I would have to see more, I guess.  I'm not
7  quite sure the context on that.  If -- if the issue was
8  known and she's trying to propose a solution
9  of buying -- swapping River Heights for Gary Branch's
10 transaction.
11     Q.  Okay.  Well, I -- maybe to help, if you look
12 at the email you sent Dee below that at -- or shortly
13 thereafter at 12:20 p.m. it says, "No, but the party
14 suing wants to sell, so there may be a settlement on the
15 horizon" --
16         (Cross-talk.)
17     A.  Thank you.
18     Q.  -- what is that in reference to?
19     A.  Thank you.  I believe that is the last lot
20 that was owned by another party, I can't remember, that
21 7 IL has since purchased.  This was the lot that the
22 driving easement was across, so perhaps Lot 16.
23     Q.  Okay.  So -- so who was -- who was the party
24 suing?  What does that mean?
25     A.  I don't remember if Gary was involved in a

Page 47

1  lawsuit or they were threatening to sue Gary over that
2  driveway, over that -- I -- I shouldn't call it
3  "driveway."  Over the access to the -- to the river.
4      Q.  Okay.  Who -- who would've been suing Gary?
5      A.  It would've been those -- those people had the
6  easement crossing them that is a servient tenement to
7  this easement that we're talking about that would've
8  accessed the tracks, not the foot easement, but the
9  driving.
10     Q.  Okay.  And they might have wanted to settle
11 with Gary; how would that have impacted this situation?
12     A.  If -- so not the -- no.  But the party suing
13 wants to sell.  I would believe I was told that by...
14         MS. TUTTLE:  I don't know if you want to --
15         (Cross-talk.)
16         THE WITNESS:  I don't -- I don't remember what
17 that is.
18         But I think that involved being able to
19 purchase the lot that the tract that the major easement
20 went over, that the driving easement went over.
21 BY MR. PODESTA:
22     Q.  Okay.  So if the -- if the purchasing party
23 wanted -- I mean, the suing party, rather, wanted to
24 sell their property, was it -- was this in reference to
25 the Padrutts wanting to sell to 7 IL?

Page 48

1      A.  All right.  As I -- they -- they had that
2  party listed -- that property listed, and I had just
3  found out about it.  Why would you list the property if
4  you're in the middle of a lawsuit?
5          So if they already got it listed and they want
6  to sell it, they're going to settle that lawsuit.
7  They're going to have -- there's going to be a
8  settlement.
9      Q.  Okay.  So you were suggesting (inaudible)?
10     A.  Yep.
11     Q.  And so this did have to do with the -- the
12 Padrutt lawsuit.
13     A.  The Padrutt I believe is the name, yes.
14     Q.  And the Padrutts were considering selling the
15 property they had, which ultimately sold to 7 IL,
16 correct?
17     A.  Yes.
18     Q.  And the theory was that they would only do
19 that if the lawsuit was going to settle beforehand?
20     A.  I don't know the specifics of a lawsuit with
21 the Padrutts and if it was an actual lawsuit, but I
22 believe it was with Gary.  And this was all recent
23 information at the end that I don't remember who told
24 me, but that property was listed.
25         And I believe Kim Knutson had the property



Page 49

1  listed, and -- and -- which surprised me because if
2  they're in a lawsuit, why would they sell the property?
3  They can't sell it with a lawsuit. Nobody will buy
4  that. So if they're going to list it for sale, then
5  we've got a settlement here.
6    Q.  Okay. Understood. And you didn't close that
7  sale, a sale of the Padrutt property, to 7 IL?
8    A.  I think I did. I believe I did. I think it
9  was -- I don't remember for sure. I was doing
10  Mr. Thatcher's closings. Kim Knutson doesn't use me
11  regularly as an attorney, and I don't remember if I --
12  if I closed that one or not. I believe I did. I mean,
13  I -- actually, I believe I personally closed that one.
14    Q.  Okay. And who's Kim Knutson?
15    A.  An agent with Harry Norman at the time or
16  Ansley. She was -- she's with Ansley now and
17  (inaudible.)
18    Q.  She's a -- she's a seller's agent for the
19  Padrutts?
20    A.  Correct. Thank you.
21    Q.  Okay. And Dee McBee was representing 7 IL and
22  Mr. Thatcher?
23    A.  Yes, sir.
24    Q.  Okay. So 7 IL bought the property even though
25  the lawsuit was still pending?

Page 50

1    A.  Yes.
2    Q.  Okay. I assume subject to some sort of
3  conditions?
4    A.  Yes. We were not going to ensure. It would
5  be an exception on the title.
6    Q.  Okay. Okay.
7    A.  I don't remember exactly how all that went
8  down though.
9    Q.  Okay. Understood. And if I could then turn
10  you back to Exhibit 3, and this will be -- I -- I'll
11  give you the specific pages because this will be
12  pages -- this will be pages --
13    MS. TUTTLE:  Oh, you (indiscernible) the whole
14  award. Okay.
15    MR. PODESTA:  Yeah, just Pages 4, 5, and 6 of
16  Exhibit 3.
17  BY MR. PODESTA:
18    Q.  Have you seen this email before?
19    MR. GOLDBERG:  Is this -- sorry. And just to
20  clarify, is this the one that's dated June 2nd?
21    MR. PODESTA:  Yes. It is June 2nd, 7:52 a.m.
22    MR. GOLDBERG:  Okay.
23    MS. TUTTLE:  It says, "Good morning, Gary."
24    MR. PODESTA:  This is not the right one.
25    MS. TUTTLE:  I'm sorry.

