## Page 1

```
 1
 2          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
                   GAINESVILLE DIVISION
 3
    7 IL PROPERTIES, LLC,      )
 4                            )
            Plaintiff,         )  CIVIL ACTION FILE
 5                            )
            -vs-               )  NO. 2:21-cv-226-RWS
 6                            )
    GARY KNIGHT,               )
 7                            )
            Defendant.         )
 8
 9                          -  -  -
10          Deposition of GARY BRANCH, taken on
11     behalf of the Defendant, pursuant to
12     Notice and agreement of counsel, in
13     accordance with the Federal Rules of Civil
14     Procedure, before Susan M. Shaw, Certified
15     Court Reporter, at 555 Sun Valley Drive,
16     Suite N-3, Roswell, Georgia, on the 27th
17     day of January 2023, commencing at the
18     hour of 10:07 a.m.
19
20     -----------------------------------------------
21
22
23
24
25
```

## Page 2

```
 1                        INDEX
 2                     EXAMINATIONS
 3   Witness Name                              Page
     Gary Branch
 4
        Examination by Mr. Podesta ............ 5
 5
        Examination by Mr. Goldberg .......... 26
 6
 7                       EXHIBITS
 8   Defendant's Exhibit                       Page
 9   Exhibit A   Amendment to Agreement, #3, dated ....... 9
                 04/18/2021
10
     Exhibit B   Preliminary survey ...................... 15
11
     Exhibit C   Recorded survey ......................... 16
12
     Exhibit D   Alpha Surveying Group invoice ........... 20
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1  APPEARANCES OF COUNSEL:
 2  On behalf of the Plaintiff, via videoconference:
 3          BRIAN S. GOLDBERG, ESQ.
            Freeman Mathis & Gary, LLP
 4          100 Galleria Parkway, Suite 1600
            Atlanta, Georgia 30339
 5          T: 678-996-9140
            brian.goldberg@fmglaw.com
 6
 7  On behalf of the Defendant:
 8          FRANK G. PODESTA, ESQ.
            FGP Law, LLC
 9          555 Sun Valley Drive, Suite N-3
            Roswell, Georgia 30076
10          T: 678-677-5143
            fpodesta@fgplaw.com
11  Also present via videoconference:
12          Gary Knight
13                        -  -  -
14          (Disclosure as required by the Georgia
15          Board of Court Reporting is attached hereto.)
16
17
18
19
20
21
22
23
24
25
```

## Page 4

1  (Witness not present.)
2      MR. PODESTA:  We are going to go on record
3  here.  It is 10:07.  We are here for the
4  January 27th deposition of Gary Branch in 7 IL
5  Properties, LLC, versus Gary Knight, Civil
6  Action 2:21-cv-226-RWS in the Northern District
7  of Georgia, Gainesville Division.
8      Mr. Branch was served personally with a
9  subpoena on January 12th at 1:23 p.m. at his
10  home, 5670 Long Island Drive, Sandy Springs,
11  Georgia 30327, and that affidavit of service
12  was filed with the court as Document Number 42.
13      Mr. Branch had received a subpoena,
14  Document 41-2, that had indicated he was to be
15  at my office at 555 Sun Valley Drive, Suites
16  N-3&4, Roswell, Georgia 30076, on Friday,
17  January 27th, 2023, at 10:00 a.m.
18      Mr. Branch is not here, but we will wait
19  30 minutes to see if he arrives.
20      Do you have anything else?
21      MR. GOLDBERG:  Please note for the record
22  that I am present.
23      MR. PODESTA:  Fair enough.  Present here
24  also are Mr. Goldberg for the plaintiffs, and
25  Gary Knight is here as well for the defendants.



Page 5

1     MR. GOLDBERG:  Thank you.

2     MR. PODESTA:  Thank you.

3     Brian, I will get off my cell and mute the

4 Zoom, and I will call you on your cell phone.

5     MR. GOLDBERG:  Can we go off the record

6 now?

7     MR. PODESTA:  Yes.  Will go off the record

8 and come back on in 30 minutes.

9     (Recess taken from 10:10 to 10:54 a.m.)

10     GARY BRANCH,

11 being first duly sworn, was examined and

12 testified as follows:

13     EXAMINATION

14 BY MR. PODESTA:

15     Q    All right.  Mr. Branch, could you state

16 your name for the record?

17     A    Gary Worthington Branch.

18     Q    Okay.  Have you ever had a deposition

19 before or given a deposition before?

20     A    Yes.

21     Q    Okay.  So you are familiar with the

22 general rules of not speaking over each other and

23 verbal answers rather than head shakes and head

24 nods?

25     A    Yes.

Page 6

1     Q    Okay.  All right.  Could you just tell us

2 briefly -- and very briefly -- this is not

3 particularly material to the case -- about your

4 educational background?

5     A    I went to Westminster High School and

6 Georgia Tech.  I spent a year in graduate school at

7 Columbia University.  That's about the size of it.

8     Q    What do you do now?

9     A    I am a franchisee with Chick-fil-A, own a

10 couple of franchises.

11     Q    Okay.  And so you -- just kind of jumping

12 into it, you entered into an agreement over a

13 property called 100 Fish Trap Road; is that correct?

14     A    That's correct.

15     Q    Is it all right if I call it the Fish Trap

16 Road deal?

17     A    Yeah.

18     Q    Or the 100 Fish Trap Road deal.

19     A    That's the one.

20     Q    We wouldn't be here if there weren't

21 others.

22     Just give me a little background.  What was

23 going on with that deal?  Why did you get into it?

24 When did you get into it?

25     A    Well, my wife and I felt like we would

Page 7

1 like to have a piece of mountain property that we

2 could put in a rental program.  And I don't know how

3 we connected with Leslie Mann, but she was the real

4 estate agent that showed us this property.  And it

5 met several of our specifications of what we were

6 looking for.  And so that's how we went, you know,

7 to sign papers and get the -- get the purchase done.

8     Q    How long had you been researching

9 properties for rental?

10     A    Probably not too long.  Several months but

11 not a long time.

12     Q    And Ms. Mann pointed you to that property?

13     A    Yes.

14     Q    100 Fish Trap?

15     A    That's correct.

16     Q    Okay.  Now, you're aware that 100 Fish

17 Trap abuts 92 Fish Trap; correct?

18     A    Yeah.  It was always Lot 9 and Lot 10 for

19 me.  I didn't know what his -- the address of the

20 adjoining property was.

21     Q    Okay.  Which is Lot 9, and which is Lot

22 10?

