# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### GAINESVILLE DIVISION

7 IL PROPERTIES, LLC,

    Plaintiff,

      v.

GARY KNIGHT,

    Defendant.

Civil Action No.

2:21-cv-226-RWS

## ORDER

This case comes before the Court on Plaintiff 7 IL Properties, LLC ("7 IL") and Defendant Gary Knight's ("Mr. Knight") Cross Motions for Summary Judgment. [Dkts. 65, 63]. After reviewing the record, the Court enters the following Order.

## BACKGROUND

### I. Factual Background

This case centers around the attempted purchase and sale of two real estate properties and the resulting series of disputes that culminated in an unsuccessful closing.

### A. 253 River Heights Rd. Sale

On March 14, 2021, 7 IL and Mr. Knight entered into a purchase and sale agreement ("PSA") for the purchase of property located at 253 River Heights Road, Blue Ridge, Georgia 30513 ("River Heights"). [Dkt. 65-2, at ¶ 1; Dkt. 70-1, at ¶ 1]. The closing date under the River Heights PSA was ultimately set for June 1, 2021. [Dkt. 63-1, at ¶ 4; Dkt. 71-1, at ¶ 4]. The River Heights property abuts the Toccoa River. [Dkt. 63-1, at ¶ 5; Dkt. 71-1, at ¶ 5]. The River Heights property and the Toccoa River are separated by the Blue Ridge Scenic Railway (the "Railroad"). [Dkt. 63-1, at ¶ 6; Dkt. 71-1, at ¶ 6].

On March 30, 2021, 7 IL, through its managing member John Thatcher ("Mr. Thatcher"), inspected the River Heights property with Mr. Knight. [Dkt. 65-2, at ¶ 4; Dkt. 70-1, at ¶ 4]. During the inspection, Mr. Thatcher had some concerns about access and easements appurtenant to the River Heights property, including access to the Toccoa River. [Dkt. 65-2, at ¶ 6; Dkt. 70-1, at ¶ 6]. Consequently, the parties orally agreed to amend the River Heights PSA to clarify "three access points" available to the property. [Dkt. 65-2, at ¶ 7; Dkt. 70-1, at ¶ 7]. And on April 5, 2021, the parties executed an amendment to the River Heights PSA memorializing their discussions ("River Heights Amendment"). [Dkt. 65-2, at ¶ 10;

Dkt. 70-1, at ¶ 10]. The River Heights Amendment states, in relevant part, the following:

> All parties acknowledge and agree purchase contingent on easement being recorded at closing granting access to lots 14, 15, and 16 to all three (3) access points to the river as discussed with buyer and seller on 3/30/21. Current gated path to serve as property owners of lot 14, 15, 16 use only for ATV use and/or, serve as foot path for owners and tenants/guest. The current stairs to serve as foot path only for lot 14,15,16 owners, tenants/guest with a shared maintenance agreement to be in place for lot 14, 15, 16. The third path to serve as foot path only to benefit owners, tenants/ guest of lots 14,15,16.
>
> All parties agree Buyer to maintain $5Million liability insurance for rail road crossing in order to use easements
>
> Any Community well agreement / Easements to be written by Licensed Georgia attorney at or prior to closing

[Dkt. 65-3, at 16; Dkt. 65-2, at ¶¶ 11–13; Dkt. 70-1, at ¶¶ 11–13]. This Amendment was prepared, in part, to allow guests and inhabitants of the River Heights property easier access to the Toccoa River. [See Dkt. 63-1, at ¶¶ 9–15; Dkt. 71-1, at ¶¶ 9–15]. According to Mr. Thatcher, 7 IL "need[ed] this river access to purchase the [River Heights] property." [Dkt. 64-1, at 24:14–16; Dkt. 63-1, at ¶ 15; Dkt. 71-1, at ¶ 15]. 7 IL's attorney, Terry Wilson ("Mr. Wilson"), was responsible for drafting any easements pursuant to the River Heights Amendment. [Dkt. 63-1, at ¶ 43; Dkt. 71-1, at ¶ 43].

**B.    92 Fish Trap Rd. Sale**

On April 2, 2021, 7 IL and Mr. Knight entered into a purchase and sale agreement for the purchase of property located at 92 Fish Trap Road, Blue Ridge, Georgia 30510 ("Fish Trap"). [Dkt. 65-2, at ¶ 19; Dkt. 70-1, at ¶ 19]. The closing date under the Fish Trap PSA was ultimately set for June 1, 2021. [Dkt. 65-2, at ¶ 33; Dkt. 70-1, at ¶ 33].

On April 5, the parties executed an amendment to the Fish Trap PSA ("Fish Trap Amendment"). [Dkt. 63-1, at ¶ 23; Dkt. 71-1, at ¶ 23]. The Fish Trap Amendment states, in relevant part, the following:

> All parties acknowledge and agree river easements and community well (water) maintenance agreements to be drafted by Georgia licensed attorney prior to or at closing.

[Dkt. 65-4, at 12]. According to 7 IL, the parties had agreed to include a footpath easement along with the sale of the Fish Trap property. [Dkt. 63-1, at ¶ 25; Dkt. 71-1, at ¶ 25]. The parties allegedly discussed the details of the footpath easement sometime in March or April. [Dkt. 64-1, at 72:16–20]. However, the Fish Trap Amendment does not specifically describe any footpath easement. [Dkt. 63-1, at ¶ 26; Dkt. 71-1, at ¶ 26]. Mr. Wilson was the attorney responsible for drafting any easements pursuant to the Fish Trap Amendment. [Dkt. 63-1, at ¶ 43; Dkt. 71-1, at ¶ 43].

### C. The 92 Fish Trap Rd. Encroachment & Proposed Land Swap

The Fish Trap PSA included a "Seller's Property Disclosure Statement" (the "Disclosure Form"), a questionnaire form designed to "make it easier for Seller to fulfill Seller's legal duty to disclose hidden defects in the Property of which Seller is aware." [Dkt. 63-4, at 12]. Section 9(c) of the Disclosure Form asks the following question: "[a]re there presently any *encroachments*, unrecorded easements or boundary line disputes with a neighboring property owner?" [Id. at 14 (emphasis added)]. In response, Mr. Knight answered, "No." [Id.]. Mr. Knight signed the Disclosure Form on April 7, 2021. [Id. at 18].