Page 51

1    MR. PODESTA:  Oh, did I hear you wrong?
2    THE WITNESS:  That's the same one that we
3  discussed.
4    MR. PODESTA:  Oh, yeah. I was hearing you
5  wrong. Here.
6    THE WITNESS:  Okay. Thank you. Thank you.
7  BY MR. PODESTA:
8    Q.  All right. Have you seen this email before?
9    MS. TUTTLE:  Take a second and look through
10  it.
11  BY MR. PODESTA:
12    Q.  And really just the first page is
13  (indiscernible.)
14    A.  Yes.
15    Q.  Okay. So there are two messages on this page,
16  right? The first from Brian White and then the second
17  your response to Brian White?
18    A.  Yes.
19    Q.  So Brian White's first message was from
20  June 1, 2021, at 6:54 p.m.
21    A.  Yes.
22    Q.  And that was the closing date, correct?
23    A.  Yes.
24    Q.  And he says, "Terry, Gary asked me about --
25  Gary asked about the easements and water agreements for

Page 52

1  253 River Heights and 92/100 Fish Trap. He mentioned he
2  hasn't reviewed yet. Is that something you can send
3  over?"
4    A.  Yes.
5    Q.  Okay. And those were the easements you were
6  doing for both of the deals pertaining to this lawsuit,
7  correct?
8    A.  Yes.
9    Q.  And then you responded the next day, June 2nd,
10  at 7:52 a.m., because the last email was sent after the
11  close of business:  "Good morning, Gary. The attached
12  are the easements and water agreement from the sale of
13  Lot 16, 290 River Heights." And if I'm correct, that
14  was Thor James's property, right?
15    A.  I -- I believe so. I've gotten the numbers
16  backwards, so I don't remember exactly where it is, but
17  that -- it would have to be.
18    Q.  "These run with the land so will continue to
19  be in place after the sale.
20    "Also attached is the unsigned amendment to
21  add the time limitation for the use of the easement.
22  I'll send the ones for Fish Trap in another email,"
23  correct?
24    A.  Yes.
25    Q.  And then attached to that are some easements,



Page 53

1 a water easement maintenance agreement signed
2 May 7, 2021, between Gary Knight and Thor James?
3    A.  Yes.
4    Q.  Okay.  And in this one that -- Gary Knight is
5 both grantor and grantee of a water and maintenance
6 agreement?
7    A.  Yes.
8    Q.  Okay.  What does that agreement -- easement
9 have to do with the Knight closings, the 7 IL and Knight
10 closings that are the subject of this lawsuit?
11    A.  Okay.  So grantor, being Gary, which was the
12 place the lot was -- the -- I'm sorry -- the well was
13 located, they're granting a water easement, so that's
14 lot 15, which I believe from the prior easement -- but
15 from the prior exhibit was the one that -- was one of
16 the ones that John Thatcher was buying.  So he would've
17 become -- stepped into the grantor's shoes.
18         Then Gary was also the owner of Lot 14 and was
19 being the grantee so he could then receive benefit of
20 that well on Lot 15.
21         And then Lot 16 was Thor James's lot that he
22 had purchased so he could also be a grantee, a
23 beneficiary of that well.
24         So there were three lots, three tracts, three
25 residences on this well.

Page 54

1    Q.  Okay.  But neither -- well, neither John
2 Thatcher nor 7 IL are parties to that incident?
3    A.  That is correct.
4    Q.  Okay.  And if you then turn a few pages later,
5 you'll see just "Easement" at the top of another
6 document.  What is that easement?
7    A.  So Gary Knight, owner of Lot 14, and also the
8 owner of Lot 15, to allow James -- Thor James as the
9 owner of Lot 16 and a part of 17...
10    Q.  And this -- this easement was executed
11 May 7th of 2021, between Gary Knight and Georgia,
12 correct?
13    A.  Yes, sir.
14    Q.  It's not something that John Thatcher or 7 IL
15 Properties is a party to?
16    A.  Correct.
17    Q.  Okay.  And this would be an easement relating
18 to some of the other issues that we discussed for
19 Thor James's property?
20    A.  Yes.  And that would also affect the Lot 15.
21 And this was for several paths as easements for
22 footpaths, it looks like.
23    Q.  Okay.  And on the third page of that document,
24 it's signed by Gary Knight and Thor James, correct?
25    A.  Yes.

Page 55

1    Q.  All right.  And then last, after that, there's
2 a single -- there's a two-page amendment to easement.
3 Do you see that?
4    A.  I do.
5    Q.  What is that?
6    A.  After this was executed at -- it might've been
7 before, but we didn't change it, and Gary wanted to
8 change it.  And Thor did agree, we're changing this --
9 the hours of use for peace -- peace and quiet of the
10 neighborhood so that it could only be used -- because it
11 is -- I -- as I look at it, it does include ATVs and
12 foot use.
13    Q.  Okay.  And so -- so you drafted Amendment to
14 Easement?
15    A.  Yes, I did.
16    Q.  And it's unsigned?
17    A.  Yes.
18    Q.  But it's expected to be signed by Thor James,
19 7 IL Properties, and Gary Knight?
20    A.  Correct.
21    Q.  And it says that John H. Thatcher was the
22 manager for 7 IL Properties?
23    A.  Yes.
24    Q.  And you sent this to Brian, Brian White, on
25 June 2nd, correct?