23     A    I think I'm 9.

24     Q    Okay.

25     A    But I'm not absolutely certain of that.

Page 8

1     Q    Okay.  So you had entered into an

2 agreement to purchase 100 Fish Trap Road from Gary

3 Knight; is that correct?

4     A    Yes.

5     Q    And that was about when?

6     A    June of 2021, I think, but it may have

7 been earlier than that.  I know some of the issues

8 that arose occurred in June; so it was probably

9 prior to that, in an earlier month.  I don't have

10 any real strong recollection of exact dates.

11     Q    And that's fine.  All right.  While the

12 agreement was pending, do you recall making an

13 amendment to the agreement to require a survey of

14 the property?

15     A    Well, as part of my due diligence, I

16 wanted to make sure that the property lines were as

17 shown on paper.

18     Q    Okay.

19     MR. PODESTA:  And, Brian, I'm going to

20 show Mr. Branch a copy of what we will mark as

21 Defendant's Exhibit A.  It's Amendment to

22 Agreement Number 3 for the -- the 100 Fish Trap

23 Road deal.

24     MR. GOLDBERG:  Okay.  I have a copy of

25 that you sent me by email.



Page 9

1      MR. PODESTA:  Okay.  Thank you.
2      (Defendant's Exhibit A was marked for
3   identification purposes.)
4      Q    (By Mr. Podesta)  Mr. Branch, have you
5   seen this before?
6      A    I don't remember it.
7      Q    Okay.  Fair enough.  Do you mind just
8   taking a moment to review it?
9      A    Well, I mean, y'all want to stare at me
10  while I read it?
11     Q    If you don't mind.  I'm not trying to
12  trick you.  Just trying to get it on the record.
13     A    (Reviewing document.)
14  Yeah.  Okay.
15     Q    Okay.  All right.  So are you familiar
16  with this document now?
17     A    Well, that's a relative term.  I think I
18  understand what it's about.
19     Q    Okay.  It appears to apply to your deal
20  for the 100 Fish Trap Road?
21     A    Yeah.  It -- I don't know whether or not
22  the issue of encroachment was at this point -- this
23  is dated April of 2021 -- whether or not it was
24  evident that there was a problem with the lines, as
25  the surveyor determined, that it crossed over the

Page 10

1   parking and turn-around area of the property that I
2   was going to buy.
3      Q    Okay.  And I will show you some other
4   exhibits from the surveyor in a moment, but the
5   surveyor -- I will represent to you that the
6   surveyor completed his job on May 31st, which is
7   after this point.
8      A    Yes.
9      Q    Does that make sense?
10     A    Yeah, yes.
11     Q    All right.  And do you see the line in the
12  middle there that says, "Both parties agree that
13  closing date shall be on June 3rd, 2021"?
14     A    Yeah.
15     Q    Does that sound about right to you?
16     A    I mean, that was about when we were having
17  real issues --
18     Q    Okay.
19     A    -- as I remember.  And, again, you're
20  asking a lot of detail that I have no -- I had no
21  reason to keep it lodged in my mind; so I don't have
22  a real strong recollection.
23     Q    Fair enough.  Whose idea was it to put
24  together an amendment to get a survey?
25     A    Well, it was mine.  I'm doing my due

Page 11

1   diligence to make sure the property lines are as --
2   as shown, and they weren't.
3      Q    Okay.  So what discussions did you -- who
4   did you discuss the concept of having a survey done
5   with before ordering the survey?
6      A    My wife.
7      Q    Okay.  And Ms. Mann?
8      A    Probably, yeah.
9      Q    Okay.  Did you discuss it with Mr. Knight
10  at all before ordering a survey?
11     A    Well, he was actually out on the survey
12  property with me.  When we determined that we had a
13  problem, I called him, and he came right out.  And
14  he took control over the -- where the lines were
15  going to be.
16     Q    Okay.  And how did he appear to you?  Was
17  he surprised by that?
18     A    Maybe a little bit; but, I mean, he was
19  determined to -- to solve the problem.
20     Q    Okay.
21     A    He -- he had an effort going to do -- to
22  solve it.  That's all I knew.  I mean, I assumed
23  that things were going to move in the right
24  direction, but it didn't.  And it wasn't like -- I
25  mean, it wasn't anything to do with my lot so much

Page 12

1   as it was the contentiousness that took place
2   between him and whoever the entity is that was
3   buying the adjoining -- what do you call it -- 92?
4      Q    92 Fish Trap, yes, sir.
5      So was it in any way Mr. Knight's idea to have
6   a survey of the property?
7      A    I can't answer that question.  I mean, you
8   would have to ask him.
9      Q    Well, let me ask you this, then.  Did
10  Mr. --
11     A    How would he do that?  I mean, it's my
12  responsibility to do my due diligence to make sure
13  that the survey -- and that walking the -- you know,
14  the pins where the corners are was, in fact,
15  correct.
16     Q    Right.
17     A    So I don't know that he would have any
18  reason to do it except when we determined that we
19  had a problem.
20     Q    Okay.  So Mr. Knight never came to you and
21  said, "Mr. Branch, why don't you pay for a survey on
22  this property"?
23     A    No.
24     Q    Okay.  And he never --
25     A    That I know of.  Again, my recollection is



Page 13

1 not all that great.

2     MR. GOLDBERG: Hang on. Excuse me.

3 Sorry. It's kind of breaking -- you're kind of

4 breaking up a little bit for me. Let me see if

5 I can get a better signal here or something. I

6 don't know what's going on.

7     MR. PODESTA: Sure. No problem.

8     (Discussion off the record.)

9     MR. PODESTA: Okay. Thank you.

10     Q    (By Mr. Podesta) Okay. So you're saying

11 Mr. Knight knew that you had -- you were planning to

12 order a survey --

13     A    Well --

14     Q    -- as of that date?

15     A    He signed it.

16     Q    Yes, yes. We all agree with that. And

17 that is your signature as well on that document?

18     A    Yeah. It was all done electronically.

19     Q    Okay. All right.

20     A    Gary's, I guess -- I don't know whether

21 that's his actual signature or not.

22     Q    Right. I think they're just standard

23 electronic signatures.

24     A    No, it's DocuSign-type stuff.

25     Q    Right. I'm just going to hand you a

Page 14

1 second document. This will be very brief.

2     MR. PODESTA: Brian, I'm pulling up the

3 May 31st not-yet-recorded version of the

4 survey. That should be in the email files as

5 well.

6     MR. GOLDBERG: Okay. Okay. Got it.

7 Can I just also just state, just for the

8 purposes, because we're doing this

9 electronically, if you can both try not to talk

10 over each other a little bit. It's hard to

11 hear sometimes when you do that. Sorry.