While 7 IL was in the process of acquiring the property at 92 Fish Trap Rd., another individual, Gary Branch ("Mr. Branch"), was simultaneously in the process of acquiring a neighboring property located at 100 Fish Trap Rd. from Mr. Knight. [Dkt. 63-1, at ¶ 35; Dkt. 71-1, at ¶ 35]. On April 18, 2021, Mr. Knight and Mr. Branch agreed to conduct a survey of the 100 Fish Trap. Rd. property ("the Survey"). [Dkt. 63-1, at ¶ 37; Dkt. 71-1, at ¶ 37]. On May 31, 2021, the Survey was completed, and on June 1, 2021, the Survey was recorded. [Dkt. 63-1, at ¶¶ 40–41; Dkt. 71-1, at ¶¶ 40–41].

The Survey revealed an encroachment on the 92 Fish Trap Rd. property ("the Encroachment"). [Dkt. 65-2, at ¶ 25; Dkt. 70-1, at ¶ 25]. More specifically,

portions of a concrete driveway and retaining wall located on 100 Fish Trap Rd. spill into the boundaries of 92 Fish Trap Rd. [See Dkt. 64-9]. The Encroachment is marked as "Lot 10A" on the Survey. [Dkt. 63-1, at ¶ 39; Dkt. 71-1, at ¶ 39].

The Survey was conducted by Adam Walker ("Mr. Walker"). [Dkt. 65-2, at ¶ 29; Dkt. 70-1, at ¶ 29]. On April 22, prior to the completion of the Survey, Mr. Walker met with Mr. Knight and Mr. Branch to express "some issues with the property line crossing over the concrete driveway area." [Dkt. 64-4, at 11:6–14]. During that meeting, Mr. Walker discussed the possibility of conducting "an equal-acreage land swap," such that "both lots would lose some in one area but gain the same amount in a different area." [Id. at 12:1–17]. Mr. Knight's real estate agent, Brian White ("Mr. White"), also suggested resolving the encroachment issue with a land swap. [Dkt. 65-2, at ¶ 30; Dkt. 70-1, at ¶ 30]. However, 7 IL and Mr. Knight never agreed in writing to any proposed land swap. [Dkt. 65-2, at ¶ 31; Dkt. 70-1, at ¶ 31]. On May 31, 2021, when the survey was finally completed, Mr. Knight was formally notified of the encroachment issue. [Dkt. 65-2, at ¶ 27; Dkt. 70-1, at ¶ 27]. 7 IL never ordered a survey of the Fish Trap property. [Dkt. 63-1, at ¶ 34; Dkt. 71-1, at ¶ 34].

### D. The Closing Date

The closings for both the River Heights and Fish Trap properties were scheduled to occur on June 1, 2021, and set to take place through Mr. Wilson at the law firm of Wilson Hamilton. [Dkt. 65-2, at ¶¶ 33–34; Dkt. 70-1, at ¶¶ 33–34].

On the morning of closing day, June 1, 2021, Mr. Thatcher and Mr. Knight met at the Fish Trap property. [Dkt. 65-2, at ¶ 39; Dkt. 70-1, at ¶ 39]. Mr. Knight then allegedly told Mr. Thatcher, "[A]n encroachment was discovered. And I don't think we're going to be able to close this." [Dkt. 64-2, at 98:2–19]. According to Mr. Knight, Mr. Thatcher responded by stating, "Hell no, we're closing. I want to close." [Id. at 99:1–4]. Mr. Thatcher, on behalf of 7 IL, purportedly communicated that 7 IL was willing to do a land swap, but with a $25,000 reduction in the original purchase price; however, absent any land swap, 7 IL would continue to offer the original purchase price. [Dkt. 64-1, at 66:4–67:3]. In response, Mr. Knight allegedly "got mad and left." [Id. at 67:12]. At some point that morning, Mr. Thatcher wanted to conduct an inspection on the Fish Trap property, but was purportedly prevented from doing so by Mr. Knight. [Id. at 67:6–12]. In any case, 7 IL, through Mr. Thatcher, was willing to proceed with the closing, despite the encroachment issue. [Dkt. 65-2, at ¶ 41; Dkt. 70-1, at ¶ 41].

Mr. Knight did not appear at the scheduled closing while 7 IL was present and allegedly ready to close. [Dkt. 65-2, at ¶¶ 42–43; Dkt. 70-1, at ¶¶ 42–43]. Mr. Knight explained that he did not appear because "[t]here were outstanding issues of that encroachment as well as there [sic] were no easement agreements." [Dkt. 64-2, at 101:22–103:1]. Thereafter, on June 10, 2021, Mr. Knight sent two notices terminating the PSAs for the River Heights ("River Heights Termination Notice") and Fish Trap ("Fish Trap Termination Notice") properties. [Dkts. 64-11, 64-12]. According to the Fish Trap Termination Notice, the parties failed to close because "Buyer declined to accept the property with [the encroachment], and the closing attorney refused to close the transaction." [Dkt. 64-11, at 1]. According to the River Heights Termination Notice, the parties failed to close, in part, because "Buyer failed to agree to an easement agreement granting access to ajoining [sic] properties over and through the subject property." [Dkt. 64-12, at 1].

E.     **Requests for Draft Easements**

Throughout the escrow period for both the River Heights and Fish Trap properties, the parties made repeated demands for drafts easements relating to the River Heights and Fish Trap Amendments (the "Easement Amendments"). Prior to closing, 7 IL requested draft easements from Mr. Wilson. [See Dkt. 63-1, at ¶ 48; Dkt. 71-1, at ¶ 48]. And on May 27, 2021, Mr. Wilson responded by e-mailing

8

three documents: (i) an unsigned reciprocal footpath easement for the Fish Trap property, [Dkt. 63-6, at 6–7]; (ii) a recorded easement related to the River Heights property but signed by James Thor—a purchaser other than 7 IL, [id. at 8–10]; and (iii) a railroad crossing agreement signed and dated September 1, 2016, [id. at 11–25]. [Dkt. 63-1, at ¶ 48; Dkt. 71-1, at ¶ 48].

On April 13, 2021, Mr. Knight requested draft easements from Mr. Wilson. [Dkt. 63-11, at 1–3; Dkt. 63-1, at ¶ 45; Dkt. 71-1, at ¶ 45]. The record is unclear whether Mr. Wilson ever responded with any drafts. And on May 26, 2021, Mr. Knight, through Mr. White, again requested draft easements. [Dkt. 63-12, at 1–3; Dkt. 63-1, at ¶ 46; Dkt. 71-1, at ¶ 46]. On May 27, 2021, Mr. Wilson appears to have responded via e-mail with several documents, including a draft "footpath easement" relating to the Fish Trap property.[1] [Dkt. 64-2, at 178:17–179:19, 182:7–183:22, 191:1–18]. At 6:54 PM on June 1, 2021, Mr. Knight, through Mr. White, e-mailed Mr. Wilson, requesting drafts easements that were meant to be signed earlier that day. [Dkt. 63-11, at 4; Dkt. 63-1, at ¶ 50; Dkt. 71-1, at ¶ 50]. The next day, Mr. Wilson responded by e-mailing three documents: (i) a recorded water easement and maintenance agreement related to the River Heights property

---

[1] The e-mail is marked as "Exhibit 14" in the Gary Knight deposition but otherwise does not seem to be in the record. [Dkt. 64-2, at 4:9, 178:14–15].

but signed by James Thor, [Dkt. 63-11, at 5–7]; (ii) a recorded easement related to the River Heights property but signed by James Thor, [id. at 8–10]; and (iii) an unsigned amendment to an easement with signature lines for both 7 IL and James Thor, [id. at 11–12]. Mr. Knight allegedly never received a single draft of any easements at any point prior to closing. [See Dkt. 64-2, at 135:7–23].