Page 56

1    A.  I believe I sent that to Gary and copied
2 Brian, yes.
3    Q.  Okay.  So you sent it to Gary -- Gary Knight
4 and Brian White on June 2nd?
5    A.  Yes.
6    Q.  Was Thor James expected to be at the closing
7 for the 7 IL Properties on June 1st?
8    A.  No.
9    Q.  Okay.  Was this document presented to Gary
10 Knight or Thor James prior to June 2nd?
11         MS. TUTTLE:  I object as to form.  Which
12 document are you referring to?
13         MR. PODESTA:  Oh, I'm sorry.  Amendment to
14 Easement.
15 BY MR. PODESTA:
16    Q.  Was Amendment to Easement provided to either
17 Thor James or Gary Knight prior to June 2nd?
18    A.  I don't believe so.
19    Q.  Okay.  Do you know why not?
20    A.  Probably because it was drafted the day of
21 closing.
22    Q.  Okay.  Was it emailed to Brian White the day
23 of closing?
24    A.  I don't believe so.
25         MR. PODESTA:  Okay.  Okay.  All right.  Do you



Page 57

1 mind if I go off the record for a minute and take Mr.
2 Knight outside for about five minutes?
3       MS. TUTTLE: I'm good.
4       MR. PODESTA: Okay. Justin, could we go off
5 one more time?
6       THE REPORTER: Going off the record. The time
7 is 3:02 p.m.
8       (A recess was taken.)
9       THE REPORTER: Going back on the record. The
10 time is 3:08 p.m.
11       MR. PODESTA: Okay. Awesome.
12 BY MR. PODESTA:
13    Q.  Mr. Wilson, we've talked about 100 Fish Trap,
14 which was the Gary Branch deal. Did you represent
15 Mr. Branch? Who did you represent in that?
16    A.  In that one, he had a lender, so I was
17 representing the lender.
18    Q.  Okay. And then we've discussed numerous
19 easement issues. Are all easement issues to be solved
20 by easement agreements? Do they have to be in writing?
21 How does that work?
22    A.  Yes. And any interest in land is not
23 enforceable unless it's in writing, and so all easements
24 that we do are in writing.
25    Q.  Okay. And then with regard to the Padrutt

Page 58

1 closing -- Padrutt is spelled P-A-D-R-U-T-T, correct?
2    A.  I don't know.
3    Q.  Okay. Fair enough. Fair enough.
4       (Discussion off the record.)
5 BY MR. PODESTA:
6    Q.  So with regard to the Padrutt closing, which
7 is the 183 closing, how -- how did that come about? How
8 did you -- what was your experience of that closing?
9    A.  I don't remember much. I believe it was quite
10 some time after this transaction, a couple of months
11 perhaps.
12       Yeah, I don't -- as I recall, that one was not
13 influencing this one. Like, that one -- mentioned --
14 when that was mentioned it would be there, I believe was
15 when that first came to light.
16    Q.  Okay. Were there some easements on the -- the
17 Padrutt property that impacted or involved Mr. Knight?
18    A.  Yes.
19    Q.  What were those easements?
20    A.  So as I recall, this is the one that went --
21 so the other areas you could not drive down. There was
22 only one way to drive down and maintain the tracks with
23 the tractor -- the property and on the other side of the
24 tracks as well. And --
25    Q.  The railroad tracks?

Page 59

1    A.  Yes.
2    Q.  Okay.
3    A.  Railroad tracks. Because there was property
4 on the other side of it between the river and the
5 tracks. And in order to maintain those, for the benefit
6 of the other lots as well, there was an easement to get
7 down there with a tractor.
8       I don't remember if that's what the lawsuit
9 was about, but that was the easement that -- as I did
10 the research, that only benefited one lot. It didn't
11 benefit the other lots. I -- I don't recall exactly.
12    Q.  Okay. But Mr. Knight and -- was not at the
13 closing for the Padrutt property?
14    A.  That is correct.
15    Q.  And no representative of Mr. Knight was there?
16    A.  That is correct.
17    Q.  And Mr. Knight did not sign any easement
18 agreements for that; they ran with the land, correct?
19    A.  Not at that closing. There may have been some
20 on record --
21    Q.  Okay.
22    A.  -- already, but nothing new.
23    Q.  So he didn't sign anything new for that
24 closing?
25    A.  He did not.

Page 60

1    Q.  Okay. And this river railroad property issue,
2 am I correct in saying that the property begins at the
3 road where the drive -- for every one of these
4 properties in Toccoa Heights, they begin at the road;
5 they proceed across with -- where there's a railroad
6 track across them; and then the river's on the other
7 side of the railroad track so that in order to use the
8 property across the railroad tracks and the river, you
9 have to have an easement to cross the railroad tracks?
10    A.  Yes.
11    Q.  And so the bulk of the issues with easements
12 that involve crossing the railroads are just to enjoy
13 the use of your property that is beyond the railroad and
14 to use the river?
15    A.  Yes.
16       MR. PODESTA: Okay. Good. Okay. No further
17 questions at this time.
18       Brian, do you have any?
19       MR. GOLDBERG: Yeah, I might just have a
20 couple.
21       EXAMINATION
22 BY MR. GOLDBERG:
23    Q.  Okay. So, Mr. Wilson, you know, I represent
24 John Thatcher, 7 IL, and this -- the plaintiffs in this
25 lawsuit.



Page 61

1    You stated -- I believe your testimony was and
2  in looking at the contracts that the closing for these
3  two properties was to occur on June 1st, right?
4    A.   One was dated June 1st, the other was dated
5  May 31st, but that, again, was a holiday, so, yes,
6  June 1st being a Tuesday.
7    Q.   Okay.  And on June 1st, were you present
8  here --
9    A.  I was.
10   Q.   -- at your office?
11   A.  Yes, sir.
12   Q.   Was my client, John Thatcher, a managing
13 member of 7 IL, present --
14   A.  Yes.
15   Q.   -- in your office?
16       Who else was present on that day in your
17 office?
18   A.  We were in this room.  John sat there; Dee
19 McBee sat there; and Brian, the agent for Gary.
20   Q.   Okay.  Was there anybody else in your office
21 that day?
22   A.  In this building?  In this room?  No, there
23 was other people working.
24   Q.   Okay.  Did Gary Knight come to your office
25 that day?