12 That's just -- I'm sure if I was there in

13 person, it would be fine; but it's hard to hear

14 it over this.

15     MR. PODESTA: No problem.

16     Q    (By Mr. Podesta) All right. Mr. Branch,

17 have you seen this document before?

18     A    Yeah, seems like I have seen this one

19 before, yeah.

20     Q    Okay. And are you familiar with it?

21     A    Enough to do what?

22     Q    To recognize it and discern --

23     A    Yeah.

24     Q    What is this document?

25     A    Well, I think this is -- both identifies

Page 15

1 the problem that warranted a change in the boundary

2 lines, and it also shows where Gary and the surveyor

3 came up with a solution.

4     Q    Gary Knight and the surveyor?

5     A    Yes.

6     Q    And is it fair to describe this as the May

7 31st preliminary survey before recording was done?

8     A    I don't know anything about the timing of

9 the recording; so I can't comment on that. But it's

10 got May 31st written on it; so I assume that was --

11     Q    Okay.

12     MR. PODESTA: And, Brian, we would like to

13 submit this as Defendant's Exhibit B.

14     (Defendant's Exhibit B was marked for

15 identification purposes.)

16     Q    (By Mr. Podesta) Mr. Branch, when did you

17 first receive this document? Do you recall?

18     A    I have no recollection of the timing of

19 it.

20     Q    Would it be fair to say that it was not

21 prior to May 31st, given that it was prepared on May

22 31st?

23     A    Well, it was prior to -- I would assume --

24 I mean, my walking of the property is -- and Gary's

25 walking with me and Adam, the surveyor -- brings to

Page 16

1 mind this solution. So even though I didn't have

2 the paper in my hand, it was understood that

3 these -- these redrawings were where we were headed.

4     Q    Okay.

5     A    So I was familiar with it, but I don't

6 know that I had seen this prior to May 31st. I'm

7 not sure what the significance of that is.

8     Q    Do you recall how far before you received

9 this document that you had actually walked the

10 property?

11     A    No. I would say the answer to that is to

12 go and look at the calendar of Adam, who did the

13 survey. He came out. He's got it on his schedule.

14 And I'm -- I mean, I might have it in my calendar as

15 to what day I was up there.

16     Q    Okay. But prior to you walking the

17 property with Adam, you were completely unaware of

18 any possible encroachment issue?

19     A    Absolutely.

20     Q    Okay. Okay. And then I will hand you

21 what we will mark as Defense C.

22     MR. PODESTA: And, Brian, I'm handing over

23 the June 1st recorded version of the survey.

24     (Defendant's Exhibit C was marked for

25 identification purposes.)

Page 17

1    Q    (By Mr. Podesta)  And, Mr. Branch, take
2  your time to look at that and familiarize yourself.
3    A    So the only difference is -- apparently is
4  the June 1st stamp signature by the lady at Fannin
5  County?
6    Q    Yes, sir.
7    A    Okay.
8    Q    Mr. Branch, are you familiar with this
9  document as well?
10    A    That is interesting because I asked about
11  that.  I'm not sure I can find it, but let's see.
12    So I wrote to Adam on June the 3rd.  I said:
13  Adam, this is Gary Branch, buyer of Lot 9 on Fish
14  Trap Road.  You, Gary Knight, and I walked the line;
15  and Gary Knight asked you to redraw the line in a
16  land swap.  I now have a copy of that plat, which
17  looks fine, but it says it's not official and that
18  it has not been approved by Fannin County.  I assume
19  you submitted it to the county for approval.  Have
20  you heard from the status -- on what the status is
21  on the official approval?
22    And Adam texted me back and said:  It should be
23  recorded.  Let me head back to the office here in a
24  few minutes, and I will send you the info.
25    That was -- my text message to him was on the

Page 18

1  3rd of June at 9:18.  His response to me was --
2  well, not sure.  I think he actually took a snapshot
3  and sent this to me back on January the 19th; so it
4  was a more recent conversation, trying to recollect
5  in my own mind in preparation for this deposition.
6    And he wrote -- he sent back -- he says:  It is
7  recorded.  I will email you and Terry Wilson office
8  a PDF.
9    So that was all done on June the 3rd.
10    And -- and I -- and I wrote back:  And to Gary
11  Knight as well.
12    So I asked Adam to send it to Gary.  I wanted
13  him to see it as well.  I mean, this was basically
14  the outcome of him walking the lines with Adam and
15  me to bring about a solution for my problem.  It
16  created, apparently, another problem but definitely
17  solved my problem.
18    Another problem came up later, and that was
19  that I couldn't close.
20    Q    Right, right.  And so, as you just said,
21  you never ultimately purchased the property?
22    A    No.  I mean, I couldn't -- I couldn't go
23  to closing.  I couldn't get clear title.
24    Q    And that was because?
25    A    Because of the client that -- of Lot 92 --

Page 19

1  92 Fish Trap was not happy with the changes that
2  were made.
3    Q    Okay.
4    A    So, I mean -- I don't know what were the
5  details or when Gary talked to him to try to bring
6  clarity to what changes were made.  I don't know
7  anything about that.  All I knew was that I couldn't
8  close.  And it drug on and on and on.  So that's
9  when I decided that this was not going to be in my
10  best interest.
11    Q    Okay.  What were the -- what were the
12  terms of Gary Knight's solution to you to solve your
13  problem for your property?  Do you remember?
14    A    Here, right here (indicating).  I mean, he
15  said that he would redraw the lines, and that way I
16  could get a survey that was approved so that I could
17  get title.
18    Q    And that was satisfactory to you?
19    A    If I could have gotten title, it probably
20  would have gone through, yeah.
21    Q    Okay.
22    A    It wasn't -- there were other -- some
23  minor things that -- I say minor.  I mean, there
24  were some issues related to termites.  Inspection
25  pulled up some problems there and -- I don't know.

Page 20

1  May have been one or two other things.
2    Again, my mind doesn't have all this stashed
3  away, but I think all those were resolvable issues.
4  This -- this was the straw that broke the camel's
5  back, so to speak.
6    Q    Okay.  And did you and Mr. Knight discuss
7  a change in price over this issue?
8    A    No, not that I remember.
9    Q    You would have been satisfied, then,
10  paying the same price, the agreed price, for the
11  property with the modification?
12    A    I don't think the price in the
13  negotiation -- there wasn't any negotiation.  It was
14  all about trying to get clear title and -- and solve
15  the problem of part of my parking area would be all
16  on my property and not on the neighbor's property.
17    Q    Right.  Okay.  Let me show you my last
18  exhibit.
19    MR. PODESTA:  Brian, I'm going to pass
20  over the invoice for Alpha Surveying.
21    MR. GOLDBERG:  Okay.
22    MR. PODESTA:  And I would like to mark
23  this as Exhibit -- as Defense Exhibit D.
24    (Defendant's Exhibit D was marked for
25  identification purposes.)