## II.    Procedural History

On October 18, 2021, 7 IL filed this action against Mr. Knight, asserting claims for breach of contract, breach of warranty of title, negligent misrepresentation, specific performance, and attorney's fees. [Dkt. 1]. On November 15, 2021, Mr. Knight filed his Answer and Counterclaim against 7 IL asserting claims for breach of contract and attorney's fees and requesting declaratory judgment. [Dkt. 7]. That same day, 7 IL filed its First Amended Complaint. [Dkt. 8]. On December 6, 2021, 7 IL filed its Answer to Mr. Knight's Counterclaims. [Dkt. 10] And on December 16, 2021, Mr. Knight filed its Answer to 7 IL's First Amended Complaint. [Dkt. 11].

On October 17, 2023, 7 IL and Mr. Knight filed their respective Cross Motions for Summary Judgment. [Dkts. 65, 63]. 7 IL and Mr. Knight each filed a response in opposition to the others' respective Motion for Summary Judgment. [Dkts. 71, 70]. Thereafter, 7 IL and Mr. Knight each filed a reply in support of

their own Motion for Summary Judgment. [Dkts. 75, 76]. On January 12, 2024,

Mr. Knight filed an unopposed Motion for Oral Argument. [Dkt. 77].

## DISCUSSION

## I.     Summary Judgment Legal Standard

The standard for summary judgment is well-established. Federal Rule of

Civil Procedure 56 requires that summary judgment be granted "if the movant

shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The moving party

bears 'the initial responsibility of informing the . . . court of the basis for its

motion, and identifying those portions of the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, which it

believes demonstrate the absence of a genuine issue of material fact.'" Hickson

Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986)). Where the moving party makes such a

showing, the burden shifts to the non-movant, who must go beyond the pleadings

and present affirmative evidence to show that a genuine issue of material fact does

exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

The applicable substantive law identifies which facts are material. Id. at 248.

A fact is not material if a dispute over that fact will not affect the outcome of the

case under the governing law. Id. An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Id. at 249–50.

In resolving a motion for summary judgment, the court will "consider the record and draw all reasonable inferences in the light most favorable to the non-moving party." Blue v. Lopez, 901 F.3d 1352, 1357 (11th Cir. 2018). But the court is bound only to draw those inferences which are reasonable. "Where the records taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249–50 (citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(a), the non-moving party "must do more than simply show there is some metaphysical doubt as to the material facts").

## II.    Motion for Oral Argument

The Court finds that the parties have thoroughly briefed the issue and provided enough information to decide the cross motions for summary judgment. Further, the Court has conducted a thorough and extensive review of the record.

As a result, the Court finds that oral argument will not provide significant assistance. Accordingly, Mr. Knight's Motion for Oral Argument, [Dkt. 77], is **DENIED**.

### III. Analysis

7 IL contends that it is entitled to summary judgment on all of its claims because: as to 7 IL's breach of contract claim and request for specific performance (Counts I, IV), 7 IL has performed or was ready to perform all of its obligations under valid contracts, and Mr. Knight breached by failing to appear at closing, [Dkt. 65-1, at 1–2, 13–17]; as to 7 IL's breach of warranty of title claim (Count II), Mr. Knight admitted to the existence of an encroachment on the Fish Trap property, [id. at 19]; and, as to 7 IL's negligent misrepresentation claim (Count III), Mr. Knight negligently represented that there were no encroachments on the Fish Trap property when, in reality, a survey revealed the existence of an encroachment, [id. at 19–21].

Mr. Knight contends that he is entitled to summary judgment on all of 7 IL's claims because: as to 7 IL's breach of contract claim (Count IV), 7 IL failed to prepare the necessary easements on both the River Heights and Fish Trap properties and, in addition, the Easement Amendments to both properties were so vague as to render the entirety of each PSA unenforceable, [Dkt. 63, at 2, 12–13,

16–20]; as to 7 IL's breach of warranty of title claim (Count II), no title was ever conveyed to be breached, [id. at 2, 13–14]; as to 7 IL's negligent misrepresentation claim (Count III), 7 IL failed to perform the due diligence required of it under Georgia law, [id. at 2, 14–16]; and, as to 7 IL's request for specific performance (Count I), monetary damages are adequate, [id. at 2, 10–13].

The Court will analyze the parties' arguments by addressing each of 7 IL's claims in the following order: (1) 7 IL's breach of contract claim (Count IV); (2) 7 IL's request for specific performance (Count I); (3) 7 IL's breach of warranty of title claim (Count II); and finally, (4) 7 IL's negligent misrepresentation claim (Count III).

## A.     Breach of Contract (Count IV)

7 IL contends that it is entitled to summary judgment on its breach of contract claim because both the River Heights and Fish Trap PSAs are valid, enforceable contracts and 7 IL had satisfied all conditions precedent under each PSA. [Dkt. 65-1, at 13–14]. 7 IL claims that it "appeared at the closing, was ready to close, and had the funds in place to close on the transaction," but "[t]he transaction did not close for the simple reason that [Mr. Knight] did not show up." [Id. at 14–15]. Thus, according to 7 IL, Mr. Knight's "failure to appear did not alleviate [his] obligations to consummate the transaction." [Id. at 15].