Page 62

1    A.  Not that I'm aware of.  He didn't come into
2  this room.
3    Q.   Okay.  Were you surprised that Gary and I
4  didn't come on the day of the closing?
5    A.  Yes.
6    Q.   And why is that?
7    A.  As I said, these were big transactions and we
8  had been working on them quite a while.  We had already
9  closed the one for Thor James.  Things happen sometimes
10 in closings, and you sit down -- usually try to sit down
11 and -- and work them out if there's -- if there's issues
12 that can be worked out.
13   Q.   And are you -- you are a Georgia-licensed
14 attorney?
15   A.  That is correct.
16   Q.   And you've prepared -- just estimating, and --
17 and feel free to tell me whether or not you think you
18 can or can't, but I mean, approximately how many
19 closings have you done in your career?
20   A.  So it's a little different now.  I don't sit
21 in the closings as much anymore.  So as a company, 8,000
22 to 10,000.  Or I should say as a company and my career,
23 8,000 to 10,000.  As far as sitting down and doing them,
24 I only do a few now.
25   Q.   What about drafting easement agreements?  Have

Page 63

1  you done those before?
2    A.  Yes.
3    Q.   Have you done a lot of those before?
4    A.  Yes.
5    Q.   As -- could you estimate how many?  I know
6  that -- that might be difficult to do, but maybe give it
7  a shot or tell me you can't.
8    A.  Maybe 30 or 40 a year.  This -- if I may,
9  there's many different easements.  If we're talking
10 about an ingress-egress easement or a driveway easement,
11 there's -- there's so many with water easements, and --
12 but I would say at least 40 to -- 30 to 40 or even 50 a
13 year.
14   Q.   Would you have -- you -- you've seen the
15 contracts for 253 River Heights and for 92 Fish Trap,
16 right?
17   A.  Yes.
18   Q.   Would you have any -- any problems drafting
19 those easement agreements?
20   A.  No.
21   Q.   Okay.  Did you, in fact, draft an easement
22 agreement?
23   A.  I drafted all those easements that were
24 attached, yes.  Those were mine.
25   Q.   My client, 7 IL, when -- when they made an

Page 64

1  appearance, were they ready to close?
2    A.  Yes.
3    Q.   Did they give you any indication that they had
4  any reservations about closing?
5    A.  I knew there was still things to be discussed,
6  although I had all the papers ready to sign.  There was
7  no amendment to change the legal description from the
8  original.  So in order to go forward, something would've
9  had to been done to finish it.
10   Q.   We talked about this land-swap agreement.  I
11 think that was presented to you.  It seemed like kind of
12 last minute.  Do you recall that?
13   A.  Yes.
14   Q.   We talked about that.  Mr. Podesta asked you
15 about that earlier, I believe.
16   A.  Yes.
17   Q.   To your knowledge, did 7 IL have -- do you
18 know whether or not they were approached about the
19 land-swap agreement before the closing?
20   A.  I do not know other than what we had -- one of
21 these exhibits had shown where that looked to be the
22 time that I notified Mr. Thatcher.
23   Q.   Did Mr. Thatcher ever express to you verbally
24 or otherwise that he was not willing to close because of
25 any of the issues presented?



Page 65

1    A. No.

2        MR. GOLDBERG: All right. I have no further

3    questions.

4        MR. PODESTA: Very few.

5        FURTHER EXAMINATION

6    BY MR. PODESTA:

7    Q. At closing, you said Mr. White was here --

8    Brian White was here?

9    A. Yes.

10    Q. Did you provide him with easements that he

11    could sign at closing?

12    A. As I recall, easements weren't discussed. He

13    was on the phone with Gary, and they were talking about

14    money, really, a way to settle this.

15    Q. Okay. But did you provide him with any

16    easement documents that day?

17    A. No. The -- all the documents other than the

18    settlement statement. I handed out the settlement

19    statement. I only (indiscernible) here.

20    Q. Okay. Why didn't you give him these two

21    documents?

22    A. He -- he didn't ask for one.

23    Q. Okay. But he did ask for them later that day

24    at 6:54 p.m.?

25    A. Yes.

Page 66

1        MR. GOLDBERG: Can you go off the record for a

2    second?

3        MR. PODESTA: Yeah.

4        MR. GOLDBERG: (Indiscernible.)

5        MR. PODESTA: Is that all right?

6        Okay. Justin, we're going to go off the

7    record for one minute.

8        THE REPORTER: We're going off the record.

9    The time is 3:19 p.m.

10        (A recess was taken.)

11        THE REPORTER: Going back on the record. The

12    time is 3:23 p.m.

13    BY MR. PODESTA:

14    Q. Okay. At the closing, were there any other

15    draft easement agreements that have John Thatcher's name

16    on them other than the ones we've seen here today?

17    A. I don't believe so.

18    Q. Were there any that had 7 IL's name on them?

19        MS. TUTTLE: Any easements?

20    BY MR. PODESTA:

21    Q. Any easement agreements other than the ones

22    we've seen today.

23    A. I don't remember if the footpath easement was

24    drawn up or not.

25    Q. Okay.

Page 67

1    A. I don't remember. That would've been the one

2    that he would need to sign.

3    Q. Okay. Were there any other agreements or

4    easement agreements at the closing that Thor James's

5    name was on other than the ones we've seen today?