Page 21

1    Q    (By Mr. Podesta)  Mr. Branch, have you
2  seen this document before?
3    A    I'm sure I have because I must have paid
4  it.
5    Q    That's fair enough.  So this -- the "Bill
6  To" name there is Gary Branch.  That is you?
7    A    That would be me.
8    Q    And that is your address, sir?
9    A    Yes, sir.
10   Q    And --
11   A    No.  My address is 5676, not 5670.
12   Q    Gotcha.  Yeah, they got that wrong.  Okay.
13 But ultimately this invoice came to you, and you
14 paid it?
15   A    I'm sure I did.
16   Q    And that was June 3rd of 2021, roughly?
17   A    That or a few days after.  I mean, I don't
18 think I delayed paying it.
19   Q    Well, I'm not asking you what date you
20 paid it, but roughly in that area?
21   A    Yeah.
22   Q    And this --
23   A    That was actually the date of the
24 recording.  I mean, he sent the invoice on the day
25 that it was recorded, according to -- well, no, not

Page 22

1  the day it was recorded.  The day it was recorded
2  was June 1st.  But it was right around that time
3  frame.  And it was the same day that I had that text
4  message exchange with him.
5    Q    Okay.  And so this invoice is the invoice
6  for the services performed by Adam on the survey for
7  the prior documents we have seen?
8    A    Yeah.
9    Q    Okay.  Did you ask Mr. Knight for any
10 contribution to this invoice?
11   A    I don't remember.  I honestly don't.
12   Q    Okay.  Do you remember -- can you recall
13 any payments at all you received from Mr. Knight for
14 this survey or this invoice?
15   A    I don't remember anything of that nature.
16   Q    Okay.  All right.  Well --
17   A    That's not to say he -- he may have done
18 it.  I just don't remember.
19   Q    Okay.  But if he did, you would have
20 records of receipt of some sort of payment from
21 Mr. Knight for that invoice?
22   A    Maybe.  I assume so.  But I don't think he
23 did.
24   Q    Okay.
25   A    I'm not sure I asked.  I mean, I was going

Page 23

1  to pay for a survey.  I don't know whether this was
2  a survey that cost more than the survey I would have
3  paid for if everything was just fine.  You know,
4  that's just part of my due diligence expense, along
5  with termite inspection and other things that go
6  with the purchase of a home.
7         MR. PODESTA:  Okay.  Brian, I would like
8    to just take about a five-minute break.  Would
9    that be all right?
10        MR. GOLDBERG:  Yeah, that's fine.
11        MR. PODESTA:  Okay.  Can we go off the
12   record for a moment?
13        MR. GOLDBERG:  Sure.
14        MR. PODESTA:  All right.  Thank you, sir.
15        (Recess taken from 11:18 to 11:25 a.m.)
16   Q    (By Mr. Podesta)  Mr. Branch, this should
17 be brief.  I would be surprised if it was more than
18 ten minutes.
19   A    Okay.
20   Q    The reason -- to answer your earlier
21 question, the reason I'm asking these questions --
22 we're just trying to get clarity on the facts
23 surrounding the ordering of the survey because there
24 is a dispute as to whether Mr. Knight knew there was
25 an encroachment issue prior to our getting into the

Page 24

1  agreement with Mr. Thatcher, which is not your
2  problem.
3    I am -- Mr. Knight and I are not interested in
4  harassing you any further than today.  And I believe
5  Mr. Goldberg is in the exact same position.  Nobody
6  is after you.  We're just trying to get information.
7    But, that being said, am I largely correct
8  that, sometime in March of 2021, you and Mr. Knight
9  entered into a sales agreement that was amended by
10 Amendment 3 in April; the survey was walked, so to
11 speak, in May; and then June was supposed to be the
12 closing day, because these issues arose around June
13 1st?
14   A    Yeah, that sounds relative -- I mean, to
15 the best of my recollection, about right.
16   Q    Okay.  And Mr. Knight had nothing to do
17 with ordering that survey at all other than signing
18 the agreement in Amendment 3?
19   A    Yeah.  I'm trying to recollect exactly the
20 time frame in that I was there when Adam was walking
21 the property because I wanted to see where my pins
22 were so I would understand, just subjectively and
23 objectively, where my property line would be.
24   I say "mine."  Obviously, I was on course to
25 make it that way, but -- so in the process of that,



Page 25

1 he told me -- he says, yeah, your driveway is partly
2 on your property and partly on -- not the driveway
3 but the turn-around area -- on the neighboring.
4     And so I think -- I don't know whether or
5 not -- I mean, I contacted Gary, and I think he
6 was -- it could have been the very same day because
7 the three of us met there. And I think he must have
8 come on over right after I pointed out to him we had
9 a problem. And his -- he was there to solve the
10 problem.
11    Q   Okay.
12    A   I don't think he -- I don't know. Maybe
13 he -- he has so many holdings in that area. I don't
14 know whether he knew that there was a problem with
15 the concrete being over the line.
16    Q   Okay.
17    A   I found that to be a problem. I did not
18 want to be on somebody else's property, even though
19 theoretically -- I mean, practically speaking, I'm
20 not sure it would have made that much difference.
21 But I didn't want to be told, "Hey, you're on my
22 property," if the lines weren't drawn -- redrawn.
23    MR. PODESTA: Okay. That sounds good.
24    Brian, I don't have any further questions
25 for Mr. Branch at this point. Do you?

Page 26

1     MR. GOLDBERG: Yeah, I would like to ask
2 just a couple questions.
3     MR. PODESTA: Okay.
4           EXAMINATION
5 MR. GOLDBERG:
6     Q   Can you hear me okay, Mr. Branch?
7     A   Yes.
8     Q   Okay. Good. So I represent 7 IL
9 Properties. And, as Mr. Podesta explained, there is
10 a dispute between our client and Mr. Knight. And I
11 will represent to you that our company was under
12 contract to buy the property next-door to the
13 property that you were going to purchase. Do you
14 understand that?
15    A   Yes, sir.
16    Q   Okay. I will also represent to you that
17 our client was the -- was in -- under contract to
18 purchase the property that is next-door that this
19 encroachment issue extended onto, if that makes
20 sense. Do you understand what I mean by that?
21    A   Yes.
22    Q   Okay. And that was 92 Fish Trap. That
23 was the address. I know you knew them by lots. I
24 think -- I think I can safely say, based on this
25 survey, that it was Lot 10.