Mr. Knight, however, does not dispute the fact that he failed to appear at closing in contravention of the River Heights and Fish Trap PSAs. [Dkt. 65-2, at ¶ 42; Dkt. 70-1, at ¶ 42]. Rather, Mr. Knight maintains that he is still entitled to summary judgment because the PSAs are unenforceable for vagueness and, alternatively, 7 IL failed to fulfill its obligations under the Easement Amendments. [Dkt. 63, at 2, 16–20]. More specifically, Mr. Knight contends that his failure to appear at closing is not actionable because: (i) the Easement Amendments are too vague to be enforceable, and because the amendments are indivisible from the PSAs, the PSAs are also unenforceable, [id. at 16, 18–20; Dkt. 76, at 5]; and (ii) 7 IL had not performed, or was not ready to perform its obligations prior to or at closing because 7 IL had failed to produce any easements in accordance with the Easement Amendments, [Dkt. 63, at 16–18; Dkt. 76, at 4–5]. Mr. Knight further claims that he made "repeated demands for some draft of the easements," but 7 IL "never produced a single draft of the easements even as of today." [Dkt. 63, at 17]. Thus, according to Mr. Knight, "[t]his had the net effect of both a default on the part of 7 IL through the failings of Mr. Wilson to draft appropriate easements . . ., and to render both contracts sufficiently vague as to the actual terms of what was being purchased." [Id. at 18].

Accordingly, the Court must address the following issues: (1) whether both the River Heights and Fish Trap PSAs are unenforceable because their respective Easement Amendment (i) lacks sufficient clarity to be enforceable and (ii) is indivisible from the entire PSA; and (2) whether 7 IL fulfilled, or was ready to fulfill, its contractual obligations under the Easement Amendments, such that Mr. Knight's failure to attend closing remains actionable. The Court will now analyze each issue, in turn.

## 1. Whether the River Heights and Fish Trap PSAs are Vague and Unenforceable

The Court first addresses whether each amendment, independent of the entire contract, is unenforceable and void for vagueness. If an amendment is unenforceable and void for vagueness, the Court will then analyze whether that amendment is indivisible from the PSA to which it belongs such that the unenforceability of the amendment renders the PSA unenforceable.

### a. Vagueness of the Easement Amendments

The Court now turns to the issue of vagueness. "The first requirement of the law relative to contracts is that there must be a meeting of the minds of the parties, and mutuality, . . . and in order for the contract to be valid the agreement must ordinarily be expressed plainly and explicitly enough to show what the parties

16

agreed upon." West v. Downer, 218 Ga. 235, 241 (1962) (citation omitted). "There are instances when certain deficiencies or ambiguities may be explained by facts aliunde to the instrument itself." Id. at 241–42. "However, information of such extrinsic nature may not be utilized to supply that which is essential to constitute a valid contract." Id. Thus, "indefiniteness in subject matter so extreme as not to present anything upon which the contract may operate in a definite manner renders the contract void." Wright v. IC Enterprises, Inc., 330 Ga. App. 303, 307 (2014).

"It is equally true, however, that '[t]he law does not favor destruction of contracts on grounds of uncertainty.'" Id. (alteration in original) (quoting Kitchen v. Insuramerica Corp., 296 Ga. App. 739, 743 (2009)). "In considering whether a contract is unenforceable, . . . a trial court must bear in mind that the law leans against the destruction of contracts on the ground of uncertainty, and the uncertainty and indefiniteness at issue must be extreme to warrant the conclusion that a contract cannot be enforced." Vernon v. Assurance Forensic Acct., LLC, 333 Ga. App. 377, 382–83 (2015). Thus, "[i]t is unnecessary that a contract state definitively and specifically all facts in detail to which the parties may be agreeing." Id. at 383. "[I]t will be sufficiently definite and certain if it contains matters which will enable the courts, under proper rules of construction, to ascertain the terms and conditions on which the parties intended to bind

themselves." Id. Importantly, "a contract is not void because its performance is, as to particular details, left subject to the subsequent agreement of the parties." Pacrim Assocs. v. Turner Home Ent., Inc., 235 Ga. App. 761, 765 (1998). Thus, "a deferral of agreement on a nonessential term does not invalidate an otherwise valid contract." Goobich v. Waters, 283 Ga. App. 53, 56 (2006).

The Court finds instructive cases where an express easement within a deed is challenged as unenforceable and void due to vagueness. In such cases, "[a] description of land in a deed need not be perfect to be valid." Morris. v. Byrd, 338 Ga. App. 540, 541 (2016). And "[a]lthough the law does not require legal perfection in the description of an easement, the description must be sufficiently full and definite to afford means of identification." Smith v. Tolar, 281 Ga. App. 406, 408 (2006). Thus, "[w]hile it is not necessary that the instrument should embody a minute or perfectly accurate description of the land, yet it *must furnish the key to the identification of the land intended to be conveyed* by the grantor." Id. "If the premises are so referred to as to indicate [the grantor's] intention to convey a particular tract of land, extrinsic evidence is admissible to show the precise location and boundaries of such tract." Id. (alteration in original). Ultimately, then, "[t]he test as to the sufficiency of the description of property contained in a deed is whether or not it discloses with sufficient certainty what the intention of the

18

grantor was with respect to the quantity and location of the land therein referred to, so that identification is practicable." Id. The Court will now apply these principles to each Easement Amendment, in turn.

### i. 253 River Heights Amendment

The Court now turns to the River Heights Amendment. It states, in relevant part, the following:

> All parties acknowledge and agree purchase contingent on easement being recorded at closing granting access to lots 14, 15, and 16 to all three (3) access points to the river as discussed with buyer and seller on 3/30/21. Current gated path to serve as property owners of lot 14, 15, 16 use only for ATV use and/or, serve as foot path for owners and tenants/guest. The current stairs to serve as foot path only for lot 14,15,16 owners, tenants/guest with a shared maintenance agreement to be in place for lot 14, 15, 16. The third path to serve as foot path only to benefit owners, tenants/ guest of lots 14,15,16.

> All parties agree Buyer to maintain $5Million liability insurance for rail road crossing in order to use easements[.]

> Any Community well agreement / Easements to be written by Licensed Georgia attorney at or prior to closing[.]

[Dkt. 65-3, at 16].

The Court finds that the River Heights Amendment is sufficiently definite to be enforceable. The Amendment provides several means of identifying the quantity or location of each easement intended to be conveyed. For instance, the description refers to an easement "granting access to lots 14, 15, and 16 to *all three* (3) *access*

*points* to the river as *discussed with buyer and seller on 3/30/21*."

[Id. (emphasis added)]. The description goes on to refer to an easement for a "Current Gated path" and "current stairs," which furnishes a key to the identification of the easements to be conveyed. [Id.]; cf. Champion v. Neason, 220 Ga. 15, 16 (1964) (finding that the description "the private driveway as presently located" furnished a key to the identification of the easement and that therefore the description of the easement was "not too vague and indefinite"). The description also delineates the purposes for which each easement is to be used. For instance, the "Current Gated path" is "only for ATV use and/or, serve as foot path for owners and tenants/guest," while the "third path" is a "foot path only to benefit owners, tenants/ guest [sic] of lots 14, 15, 16." [Id.]. The Amendment also obligates, in a sufficiently definite manner, the "Buyer to maintain $5Million liability insurance for rail road crossing in order to use easements." [Id.]. Lastly, the Amendment does not condition the purchase of the Fish Trap property on the creation of a "Community well agreement," but merely requires that any such agreements "be written by a Licensed Georgia attorney at or prior to closing." [Id.].