6    A. No.

7    Q. Okay. Did you speak with Scott Kiker on the

8    day of closing?

9    A. I think I did.

10    Q. Okay. Did you happen to remember what it

11    might have been about?

12    A. I believe he called -- he called saying he was

13    representing Gary. And it was while we were all here, I

14    believe, and I stepped in the other room. I don't

15    remember.

16    Q. Would it have -- do you recall if it might

17    have had to do with the encroachment on 92 Fish Trap?

18    A. I don't remember. I didn't remember until you

19    mentioned that, that he had called. But he did.

20    Q. Okay. You said that Mr. Knight was speaking

21    with Brian White at closing about money.

22    A. I'll clarify. So Brian was here as the agent.

23    He had called Gary and Gary was on the phone, so Brian

24    was talking to Gary and they were relaying.

25    Q. On a cell phone?

Page 68

1    A. So Gary -- Brian was sitting here talking to

2    Gary and then he would, you know -- can we do this? And

3    I don't remember. I -- I'm sitting here. I don't get

4    involved in negotiations. I let them talk.

5    Q. Okay.

6    A. Yeah. And that's why I was sitting here, and

7    that's what they were doing.

8    Q. What phone was Brian using?

9    A. Brian's phone.

10    Q. So he was using his cell phone?

11    A. Yes.

12    Q. Okay. And he was talking about money?

13    A. It was John who was mentioning the money.

14    Q. Okay. What -- what did John say about it?

15    A. As I recall, he said, "50,000, 50,000. You

16    give me 50,000 off, we'll sign it today."

17    Q. Okay. $50,000 off of what?

18    A. I -- one of the purchase prices.

19    Q. Okay. For both properties?

20    A. As I recall, one property was really at issue,

21    and that was the one that was -- the line was changed.

22    It would've been that property.

23    Q. So John was negotiating on the day of closing?

24    A. He -- so with the new amendment, there'd be no

25    proper amendment to close on the new survey. John, from



Page 69

1  what I understood, was saying, "I will agree to that. I
2  will take the new survey for $50,000."
3      Q.  Okay.  So the two properties -- so what John
4  was suggesting was that Gary Knight would sell
5  92 Fish Trap and 253 River Heights to John, or 7, IL for
6  the previously accepted prices minus $50,000?
7      A.  The way I understood it was for that one lot
8  a -- a total of 50,000.  That's what I understood it.
9  It was just very direct like that, "I'll take 50,000."
10     Q.  Okay.  So that -- that was off just
11  92 Fish Trap but didn't impact 253 River Heights?
12     A.  That is correct.  That's what I understand.
13     Q.  Okay.  But you did not personally speak to
14  Gary Knight at all?
15     A.  I did not.  I do not believe I did.
16     Q.  Okay.  And --
17     A.  As I remember, I -- this is the first time
18  I've seen or talked to Gary since then, if I remember.
19         MR. GOLDBERG:  That is on (inaudible.)
20         THE WITNESS:  I understand.
21         MR. GOLDBERG:  Okay.  Off the record.
22         MR. PODESTA:  One more -- I'm sorry.  Can we
23  go off the record one more time, Justin?
24         THE REPORTER:  Going off the record.  The time
25  is 3:28 p.m.

Page 70

1          (A recess was taken.)
2          THE REPORTER:  Going back on the record.  The
3  time is 3:31 p.m.
4  BY MR. PODESTA:
5      Q.  Okay.  All right.  So, Mr. Wilson, during this
6  closing, you're saying you -- you heard Brian White
7  speaking with John Thatcher, and you believe Mr. Knight
8  was on the phone with Brian White; is that correct?
9      A.  He said Gary was on the line.
10     Q.  Okay.  Did you hear Gary's voice?
11     A.  No.
12     Q.  Okay.  So the only reason you have to believe
13  that Gary Knight was actually on the phone is that Brian
14  said he was on the phone?
15     A.  Yes.
16     Q.  Okay.  And it was Brian speaking with
17  Mr. Thatcher?
18     A.  Yes.
19     Q.  Were you speaking with them at all?
20     A.  I was pretty quiet --
21     Q.  Okay.
22     A.  -- honestly.
23     Q.  Okay.  And Ms. McBee was in the room?
24     A.  She was very quiet.
25     Q.  She was very...

Page 71

1      So you and Ms. McBee were really not saying
2  anything?  Was -- it was a two-way, two-party
3  negotiation --
4      A.  Yes.
5      Q.  -- with somebody on the phone?
6      A.  Yes.
7      Q.  Okay.  And how long did this negotiation take
8  place?
9      A.  I don't remember.  I'm going to say 20 or 30
10  minutes, if not longer.
11     Q.  Okay.  How long were the -- well, were the
12  four of you in the room basically the entire time, or
13  were people going in and out?
14     A.  So initially, Brian was late and then he would
15  go out of the room to talk.  And I believe they sat
16  there the entire time.
17     Q.  Mr. Thatcher and Ms. McBee?
18     A.  Correct.
19     Q.  Okay.  And you were in the room the whole
20  time?
21     A.  Yes.  And I believe the one time that I did go
22  out it was when Mr. Kiker called because I -- I went out
23  of the room to speak to him.
24     Q.  Okay.  All right.  But the whole time
25  Mr. Thatcher and Ms. McBee were in the room sitting