Page 27

1     A   Yeah. Well, it could be.
2     Q   If you have that still in front of you.
3     A   Yeah.
4     Q   Do you still have that in front of you?
5     A   Yes, sir. I'm just -- Lot 10 is the
6 property, 92 Fish Trap; is that correct?
7     Q   Yes, I will represent to you that's --
8 that's correct. And your property that you were
9 going to purchase was Lot 9?
10    A   Yeah.
11    Q   Right. Okay. All right. Just to make
12 sure we're on the same page here.
13    So do you know who John Thatcher is?
14    A   No. Should I?
15    Q   Well, you -- I don't know if you should or
16 shouldn't. I'm just asking a question. There's no
17 should or shouldn't.
18    A   No.
19    Q   I will represent to you he is our
20 client -- he's a member of our client's company. So
21 I didn't know if you had any interactions with him
22 in your purchase and sale process; so that's why I
23 wanted to ask you, just to find out whether or not
24 you had any interaction with him.
25    A   I don't remember if I did. I may have,

Page 28

1 but I don't remember if I did.
2     Q   That's fair enough.
3     A   Does he -- he doesn't remember talking to
4 me, does he? Or did I?
5     Q   I don't think so, but --
6     A   Okay.
7     Q   I just wanted to see if you recalled that
8 or not.
9     But you're aware -- you are now or you were
10 made aware that there was an encroachment issue, and
11 you described it, I think -- and correct me if I
12 misstate your testimony -- but I think it was your
13 testimony that the encroachment issue, as you
14 described it, was the driveway extending beyond your
15 property lines. Is that a good, accurate
16 description of that?
17    A   Yes. That was the primary --
18    Q   Okay. The driveway that --
19    A   That was the primary reason for my
20 concern.
21    Q   And when I said "your driveway," I meant
22 the driveway of the property that you were going to
23 purchase. But, obviously, it's not your driveway.
24    A   Yeah, that's exactly right. It was not
25 only the driveway, but a part of the retention wall

Page 29

1    was -- had stretched over the boundary line.
2       Q    And looking at the survey that's in front
3    of you, do you see --
4            MR. PODESTA:  Brian -- Brian, there are
5       two surveys in front him.  Which one?  I
6       realize they're the same property, but if you
7       don't mind --
8            MR. GOLDBERG:  Sure.
9       Q    (By Mr. Goldberg)  Well, is there any
10   practical difference between them, Mr. -- and, if
11   you could, look at the preliminary survey, and then
12   you have got the recorded survey.  To your
13   knowledge, is there any practical difference between
14   those two, other than one is recorded and one is
15   not?
16      A    I think that's, in essence, the -- the
17   only difference.
18      Q    Okay.  Well, let's look at the recorded
19   survey, just to make sure we're looking at the same
20   document.
21      A    Okay.
22      Q    Do you have that in front of you?
23      A    Yes, sir.
24      Q    Okay.  Do you see the encroachment that
25   we're discussing on this survey?

Page 30

1       A    Yes.
2       Q    Okay.  Is that located within this -- it
3    looks like it's been designated as Lot 10A, and
4    there's a bold writing in the middle.  Looks like
5    kind of a triangle.  Says, "Area equals 0.16 acres."
6    Is it within that area?  Do you see what I'm talking
7    about?
8       A    I see the adjusting line that created this
9    triangle.  Is that what you're trying to describe?
10      Q    I'm just trying to make sure we're looking
11   at the same area here.
12      A    Yeah.  It says, "Trash Containers."  That
13   too was on our -- I mean, it was trash containers
14   for our -- for that -- for Lot Number 9.  So that
15   too was an encroachment.
16      Q    Okay.  So, to me, it looks like the --
17   there's the concrete driveway, the trash containers,
18   and also, it sounds like you said, a retaining wall.
19   Those all extended beyond the boundary line of the
20   property that you were -- you were intending on
21   purchasing; is that right?
22      A    Yes.
23      Q    Okay.  And would you say that this survey
24   accurately depicts approximately the location of
25   those, based upon your observations on the ground?

Page 31

1       A    I assume that it's accurate, but I -- I am
2    not a surveyor.  I didn't do the survey.  But it --
3       Q    I understand.
4       A    From my recollection, that makes sense as
5    to what -- you know, why we -- we went through that
6    process of trying to, you know, solve a problem.
7       Q    Right.  I think you said that you went to
8    the property and you -- you tried to walk the
9    boundary lines, and that's when you first believed
10   there might be an issue?
11      A    Yeah, I mean, I -- obviously, everything I
12   gained knowledge from was not because I was looking
13   through a surveyor's equipment.  I was listening to
14   Adam describe you have -- you have -- there's an
15   encroachment here.  So, I mean, the surveyor was
16   telling me what I -- I'm glad he did.  I mean, I
17   wanted to know those things.  That was part of the
18   reason he was doing what he was doing.  And it was
19   part of my due diligence.
20      Q    Okay.  So when -- so did you -- you have
21   the first -- the first time that you discovered the
22   encroachment issues, you had the surveyor with you?
23      A    Yes.
24      Q    And he walked the line with you?
25      A    Yes.

Page 32

1       Q    And when I said "line," the boundary line
2    of the property?
3       A    Yeah.  Now, let me clarify a little bit
4    about this.  Have you walked the property?
5       Q    No, I have not.
6       A    Okay.  The property is very steep.  It's
7    very difficult terrain to walk.  So, to some degree,
8    I relied on his professional knowledge that we were
9    encroached.  I didn't physically walk that
10   particular line because it's very steep.
11      Q    Okay.
12      A    So I just want to make that clear that
13   it's not only steep going toward the river -- or the
14   railroad tracks, but it's also steep going from Lot
15   9 to Lot 10.  It's very steep.
16      Q    Okay.
17      A    There's no topography showing the
18   elevation changes, but there's a great deal of
19   elevation change just beyond the trash containers.
20   It goes very -- I mean, I don't think either one of
21   us could walk that unless you had some kind of
22   special shoes.
23      Q    Understood.
24      A    At least, that's my -- that's my
25   recollection of it.