Thus, in reviewing the River Heights Amendment, the Court finds that the Amendment's indefiniteness is not so extreme as to warrant its unenforceability.

Accordingly, the River Heights Amendment is sufficiently definite to be binding and enforceable.

### ii.    92 Fish Trap Amendment & PSA

The Court now turns to the Fish Trap Amendment. It states, in relevant part, the following:

> All parties acknowledge and agree river easements and community well (water) maintenance agreements to be drafted by Georgia licensed attorney prior to or at closing.

[Dkt. 65-4, at 12].

The Court finds that the Fish Trap Amendment is too vague to be enforceable. A plain reading of the Amendment reveals that it presupposes the existence of "river easements." [See id.]. However, the Amendment provides no language that could serve as a key to identifying the quantity or location of any such easements. It is so devoid of detail that it lacks even the slightest clue as to the dimensions of any proposed easement or where such an easement might begin, lead, or end. And "[w]ithout a sufficient key," even "extrinsic evidence cannot be added to complete the description." Morris, 338 Ga. App. at 540. To the extent that the Amendment merely memorializes the parties' intent to conduct further negotiations, such "[a]n agreement to reach an agreement is a contradiction in

terms and imposes no obligation on the parties thereto." <u>Se. Underwriters, Inc. v.</u>

<u>AFLAC, Inc.,</u> 210 Ga. App. 444, 446 (1993).

Thus, in reviewing the Fish Trap Amendment, the Court finds that the

Amendment "lacks such definite terms and certainty that [no] court may determine

what has been agreed upon . . . ." <u>Id.</u> (alteration in original). Accordingly, the Fish

Trap Amendment is unenforceable and void for vagueness.

### b. Severability of the Fish Trap Amendment

The Court now turns to the issue of severability. Because the Court finds

that the Fish Trap, and not River Heights, Amendment, is vague and

unenforceable, the Court will only conduct a severability analysis as to the Fish

Trap Amendment. Accordingly, if the Court determines that the Fish Trap

Amendment is indivisible from the Fish Trap PSA, then the PSA is unenforceable.

Alternatively, if the Court determines that the Fish Trap Amendment is severable,

then the Fish Trap PSA remains binding and enforceable.

"A contract may be either entire or severable. In an entire contract, the

whole contract stands or falls together. In a severable contract, the failure of a

distinct part does not void the remainder." O.C.G.A. § 13-1-8(a). Thus, if an

invalid provision "of [a] contract is severable, the invalid provision does not render

other provisions of the contract void, but a contract in the entirety is unenforceable

if any part is void." <u>Farmer v. Argenta</u>, 174 Ga. App. 682, 683 (1985). "Whether the contract is entire or severable is a question of intention to be determined from the language of the parties, in the light of all surrounding circumstances." <u>National-Ben Franklin Fire Ins. Co. v. Stuckey</u>, 92 F.2d 411, 412 (5th Cir. 1937); <u>Dozier v. Shirely</u>, 240 Ga. 17, 18 (1977); O.C.G.A. § 13-1-8(b). "If it appears that the contract was to take the whole or none, then the contract would be entire." <u>Farmer</u>, 174 Ga. App. at 683.

The Court finds that questions of fact remain as to whether the parties intended the Fish Trap Amendment to be severable. A brief comparison with the River Heights Amendment is informative. For instance, the River Heights Amendment contains conditional language which explicitly conveys that the purchase of the River Heights property is contingent upon easements being prepared and recorded. [Dkt. 65-3, at 16 ("[P]urchase contingent on easement being recorded at closing . . . .")]. However, the Fish Trap Amendment lacks any comparable language and instead ambiguously refers to "river easements" that must be drafted by a "Georgia licensed attorney." [<u>See</u> Dkt. 65-4, at 12].

In addition, the undisputed facts reveal that 7 IL deemed the River Heights easements *necessary* to purchase the River Heights property. [Dkt. 64-1, at 24:14–16; Dkt. 63-1, at ¶ 15; Dkt. 71-1, at ¶ 15]. But the record reveals no such

comparable desire by 7 IL with respect to the easements for the Fish Trap property.[2] In fact, when asked, "How much less do you think River Heights would have been without easements," Mr. Thatcher responded by saying "One to 200,000." [Dkt. 64-1, at 129:21–23]. When asked whether "Fish Trap would be worthless to the tune of six figures less without easements," Mr. Thatcher replied by stating, "Six figures less than Fish Trap. For Fish Trap, no." [Id. at 129:12–17]. However, when asked whether "there had to be certain easement agreements" at or prior to the closings for both the River Heights and Fish Trap properties, Mr. Knight responded in the affirmative. [Dkt. 64-2, at 228:13–229:17]. In any case, the severability of the Fish Trap Amendment is unclear from the language therein. As a result, questions of fact remain as to whether the parties intended the Fish Trap Amendment to be an indivisible part of the Fish Trap PSA.

In sum, the Court finds that the River Heights Amendment is sufficiently definite, such that it is binding and enforceable. However, the Court finds that the Fish Trap Amendment unenforceable and void for vagueness. Despite the Fish

---

[2] 7 IL admits Mr. Knight's statement of undisputed fact that states the following: "Mr. Thatcher stated that he did not want *any* properties without proper easements." [Dkt. 63-1, at ¶ 20 (emphasis added); Dkt. 71-1, at ¶ 20]. But this statement is not supported by the record. The relevant portion of Mr. Thatcher's testimony clearly indicates that Mr. Thatcher was referring to the *253 River Heights* property, not the Fish Trap property. [Dkt. 64-1, at 104:5–10].

Trap Amendment's unenforceability, questions of fact remain as to whether the parties intended the Fish Trap Amendment to be severable from the Fish Trap PSA.

### 2. Whether 7 IL Performed or Was Ready to Perform

The court now turns to the issue of whether 7 IL performed, or was ready to perform, its obligations in drafting any necessary easements. Because the Fish Trap Amendment is unenforceable and void for vagueness, the Court will only address 7 IL's obligations under the River Heights Amendment.