Page 72

1  here?
2      A.  As I recall, yes, they were.
3      Q.  Okay.  And so the whole closing, the whole
4  meeting that you were present for, was that 20 or 30
5  minutes?  Or was Mr. White's phone call 20, 30 minutes?
6      A.  The entire from -- I believe closing was
7  scheduled for 3:00.  So if that was the case, we were
8  here from 3:00 to maybe 3:30 or 3:40.  It might've been
9  longer, but that seemed about right.
10     Q.  Okay.  And then everyone left when it did not
11  close?
12     A.  Yes.
13     Q.  Okay.  Did somebody reject the deal from
14  somebody else?  In other words, did Mr. Thatcher reject
15  the deal that Mr. White had presented, or did Mr. White
16  reject a deal that Mr. Thatcher had presented?  How did
17  it end?
18     A.  I don't believe Brian conveyed any -- like,
19  it's hard to even say "offer" other than that's what
20  Mr. Thatcher said.  I don't believe Brian came back to
21  say anything other than no.  There was not a 10,000, a
22  25,000.  There was nothing like that.
23     Q.  Okay.
24     A.  It was pretty matter of fact.
25     Q.  And so the option to just close the deal as



Page 73

1 per the agreements was not on the table?

2    A.  I don't recall.

3    Q.  Okay.  But Mr. Thatcher never said, "All
4 right.  Let's just close this as it is with the same
5 price we have"?

6    A.  He did not.

7    Q.  Okay.  So Mr. White never tried -- to your
8 recollection, never tried to come up from the $50,000
9 haircut?

10    A.  Correct.

11    Q.  Okay.  And how long of the 20 to 30 minutes
12 was Mr. White on the phone?

13    A.  Probably -- probably 20 minutes.  And I don't
14 remember if he hung up and called back, if there was one
15 continuous phone call.

16    Q.  But basically the whole time he was here?

17    A.  Not at the end.  I believe at the end he hung
18 up and we had talks and -- and honestly, I felt this
19 would close the next day or two.

20    Q.  Okay.

21    A.  So...

22    Q.  Okay.  And so it wasn't left in a particularly
23 hostile position or anything like that?

24    A.  Not from my feeling.  You know, it's not my
25 comfort zone.  But at the same time, it wasn't like --

Page 74

1 there was no profanity; there was no -- no.  It was all
2 just business.

3    Q.  Okay.  Did Mr. White take the phone outside
4 and make any calls, or was he here?

5    A.  I believe he did walk inside and out, would --
6 would go outside and come back.  I believe he did.

7    Q.  And did your phone call with Mr. Kiker overlap
8 Mr. White's phone call, or how did that work?

9    A.  Well, I barely remember that phone call.  I --
10 I don't remember.

11    Q.  Okay.  Did Mr. White ask you anything about
12 what Mr. Kiker had said?  Do you recall at all?

13    A.  I don't remember that either.

14    Q.  Do you recall if Mr. Thatcher asked any
15 questions about what Mr. Kiker had said?

16    A.  I don't remember.

17    Q.  Okay.

18    A.  As I said, I didn't remember that phone call
19 until you brought it up.

20    Q.  That's fair enough.  Okay.

21        And when you talked to Mr. Kiker, did he -- do
22 you recall him saying anything about what Mr. Knight
23 wanted to do?

24    A.  All I remember is saying that he was
25 representing Gary because I believe there was another

Page 75

1 transaction that he might have been working with Gary
2 on, and that's all I remember him saying.  I don't
3 remember that there was anything other -- else conveyed.
4 I just don't remember that much significance with the --
5 the phone call with Mr. Kiker.

6    Q.  Okay.  And so did either Mr. White or
7 Mr. Thatcher say, "Okay.  You know, let's end this
8 meeting.  I'm going home?"  Or who -- who ended the
9 meeting?  Who calls the meeting to close?

10    A.  Well, Brian was off the phone at the end, and
11 he had said, "Gary's not coming so there is no reason to
12 sit here."  And it was -- from my recollection was,
13 "Just walk away, get a good night sleep, come back,
14 we'll talk about it tomorrow."  That was my feeling.
15 That's not what I remember being said, but that was my
16 feeling.  Things have happened before and, you -- you
17 know, I expect things to work out.

18    Q.  Did Mr. Thatcher make any phone calls?

19    A.  I do not believe he did.

20    Q.  Okay.  Did anybody communicate with Dan
21 Harrison?

22    A.  CP 1031?

23    Q.  He's a -- a good way describe it.  He's an
24 agent of Mr. Thatcher in Colorado.

25    A.  No, I met him months later.

Page 76

1    Q.  Okay.

2    A.  I -- I believe I met that fellow.

3    Q.  But nobody communicated with Dan Harrison on
4 the day of (indiscernible)?

5    A.  I don't believe so.  I don't believe we
6 communicated with anybody else on that side.

7    Q.  Okay.  And, you know, I'm not trying to
8 overplay the details here, but did everyone have
9 computers out like this or phones out, or they -- were
10 they texting or just sitting quietly staring at their
11 hands?

12    A.  No, everybody was sitting quietly.  There was
13 no other laptops open or --

14    Q.  Okay.

15    A.  I don't believe Dee -- I believe Dee was just
16 sitting there as well.

17    Q.  Okay.  And Dee was -- since she was the
18 buyer's agent, she's standing to get a 3 percent
19 commission.

20    A.  I believe that is what it was.

21    Q.  For both properties?

22    A.  Yes.

23    Q.  Okay.  And she has, to your knowledge, not
24 been paid for any of this?

25    A.  Correct.



Page 77

1    Q.  Okay.  And the 3 percent commission would've
2  come out of yourself?
3    A.  Yes.
4    Q.  Okay.  Okay.  Dan Harrison wasn't here?
5    A.  No, he wasn't here.
6    Q.  But no, Dan Harrison was not here?
7    A.  He was not.
8        UNIDENTIFIED SPEAKER:  Okay.  Do you want to
9  talk outside or --
10        THE WITNESS:  No.
11        MR. PODESTA:  Okay.  No further questions at
12  this time.
13        Do you have any?
14        MR. GOLDBERG:  Did you -- can we -- are we off
15  the record, or --
16        MR. PODESTA:  We're still on but we can go
17  off.
18        MR. GOLDBERG:  Can we go off the record for
19  just a second?
20        MS. TUTTLE:  Yep.
21        MR. PODESTA:  You got that, Justin?
22        THE REPORTER:  Going off the record.  The time
23  is 3:39 p.m.
24        (A recess was taken.)
25        THE REPORTER:  Going back on the record.  The