1    So I guess what I'm trying to get at -- and it
2   was part of what -- the reason Gary did what he
3   did -- is that that's not useful land, one way or
4   the other, as far as that bank, the steep bank. I
5   mean, the owner of Lot 10 -- I don't know that he
6   could do anything with that property.
7        But that's just -- that was just my remembrance
8   of the problem and felt that, you know, the solution
9   would not be -- it was an even land swap, as I
10  understood it. That's what the surveyor told me.
11  It gave up some land here and then gave it back on
12  here, on the driveway part of it.
13       Q    Okay. So did you ever ask who built the
14  driveway or the retaining wall or the trash
15  receptacles?
16       A    No, no, not that I remember.
17       Q    Okay. So you don't know when they were
18  built?
19       A    No. I mean, in the real estate documents,
20  it gave the year it was built, and I don't really
21  remember that either. But it was maybe eight years
22  ago or nine years ago, something like that.
23       Q    And you don't know whether or not the
24  driveway was built later or earlier than whenever
25  the property was built? When I say "the property,"

1   I mean the house, the structure of the house.
2        A    Yeah, I can't speak to that. I think Gary
3   Knight -- this is property he owned all along this
4   riverfront, and so he made -- he made the land
5   approachable by cutting a road or a driveway or
6   whatever you want to call it. So, I mean, I -- I
7   think that was part of the development that he did.
8        Q    Okay. Well, I guess specifically my
9   question was you don't know -- you don't know
10  whether or not perhaps, for example, the house was
11  built at one point and then the driveway was built
12  at another point?
13       A    No. I --
14       Q    Or maybe -- or maybe even extended at
15  another point. You don't know that?
16       A    No, I don't.
17       Q    Okay. Okay. What were the substance of
18  the conversations that you had with Gary Knight
19  concerning the encroachment?
20       A    Well, I mean, the same expressions that I
21  have made in this, that -- in this deposition --
22  that I was not comfortable with moving forward with
23  this with the encroachments that made my turn-around
24  area really impossible to navigate if I was going to
25  respect the property line.

1        Q    Okay.
2        A    And I needed some relief. And it was
3   his -- his objective to bring about a satisfactory
4   solution.
5        And I don't think he had any feeling that it
6   was going to be a problem for the buyer of Lot 10,
7   but obviously -- I don't know how that all came
8   about. I don't know whether Gary shared that
9   information with him immediately or whether it was
10  days or weeks beyond the January 1st recording that
11  he conveyed this change to the -- to your client. I
12  don't know. I mean, I wasn't involved in that.
13       Q    Okay. Fair enough. And did you ask him
14  to fix the issue, the encroachment issue,
15  specifically?
16       A    Yes. He's the owner of the property.
17  He's the only one that can fix it.
18       Q    Do you remember if it was -- if it was
19  you, or did he come up with the idea to do the land
20  swap?
21       A    Actually, it was his. Because I was a
22  little concerned about giving up my driveway. But
23  it was just a matter of -- it's an easement, I
24  think, that -- in other words, I would have an
25  easement to use that driveway, just like he did when

1   it was on my property.
2        Q    Okay. When you were -- when you were in
3   the process of buying this property that you
4   ultimately didn't buy, did you know that there was a
5   buyer that was under contract on Lot 10 for the
6   purchase of Lot 10? Did you know that during the
7   process?
8        A    It seems to me -- and, again, it's
9   recollection. You're asking me to recollect what I
10  was aware of. But it seems to me that I -- I must
11  have asked Gary if this house was available, and he
12  said -- he must have said to me that it was under
13  contract. Seems like to me I must have had some
14  recollection of it, but -- or some awareness of it,
15  I should say.
16       Q    Okay. So that's something that you --
17  maybe you learned during the process of purchasing
18  the property through --
19       A    Yeah.
20       Q    -- Gary Knight communicating that to you?
21       A    Yeah. And I think there may have been
22  some discussion with him to the extent that this was
23  a solution for me, but he would have to convey that
24  to the buyer of Lot 10. So I don't know when that
25  took place or why it didn't work out the way it --



1 maybe there should have been one more party to this
2 process. I don't know. All I know is that Gary's
3 efforts to bring about the satisfactory sale for me
4 was taken care of.
5     Q    Okay.
6     A    And the only thing that kind of killed the
7 deal is that I couldn't -- I couldn't take
8 possession of the property; I couldn't close, and --
9 because of the -- the disagreement between Gary and
10 whoever these folks are that were buying this
11 property.
12     Q    Okay. Well, since there -- this was a
13 land swap -- I guess that's how it's kind of been
14 described, swapping one portion of land for
15 another -- and given that you had some -- at least
16 some -- maybe some basic knowledge that there was
17 another purchase by another buyer in progress for
18 Lot 10, would you expect that Gary Knight would get
19 permission from that buyer to do that land swap?
20     A    Well, I would think so. I mean, as it
21 turned out, he couldn't get the approval, and it
22 blocked my -- kept me from going to closing.
23     I mean, obviously, I knew there was a buyer of
24 the property, because it obstructed my closing. So,
25 you know, maybe I did talk to that guy, John. What

1 was his name? John Thatcher?
2     Q    John Thatcher.
3     A    I may have talked to him.
4     Q    Okay. Maybe -- maybe over the phone?
5     A    Yeah.
6     Q    Or in person?
7     A    No, I didn't ever see him. I may have
8 been -- if I did talk to him, it was over the phone
9 because, I mean, it was holding me up. And, of
10 course, I don't think he really cared, to be honest
11 with you. I mean, his primary focus was on his
12 own -- own assets or attempt at purchasing Lot 10.
13 So he could care less about who I was.
14     Q    Okay. Well, I guess, back to my -- my
15 original question was -- and I think you answered
16 it, but just to be clear -- to be clear, would you
17 have expected Gary Knight to get permission from our
18 client to do this land swap, to complete this
19 land -- this proposed land swap? I think you
20 answered, but I just want to be clear if you
21 expected -- or you would have expected --
22     A    Well, who else would? Who else would
23 satisfy -- I mean, if he didn't have a buyer, it
24 wouldn't be a problem. But he obviously had a
25 buyer.