"Neither the buyer nor the seller is obligated to perform unless the other is ready and able to perform his or her obligations under the contract." Haislip v. Garber, 155 Ga. App. 94, 94 (1980). Therefore, "[t]o recover damages, a party who bases his action on an express contract must have performed all his obligations under the contract." Corrosion Control, Inc. v. William Armstrong Smith Co., 148 Ga. App. 75, 75 (1978); Dolan v. Lifsey, 19 Ga. App. 518, 518 (1917) ("Where the plaintiff bases his right to recover upon an express contract, which is entire and indivisible, he cannot recover unless he has performed all his obligations under the contract."). "So, when a plaintiff's right to recover on a contract depends upon a condition precedent to be performed by him, he must allege and prove the performance of such condition or allege sufficient legal cause for its

nonperformance." <u>Sellers v. City of Summerville</u>, 208 Ga. 361, 366 (1951); <u>see also</u> <u>Owensby v. Byrd</u>, 75 Ga. App. 729, 731–32 (1947) (affirming trial court's dismissal of plaintiff's breach of contract claim for failure to establish a readiness to perform). Applying these principles here, the Court finds that questions of fact remain as to what exactly 7 IL's obligations were and whether 7 IL fulfilled or was ready to fulfill those obligations prior to or at closing.

As an initial matter, genuine issues remain as to what 7 IL's obligations were. The River Heights Amendment provides, in relevant part, the following: "purchase contingent on easement being *recorded at closing*"; "Easements to be written by Licensed Georgia attorney *at or prior to closing*." [Dkt. 65-3, at 16 (emphasis added)]. Neither party disputes that Mr. Wilson, 7 IL's attorney, was responsible for drafting the easements at issue. [Dkt. 63-1, at ¶¶ 43–44; Dkt. 71-1, at ¶¶ 43–44].

Mr. Knight, however, contends that 7 IL failed to fulfill its obligations under the PSAs at issue because "Mr. Wilson provided zero easements" by the closing date. [Dkt. 63-1, at ¶ 54; <u>see</u> Dkt. 64-2, at 135:7–23]. In support, Mr. Knight relies primarily on two pieces of evidence: (i) draft easements that Mr. Wilson e-mailed to 7 IL prior to closing, [Dkt. 63-6]; and (ii) draft easements that Mr. Wilson e-mailed to Mr. Knight after the closing date, [Dkt. 63-11]. In both instances, Mr.

Wilson responded to requests for draft easements of the River Heights and Fish Trap properties. [Dkt. 63-6, at 1–5; Dkt. 63-11, at 1–4]. And in both instances, Mr. Wilson e-mailed draft easements that, while related to the properties at issue, were signed by an unrelated purchaser or were otherwise incomplete. [Dkt. 63-6, at 8–15; Dkt. 63-11, at 5–10]. However, Mr. Wilson did prepare a reciprocal footpath easement for the Fish Trap property that appears to be complete. [Dkt. 63-6, at 6–7]. Ultimately, neither e-mail establishes as a matter of law that 7 IL could *not* have fulfilled its obligations (whatever they might have been) under the River Heights Amendment.

7 IL, on the other hand, maintains that Mr. Wilson did in fact prepare all proposed easement agreements "on the day of closing." [Dkt. 71, at 13–14]. In support, however, 7 IL cites two pieces of evidence: (i) the proposed reciprocal footpath easement for the Fish Trap property, [Dkt. 64-10]; and (ii) Mr. Wilson's testimony acknowledging that he drafted a series of easements, some of which were for James Thor—not 7 IL—and one of which was allegedly for 290 River Heights—not 253 River Heights. [Dkt. 64-3, at 63:14–24; see Dkt. 63-11, at 4–12]. According to Mr. Knight, these easements were "forms that [Mr. Wilson] intended to begin working from," but were otherwise incomplete. [Dkt. 70-1, at ¶ 38]. In any case, neither the footpath easement nor Mr. Wilson's deposition testimony

establishes as a matter of law that 7 IL fulfilled or was ready to fulfill all of its obligations (whatever they might have been) under the River Heights Amendment.

Putting aside the question of what the parties intended 7 IL's obligations to be, there is also a question of fact as to what exactly happened at closing. According to the testimony of Mr. Thatcher, at least some easements were "at the closing table that day." [Dkt. 64-1, 72:2–11]. Mr. Knight, however, was never at closing and therefore could not prove conclusively what 7 IL and Mr. Wilson had or had not prepared. [Dkt. 65-2, at ¶ 42; Dkt. 70-1, at ¶ 42].

As a result, genuine issues of material fact remain as to whether 7 IL performed or could have performed its obligations under the River Heights Amendment. For instance, a jury may conclude that the Amendment did not require 7 IL to present any draft easements in advance of closing. Instead, the Amendment may have permitted 7 IL to prepare the easements during closing with Mr. Knight's assistance.[3] Consequently, so long as 7 IL supplied templates that the

---

[3] According to Mr. Knight, Mr. Wilson appears to have drafted closing documents at the "closing table" at least once before. [Dkt. 64-2, at 168:9–12 ("And in past experiences with . . . Terry Wilson, I just knew what the hell is going to happen. We are going to push this thing up to until the very last -- as a matter of fact, I've even had this happen at closing table. I haven't got it drafted yet. Let me go draft it and print it right now for you to see, right?")]. Indeed, when asked why Mr. Knight did not receive a particular draft easement prior to closing, Mr. Wilson stated, "Probably because it was drafted the day of closing." [Dkt. 64-3, at 56:16–21].

parties could use to finalize any necessary easements, a jury may find that 7 IL met its obligations by providing these templates at closing.[4] Alternatively, a jury may conclude that the River Heights Amendment imposed upon 7 IL a duty to present and submit any proposed easements to Mr. Knight prior to closing, such that the parties could work out any details and make changes accordingly. This would enable easements to be signed and recorded on closing day.

In sum, as to 7 IL's breach of contract claim, the Court finds that it cannot award summary judgment for either party because questions of fact remain as to: (1) whether the Fish Trap Amendment is severable, such that the unenforceability of the Amendment would render the Fish Trap PSA unenforceable; and (2) whether 7 IL performed or was ready to perform its obligations under the terms of the River Heights Amendment. Accordingly, 7 IL and Mr. Knight's Cross Motions for Summary Judgment as to 7 IL's breach of contract claim (Count IV) are **DENIED**.

---

[4] In fact, Mr. Knight suggests that Mr. Wilson may have been intending to use the Thor James easements as templates to then draw up the actual easements at closing. [See Dkt. 64-2, at 187:4–8 ("But what I think is, [Mr. Wilson] was trying to take this that was drafted for Thor and of Thor and then use that for his other amendment. And that's -- that's what I think.")].