Page 78

1  Time is 3:40 p.m.
2        MR. PODESTA:  So Justin, I think Brian is
3  going to mark -- I --I've marked an exhibit in the
4  Dropbox as Exhibit 6.  I think Brian's going to ask
5  questions about that.
6        MR. GOLDBERG:  Yes.  Okay.
7        (Deposition Exhibit 6 marked for
8  identification.)
9        FURTHER EXAMINATION
10  BY MR. GOLDBERG:
11    Q.  All right, Mr. Wilson, you now have in front
12  of you I believe what's been marked as Exhibit 6.  Do
13  you recognize that document?
14    A.  I do.
15    Q.  Can you identify what that is?
16    A.  Yes.  This is the easement between the two
17  lots for the walking trail down to the river -- down to
18  the railroad tracks.
19    Q.  Do you recall which property that is?
20    A.  Lot 9 was owned by Gary, so that would be the
21  one that the other Gary was going to purchase.  This is
22  the -- these are the two lots where there was the swap.
23    Q.  Is that the 92 Fish Trap (indiscernible) the
24  land swap?
25        (Cross-talk.)

Page 79

1    A.  Yes, that sounds right.  I -- I'm sorry.  I
2  don't -- yeah, I don't do the addresses much.
3    Q.  And is the -- who are the parties that are
4  listed on that?
5    A.  So that is Gary Knight and 7 IL.
6    Q.  Okay.  And was this prepared for the closing
7  scheduled for June 1, 2021?
8    A.  Yes.
9    Q.  And did you prepare this?
10    A.  Yes, I did.
11    Q.  And in your opinion, was this in compliance
12  with the contract between the parties?
13    A.  Yes.
14        MR. GOLDBERG:  All right.  No further
15  questions.
16        FURTHER EXAMINATION
17  BY MR. PODESTA:
18    Q.  Okay.  Just, did you ever send this Exhibit 6,
19  reciprocal easement, to Mr. Knight prior to closing?
20    A.  I don't know.  I really -- really don't
21  remember.
22    Q.  Do you recall giving or showing a copy to
23  Mr. White at closing?
24    A.  I -- I know I didn't show him anything other
25  than the settlement statement, if I showed him that.

Page 80

1        MR. PODESTA:  Okay.  All right.  I -- I have
2  no further questions.
3        Tania?
4        MS. TUTTLE:  Oh, no, I've got nothing.
5        MR. GOLDBERG:  No, I don't think I have any
6  further questions.
7        MR. PODESTA:  Okay.  All right.  So Justin,
8  can we just use the six exhibits that we marked and we
9  can just delete the rest from the Dropbox; is that all
10  right with everybody?
11        THE REPORTER:  No worries.
12        MR. PODESTA:  Okay.  Yeah.
13        MR. GOLDBERG:  They weren't used, right?
14        MR. PODESTA:  Right, since they weren't used.
15        All right.  And I believe, Tania, you already
16  said we will sign.
17        MS. TUTTLE:  Yes, please, just out of
18  precaution, but -- and here, do you want your --
19        MR. PODESTA:  No.  Well, we can throw them
20  out, or I could take them --
21        (Cross-talk.)
22        MS. TUTTLE:  I didn't know if you wanted to
23  go --
24        (Cross-talk.)
25        MR. GOLDBERG:  That's right.  That's right.



Page 81

1      MR. PODESTA:  Yeah, yeah.
2      THE REPORTER:  (Audio interruption) transcript
3  orders?
4      MR. PODESTA:  I'm sorry, Justin?
5      THE REPORTER:  Can I get transcript orders?
6      MS. TUTTLE:  You're breaking up.  Say that
7  again.
8      THE REPORTER:  Will there be any transcript
9  orders?
10      MR. PODESTA:  Yes.  I thought -- Brian, do you
11  want a transcript?
12      MR. GOLDBERG:  Yeah, I want a PDF.
13      MR. PODESTA:  And we will take a mini PDF with
14  the -- the four square boxes.
15      THE REPORTER:  Did you need that by a certain
16  day?
17      MR. PODESTA:  No, I don't --
18      MR. GOLDBERG:  Not necessarily.
19      MR. PODESTA:  I don't think we're in a rush.
20      Do you think -- I mean, what do you think that
21  we could have it by?  I mean, in a normal course, if it
22  wasn't on a rush, when would you expect it to be done?
23      THE REPORTER:  Fourteen days.
24      MR. PODESTA:  Is it 14 days with no rush?
25      THE REPORTER:  Yes.