1     Q    Okay.
2     A    Because -- and, again, I don't know that I
3 knew that in the process of trying to ask for the
4 adjustment, but I did find out.
5     And I -- and I think I did wind up to talking
6 to John, just to find out, you know, what his --
7 because I wanted a settlement so I could move
8 forward.
9     But it was obvious that there was no
10 negotiating for this to happen; so that's when I
11 realized that I was -- I was held up from being able
12 to fulfill what my wife and I wanted to do, and that
13 is to purchase a home in Blue Ridge.
14     Q    Did you end up buying a house somewhere
15 else?
16     A    Yes, we did.
17     Q    Okay. Now, kind of -- kind of on the same
18 lines of my last question, would you have been okay
19 if Gary Knight had come to you and said I'm going
20 to -- I want to change this contract with you?
21 Would you have been okay with that?
22     A    Well, it's -- it's a circumstantial
23 question. Depends on what the circumstances would
24 be. In other words, if -- if a land swap infringed
25 on what I saw was property that was useful to me, I

1 might have been upset about it. That's one of the
2 reasons I made the comment that the portion of land
3 that was moved off of his property and onto mine was
4 real -- was real steep. It wasn't really a useful
5 piece of property, from just a topography. The
6 property swap that went back on his side was
7 basically the roadway or the driveway for both of
8 us.
9     It's just that, if I remember correctly, that
10 the line on the road going down was on my side of
11 the road. And all we did was we moved it either to
12 the center of the road or on the opposite side of
13 the driveway in order to restore to him the amount
14 of acreage that was being swapped out down here by
15 the driveway, parking.
16     Q    Well, if Mr. Knight had come to you and
17 said, "I'm going to unilaterally change our
18 contract," without having discussed it with you
19 previously, would you -- would you have been okay
20 with that?
21     A    It's circumstantial, Brian. I can't
22 answer that question because I don't know when Gary
23 went to the new -- to this buyer of Lot 10 and asked
24 his -- if he was okay with it. If he went to it
25 immediately and he said no, then -- then Gary should



Page 41

1  have gotten back to me and said, hey, we have got a
2  problem.
3      But if he delayed and waited until closing to
4  tell the buyer that, you know, it's not exactly what
5  you thought you were buying, that would be a
6  problem.  If I were the buyer, that would be a
7  problem for me.
8  Q    Okay.
9  A    So it's all -- it's all a matter of
10  circumstantial situations.  I don't know what -- the
11  steps that Gary took from -- from the date of
12  this -- you know, when we walked the line.  I would
13  have -- if I were in his shoes, I would have called
14  him almost immediately and said, hey, we have a
15  concern here.  We need your approval on it.
16      That would be my -- that would have been the
17  way I would have approached it.
18      MR. GOLDBERG:  Okay.  All right.  I think
19  that's probably all the questions that I have.
20      Did you have any follow-up questions,
21  Frank?
22      MR. PODESTA:  I -- I don't believe so.  I
23  think that's -- that's sufficient.
24      Let's -- if it's all right with you, we
25  can let Mr. Branch go and enjoy the rest of his

Page 42

1  week.
2      MR. GOLDBERG:  Yep.  Hopefully, we didn't
3  mess you up too bad this week.
4      THE WITNESS:  No.  You wouldn't believe
5  what my life was like.  Off the record.
6      (Deposition concluded at 11:51 a.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 43

1          E R R A T A   P A G E
2
        Pursuant to Rule 30(e) of the Federal Rules
3  of Civil Procedure and/or Georgia Code Annotated
   9-11-30(e), any changes in form or substance which
4  you desire to make to your deposition testimony
   shall be entered upon the deposition with a
5  statement of the reasons given for making them.
6      To assist you in making any such corrections,
   please use the form below.  If supplemental or
7  additional pages are necessary, please furnish
   same and attach them to this errata sheet.
8
        I, the undersigned, GARY BRANCH, do hereby
9  certify that I have read the foregoing deposition
   and that, to the best of my knowledge, said
10  deposition is true and accurate (with the
   exceptions of the following corrections below).
11
12  Page / Line /      Change      /      Reason
13  ____ / ____ / _____ / _____
14  ____ / ____ / _____ / _____
15  ____ / ____ / _____ / _____
16  ____ / ____ / _____ / _____
17  ____ / ____ / _____ / _____
18  ____ / ____ / _____ / _____
19  ____ / ____ / _____ / _____
20  ____ / ____ / _____ / _____
21  ____ / ____ / _____ / _____
22  ____ / ____ / _____ / _____
23  ____ / ____ / _____ / _____
24  ____ / ____ / _____ / _____
25  ____ / ____ / _____ / _____

Page 44

1  Page / Line /      Change      /      Reason
2  ____ / ____ / _____ / _____
3  ____ / ____ / _____ / _____
4  ____ / ____ / _____ / _____
5  ____ / ____ / _____ / _____
6  ____ / ____ / _____ / _____
7  ____ / ____ / _____ / _____
8  ____ / ____ / _____ / _____
9  ____ / ____ / _____ / _____
10  ____ / ____ / _____ / _____
11  ____ / ____ / _____ / _____
12  ____ / ____ / _____ / _____
13  ____ / ____ / _____ / _____
14  ____ / ____ / _____ / _____
15  ____ / ____ / _____ / _____
16  ____ / ____ / _____ / _____
17
18
                        _____
19                        GARY BRANCH
20
   Sworn to and subscribed before me
21
   this ____ day of _____, ____.
22
   _____
23  Notary Public.
24  My commission expires _____
25



Page 45

```
1                C E R T I F I C A T E
2   STATE OF GEORGIA:
3   COUNTY OF DEKALB:
4
5           I hereby certify that the foregoing
6       transcript was taken down, as stated in the
7       caption, and the questions and answers thereto
8       were reduced to typewriting under my direction;
9       that the foregoing pages 1 through 42 represent
10      a true and correct transcript of the evidence
11      given upon said hearing, and I further certify
12      that I am not of kin or counsel to the parties
13      in the case; am not in the regular employ of
14      counsel for any of said parties; nor am I in
15      anywise interested in the result of said case.
16      The witness did reserve the right to read and
17      sign the transcript.
18              This, the 9th day of February 2023.
19
20
21
                Susan M. Shaw, CCR# B-1037
22
23
24
25
```

Page 46

```
1                    DISCLOSURE
2   STATE OF GEORGIA:
3   COUNTY OF DEKALB:
4
5           Deposition of GARY BRANCH
6           Date:  January 27, 2023
7       Pursuant to Article 10.B of the Rules and
    Regulations of the Board of Court Reporting of the
8   Judicial Council of Georgia, I make the following
    disclosure:
9
        I am a Georgia Certified Court Reporter.  I am
10  here as a representative of Regency-Brentano, Inc.
11      I am not disqualified for a relationship of
    interest under the provisions of O.C.G.A.
12  9-11-28(c).
13      Regency-Brentano, Inc., was contacted by the
    offices of Esquire Deposition Solutions to provide
14  court reporting services for this deposition.
15      Regency-Brentano, Inc., will not be taking this
    deposition under any contract that is prohibited by
16  O.C.G.A. 15-14-37 (a) and (b).
17      Regency-Brentano, Inc., has no exclusive
    contract to provide reporting services with any
18  party to the case, any counsel in the case, or any
    reporter or reporting agency from whom a referral
19  might have been made to cover this deposition.
20      Regency-Brentano, Inc., will charge its usual
    and customary rates to all parties in the case, and
21  a financial discount will not be given to any party
    to this litigation.
22
23
24              Susan M. Shaw, CCR# B-1037
25
```



kdloop signature verification: ...............