**B.      Specific Performance (Count I)**

Mr. Knight contends that he is entitled to summary judgment on 7 IL's specific performance claim because 7 IL has an "adequate remedy at law" in the form of damages. [Dkt. 63, at 10]. Mr. Knight claims this is so because the underlying real estate properties "were to be bought as investment properties" that generate income which "may be acquired readily at any other similar investment, of which this country has thousands." [Dkt. 76, at 2]. Further, Mr. Knight claims that "[t]he very act of bringing a claim for breach of contract is a concession that monetary damages are available for 7 IL." [Dkt. 63, at 10]. Therefore, 7 IL's claim for breach of contract "inherently quashes specific performance." [Id.].

7 IL, however, contends that it is entitled to summary judgment because it has met all requirements for specific performance as a matter of law. [Dkt. 65, at 13–18]. 7 IL emphasizes that the underlying properties are unique, "one-million-dollar valued" "luxury riverfront properties nestled in the north Georgia mountains" and are therefore the proper subject matter of a request for specific performance. [Dkt. 71, at 2]. Further, 7 IL maintains that it is permitted to plead in

the alternative by asserting both a breach of contract claim and a request for specific performance. [Id.].

"Specific performance is an extraordinary, equitable remedy, which will be granted only if the complainant does not have an adequate remedy at law." Sexton v. Sewell, 351 Ga. App. 273, 275 (2019). "It is not a remedy that either party can demand as a matter of absolute right and will not be granted in any given case unless strictly equitable and just." Id. "As a general rule, a party to a contract may seek specific performance of a contract upon a showing that [monetary] damages recoverable at law would not constitute adequate compensation for another parties' nonperformance." Id. (alteration in original). "It necessarily follows that, in order to obtain an award of specific performance, the plaintiff must present evidence to show his 'entitlement to the extraordinary remedy of specific performance' by, inter alia, demonstrating that he has no adequate remedy at law." Id. at 276. "[T]he law regards real property 'as sufficiently unique that equity will enforce a contract for its sale or lease.'" Ayer v. Norfolk Timber Inv., LLC, 291 Ga. App. 409, 411 (2008).

Applying these principles here, the Court finds that it cannot award summary judgment for either party. As an initial matter, the Court finds that 7 IL has met its burden of proving that it does not have an adequate remedy at law as to

its breach of contract claim. This is because "[i]t is well-established that monetary damages are not an adequate legal remedy where, as here, the contract sought to be enforced involved the sale of unique real property." Forsyth Cnty. v. Waterscape Servs., LLC, 303 Ga. App. 623, 637 (2010). Further, the Court finds that 7 IL's alternative request for damages does not preclude its continued pursuit of specific performance as an equitable remedy. This is because "[s]pecific performance and damages are not inconsistent remedies, and may be pursued in the same action." Loewus v. Eskridge & Downing, 175 Ga. 456, 460 (1987).

Mr. Knight cites Sexton for the proposition that Georgia courts have "expressly rejected claims for specific performance, even in real estate cases, where a monetary remedy exists, as here." [Dkt. 70, at 11]. However, Mr. Knight's reliance upon Sexton is misplaced. In Sexton, the court reversed the trial court's award of specific performance to the seller because the seller had failed to establish that he had no adequate remedy at law. In so ruling, the court emphasized that, from the seller's perspective, "there is nothing 'unique' about cash, or more specifically, the cash of potential purchasers." Sexton, 351 Ga. App. at 279. Thus, critical to the Sexton court's decision was that the party seeking specific performance was the vendor/seller. See id. at 275–82. Here, however, the party seeking specific performance is the purchaser/buyer—7 IL. As the Sexton court

explained, upon learning of a breach, vendors/sellers can ordinarily sell the underlying property at issue to other purchasers for a price comparable to that in the breached contract and still receive the benefit of the original bargain. See id. at 279. Here, however, 7 IL cannot simply purchase another property and expect to receive the benefit of purchasing the River Heights property, even if 7 IL intends to use the property for investment purposes. Therefore, Sexton does not prevent 7 IL's claim for specific performance.

Nonetheless, 7 IL's request for specific performance cannot be awarded because it has yet to prove the underlying injury for which specific performance is sought. Accordingly, 7 IL and Mr. Knight's Cross Motions for Summary Judgment as to 7 IL's specific performance claim (Count I) are **DENIED**.

### C. Breach of Warranty of Title (Count II)

7 IL contends that it is entitled to summary judgment on its breach of warranty of title claim because "[i]t is undisputed that there is an encroachment on the Fish Trap Property." [Dkt. 65-1, at 19]. Mr. Knight, however, argues that he is entitled to summary judgment because the parties never closed as to the Fish Trap PSA, and "[i]n the absence of closing, Mr. Knight never provided a deed or a title to 92 Fish Trap to 7 IL." [Dkt. 63, at 13]. 7 IL concedes that "if this Court does not

grant specific performance on the 92 Fish Trap Property, then there would be no breach of warranty of title claim." [Dkt. 71, at 11].

Under Georgia law, "damages arising from a breach of warranty of title to land should be assessed in accordance with the conditions existing at the time when the covenant was entered, because '[a] breach of covenant of warranty, if breached at all, is at least technically breached when the covenant is entered into.'" Hitchcock v. Tollison, 213 Ga. App. 477, 479 (1994). Put another way, "a covenant of freedom from encumbrances in a warranty deed, if breached at all, is breached at the time of execution." Homeland Cmtys., Inc. v. Rahall & Fryer, P.C., 235 Ga. App. 440, 442 (1998). "Thus, if the covenant was breached here, it was breached at the time of the closing." Id.

Applying these principles here, the Court finds that 7 IL's claim for breach of warranty of title is inappropriate. Because Mr. Knight failed to appear at closing, the closing never occurred, the deed to the Fish Trap property was never conveyed, and any covenant of warranty associated with the Fish Trap property was never executed. As a result, Mr. Knight could not have breached any warranty contained within the Fish Trap deed. 7 IL admits that its only basis for relief on this claim is predicated on it being awarded specific performance. [Dkt. 71, at 11]. Consequently, 7 IL appears to be stating that if the Court awards its request of

specific performance as to the Fish Trap property, then 7 IL would theoretically be in possession of the deed and the covenants would therefrom be executed.[5] However, the Court cannot identify, and 7 IL fails to provide, any authority that permits recovery in this way. On the contrary, in cases involving a breach of warranty of title, the property that is the subject of the breach has already been conveyed. See, e.g., Kinzy v. Waddell, 203 Ga. 689, 691 (1948); McMurray v. Housworth, 282 Ga. App. 280, 280–81 (2006). Thus, the Court finds that 7 IL's claim for breach of warranty of title is, at the very least, unripe for adjudication.