Page 82

1      MR. PODESTA:  We have time for this one, maybe
2  not Thatcher's, but...
3      MR. GOLDBERG:  Yeah, that should be fine.
4      MR. PODESTA:  All right.  Yeah, we'll take
5  regular delivery of a meeting and, of course, the
6  original for Mr. Knight.
7      THE REPORTER:  We're going off the record.
8  The time is 3:44 p.m.
9      (The deposition concluded at 3:44 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                          1

Page 83

1              REPORTER DISCLOSURE
2      Pursuant to Article 10.B of the Rules and Regulations of
3  the Board of Court Reporting of the Judicial Council of
4  Georgia, I make the following disclosure:
5      I am a Georgia Certified Court Reporter.  I am here as a
6  representative of Esquire Deposition Solutions.  I am not
7  disqualified for a relationship of interest under the
8  provisions of O.C.G.A. 9-11-28(c).
9      I was sent by the offices of Esquire Deposition
10  Solutions to provide court reporting services for these
11  proceedings.  I will not be taking this hearing under any
12  contract that is prohibited by O.C.G.A. 15-14-34 (a) or (b).
13      Esquire has no exclusive contract to provide reporting
14  services with any party to the case, any counsel in the case,
15  or any reporter or reporting agency from whom a referral might
16  have been made to cover this proceeding.
17      Esquire will charge its usual and customary rates to all
18  parties in the case, and a financial discount will not be given
19  to any party to this litigation.
20      Dated this 4th day of August, 2023.
21
22
         Justin Hoffman
23       Certified Court Reporter
24
25

                          2

Page 84

1           CERTIFICATE OF REPORTER
2
3      I,[!DIGITAL REPORTER], a Digital Reporter,
4  Notary Public, and Certified Court Reporter in and for
5  the State of Georgia, do hereby certify:
6
7      That the foregoing witness was duly sworn;
8  that the proceeding took place before me at the time
9  and place herein set forth; that the testimony and
10  proceedings were accurately captured with annotations
11  by me during the proceeding.
12
13      I further certify that I am not related to
14  any of the parties to this action by blood or marriage
15  and that I am not interested in the outcome of this
16  matter, financial or otherwise.
17
18      IN WITNESS THEREOF, I have hereunto set my
19  hand this XX of <Month> 2022.
20
21
         _____
22       JUSTIN HOFFMAN, CCR
         Notary Commission Georgia No. HH 279701
23       Commission Expires:  jUNE 23, 2026
24
25



Page 85

CERTIFICATE OF TRANSCRIPTIONIST

1
2      I, Tracy Allen, RPR, Registered Professional
3  Reporter, in the Commonwealth of Pennsylvania, do hereby
4  certify:
5      That the foregoing is a complete and true
6  record of the original digital audio recording of the
7  testimony and proceedings captured at that time in the
8  above-entitled matter.  As the transcriptionist, I have
9  reviewed the entirety of the original digital audio
10  recording of the proceeding to ensure a verbatim record
11  to the best of my ability.
12      I further certify that I am neither attorney
13  for nor a relative or employee of any of the parties to
14  the action; further, that I am not a relative or
15  employee of any attorney employed by the parties hereto,
16  nor financially or otherwise interested in the outcome
17  of this matter.
18
19      IN WITNESS THEREOF, I have hereunto set my
20  hand this 4th day of August, 2023.
21
22                    _____
                      Tracy Allen, RPR
23                    Pennsylvania
24
25

Page 86

DEPOSITION ERRATA SHEET

1
2  Our Assignment No. J9870404
3  Case Caption: 7 IL PROPERTIES, LLC vs. GARY KNIGHT
4
5      DECLARATION UNDER PENALTY OF PERJURY
6      I declare under penalty of perjury that I have
7  read the entire transcript of my deposition taken in the
8  above-captioned matter or the same has been read to me,
9  and the same is true and accurate, save and except for
10  changes and/or corrections, if any, as indicated by me
11  on the DEPOSITION ERRATA SHEET hereof, with the
12  understanding that I offer these changes as if still
13  under oath.
14
15      Signed on the _____ day of _____,
16  20_____.
17                    _____
18                    TERRY L. WILSON
19
20
21
22
23
24
25

Page 87

DEPOSITION ERRATA SHEET

1
2  Page No._____Line No._____Change to:_____
3  Reason for change:_____
4  Page No._____Line No._____Change to:_____
5  Reason for change:_____
6  Page No._____Line No._____Change to:_____
7  Reason for change:_____
8  Page No._____Line No._____Change to:_____
9  Reason for change:_____
10  Page No._____Line No._____Change to:_____
11  Reason for change:_____
12  Page No._____Line No._____Change to:_____
13  Reason for change:_____
14  Page No._____Line No._____Change to:_____
15  Reason for change:_____
16  Page No._____Line No._____Change to:_____
17  Reason for change:_____
18  Page No._____Line No._____Change to:_____
19  Reason for change:_____
20  Page No._____Line No._____Change to:_____
21  Reason for change:_____
22  Page No._____Line No._____Change to:_____
23  Reason for change:_____
24  SIGNATURE:_____   DATE:_____
25           TERRY L. WILSON

Page 88

DEPOSITION ERRATA SHEET

1
2  Page No._____Line No._____Change to:_____
3  Reason for change:_____
4  Page No._____Line No._____Change to:_____
5  Reason for change:_____
6  Page No._____Line No._____Change to:_____
7  Reason for change:_____
8  Page No._____Line No._____Change to:_____
9  Reason for change:_____
10  Page No._____Line No._____Change to:_____
11  Reason for change:_____
12  Page No._____Line No._____Change to:_____
13  Reason for change:_____
14  Page No._____Line No._____Change to:_____
15  Reason for change:_____
16  Page No._____Line No._____Change to:_____
17  Reason for change:_____
18  Page No._____Line No._____Change to:_____
19  Reason for change:_____
20  Page No._____Line No._____Change to:_____
21  Reason for change:_____
22  Page No._____Line No._____Change to:_____
23  Reason for change:_____
24  SIGNATURE:_____   DATE:_____
25           TERRY L. WILSON