**DEFENDANT'S EXHIBIT**
A
1/27/23


**RE/MAX**
Town & Country

# AMENDMENT TO AGREEMENT
## AMENDMENT # 3

**Date:** 04/18/2021

*Georgia* REALTORS°

2021 Printing

**Whereas**, the undersigned parties have entered into a certain Agreement between Gary W Branch

Deborah W Branch _____ ("Buyer") and Gary Knight _____ ("Seller"),
with a Binding Agreement Date of _____ for the purchase and sale of real property located at:
100 Fish Trap Rd _____ , Blue Ridge _____ , Georgia 30513 _____ ; and

**Whereas**, the undersigned parties desire to amend the aforementioned Agreement, it being to the mutual benefit of all parties to do so;

Now therefore, for and in consideration of the sum of Ten Dollars ($10.00) and other valuable considerations paid by each to the other, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree to modify and amend the aforementioned Agreement as follows: [Note: The following language is furnished by the parties and is particular to this transaction.]

All parties understand and agree that this purchase remains contingent upon a new survey that has been ordered and paid for by buyer. Survey shall be completed within 7 days of 04/18/2021. Should new survey show that subject property is encroaching on neighboring property, seller agrees to extend subject property line at sellers expense so that there is no encroachment including setbacks if setback is required by county. Buyer shall have right to terminate with no penalty if said property adjustment is needed and not completed by seller prior to closing.

Both parties agree that closing date shall be on June 3, 2021.

In purchasing the Property, Buyer may elect to utilize an I.R.C Section 1031 tax deferred exchange by trading Property with a qualified intermediary. In such event, Seller agrees to cooperate with and assist Buyer in connection with Buyer's like/kind exchange and execute an assignment of this Agreement to the qualified intermediary. Notwithstanding the above, Buyer shall pay additional expenses, if any, in connection with Buyers exchange of Property. Moreover Buyer shall remain fully obligated to perform all obligations of the Buyer under the Agreement even after it has been assigned to a qualified intermediary.

☐ **Additional pages are attached.**

It is agreed by the parties hereto that all of the other terms and conditions of the aforementioned Agreement shall remain in full force and effect other than as modified herein. Upon execution by all parties, this Amendment shall be attached to and form a part of said Agreement.

**By signing this Amendment, Buyer and Seller acknowledge that they have each read and understood this Amendment and agree to its terms.**

| | |
|---|---|
| *Gary W Branch* | *George Knight* |
| **1 Buyer's Signature** | **1 Seller's Signature** |
| *Deborah W Branch* | |
| **2 Buyer's Signature** | **2 Seller's Signature** |

☐ Additional Signature Page (F267) is attached.     ☐ Additional Signature Page (F267) is attached.

Remax Town and Country
**Buyer Brokerage Firm**

Ansley Atlanta Real Estate
**Seller Brokerage Firm**

*Leslie Jabaley Mann*           *Brian White*
**Broker/Affiliated Licensee Signature**      **Broker/Affiliated Licensee Signature**

**REALTOR® Membership**          **REALTOR® Membership**

**Acceptance Date.** The above Amendment is hereby accepted, 915 o'clock p .m. on the date of 04/18/2021 , ("Acceptance Date"). This Amendment will become binding upon the parties when notice of the acceptance of the Amendment has been received by offeror. The offeror shall promptly notify offeree when acceptance has been received.

THIS FORM IS COPYRIGHTED AND MAY ONLY BE USED IN REAL ESTATE TRANSACTIONS IN WHICH Leslie Jabaley Mann IS INVOLVED AS A REAL ESTATE LICENSEE. UNAUTHORIZED USE OF THE FORM MAY RESULT IN LEGAL SANCTIONS BEING BROUGHT AGAINST THE USER AND SHOULD BE REPORTED TO THE GEORGIA ASSOCIATION OF REALTORS® AT (770) 451-1831.

Copyright© 2021 by Georgia Association of REALTORS®, Inc.      F701, Amendment to Agreement, 01/01/21



DEFENDANT'S
EXHIBIT
B
PENGAD 800-631-6989

PRELIMINARY
NOT FOR RECORDING

SURVEY FOR

GARY BRANCH

BEING A PORTION OF LOTS 9 & 10 OF THE TOCCOA HEIGHTS S/D
AS RECORDED IN PLAT HANGER U-149, PAGE 5
LOCATED IN LAND LOT 50, OF THE 8th DISTRICT, 2nd SECTION
FANNIN COUNTY, GEORGIA

ALPHA
Surveying Group
51 HIGH PARK DRIVE, P.O. BOX 42, BLUE RIDGE, GA 30513
OFFICE 706-946-6134  CONTACT @ ALPHASURVEY.NET

| SHEET | OF |
|---|---|
| 1 | 1 |



DEFENDANT'S EXHIBIT
C
1/27/23
PENGAD 800-631-6989

SURVEY FOR

GARY BRANCH

BEING A PORTION OF LOTS 9 & 10 OF THE TOCCOA HEIGHTS S/D
AS RECORDED IN PLAT HANGER C-149, PAGE 5
LOCATED IN LAND LOT 50, OF THE 9th DISTRICT, 2nd SECTION
FANNIN COUNTY, GEORGIA

ALPHA
A
Surveying Group
21 HIGH PARK DRIVE, P.O. BOX 48, BLUE RIDGE, GA 30513
OFFICE 706-946-0134  CONTACT @ ALPHASURVEY.NET

**Alpha Surveying Group, LLC**
P.O. Box 40
21 High Park Drive, Suite 1
Blue Ridge, GA 30513

Phone # 706-946-6134

Date 6/3/2021

Invoice # 1461

**Bill To**

Gary Branch
5670 Long Island Drive
Sandy Springs, GA 30327

# Invoice

| Terms | Due Date | Project Number |
|---|---|---|
| | 6/3/2021 | 21-025-01 |

| Description | Amount |
|---|---|
| Boundary Survey - Land Swap | 700.00 |
| Boundary Survey - Extra Length Added to Easement | 100.00 |
| County Recording Fee | 30.00 |

| | |
|---|---|
| Total | $830.00 |

**Payments/Credits**

$0.00

**Balance Due**

$830.00

All work is complete!

Your file seems to have a date in it. Did you know you can set up naming conventions in Dropbox?

Show me ✕

DEFENDANT'S
EXHIBIT
D
1/27/23
PENGAD 800-631-6989