Accordingly, as to 7 IL's breach of warranty of title claim (Count II), 7 IL's Motion for Summary Judgment is **DENIED**, and Mr. Knight's Motion for Summary Judgment is **GRANTED**.

### D.     Negligent Misrepresentation (Count III)

7 IL contends that it is entitled to summary judgment on its claim for negligent misrepresentation because Mr. Knight represented that the Fish Trap property was free of any encroachments when, in reality, a retaining wall and driveway located on a neighboring property spilled into the Fish Trap property.

---

[5] The Court does note that a decree of specific performance operates as a deed. See Code section 9-11-70, which provides that "[a] decree for specific performance shall operate as a deed to convey land or other property without any conveyance being executed by the vendor." O.C.G.A. § 9-11-70.

[Dkt. 65-1, at 20; see Dkt. 64-9]. Mr. Knight, however, contends that it is entitled to summary judgment on 7 IL's claim because it failed to perform the due diligence required of it under Georgia law. [Dkt. 63, at 14–16].

"The essential elements of a claim of negligent misrepresentation are: (1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance." Trico Env't Servs., Inc. v. Knight Petroleum Co., 357 Ga. App. 826, 831 (2020). "The same principles apply to both fraud and negligent misrepresentation cases and the only real distinction between negligent misrepresentation and fraud is the absence of the element of knowledge of the falsity of the information disclosed." Id. at 831–32. Importantly, "an action for fraud cannot be sustained when based upon alleged misrepresentations which are 'immaterial, not relied upon, or which the plaintiff in the exercise of reasonable diligence should have ascertained to be untrue.'" Najem v. Classic Cadillac Atlanta Corp., 241 Ga. App. 661, 664 (1999) (emphasis added).

In measuring damages under a negligent misrepresentation claim, Georgia courts have adopted the "traditional negligence standard" set forth in the Restatement (Second) of Torts § 552—the "out-of-pocket" standard.

<u>BDO Seidman, LLP v. Mindis Acquisition Corp.</u>, 276 Ga. 311, 311 (2003).

Accordingly, "[t]he damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause." <u>Id.</u> at 311–12. They include both: "(a) The difference between the value of what he has received in the transaction and its purchase price or other value given for it; and (b) Pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the representation." <u>Id.</u> at 312. The goal of the "out-of-pocket" measure of damages "seeks to place the injured party in the same place it would have been had there been no injury or breach of duty." <u>Id.</u>

Applying these principles here, the Court finds that 7 IL has failed to produce evidence sufficient to raise a genuine issue as to two elements of its claim: (i) 7 IL's reasonable reliance on Mr. Knight's alleged misrepresentation; and (ii) economic injury proximately resulting from such reliance.

First, in acquiring the Fish Trap property, 7 IL could not have reasonably relied on Section 9(c) of the Disclosure Form because 7 IL had actual knowledge of the Encroachment prior to closing. The undisputed facts reveal that Mr. Knight, as a part of the Fish Trap PSA, filled out and signed the Disclosure Form. [Dkt. 63-4, at 12; Dkt. 65-2, at ¶ 23; Dkt. 70-1, at ¶ 23]. In Section 9(c), Mr.

Knight represented that he was not aware of any encroachments on the property. [Dkt. 63-4, at 14; Dkt. 65-2, at ¶ 24; Dkt. 70-1, at ¶ 24]. However, on the morning of closing day, June 1, 2021, Mr. Knight informed 7 IL of the Encroachment. [Dkt. 65-2, at ¶ 41; Dkt. 70-1, at ¶ 41]. At that point, 7 IL knew the truth regarding the purported misrepresentation arising from Section 9(c) of the Disclosure Form. Consequently, 7 IL could not have relied on Section 9(c) in making its decision to acquire the Fish Trap property. In fact, upon learning of the Encroachment, 7 IL was allegedly willing to do a land swap with a $25,000 reduction in the original purchase price; however, absent any land swap, 7 IL would continue to offer the original purchase price. [Dkt. 64-1, at 66:4–67:3]. Thus, even assuming that Mr. Knight's statement on the Disclosure Form constitutes a "negligent supply of false information," 7 IL's subsequent discovery and actual knowledge of the Encroachment prior to closing defeats any claim that 7 IL detrimentally relied on such false information.

Second, the record does not reflect that 7 IL suffered any economic harm as a result of its purported reliance upon the Disclosure Form. Under the "out-of-pocket" standard for measuring damages, 7 IL is entitled to "the difference between the value of what [7 IL] has received in the transaction and its purchase price or other value given for it" and "[p]ecuniary loss suffered otherwise."

38

BDO Seidman, 276 Ga. at 312. Here, the subject of the transaction between 7 IL and Mr. Knight is the Fish Trap property. But because Mr. Knight was absent from closing, the closing never occurred, and the Fish Trap property was never conveyed. Consequently, 7 IL is unable to establish any damages caused by the alleged misrepresentation.

7 IL claims that Mr. Knight's misrepresentation caused damages "by virtue of the closing not proceeding" and "lost profit from rents." [Dkt. 65-1, at 21]. But the Court does not see how the failure of the closing was *proximately* caused by 7 IL's apparent reliance on the Disclosure Form. If anything, such reliance would entice 7 IL into unknowingly purchasing the Fish Trap property with a defective title. But here, 7 IL desired to proceed with the closing and even negotiate the purchase price after discovering the Encroachment. [Dkt. 65-2, at ¶ 41; Dkt. 70-1, at ¶ 41]. Further, the "lost profit from rents" that 7 IL seeks are not recoverable under the "out-of-pocket" standard.

Thus, 7 IL has failed to produce evidence sufficient to raise a genuine issue as to the elements of reasonable reliance and economic injury proximately caused therefrom. Accordingly, as to 7 IL's negligent misrepresentation claim (Count III), 7 IL's Motion for Summary Judgment is **DENIED**, and Mr. Knight's Motion for Summary Judgment is **GRANTED**.

## CONCLUSION

For the foregoing reasons, Plaintiff 7 IL Properties, LLC's Motion for Summary Judgment, [Dkt. 65], is **DENIED**. Defendant Gary Knight's Motion for Summary Judgment, [Dkt. 63], is **GRANTED in part** and **DENIED in part**. It is **GRANTED** as to 7 IL's claims for breach of warranty of title (Count II) and negligent misrepresentation (Count III). It is **DENIED** as to 7 IL's claims for breach of contract (Count IV) and specific performance (Count I).

The parties shall file a proposed consolidated pretrial order within 30 days of the entry of this Order.

**SO ORDERED** this 7th day of February, 2024.

_____
**RICHARD W. STORY**
United States District Judge